# Exhibit P-15

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH CENTRAL DIVISION

3

4   * * * * * * * * * * * * * * * * *

5   CHARLES YOUNG,                    *

6          Plaintiff,                 *

                                      *  Case Number: 2:23-cv-00420-TS
7   v.                                *
                                      *  Judge Ted Stewart
8   MOUNTAIN LAND COLLECTIONS,        *
    et. al,                           *
9                                     *
           Defendant.                 *
10  * * * * * * * * * * * * * * * * *

11

12

13

14

15                30(b)(6) DEPOSITION OF

16              Mountain Land Collections

17                   Quinn Kofford

18                   April 23, 2024

19

20            CONTAINS CONFIDENTIAL TESTIMONY

21

22

23

24
         Reported by:   Spencer Von Jarrett, RPR No. 993793
25

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 2..5

---

Page 2

```
 1   Deposition of Quinn Kofford, taken on April 23, 2024 at 10:00 a.m.
 2   at the offices of JD Legal Support located at 2901 W. Bluegrass
 3   Blvd., Ste. 200, Lehi, UT 84043, before Spencer Von Jarrett,
 4   Certified Court Reporter, in and for the State of Utah.
 5
 6                  A P P E A R A N C E S
 7   Eric Stephenson (9779)
     STEPHENSON LAW FIRM
 8   250 North Redcliffs Drive, 4B #254
     Saint George, Utah 84790
 9   ericstephenson@utahjustice.com
     Attorney for Plaintiff
10
11   David Grassi
     FROST ECHOLS LLC
12   224 Oakland Avenue
     Rock Hill, SC 29730
13   david.grassi@frostechols.com
     Attorney for Defendant Mountain Land Collections
14
15   Christopher Hill
     KIRTON McCONKIE
16   36 S. State St., Ste. 1900
     Salt Lake City, UT 84111
17   CHill@kmclaw.com
     Attorney for the Defendants, except Mountain Land Collections
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
     WITNESS: Quinn Kofford
 2
     EXAMINATION                                      PAGE
 3
        By: Mr. Stephenson                              4
 4
        By: Mr. Grassi                                102
 5
 6
 7
                     E X H I B I T S
 8
 9   NUMBER         DESCRIPTION                        PAGE
10   EXHIBIT 1    Notice of Deposition                   5
     EXHIBIT 2    Debt$Net Records                      32
11   EXHIBIT 3    Phone Records                         37
     EXHIBIT 4    Debtor Contact List                   38
12   EXHIBIT 5    Consolidated Debt$Net Notes           39
     EXHIBIT 6    Complaint                             40
13   EXHIBIT 7    Default Judgment                      50
     EXHIBIT 8    Application for Writ of Execution     52
14   EXHIBIT 9    Writ of Execution                     52
     EXHIBIT 10   Constable Letter, Writ of Execution   70
15   EXHIBIT 11   Constable Letter, Sale Notice         76
     EXHIBIT 12   Constable Letter                      86
16   EXHIBIT 13   Constable Letter                      87
     EXHIBIT 14   Constable Letter                      87
17   EXHIBIT 15   Constable Letter                      87
     EXHIBIT 16   Constable Letter                      88
18   EXHIBIT 17   Constable Letter                      88
     EXHIBIT 18   $84 Payments                          89
19   EXHIBIT 19   $167 Payment                          90
     EXHIBIT 20   Mountain Land Transaction List        91
20
21
22
23
24
25
```

Page 4

```
 1                  P R O C E E D I N G S
 2   [On the record at 10:03 a.m.]
 3   [Appearances noted.]
 4                    QUINN KOFFORD,
 5   a witness herin, having been administered an oath,
 6   was examined and testified as follows.
 7                    EXAMINATION
 8   BY MR. STEPHENSON:
 9      Q.   Okay.  Will you state your name for the record.
10      A.   My name is Quinn Kofford, often mispronounced Kaufford.
11      Q.   And you're here on behalf of Mountain Land Collections,
12   correct?
13      A.   Correct.
14      Q.   Okay.  I'm a little distracted by the traffic noise, so
15   you'll forgive me if I take a sec.
16      A.   You bet.
17      Q.   Okay.  And for Mountain Land Collections, tell me your
18   position here.
19      A.   I am the manager and a member of the LLC.
20      Q.   And are there other members of the LLC?
21      A.   One other, yes.
22      Q.   Who is that?
23      A.   Seiler Capital [phonetic].
24      Q.   How much of a percentage do you own compared to Seiler
25   Capital?
```

Page 5

```
 1      A.   53 to 47; I'm 53 percent.
 2      Q.   And who owns Seiler Capital?
 3      A.   I don't know.  I can tell you the manager is.
 4      Q.   Who is the manager?
 5      A.   Shawn Olsen.
 6      Q.   Okay.  And the reason I ask that is because I want to
 7   make sure that the record is clear that you're here to answer
 8   questions on behalf of Mountain Land Collections, right?
 9      A.   That is correct.
10      Q.   Okay.  So I'm going to hand you what's marked as Exhibit
11   1.
12           [Exhibit 1 Marked]
13           And again, I apologize to the counsel here that I don't
14   have copies.  Everyone knows what it is, so it should be okay.  I
15   don't even have a copy for me.
16           So do you recognize the document I've handed you?
17      A.   I do.
18      Q.   And what is the document?
19      A.   That is the second amended notice of today's deposition
20   of Mountain Land Collections.
21      Q.   Okay.  And have you read through that and looked at the
22   topics?
23      A.   I have.
24      Q.   Are you prepared to discuss those topics today?
25      A.   I am.
```

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 6..9

---

Page 6

1    Q.   Are there any topics in there you're not prepared to
2 discuss?
3    A.   No.  I'm prepared to discuss all, subject to
4 recommendations from counsel, my counsel, Mountain Land's counsel.
5    Q.   Yes.  We have an agreement that you'll have a -- I'll
6 make sure I get this right -- some basic understanding of the
7 topics, but you won't have -- you didn't prepare for details of
8 some of the numbers we're asking for.
9    A.   Correct.
10    Q.   Okay.  What did you do to prepare for today's
11 deposition?
12    A.   I reread all of the discovery pleadings that Mountain
13 Land prepared in this matter, all of the documents that were
14 produced.
15         I re-reviewed Mountain Land's file on Mr. Young, and I
16 met with counsel.
17    Q.   Okay.  And Mountain Land's file on Mr. Young, does that
18 contain any documents that have not been produced in discovery?
19    A.   No, sir.
20    Q.   And let's just get this out of the way now.
21         Monday, yesterday morning -- I think it was yesterday
22 morning -- I was given a document in discovery.
23         Do you know what that was?
24    A.   If you wouldn't mind refreshing my memory, I do.  I'm
25 just drawing a morning blank.

---

Page 7

1    Q.   That's totally fine.  I don't have a copy of it because
2 it was given to me at a time when I was out of the office.
3         It was an information sheet.
4    A.   Oh, yes.  Yes.  Thank you.
5    Q.   Can you tell me what that was?
6    A.   So in my review, one of the things that occurred to me
7 that we had not produced was the actual writ of execution that was
8 given to the constable.  And so that was correcting that error.
9    Q.   And the first page of that document -- and I hate to ask
10 questions about a document we don't have, but we're going to have
11 no choice because it was produced yesterday -- I think it was
12 yesterday.  Anyway, whatever day it was produced, it was not
13 within enough time for me to print it and have it ready.
14         Is that a normal document you give to the constables?
15    A.   It is.  We call it a writ packet.
16    Q.   A writ packet, okay.  Thank you.
17         So one of the things to be worried -- we're not worried
18 about -- but aware of: sometimes I will say "you" instead of
19 Mountain Land.  I usually mean Mountain Land, is that okay?
20    A.   Yeah.  In fact, if I say "I", I also mean Mountain Land.
21    Q.   And if there's any specific questions directed at you,
22 Quinn Kofford, I will probably clarify that.  It gets confusing,
23 but it is part of what we do.
24    A.   Great.
25    Q.   Okay.  And if you do have any confusion or any concerns

---

Page 8

1 about what I'm asking, just let me know.  I'll be happy to
2 rephrase.
3    A.   You bet.  Thank you.
4    Q.   Okay.  So what is it that Mountain Land does as a
5 business model?
6    A.   We collect debts.
7    Q.   Okay.  Does Mountain Land do anything other than collect
8 debt to generate revenue specifically?
9    A.   No.
10    Q.   Okay.  There's two ways to do this.  And we need to
11 establish that Mountain Land collections is a debt collector under
12 the FDCPA.
13         I can go through four pages of questions or we can just
14 ask you the question.
15         Do you believe that Mountain Land collections is a debt
16 collector under the FDCPA?
17         MR. GRASSI:  Objection, legal conclusion.
18         Go ahead.
19         THE WITNESS:  Answer it?
20         MR. STEPHENSON:  Yep.
21    A.   Depending on the context, yes.
22    Q.   Okay.  In the context of collecting the debt from my
23 client, is that one of the contexts where it counts as a debt
24 collector?
25    A.   Pre- or post-judgment?

---

Page 9

1    Q.   Post-judgment.
2    A.   No.
3    Q.   Okay.  Can you explain why that is?
4    A.   Our belief is that once a judgment is obtained, the
5 nature of the debt changes and we become a judgment creditor.  And
6 the original debt has been absorbed in the judgment itself.
7    Q.   Okay.  But Mountain Land regularly does collect
8 judgments after they're rendered, correct?
9    A.   Yes, we collect on those judgments.
10    Q.   And Mountain Land obtained -- let's just go
11 through these to make sure we're good.
12         And the judgments -- let's see, so Mountain Land
13 collections is collecting debts before the judgment is rendered;
14 it's collecting debts for other companies, correct?
15    A.   We are collecting debts that originated with other
16 companies.
17    Q.   Right.  And they are assigned to Mountain Land after
18 they fall past due.
19    A.   Correct.
20    Q.   And then Mountain Land -- we're jumping way ahead if I
21 go there.  Let's not do that yet.
22         Okay.  Mountain Land is not a lender?
23    A.   No, sir.
24    Q.   And I'm not asking the number; I just want to know what
25 percentage of your annual gross revenue comes from suing consumers

---

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 10..13

Page 10

1  to collect those debts.
2      A.   Oh, I don't know the answer to that.
3      Q.   Okay.  Because some of your revenue comes from
4  collecting before you sue?
5      A.   Correct.
6      Q.   And is there a ballpark of what percentage is after you
7  sue?
8      A.   I don't know a ballpark percentage.
9           I will tell you this: my belief is that the lion's share
10  of the collection happens pre-judgment.
11     Q.   And I don't want you to guess, so I appreciate that.
12          So in this case, one of the issues is that you sent some
13  of those judgments to constables, correct?
14     A.   Yes.  The word I would use is delivered.
15     Q.   Delivered, okay.  I appreciate that because every time I
16  use the word hired or something like that, everybody flips out.
17          So delivered is what you'd use.
18     A.   Delivered is great.
19     Q.   Is it wrong for me to say that you hired the constables
20  to collect, though?
21     A.   Yes.
22     Q.   And why is that?
23     A.   Our understanding is that once a writ is obtained, the
24  constable is acting in their capacity and we have zero ability or
25  authority or desire to control them.

Page 11

1      Q.   Do you ever hire someone other than the constables to
2  assist in that process?
3          MR. GRASSI:  Object to form.
4          Which process?
5      Q.   Well, the process of obtaining a payment.  I mean,
6  ultimately that's the goal, right: obtaining a payment from the
7  customer or the -- not the customer, excuse me, the consumer?
8      A.   Are we post-judgment?
9      Q.   Yes.
10     A.   The objective is to collect on the judgment.
11     Q.   Yeah.  And you do deliver documents to the constable to
12  meet that objective?
13     A.   Whatever the constables do to collect on the writ is up
14  to them.
15     Q.   Okay.  But the objective is ultimately that you want
16  them to collect money?
17     A.   I wouldn't characterize it that way.  I understand you
18  do and you are, but I wouldn't characterize it that way.  Mountain
19  land doesn't characterize it that way.
20     Q.   That's fair.  How does Mountain Land characterize the
21  objective?
22     A.   We have obtained a judgment, we requested a writ of
23  execution from the court, the court issued it.  We deliver it to
24  the constable.
25          From that point, the constables do what the constables

Page 12

1  do.
2      Q.   You don't care what the result is, then?
3      A.   I didn't say that.  We just give it to the constables to
4  do what the constables do.
5      Q.   Okay.  We're going to talk way more about that later.
6  I've got lots of questions about that.
7          But my concern here is I'm just trying to build a
8  foundation for other questions.
9          And the objective in giving it to the constables is to
10  obtain money, one, like in some fashion, isn't it; otherwise, why
11  hire them?
12     A.   To execute on the writ of execution.
13     Q.   Okay.  To execute on the writ of execution: the
14  objective of that is to collect payments or the judgment itself?
15     A.   It's to satisfy the judgment.
16     Q.   Okay.  There.
17          Okay.  Do you hire anyone else to help you satisfy the
18  judgments?
19          MR. GRASSI:  Object to form.
20     Q.   Or, excuse me, I use the word hire cause it just makes
21  sense to me.  If I bring a plumber in, I'm hiring him.
22          Do you use or deliver papers to anyone other than the
23  constables to help you satisfy the judgments?
24     A.   Yes and no.
25     Q.   Okay.  Help me understand.

Page 13

1      A.   Mountain Land's whole operation internally, once a
2  judgment is obtained, is to try and collect on it as amicably as
3  we can with the consumer, that at that point is now a judgment
4  debtor.
5      Q.   Yes.  I understand that and I respect that.  And I
6  respect the way of Mountain Land does this.
7          But what I want to know is you've got the judgment and
8  you've got the constables over here trying to help satisfy that
9  judgment.  Do you have anybody else that you do that with?
10     A.   The way the question is formed is kind of putting -- I
11  understand your theory of the case.
12     Q.   I'm not trying to, I'm just trying to understand: is
13  there somebody else out there that is helping with the judgment,
14  trying to --
15     A.   Outside of Mountain Land Collections?
16     Q.   Yes.
17     A.   Post-judgment?
18     Q.   Yes.
19     A.   I cannot think of any circumstances where we have, but
20  there might be where we have.
21     Q.   Okay.  And what about pre-judgment; do you have some
22  outsiders that help in some way?
23     A.   Help me understand what you mean by help.
24     Q.   Well, I'm trying to ask the question in a way that --
25          Well, Mountain Land is trying to collect money, we all

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 14..17

Page 14

1  understand that.
2    A.   Yes.
3    Q.   And does Mountain Land ever use another entity
4  pre-judgment to help it collect that money?
5    A.   Yes.
6    Q.   And what are those entities?
7    A.   The constable -- excuse me, the process servers that
8  will serve the complaint.
9    Q.   Okay.
10    A.   They're part of what's used, but not to collect the
11  debt.
12         We give our summons and complaints to those folks to
13  carry out their functions.
14         Post-judgment, we give the documents to the constables
15  to carry out their functions.
16    Q.   And so there's not a company out there, a debt
17  collection company out there that's making phone calls or sending
18  letters on your behalf?
19    A.   Other than Mountain Land Collections, no.
20    Q.   Right.  That's what I was trying to get to.  I know it
21  took forever to get to that, but I needed to do background
22  questions to make sure we were good.
23         Okay.  At the time Mountain Land was seeking payment
24  from my client, it was registered as a debt collection agency in
25  Utah; correct?

Page 15

1    A.   Yeah.  I think at that point in time -- what was your
2  question again?
3    Q.   Well, registration with the state of Utah --
4    A.   Licensed.
5    Q.   Is that what you call it?
6    A.   Yeah.
7    Q.   Under the statute, it uses the word registered.
8    A.   Yes, we were registered.
9    Q.   We're talking about the same thing, aren't we?
10    A.   Yes.
11    Q.   It's not a trick.
12    A.   No.
13    Q.   It's public record.
14    A.   It went away.
15    Q.   It went away, yeah.  I'm sure that -- yeah.  I know that
16  how that happened.
17    A.   Oddly, it went away.
18    Q.   Yeah.  Wink, wink.
19    A.   Why, I don't know.
20    Q.   I'm aware of how that happened.
21    A.   Why don't you and I chat sometime, I'd love to know.
22    Q.   Well, it's pretty -- anyway.
23         And Mountain Land was also bonded as a collection
24  agency?
25    A.   Yes, sir.

Page 16

1    Q.   And the reason for that is because at the time, it was
2  required to be licensed and bonded?
3    A.   Correct.
4    Q.   It doesn't have to do that anymore.
5    A.   My understanding of the law is we don't have to do that
6  anymore.
7    Q.   Yeah.  The statute was repealed.
8    A.   Yes.
9    Q.   Are you aware, as Mountain Land, that if a debt
10  collector, in a general term, wasn't registered with the state and
11  it was collecting debt, that was a criminal offense?
12    A.   I did not know that.
13    Q.   And now, Mountain Land is currently a member of ACA
14  International?
15    A.   Yes.
16    Q.   And has been since March of '93?
17    A.   I don't know that; it sounds about right.
18    A.   Yeah.  It's been a while.
19    A.   Yeah.
20    Q.   And it's registered as a third-party collections member
21  with the ACA?
22    A.   I don't know that either, but it sounds about right.
23    Q.   Okay.  Has that registration been kept continuous since
24  it was started?
25    A.   I don't know that.  It's current now.

Page 17

1    Q.   And the website.  I don't want to bring in paperwork
2  everywhere, but your website: you are aware of your own website?
3    A.   Yes.
4    Q.   Okay.  And for the record, it's www.MLC123.com?
5    A.   Yes.
6    Q.   Okay.  And on your website, you state that Mountain Land
7  is Utah's premier collection agency, correct?
8    A.   Yes.
9    Q.   And is that statement true?
10    A.   I believe it is, yes.
11    Q.   And you also say on your website that Mountain Land is a
12  fully licensed and bonded collection agency, correct?
13    A.   Yes, I'm sure it says that.
14    Q.   Okay.  And if you don't remember, that's okay to say
15  that.
16    A.   Yeah, I don't remember.
17    Q.   Because I didn't bring copies because I don't actually
18  care.
19         Oh, it does mention, though, on your website that you
20  specialize in debt recovery.  Is that right?
21    A.   I'm going to take your word that it says that, yes.
22    Q.   Okay.  But even if it doesn't say that, it would be true
23  to say that?
24    A.   Yes.
25    Q.   Okay.  Does your website advertise or solicit business

Page 18

1  for debt collection services to other companies?
2      A.   In a roundabout way, yes.  It's not our marketing and
3  advertising tool.
4      Q.   Yeah, it's just to have a presence?
5      A.   Yes.
6      Q.   And the website doesn't advertise services other than
7  debt collection?
8      A.   I hope not.
9      Q.   Okay.  And when Mountain Land is collecting debt, it
10 does that through the mail?
11     A.   Yes, we use the mail.
12     Q.   And you use telephone?
13     A.   Yes.
14     Q.   Email?
15     A.   We're starting to, yes.
16     Q.   Fax?
17     A.   Holy smokes.  I'm sure we do from time to time.
18     Q.   How about text message?
19     A.   Yes.
20     Q.   And you use couriers like UPS and FedEx?
21     A.   To collect the debt?
22     Q.   Yeah, to send collection letters or anything?
23     A.   I don't believe we use UPS or FedEx to send collection
24 notices.
25     Q.   And of course you use processors and constables -- we

Page 19

1  already talked about that?
2      A.   Yes.
3      Q.   And you accept payments through your website?
4      A.   Yes.
5      Q.   And you accept payments also through the mail?
6      A.   Yes.
7      Q.   And by telephone?
8      A.   Yes.
9      Q.   And do you accept payments any other method; have I left
10 anything out?
11     A.   Hand delivery.
12     Q.   Hand delivery.  Oh, yeah.
13          Okay.  And when you accept payments, you use the
14 internet, you process those to your bank through the internet?
15     A.   We don't.
16     Q.   Okay.
17     A.   We don't, Mountain Land does not.
18     Q.   Okay.  How does Mountain Land -- let's say you get a
19 payment on your website: it goes straight to the bank?
20     A.   No, it goes through our payment processor.
21     Q.   Okay.  And then they put it in the bank?
22     A.   Yes.
23     Q.   And that's all done through the internet?
24     A.   Yes.
25     Q.   Okay.  Now here I want to talk about -- and let me know

Page 20

1  if you need a break or anything.
2      A.   No, I'm good.  I got my water and my mints.  But I am
3  old and have a small bladder, off the record.
4      Q.   Okay.  So let's just talk about litigation.
5      A.   This litigation?
6      Q.   No, no.  Mountain Land's litigation.
7      A.   Okay.
8      Q.   You knew this was coming.  This is part of the topic
9  we've been discussing.
10     Q.   Do you know how many -- and a ballpark is fine -- how
11 many lawsuits Mountain Land has filed this year to collect at?
12     A.   This year, 2024?
13     Q.   Yes.
14     A.   To date?
15     Q.   Yes.
16     A.   Approximately 1500.
17     Q.   Okay.  And in 2023, do you know the number?
18     A.   I do.  You're asking them in a reverse order.
19     Q.   Oh, I am.
20     A.   I had them memorized --
21     Q.   Let's start the other way, if you want.
22     A.   I can give it to you.  In 2023 was your question?
23     Q.   Yes.
24     A.   Approximately 4900.
25     Q.   Okay.  I have 3717.

Page 21

1      A.   Yeah, 4900 is a more accurate number.
2      Q.   All right.
3      A.   I'm happy to explain that difference.
4      Q.   Yeah, please.
5      A.   I think the figure that we gave you had more -- shorter
6  timeframes in mind.  Your question you asked today was during the
7  calendar year.
8      A.   Yes, that may explain it.
9           And then my next question, do correct me if I'm wrong:
10 I've got how many between 2020 and 2022?
11          Is that the number you prepared for or do you know?
12     A.   No, I only have 2022.  I don't have anything going back
13 to 2020.
14     Q.   Okay.  What was 2022?
15     A.   2022 was approximately 4200.
16     Q.   And is the number 4200/4900, is that a typical year for
17 Mountain Land?
18     A.   I would say so, yes.
19     Q.   Okay.  And is 2020 going to be an anomaly?
20     A.   2020?
21     Q.   Yeah.  I'm not asking the number, but did you file less
22 in 2020?
23     A.   Oh, I'm sorry.  I don't know and I don't want to guess.
24     Q.   I don't want you to guess either.
25     A.   Yeah.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 22..25

Page 22

1    Q.   Okay.  And in 2019, I have 4354.  And that was according
2 to the Utah Bar study.
3         Is that -- we don't know if it's exact, but we know it's
4 close.
5    A.   No, but that's putting it in that range that sounds
6 about like Mountain Land.
7    Q.   Okay.  What percentage of the debts you're collecting
8 are medical care type related; do you know?
9    A.   I do not know an exact percent.  I can approximate at
10 about 90-plus percent.
11   Q.   Yeah, it's a lot of them.
12   A.   Yes.
13   Q.   Okay.  That coincides with what I thought it would be.
14        And commercial debt, does Mountain Land collect
15 commercial debt?
16   A.   No.
17   Q.   Okay.  Now, you mentioned earlier about Mountain Land
18 collecting -- well, let's just go to the beginning.
19        Mountain Land collects, it sues -- sorry, I'm distracted
20 by that traffic.
21        When Mountain Land sues a debtor, it sues in the name of
22 its own name?
23   A.   Correct.
24   Q.   And so when it prevails in a collection lawsuit,
25 Mountain Land is the judgment creditor?

Page 23

1    A.   Correct.
2    Q.   Can you explain, or really briefly, I don't want a
3 monologue, but just briefly: why does it do that way instead of
4 suing in the name of the original creditor?
5    A.   It's based on our understanding of Utah law, assignment
6 law specifically.
7    Q.   And is the reason because you're hoping or believing
8 that it takes the further collections out of the FDCPA?
9    A.   No.
10   Q.   Are you aware that other law firms don't do it that way?
11   A.   I'm not aware of that.
12   Q.   Okay.  So when Mountain Land is assigned the debt -- is
13 that appropriate; can I use that word, please?
14   A.   You bet.
15   Q.   Okay.  Thank you.  Because who knows what's going to
16 generate an objection.
17        So when Mountain Land is assigned the debt, does it take
18 an ownership interest in the debt?
19   A.   Based on our understanding of Utah law, yes.
20   Q.   And what specifically is that ownership interest it
21 takes?
22   A.   It's just this legal concept that's known as assignment.
23   Q.   Mountain Land doesn't buy the debt though?
24   A.   No, sir.
25   Q.   And it collects for a percentage of what it collects;

Page 24

1 that's how it gets paid?
2    A.   I flip it on its head and say we remit back to the
3 client a percentage.
4    Q.   Okay.  Have you ever obtained an opinion from the Utah
5 Bar on whether that's the appropriate way to collect: where
6 Mountain Land becomes the actual -- where Mountain Land puts
7 itself as the plaintiff?
8    A.   No.
9    Q.   Have you ever had another attorney give you a written
10 opinion on that?
11   A.   No.
12   Q.   When you take the debt from the original creditor, do
13 you have a written agreement with them?
14   A.   At assignment?
15   Q.   Yeah.  I ask my -- there's always an agreement with the
16 original creditor, it may not be at assignment.
17   Q.   You might have a blanket agreement and then they can
18 send you cases throughout the year?
19   A.   Correct.
20   Q.   And is the notion that Mountain Land is going to sue
21 under its own name instead of the creditor's name a condition of
22 that written agreement?
23   A.   I don't know if it is, Eric.
24   Q.   What kind of authority -- well, let me be more specific.
25        When the accounts are assigned to you, you obtain full

Page 25

1 authority from the original creditor to do whatever you want?
2    A.   No.
3    Q.   Okay.  What limitations on your authority are there?
4    A.   We represent that we're going to comply with the laws.
5 And for quite a few of our clients, they would like to know before
6 we initiate a lawsuit.
7    Q.   When they say they want to know, does that mean they
8 want to be able to say, "Don't sue."?
9    A.   A very small handful do reserve that right.
10   Q.   And, generally, your agreements with the original
11 creditor allows you to make the decision whether to sue or not
12 without further feedback from the original creditor?
13   A.   I believe so.
14   Q.   Do the original creditors have different criteria for
15 when they want you to sue or don't want you to sue?
16   A.   I'm only aware of one.
17   Q.   So if you decide you want to -- well, and after the
18 lawsuit, do you have any limitations on your discretion on how to
19 collect the judgment?
20   A.   No, other than comply with the law.
21   Q.   Of course.  I didn't mean that at all; I didn't actually
22 mean that.  But I appreciate the clarification.
23        So if you want to garnish wages, place liens on
24 property, seize assets, that's all Mountain Land's decision?
25   A.   Yes.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 26..29

Page 26

1    Q.    Or collecting partial payments?
2    A.    Yes.
3    Q.    Settling the debt for whatever amount you want?
4    A.    No.
5    Q.    Okay.  That's interesting, then.  Not interesting, but
6    let's follow up.
7          I'm not going to ask the limitations, but your original
8    creditors then do give you criteria for what they want you to
9    collect number wise and "Don't go below a certain number."?
10   A.    As a general rule, yes.  That's the way we approach it.
11   Q.    Okay.  And again, I'm not going to ask you for that.  It
12   would be unfair.
13         Whether or not to dismiss the case: is that up to
14   Mountain Land or the original creditor?
15   A.    Mountain Land.
16   Q.    What about hiring someone else to take over the
17   collection process?
18         If Mountain Land had a difficult -- or not difficult,
19   but if Mountain Land ever said, "I don't want to collect this
20   particular debt.", can I send it to my cousin or somebody, another
21   collection agency?
22         Does Mountain Land have that discretion?
23   A.    We might.  I don't know.
24   Q.    It's never come up?
25   A.    Never come up.

Page 27

1    Q.    If Mountain Land ever says, "We don't want to collect
2    this debt.", you just tell the original creditor, "We're not going
3    to collect this debt."?
4          Or is it a discussion?
5    A.    It's not even a discussion.
6    Q.    Okay.  So you can simply say, "We're not going to
7    collect this debt."?
8    A.    Yeah.  The word choice is what's throwing me for a loop,
9    but yes, that's the general nature of the arrangement.
10   Q.    Okay.  And I'm not trying to mess you up, man.  I am
11   really literally just trying to figure out how to ask these
12   questions without triggering these two.
13         No offense, dude.  He's been really good.
14         And how is Mountain Land compensated for collecting for
15   these other companies?
16         And you mentioned that Mountain Land collects the debt
17   and then gives some of it back to the original creditor.
18   A.    Yes.  That's the compensation.
19   Q.    Okay.  When Mountain Land sues, it requests attorney's
20   fees from the court?
21   A.    Only if authorized by contract.
22   Q.    Right.  Yeah, because some of the debts in our case --
23   there were five debts and some of them didn't have a contract,
24   some of them did, so you can ask for attorney's fees.
25   A.    Yes.

Page 28

1    Q.    Yeah.  And Mountain Land requests a collection fee too?
2    A.    Only if the original creditor has requested it and only
3    if we're satisfied that there's a contract that supports it.
4    Q.    Now a debt collector: isn't it true that a debt
5    collector could collect a collection fee whether it's in a
6    contract or not?
7    A.    I don't know that.  That's not Mountain Land's approach.
8    Q.    Okay.  You only collect the collection fee if it's in
9    the contract?
10   A.    Correct.
11   Q.    Okay.
12   A.    I hoped you knew that.
13   Q.    I did -- actually, I didn't know that, because you don't
14   have to.  The collection fee -- well, the statute's been repealed,
15   nevermind.
16   A.    We do not add collection fees unless it's supported by a
17   contract.
18   Q.    There was a limitation in the statute on that.
19   A.    Correct.
20   Q.    And it didn't require a contract.
21   A.    Our interpretation was it required a contract as well as
22   a couple other criteria that were very beneficial to the consumer,
23   but we extended those benefits.
24   Q.    And I appreciate that.  Like I said, you do it better
25   than most.

Page 29

1          When Mountain Land is collecting debts, do you use
2    software to keep track of all these accounts and payments?
3    A.    Yes, clearly.
4    Q.    Yeah.  And what is it called?
5    A.    Debt$Net.
6    Q.    And there's a dollar sign in the middle of that, right?
7    A.    There is.
8    Q.    So it's Debt$Net.
9    A.    Yes.  You can find it in the stone ages.
10   Q.    Yes.  A lot of guys use that still, that's fine.  If it
11   works, it works.
12         And that software, it tracks your calls?
13   A.    What the -- yes, it does; it does track calls.
14   Q.    And we'll go back.  Let me start there, then.
15         It allows your people to put in notes?
16   A.    Yes.
17   Q.    And they put in call notes when something
18   happens?
19   A.    Yes.
20   Q.    Go ahead.
21   A.    It also does track them.
22   Q.    Okay.  It does track the dialer?
23   A.    Yes.
24   Q.    Okay.  And it tracks the letters you send?
25   A.    Yes.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 30..33

---

**Page 30**

1    Q.   And it doesn't do that automatically, does it?

2    A.   All the letters are tracked automatically.

3    Q.   They're generated in Debt$Net?

4    A.   Code is generated in Debt$Net.

5    Q.   Okay. And it tracks payments?

6    A.   Yes.

7    Q.   What else does it track; did I leave anything out?

8    A.   It tracks a million different things, but generally

9    speaking, you have not left out anything.

10   Q.   Well, like skip tracing and bankruptcy searches and that

11   kind of thing?

12   A.   Yes.

13   Q.   Okay. Is all of that skip tracing and bankruptcy

14   searching done through the software, or is it something another

15   software does and then connects to Debt$Net?

16   A.   Some of both. Actually, no. Debt net is too old to do

17   any of that on its own.

18   Q.   Okay. I thought so.

19   A.   It's pinging outside and then coming back in.

20   Q.   Now, does that also include when a judgment is sent to

21   the constable: does your software track what they do?

22   A.   No. Well, it updates with what they have updated us on,

23   but it does not track what they do.

24   Q.   Okay. Now we're bouncing a little bit out of my notes,

25   but I want to follow up on that.

---

**Page 31**

1    When you give a debt to the constables, how often do

2    they update you on their progress?

3    MR. GRASSI:   Object to form.

4    A.   When we deliver a writ of execution to the constables.

5    Q.   Yes, I don't know what I said that was wrong.

6    A.   Give a debt.

7    Q.   Okay. I meant deliver. To me, it's the same thing.

8    I'm not trying to create a trap here; I'm just trying to figure it

9    out.

10   When you deliver a debt to the constables, do you

11   anything to keep track of their progress?

12   A.   We don't deliver a debt, we deliver a writ of execution.

13   Q.   Okay.

14   A.   And then we don't do anything to track their progress,

15   no.

16   Q.   Do they update you on their progress?

17   A.   Yes.

18   Q.   And how often do the update?

19   A.   Whenever they want. Very sporadic.

20   Q.   And do they update you on every -- do they have certain

21   events where they update you on and others they don't?

22   A.   I don't know that.

23   Q.   Okay.

24   A.   Meaning, Eric, I don't know what they choose to update

25   us on. I just know we receive updates from them at very random

---

**Page 32**

1    times.

2    Q.   Okay. And how do you receive those updates; by what

3    method?

4    A.   Electronically.

5    Q.   Email?

6    A.   Email.

7    Q.   They don't have access to Debt$Net.

8    A.   No, sir.

9    Q.   Do you know if they use software to do any of their

10   work?

11   A.   I don't.

12   Q.   Let's mark this as Exhibit 2.

13   [Exhibit 2 Marked]

14   Do you recognize Exhibit 2?

15   A.   Give me one second.

16   Q.   Yeah, take your time.

17   A.   I do.

18   Q.   Can you tell me what it is?

19   A.   Yes. The first page is actually something that we

20   created to respond to one of your requests.

21   So this is not something that came out of our system, we

22   created it for you.

23   Q.   Okay. Page one is not part of your system, it was

24   generated for me.

25   A.   MLC 0049, yes.

---

**Page 33**

1    Q.   Can you tell me why, what it says? Because it's

2    confusing.

3    A.   Yeah. Tell me what's confusing and I'm happy to clarify

4    it.

5    Q.   Well, what is it meant to convey?

6    A.   I can see that it's got -- let's go to number 1A:

7    "asdf"; what does that mean?

8    A.   I think that's a typo.

9    Q.   Okay. What does "Validation for each COA by account

10   number" mean?

11   A.   It means that we checked for validation on each one of

12   the separate causes of action as part of our litigation due

13   diligence.

14   Q.   Okay.

15   A.   To make sure the accounts have been properly validated.

16   Q.   And validated properly, what does that mean?

17   A.   That means send the required notice under the FDCPA,

18   model validation notice, or, prior to model validation notice, the

19   dunning notice.

20   Q.   And that doesn't have to be sent unless they ask for it?

21   A.   No, we send it on every account.

22   Q.   And number 2: "MDP collections agent attempted to call

23   the number on file."

24   This is just a call note?

25   A.   Yeah. That's an initial of one of the employees. And

Page 34

1  I'm sorry, Eric, I don't know all the initials.
2      Q.   That's okay.
3           And LCM means left a message?
4      A.   Limited content message.
5      Q.   Limited content message, okay, to comply with
6  FOIA [phonetic]?
7      A.   In fact, yeah, we use limited content message way before
8  Reg F came out, so it was FOIA in the old days, yes.
9      Q.   Right.  Yeah, I'm old too.
10          And then I don't know that we need to go through this,
11 because if we go to turn to page two, isn't it more detailed?
12     A.   Yes.
13     Q.   Okay.  So maybe we should do that.
14          I really don't want to spend much time on these notes,
15 but I do want to kind of get a handle on -- they're coded.
16     A.   Their coded/shorthand.
17     Q.   I really just want to know which ones should I check off
18 as attempted phone calls to my client.
19          Is that just a weird enough question that we shouldn't
20 go there?
21          Or tell me how I can find -- if there's a phone number
22 in it, that means they tried to call; is that right?
23     A.   That's correct.  Yeah, let me quickly go back.
24          So this information on this Exhibit 2, starting at MLC
25 0050, is in another place that was produced to you?

Page 35

1           No, it's in screenshots of Debt$Net that are almost
2  impossible to read because they're separated out.
3           This is all of those notes put in one convenient place.
4           And so the way I do it, is I always start with the
5  oldest and come forward.
6           So I'm on page MLC 005.
7           And I start at the bottom and then I come up and I can
8  see on 5/11/21: "VOAPPS successfully delivered to phone number."
9           There's an example of an attempt to contact your client
10 dated 5/11/21.
11     Q.   And what does VOAPPS mean?
12     A.   VOAPPS is a third party vendor that does voicemail
13 drops.
14     Q.   Does that mean your collector -- your employee, do I
15 dare call them collectors?
16     A.   You can call them collectors.
17     Q.   Okay.  Does that mean your employee made the call, or an
18 automated system made the call?
19     A.   In this case, RDC probably initiated it.  So it'd be an
20 individual.
21     Q.   Is there a way to tell if -- oh, RDC is the employee who
22 made the call?
23     A.   Yeah.
24     Q.   And we go up and we see --
25     A.   I'm going to take that back.  Those are initials I

Page 36

1  recognize: that's Rick.
2      Q.   What's his name?
3      A.   College, Rick College.  That was a system generated
4  voicemail drop.
5      Q.   So when your employee picks up the phone, dials the
6  number, it automatically puts that in to the notes?
7      A.   In Rick's case, yes, because he's doing it.  He's not
8  dialing, he's queuing things up for batch dials to happen.
9      Q.   Okay.  And the way we know whether it's a batch dial or
10 not is by VOAPPS?
11     A.   VOAPPS is one example of a batch.
12     Q.   And we see more of those up on 5/24/2021?
13     A.   Yes.
14     Q.   Okay.  And throughout this.
15     A.   Yes.
16     Q.   How do we tell when there's just been -- well, is there
17 a way that an employee can dial the number and it not be in these
18 notes?
19     A.   No.
20     Q.   If they just dial it and hang up really fast, it's still
21 going to make a note of it?
22          Not accusing of that.
23     A.   Yeah, no.  Our system on every dial requires that they
24 disposition the call.  The second they've dispositioned the call,
25 a note is created.

Page 37

1      Q.   And when you mean they disposition a call, it means the
2  collector has to push a button or type something in.
3      A.   Has to, yes.
4      Q.   So there could be a way they could dial the phone, hang
5  up and not disposition the call?
6           Again, not accusing.
7      A.   Yeah.  In the olden days, yes; in the new days, no.
8      Q.   And again, I'm not accusing anybody of that.  I'm just
9  trying to figure out the capabilities of the system.
10          Does the system record all the calls?
11     A.   Randomly records, yes.
12     Q.   Randomly.  So some calls won't be there, some will.
13     A.   Yes.
14     Q.   Okay.  I hate going through these notes, let's get them
15 over there.
16          Let's do Exhibit Number 3.
17          [Exhibit 3 Marked]
18          Again, I hate going through these, but we have to know
19 what they are.
20          So can you tell me what Exhibit Number 3 is?
21     A.   Yes.  One of your questions -- I can't remember in which
22 set -- asked for data relating to what phone numbers attempted to
23 call your client using what carrier.  It didn't ask it that
24 succinctly.
25          We created this to put it all in one spot.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 38..41

Page 38

1      Q.   Okay.  And so if it's listed here, then it's a call that
2   did take place.
3      A.   Yes.
4      Q.   And this isn't missing any calls that you know of?
5      A.   Not that I'm aware of.
6      Q.   Okay.  That's good.
7           Let's mark that as Exhibit 4.
8           [Exhibit 4 Marked]
9      Q.   Do you recognize Exhibit 4?
10     A.   I do.
11     Q.   Can you tell me what that is?
12     A.   Yes.  This came out of the Debt$Net system.  And it is
13  redundant to the two exhibits we just reviewed, but it's right out
14  of the Debt$Net system.
15     Q.   Same information as what we looked at before?
16     A.   Yes, with the additional columns of collector number,
17  call duration.  I mean, each document kind of speaks for itself,
18  but it's the same basic information.
19     Q.   Duration is -- help me understand these two columns.
20     A.   Seconds.
21          Collector number is our employees in Debt$Net are known
22  by numbers.
23          And duration is the number of seconds, I believe.
24     Q.   And that's why some of them are blank, because that was
25  a call dropped or no message?

Page 39

1      A.   Yes.
2      Q.   Last one.  Let's see, this is number five.
3           [Exhibit 5 Marked]
4      Q.   Do you recognize Exhibit 5?
5      A.   I do.
6      Q.   Tell me what that is.
7      A.   Those are notes taken from Debt$Net again.
8           Actually, give me a second here, Eric.
9      Q.   May I suggest that it's probably something more created
10  for the litigation?
11     A.   Yeah, I'm --
12     Q.   Or is it just a continuation of the other notes?
13     A.   No, no, no.  This is not pulled out of Debt$Net.
14          MR. GRASSI:  No, this was not produced by Mountain Land.
15     A.   Yeah, I'm drawing a blank on where this came from.
16     Q.   Yeah, I am aware.  I wanted to know if --
17          What I am wanted to know is if you had --
18          So, okay, let me just ask the question, then.
19          You're not aware of Exhibit Number 5; you don't know
20  where this came from?
21     A.   No, I don't.
22     Q.   Can you turn to the back page.  It's got payments
23  listed.
24          Do you know whether or not that list of payments is
25  accurate or not?

Page 40

1      A.   Wow.
2      Q.   Totally fine if you don't.
3      A.   I don't know.
4      Q.   Okay.
5      A.   Yeah, I don't know.
6      Q.   Let's put that aside, then, just add it to your pile if
7   you would.
8      A.   Yeah, you're not going to come back to it?
9      Q.   I don't think so.  I didn't want to go through it in the
10  first place.
11          Okay.  Document Number 6.
12          [Exhibit 6 Marked]
13          Do you recognize Exhibit 6?
14     A.   I do.
15     Q.   Tell me what Exhibit 6 is.
16     A.   Exhibit 6 is the complaint in the matter of Mountain
17  Land Collections versus Charles Young and Corie Young.
18     Q.   Okay.  I'm going to ask a few questions about this
19  generically speaking.
20          Let's start with: is this complaint based on a template
21  complaint you use in other cases?
22     A.   It's based on a template.  But as you can see, there's
23  very specific information to these consumers.
24     Q.   Okay.  And you signed it.  If we go to the end, this is
25  your signature?

Page 41

1      A.   Yes.
2      Q.   Did you review it before it was filed?
3      A.   I reviewed what is referred to in this as Exhibit 1.  I
4   call that, in the office, a cheat sheet.
5      Q.   Exhibit 1 lists each account you're suing for?
6      A.   Yes.
7      Q.   And it includes the details of each account?
8      A.   Yes.
9      Q.   Those details include the assignor?
10     A.   Yes.
11     Q.   The amount owed?
12     A.   Yes.
13     Q.   And whether collection fees or costs or attorneys fees
14  are allowed?
15     A.   Yes.
16     Q.   Do you compare Exhibit 1 to what's listed in the
17  complaint?
18     A.   I personally regularly don't, but periodically do.
19     Q.   And when you -- oh, go ahead.
20     A.   They're generated out of the same system.
21     Q.   Yeah.  And that's typical for a paralegal to look
22  through it and create it, that's fine.
23          But when you look at the cheat sheet, do you ever do the
24  math to make sure these numbers add up?
25     A.   Yes.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 42..45

---

Page 42

1    Q.   And do you have a system to help you with that or just a
2  standard calculator next to you?
3    A.   It's a solar powered calculator.
4    Q.   And when I ask about this case, this complaint being a
5  template, I want to make sure that -- like, let's look at page
6  one.
7         The first two allegations, those are in all of your
8  complaints?
9    A.   Yes.
10   Q.   And those are true statements?
11   A.   Unless it's more than $20,000, yes.
12   Q.   Okay.  Where it says in number two that plaintiff is a
13 licensed and bonded collection agency, that's true; it was?
14   A.   Yes.
15   Q.   And the legal assignee of the rights and claims in the
16 complaint, that's true?
17   A.   Yes.
18   Q.   Before you filed the -- let's do the date of you filing
19 this.
20        When was this complaint filed?
21   A.   I'm going to go back to the Debt$Net notes.
22        It was filed on 6/6 of '22.
23   Q.   Okay.  And on page 11, it's dated for April 15th, 2022.
24        That's not the filing date then, that's the creation
25 date?

---

Page 43

1    A.   When it was prepared, yes.
2    Q.   Do you serve these and then file with a 10-day notice?
3    A.   The 10-day summons is the process we use, yes.
4    Q.   Do you do anything else to verify the information in the
5  complaint is accurate?
6         MR. GRASSI:  Object to form.
7    Q.   Other than looking at the cheat sheet?
8    A.   Me personally, or Mountain Land?
9    Q.   Well, Mountain Land.
10   A.   Yeah.
11   Q.   Okay.  And what steps does Mountain Land use to verify
12 these claims are accurate?
13   A.   There is a several-part process to make sure that the
14 person that inputs the data into the templates is not the person
15 that spot-checks the templates, that is not the person that
16 verifies the accuracy of the templates, that is not me that's
17 reviewing Exhibit 1.
18   Q.   So one employee fills out the template with the
19 information, or the computer does?
20   A.   No, the computer doesn't grab it.
21   Q.   Okay.
22   A.   We have a proprietary software system known as HotDocs
23 that we've created that sets up a series of interview questions
24 that have to be specifically answered.
25   Q.   Okay.  I want to make sure I'm clear on this, because

---

Page 44

1  HotDocs is a standalone software.
2         You're not saying you created that software.
3    A.   No.
4    Q.   You created the template using HotDocs?
5    A.   Yes.
6    Q.   Okay.  So an employee goes through and answers the
7  questions in HotDocs?
8    A.   Yes.
9    Q.   It populates the complaint?
10   A.   Yes.
11   Q.   And a different employee reviews the complaint against
12 those answers?
13   A.   Yes.
14   Q.   What efforts do you make to ascertain whether the debts
15 might be subject to workers' compensation?
16        MR. GRASSI:  Object to form.
17   A.   Any prior communications with the original creditor that
18 would indicate it as workers' comp would bring things to a
19 screeching halt, or what the consumer would bring it to a
20 screeching halt.
21   Q.   And where would you find those prior communications?
22   A.   All in the Debt$Net notes.
23   Q.   And when the employee is answering the questions for
24 HotDocs, they review those Debt$Net notes?
25   A.   A matter that is a workers' comp claim or subject to

---

Page 45

1  workers' comp wouldn't be queued up for a lawsuit.
2    Q.   How does that work?
3    A.   If we're notified of workers' comp, no matter how we're
4  notified, whisperings in the wind.  We have a code that labels the
5  account workers' comp and it stops all further collections.
6    Q.   And if Mountain Land is not notified it's workers' comp,
7  that process doesn't kick in.
8    A.   That's right.
9    Q.   What about bankruptcy; is that sort of the same thing,
10 or is that a different system?
11   A.   No.  Bankruptcy's got a system that can be queried, so
12 we query it.
13   Q.   Does your employee ever review the actual medical
14 records to see if it might be workers' comp?
15   A.   Not the same employee that's preparing the complaint,
16 but yes.
17        Again, your question suggests that it's being reviewed
18 at the time of the complaint.  If there's workers' comp that's
19 known, it's caught way before the lawsuit kicks in.
20   Q.   Okay.  And tell me how that -- help me, explain that
21 process.
22        Is that a person that finds out about the workers' comp
23 and then kicks it out of the system, or is it an automated
24 process?
25   A.   No, it's a person.

---

Page 46

1    Q.    And that only happens, the omitting a case from even
2 having a complaint generated, is dependent on being told by the
3 original creditor that it might be workers' compensation?
4    A.    Or conversations with the consumer or anybody else that
5 would tell us.
6    Q.    Oh, right, because the complaint isn't prepared until
7 after you've probably collected a while, or tried to?
8    A.    Yes.
9    Q.    Okay.  And if you don't have any contact with the
10 consumer, you can't know if it was workers' comp or not, from that
11 perspective, from the client or the consumer perspective?
12    A.    Yes.
13    Q.    Does Mountain Land do anything else to determine whether
14 workers' compensation might be involved or not?
15    A.    Not that I'm aware of, no.
16    Q.    You mentioned that if workers' compensation is involved,
17 you won't sue, correct?
18    A.    We don't collect, period.
19    Q.    You'll stop collecting altogether, okay.
20    A.    Yes.
21    Q.    If you find out after a judgment is rendered that it
22 might be workers' compensation, do you dismiss the case?
23    A.    Yes.
24    Q.    Then I have to ask: why didn't you dismiss this one?
25    A.    We don't know of any workers' comp claim.

Page 47

1    Q.    Okay.  But if you did know of a workers' comp claim --
2 well, never mind, no.  No, I don't want to add on.
3          In the complaint prayer for relief, you ask for
4 attorney's fees, correct?
5    A.    Yes.
6    Q.    And the reason for that is because attorney's fees are
7 in the contract with the original creditor?
8    A.    With at least one of them, yes.  A copy of that
9 complaint is attached to -- or a copy of the contract is attached
10 to the complaint, two of them.
11    Q.    When you get a judgment -- well, let me rephrase.
12          Is it fair to say that most of the lawsuits you file
13 result in default judgments?
14    A.    Yes.
15    Q.    Do you know a ballpark number?
16    A.    Oh, no.
17    Q.    It's probably in the 90 percent or higher, right?
18    A.    I don't know, but it's high.
19    Q.    It's a lot.
20    A.    Yeah.
21    Q.    Okay.  So Mountain Land has requested and received --
22 and the attorney's -- I'm so sorry, I don't --
23          And the attorney's fees requested here are $350?
24    A.    Yes.
25    Q.    And Mountain Land usually requests the 350?

Page 48

1    A.    We follow the statute.  So yes, most of the time they're
2 350.
3    Q.    So over the years, Mountain Land has requested
4 attorney's fees of $350 in cases thousands of times?
5    A.    Yes.
6    Q.    And it receives those awards thousands of times over the
7 years?
8    A.    It receives the judgment.
9    Q.    The judgment for those?
10    A.    Yes.
11    Q.    And in this case, you actually did get a default
12 judgment, correct?
13    A.    Yes.
14    Q.    And you were awarded $350 against my client?
15    A.    Yes.
16    Q.    For attorney's fees?
17    A.    Yes.
18    Q.    And you attempted to collect that 350 from my client?
19    A.    When?
20    Q.    Anytime.
21    A.    Post-judgment only.
22    Q.    Oh, yeah, post-judgment only.
23    A.    Yeah.
24    Q.    And the constables, they added -- they tried to collect
25 that amount as well when they were trying to collect

Page 49

1 post-judgment?
2    A.    I don't know what the constables tried to collect.  We
3 gave them a writ, and they did what they do.
4    Q.    Okay.  On the complaint, at the very first page, it's
5 got you listed as the attorney for Mountain Land Collections,
6 correct?
7    A.    Correct.
8    Q.    And it lists you as -- it says specifically "attorney
9 for plaintiff", correct?
10    A.    Yes.
11    Q.    It doesn't say pro se, correct?
12    A.    It does not say pro se.
13    Q.    Okay.  And can you explain to me why it doesn't say pro
14 se?
15          If Mountain Land is collecting on its own behalf,
16 shouldn't it say pro se?
17          MR. GRASSI:  Object to form.
18    A.    I don't know.  I don't believe so, no.
19    Q.    In all the thousands of cases you file, it says
20 "attorney for plaintiff", not pro se?
21    A.    Correct.
22    Q.    Has anyone at Mountain Land Collections ever expressed
23 concern about telling the court that it's the plaintiff when it is
24 actually appearing pro se?
25    A.    No.

Page 50

1      MR. GRASSI:  Object to form.
2      Q.  Can you explain to me why you don't consider it to be
3  appearing pro se when you're representing Mountain Land
4  Collections, your own company?
5      MR. GRASSI:  Object to form.
6      A.  This is the first time I've even had this conversation
7  or dialogue.  It's just never crossed my mind.
8      Q.  Okay.  Okay.
9      MR. STEPHENSON:  Do we need a break, does anybody need a
10  break?
11      MR. GRASSI:  I could use a break.
12      MR. STEPHENSON:  Okay.  Let's take a five minute break.
13      [Off the record at 11:02 a.m.]
14      [Back on record at 11:11 a.m.]
15  BY MR. STEPHENSON:
16      Q.  Let's mark this one 7.
17      [Exhibit 7 Marked]
18      Do you recognize Exhibit 7?
19      A.  I do.
20      Q.  This is the default judgment you obtained against my
21  client?
22      A.  Yes.
23      Q.  And the date the judge awarded this was June 28th, 2022?
24      A.  Yes.
25      Q.  And the amount awarded is, total, $5,362.08.

Page 51

1      A.  That's correct.
2      Q.  And that amount includes $350 awarded for attorney's
3  fees.
4      A.  Yes.
5      Q.  And $103.40 for a collection fee.
6      A.  Yes.
7      Q.  Is it your standard practice to collect both the
8  attorney's fees and the collection fee?
9      MR. GRASSI:  Object to form.
10      Go ahead.
11      A.  Only if allowed by contract.
12      Q.  And has anyone at Mountain Land ever expressed concerns
13  about how collecting both a collection fee and an attorney's fee
14  might be illegal?
15      MR. GRASSI:  Object to form, calls for legal conclusion.
16      Go ahead.
17      A.  No.
18      Q.  No judge has ever said you can't collect both?
19      A.  No.
20      Q.  Is it fair to call that -- is it fair to say that it's
21  your standard practice to collect both the attorney's fees and
22  collection fees if the contract allows it?
23      MR. GRASSI:  Object to form.
24      A.  Yes.  I don't want to split hairs, but given the way you
25  asked the question, if they are supported by contract: collection

Page 52

1  fee and attorney's fees, we seek them both.
2      Q.  Yes.  Okay.  Thank you.  And I didn't mean to imply that
3  it was -- number eight -- and I didn't mean to imply that you were
4  doing something outside the contract; I just want to clarify the
5  documents and what they say.
6      [Exhibit 8 Marked]
7      Q.  Do you recognize Exhibit Number 8?
8      A.  I do.
9      Q.  This is the application you filed for a writ of
10  execution.
11      A.  That is correct.
12      Q.  And in the application for a writ of execution, you
13  added amounts for post-judgment interest, a cost to file an
14  application for a writ, and additional attorney's fees.
15      A.  Yes.
16      Q.  So the amount you asked for in this writ was a total of
17  $5,542.18.
18      A.  Correct.
19      Q.  I'd like to give you Exhibit Number 9.
20      [Exhibit 9 Marked]
21      And Exhibit Number 9 is the writ of execution entered by
22  the court.
23      A.  Yes.
24      Q.  It entered on July 29th, 2022.
25      A.  Yes.

Page 53

1      Q.  And the court granted the amount of $5,542.18.
2      A.  Yes.
3      Q.  And the writ doesn't award any other fees or costs, does
4  it?
5      A.  No.
6      Q.  And is it your office that wrote this writ?
7      A.  Yes.
8      Q.  Now, just a question about the timing.
9      You filed the application for the writ of execution on
10  July 27th and received the writ signed by the court July 29th,
11  correct?
12      A.  Yes.
13      Q.  How did it get in so fast; is that a typical time frame?
14      A.  I don't know that.  It sounds like it is, yes.
15      Q.  Okay.  We can move off of that now.
16      Okay.  So let's talk about the constables and their
17  involvement.
18      My understanding is that Mountain Land sent Kolkman
19  1,316 writs of execution from January 1st, 2022 to April 15th,
20  2024.  That comes from one of your responses of you or your
21  attorney.
22      A.  Supplemental responses, yes.
23      Q.  Yeah.  So is that an accurate number: 1,316 writs from
24  January 1st, 2022 to April 15th, 2024?
25      MR. GRASSI:  Object to characterization.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 54..57



Page 54

1    A.   Give me the number again?
2    Q.   1,316.
3    A.   Yes, that's sounding about right.
4    Q.   Okay.  And if it's not exact, I'm not --
5         MR. GRASSI:  Yeah, I would have answered the question
6    approximately 1,300, so we're close.
7    Q.   Yeah.  So how many of those writs were sent to -- well,
8    which constables do you send writs of execution to?
9    A.   Utah County Constables is who we use.
10   Q.   And that is Michael Erickson?
11   A.   Our understanding is Utah County Constables includes
12   Erickson.
13   Q.   Does it also include Kolkman?
14   A.   That's our understanding, yes.
15   Q.   Do you use any other constables; did you deliver writs
16   of execution to any other constables in that time period?
17   A.   Give me the time period again.
18   Q.   In 2022, 2023, and 2024?
19   A.   Yes.
20   Q.   Okay.  And who were those other constables?
21   A.   John Sindt.
22   Q.   How many did you send to John Sindt in that same --
23   A.   It's going to be all part and parcel of that number.
24   Q.   John Sindt is part of Utah County Constables?
25   A.   That's our belief, yes.

Page 55

1    Q.   Is it your belief that John Sindt is a constable?
2    A.   Yes.
3    Q.   Does he hold himself out as a constable?
4    A.   Yes.
5    Q.   Does he hold himself out as a constable in Utah County?
6    A.   I believe so, yes.
7    Q.   Is John Sindt serving the writ of executions that you
8    sent him?
9    A.   I don't know.
10   Q.   Do you know if John Sindt is holding himself out as a
11   constable to your debtors?
12   A.   I don't know.
13   Q.   Other than Erickson, Kolkman, and Sindt, are there any
14   other constables you deliver writs of execution to?
15   A.   No.
16   Q.   And when did you start sending writs of -- excuse me,
17   delivering writs of execution to Utah County Constables?
18   A.   I would -- it goes back into the 90s, I believe.
19   Q.   And back in the 90s, do you know if it was all three,
20   Erickson, Kolkman, and Sindt?
21   A.   I believe it was only Sindt.
22   Q.   So in your mind, you never stopped sending writs of
23   execution to Erickson and went to Kolkman; in your mind, it's the
24   same company?
25   A.   Yes and no.  May I explain?

Page 56

1    Q.   Yes, please.
2         [The following testimony was deemed confidential.]
3    A.   ████████████████████████████████████████
     ████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████████████
     ████████████████████████████
     ████████████████████████████████████
18        [End of confidential testimony.]
19   Q.   When do you typically send writs of execution to the
20   constables?
21   A.   After they're issued by the court.
22   Q.   Is there a specific day of the week that they get a
23   batch of them, or do you send them individually?
24   A.   No.  We send them in batches a couple times a month.
25   Q.   And when you say a couple times a month, I want to be

Page 57

1    specific.  Is it only two times?
2    A.   I believe it's only two times a month.
3    Q.   Okay.  And is it two times every month, routine?
4    A.   There's no set routine, but more or less, yes.
5    Q.   Is there a specific number you wait until you get enough
6    of them to send them over?
7    A.   No.
8    Q.   Just figure every couple of weeks you should send some
9    over?
10   A.   Yes.
11   Q.   Do you know how many in a batch you normally send?
12   A.   It's going to vary.  I don't know the exact number, but
13   it's going to vary from 10 to 30, or however the math adds up.
14   Q.   And you mentioned earlier that once you deliver a writ
15   of execution to the constables, you don't know what happens next.
16   A.   That is correct.
17   Q.   And do you make any attempts to ever discover what
18   happens next?
19   A.   No.
20   Q.   What do you expect them to do when you deliver a writ to
21   the constables?
22   A.   Execute on the writ of execution.
23   Q.   And you expect the constables to execute 100 percent of
24   the writs you deliver to them?
25   A.   That would be our hope, yes.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 58..61

Page 58

1    Q.   After you deliver the writs to the constables, they
2  periodically send you payments, correct?
3    A.   Yes.
4    Q.   And do you ever inquire where those payments come from?
5    A.   No.
6    Q.   They indicate to you what account or what judgment the
7  payment applies to, though?
8    A.   Yes.
9    Q.   So you know that you're receiving money from the
10  constables that they collected from the judgment debtor?
11    A.   Yes.
12    Q.   But you don't know the method they're using to collect
13  those payments?
14    A.   No, we do not.
15    Q.   When the constables send you the payments, do they ever
16  send you a certificate of sale?
17    A.   No.
18    Q.   And you said that you've been using the constables since
19  the 1990s.  And in all that time you've never received even one
20  certificate of sale?
21    A.   Not that I can recall.
22    Q.   Are you aware of any sales that they've held to collect
23  the debt for you?
24    A.   Not that I'm aware.
25    Q.   Have you ever asked the constables, "Are you holding

Page 59

1  sales?"
2    A.   No.
3    Q.   Do you communicate directly with the constables, or does
4  this process occur through your employees?
5    A.   Generally through the employees.
6    Q.   So it's not -- let me rephrase.
7         So this is part of a system you've set up that you don't
8  have to be involved in handling these batches and sending them to
9  the constables?
10    A.   No.  I'm involved in everything at Mountain Land, to one
11  extent or another.  So it's not been set up so that I'm not
12  involved.
13    Q.   Oh, no, but it set up so you don't have to micromanage
14  either, right, you can trust that your employees are doing what
15  you told them to do?
16    A.   Yes.  The reason I'm hesitating here is the question
17  makes it sound like there's communication and direction from
18  Mountain Land with the constables, there's not.
19         Our employees at Mountain Land, as updates are provided
20  to us, they put the updates in the notes, period.
21    Q.   You're saying there's no -- help me understand this.
22         You're saying -- okay, so Mountain Land delivers writs
23  of execution to the constables by email.
24    A.   No.  They come pick them up.
25    Q.   Oh, they come physically pick them up.  Okay.  I've got

Page 60

1  to remember that for the future questions.
2         And when the constables pick up the writs, that's the
3  only communications Mountain Land is having with constables?
4    A.   There are also periodic reports coming back from the
5  constables saying, "Here's your check, here's" -- yeah.
6    Q.   And those reports for when you get payments, do they
7  send those in batches?
8    A.   Yes.  The reason for the hesitation: we don't know how
9  they calculate what they send or when they determined to send
10  them, but we get them generally twice a month.
11    Q.   And they send the payments reports by email?
12    A.   Yes.
13    Q.   And how do you verify how much money the constable
14  collects and keeps for itself?
15    A.   We have no idea.
16    Q.   Now, in the discovery responses, you mentioned 400 --
17  sorry.
18         Out of the 1,316 writs you provided to the constables in
19  the time period we discussed before, you mentioned that out of
20  that, they provided you back 494 individual payments.
21         Does that sound right?
22    A.   Sounds about right.
23    Q.   And out of those 494 individual payments, the constables
24  provided you -- oh, sorry, you want to say something, go ahead.
25    A.   Remittances.

Page 61

1    Q.   I can't call it payments?
2    A.   You can, yeah.
3    Q.   Okay.  Because I'm already struggling here.
4    A.   Our system calls them remittances.
5    Q.   Okay.  So if I say payments, you'll know that I mean
6  remittances.
7    A.   Okay.
8    Q.   And I might not.  I guess in this context, I'm talking
9  about payments from the constables to you.
10    A.   Yes.
11    Q.   Okay.  We're not talking about what they collect.
12    A.   That's what I wanted to clarify.
13    Q.   Yes.  I want to be sure we're clear on that, too.
14         You guys keep changing my terminology, though.  At some
15  point it'll break.
16         Out of those 494 payments, the constables included zero
17  certificates of sale?
18    A.   That is correct.
19    Q.   And when the constables serve the writ of execution, do
20  they provide you with a proof of service?
21    A.   No.  What do you mean by proof of service?
22    A.   Something you can file with the court.
23    A.   No.
24    Q.   So you don't know how many -- of the writs you deliver
25  to the constables, you don't know how many are being served?

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 62..65

Page 62

1    A.    That's correct, through that process.
2    Q.    Okay.
3    A.    Remember that I told you they provide us periodic
4 reports whenever they want to?
5    Q.    Okay.
6    A.    Those reports will say "writ served".
7    Q.    Okay.  And will the reports tell you how the writs were
8 served?
9    A.    No.
10   Q.    And the reports don't give you anything you can file
11 with the court to notify the court the writ was served?
12   A.    Correct.
13   Q.    And out of those 494 payments, do you know how many of
14 those came from the constables actually executing the writ,
15 seizing the debtors' property, and selling it?
16   A.    I don't.
17   Q.    Have the constables ever notified you that they sold a
18 debtor's property?
19   A.    Not that I'm aware of.
20   Q.    Do you ever collect debts from people who own mobile
21 homes?
22         Let me rephrase that.  That's a stupid way to ask that.
23         Do you ever collect debts for the mobile home
24 communities?
25   A.    No.

Page 63

1    Q.    Okay.  And when you provide the writ of execution to the
2 constables, what specific instructions do you give the constables?
3         I think we kind of went over that: it's none.
4    A.    None.
5    Q.    Did you, in the beginning, provide them any
6 instructions?
7    A.    No.
8    Q.    So all the way back to the 1990s, your process has been
9 to deliver a writ of execution to the constables and then walk
10 away and let them do their thing?
11   A.    Our understanding has been the same all along, which is
12 they do their job and we don't have a right in their space.  So
13 that is correct.
14   Q.    Are you aware -- well, no, stop.
15         I want to circle back to what you said about
16 communications with the constables.
17         Is it your testimony that your employees don't
18 communicate with the constables in any other -- to discuss what's
19 going on with these writs?
20   A.    Yes, that is my testimony.
21   Q.    Are you aware of --
22   A.    They'll swing by and pick the checks up and I'm sure
23 they're saying, "How's your day?", you know.
24   Q.    Yeah.  Do you know if any of your employees are familiar
25 or friendly -- it's a weird way to put it -- but on a good working

Page 64

1 relationship with the constables or the constables' employees?
2    A.    I don't know that.  I would be shocked if there's not
3 some sort of association and friendship.
4    Q.    And why would that shock you?
5    A.    I think it's normal.  I consider you a friend and I just
6 think it's the way human beings are wired.
7    Q.    In Discovery, I was given a phone call between the
8 constables and one of your employees.
9         Are you aware of that?
10   A.    Yes.
11   Q.    So I want to understand -- I don't really want to put
12 all that in the record, but I do want to discuss the phone call in
13 brief.
14   A.    You bet.
15   Q.    Who is the employee that made that phone call?
16   A.    Her name is Jenna.
17   Q.    And what's her last name?
18   A.    Adams; it may be Adam.
19   Q.    She's your employee?
20   A.    Yes.
21   Q.    What is her role there?
22   A.    She works in the operations department, in legal.  She
23 manages several of the cronies, underlings.  She's my assistant as
24 well.
25   Q.    In that phone call, she speaks with who?

Page 65

1    A.    Cory.
2    Q.    That's Cory Revel [phonetic], if you know?
3    A.    I believe that's his last name, I don't know.
4    Q.    Do you know if he's a constable or not?
5    A.    I don't believe he is, but I don't know that.
6    Q.    Do you want to play that phone call?
7    A.    No, I'm familiar with it.  I'm very familiar with it.
8    Q.    It sounds to me in that phone call, they're pretty
9 familiar with each other.
10        Am I wrong on that?
11   A.    No, I think they are.  Cory's been coming to our office
12 for years.
13   Q.    Okay.  He's the one who picks up these writs?
14   A.    Not always.
15   Q.    But enough that they're familiar with each other?
16   A.    Yes.
17   Q.    Now, here's the weird question.
18        The phone call gets cut off at the end, and they say
19 "We're going to call back and talk to each other.", but there's no
20 second call.
21   A.    We looked.  They're randomly recorded.
22   Q.    Okay.  Convenient, but okay.  It's okay.
23   A.    Can I just give you more detail on that for my personal
24 satisfaction?
25   Q.    Yes.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 66..69

Page 66

1    A.    That's the same day you and I spoke about the potential
2    lawsuit.  So I went over and said to Jenna, "I'd like that writ
3    recalled."
4          That conversation, I think by then Cory had known about
5    you.  I'm not really pleased with that conversation because I
6    don't like that dialogue happening about anybody, but it is what
7    it is.
8    Q.    I'm not at all bothered by it.  I was just wondering why
9    the second part of the phone call wasn't produced.
10   A.    Now you know.
11   Q.    That was my only issue, and why it occurred.  Because if
12   there's no communication, that sort of changes the narrative.
13   A.    Yeah, I actually don't believe there was a second phone
14   call.  I think there was no call back.
15   Q.    Yeah, either way is fine.  I am not at all bothered by
16   it.  That wasn't my concern, but I do appreciate the clarification
17   because that my concern was delivery of it.  And now we understand
18   why.
19         Just so we're on the same page, though, when the
20   constables come to pick up the writs, is Jenna the one that gives
21   them to him, or is it anybody?
22   A.    Anybody.
23   Q.    Since this case has been filed, is it fair to say that
24   it's come to your attention the constables are collecting for you
25   by sending collection letters?

Page 67

1          MR. GRASSI:  Object to form.
2    A.    Yes.
3    Q.    And that is contrary to your prior expectation, is it
4    not?
5          MR. GRASSI:  Object to form.
6    A.    Yes.
7    Q.    You weren't aware the constables were sending letters to
8    collect these debts?
9          MR. GRASSI:  Object to form.
10   A.    No.
11   Q.    Has the process changed as a result of that awareness?
12   A.    Yes.
13   Q.    Tell me how the process has changed.
14   A.    We stopped sending writs.
15   Q.    To all constables or just these constables?
16   A.    All constables.
17   Q.    Is that fair to say, then, that you disapprove of the
18   way they collected this on your behalf?
19   A.    It raised concerns.
20   Q.    And I know that we've gone over this, but I want to be
21   certain that it's crystal clear.
22         So you never told the constables, "Collect these debts
23   by sending letters."?
24         You never told them to do that?
25   A.    That is correct.

Page 68

1    Q.    And you don't know how much the constables kept from the
2    amounts collected on the debts on the judgments you delivered to
3    them?
4    A.    No.
5    Q.    Does that concern you?
6    A.    Yes.
7    Q.    Did it concern you that the constables were not
8    registered as debt collectors with the Utah State?
9          MR. GRASSI:  Object to form.
10   A.    No.
11   Q.    And the reason it didn't concern you is because you
12   didn't -- no, never mind.
13         Okay.  There was a collection call between your company
14   and my client on June 10th, 2022, is that correct?
15   A.    Yes.
16   Q.    Do you know the substance of that phone call?
17   A.    Yes.
18   Q.    Can you tell me what happened during that phone call?
19   A.    Based on the notes, there was a contact made,
20   Mini-Miranda was given, date of birth was verified, what we call
21   7 and 7 consent was obtained.
22         And your client said that he spoke to his insurance
23   company, that they should be able to process this claim.
24         Our representative said we're not going to be able to
25   hold this for insurance, he's welcome to set up a payment plan to

Page 69

1    secure these accounts, but at this point would not hold up on the
2    lawsuit; it wouldn't stop the lawsuit without payment, told your
3    client when the judgment was scheduled to be signed on the 22nd.
4          And he said he would call the courts and if his
5    insurance will not cover, he will call us back.
6          That's the substance of the conversation.
7    Q.    And you're reading that from Exhibit what number?
8    A.    MLC 0051, Exhibit 2.
9    Q.    Have you listened to the recording of that call?
10   A.    I have.
11   Q.    And are those notes accurate to the call?
12   A.    To the best of my recollection, yes.
13   Q.    During that call, your employee did not ask what
14   insurance my client had, did it?
15   A.    That is correct.
16   Q.    And my client told your employee that he was divorced
17   from the co-defendant?
18   A.    Yes.
19   Q.    And you stopped immediately collecting from his ex-wife?
20   A.    We had never pursued against his ex-wife, but yes -- yes
21   and no.
22   Q.    Yeah, the ex-wife was never really -- we got over that.
23   A.    We got that resolved, yes.
24   Q.    And you did a check before you filed this to see if they
25   were still married, correct?

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 70..73

---

Page 70

1  A.  We did.

2  Q.  That was in the notes.

3  A.  It was.

4  A.  And we also do a reverse check where we look for dates

5  of divorce and didn't find anything.

6  Q.  Yeah, that was in the notes, correct?

7  A.  Yes.

8  Q.  Do you know why that happened then, why it slipped

9  through the cracks somehow?

10  A.  I don't.  I will say that when this case was served, we

11  looked at that and found no errors in the system, so it's one of

12  those head scratchers.

13  Q.  Yeah.  And you and I talked about that in detail and we

14  got rid of Corie altogether, correct?

15  A.  Yeah.

16  Q.  Okay.

17  A.  And on our judgment and writ, we say "As to Charles

18  only."

19  Q.  Yes, that is correct.

20  Okay, I've handed you Exhibit Number 10.

21  [Exhibit 10 Marked]

22  Do you recognize Exhibit 10?

23  Well, yeah, do you recognize it?

24  A.  I don't.

25  Q.  You didn't write this -- well, let me submit for the

---

Page 71

1  record that it's a letter.

2  Is that a fair characterization of what this is?

3  A.  It looks like a pleading.

4  Q.  What do you mean by that?

5  A.  There's a plaintiff, a defendant, and a case number

6  listed on it.

7  Q.  And the constables are listed there: Michael Erickson,

8  Utah County Constable, his name and address is listed where the

9  attorney is normally listed, correct?

10  A.  Yes.

11  Q.  And his signature even shows up where the attorney's

12  signature shows up, generally?

13  A.  Yeah.

14  Q.  To you, this looks like a pleading?

15  A.  Yes.

16  Q.  And the original balance is listed here as $5,542.18,

17  correct?

18  A.  As listed on this document, yes.

19  Q.  Okay.  And you didn't write this document?

20  A.  No, I did not.

21  Q.  And the date of this document says on it 8/23/2022,

22  correct?

23  A.  Yes.  It says "8/20 -- looks like it says "23/2022."

24  Q.  Okay.  And I don't know how good your eyesight is, but

25  at the very bottom there's a teeny tiny stamp.  He might have

---

Page 72

1  covered it, actually.

2  A.  Nope, it's there.

3  Q.  Do you see where it says 8/18/22?

4  A.  Yes.

5  Q.  Does that look like a date to you?

6  A.  It does to me, yes.

7  Q.  And that coincides with the date written, handwritten,

8  of 8/23/22?

9  Not exactly, but they're within the same week of each

10  other?

11  A.  Yeah.

12  Q.  And the case number 229102019 is the same case number as

13  in your lawsuit against my client?

14  A.  Oh, crap, Eric.  Yes.

15  Q.  And now, in this letter, the total due is listed as

16  $5,800.31, correct?

17  A.  Yes.

18  Q.  And that's because -- or according to the letter, it

19  says the original balance, and then it adds $50 for a service fee,

20  $105 for a mileage fee, $88.13 for a commission, and $15 for a

21  notices fee, correct?

22  A.  That's what it says.

23  Q.  And the math is not your math, someone else did this?

24  A.  Yes.

25  Q.  And then attached to this letter is your writ of

---

Page 73

1  execution.

2  A.  The writ of execution that Mountain Land requested of

3  the court that they issued, yes.

4  Q.  Okay.  And it indicates -- there's a stamp by the

5  constable, and it says the date served was August 25th, 2022, I

6  think.

7  A.  Okay.  You're looking more or less the upper right-hand

8  corner.  It looks like it says 8/22 or 8/28 to me.

9  Q.  Or 25 maybe.

10  A.  Yeah.

11  Q.  Okay.  Do you know the signature of -- is that Andrew

12  Collet [phonetic]?

13  A.  I have no idea.

14  Q.  And do you know what that stamp indicates?

15  A.  I do not.

16  Q.  Okay.  Let's go back to the first page.  Well, let's

17  generally talk about this.

18  You didn't review or see this letter prior to it being

19  mailed?

20  A.  That is correct.  I don't even know if it was mailed.

21  Q.  Oh, okay.  Right.  It could have been delivered in hand,

22  you don't know.

23  A.  Correct.

24  Q.  When did you first become aware of this letter?

25  A.  Sitting here today.

---

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 74..77

Page 74

1    Q.    You haven't seen this letter before today?

2    A.    No.

3    Q.    Do you know how these fees were calculated: the service,

4    mileage, commission, and notices fees?

5    A.    I don't.

6    Q.    So you can't testify that they're accurate?

7    A.    I have -- no, I cannot.

8    Q.    Do you know why this letter is formatted to look like a

9    court filing?

10   A.    I do not know that.

11   Q.    Is mailing a writ of execution proper service of process

12   of a writ of execution?

13         MR. GRASSI:  Object to form.

14   A.    I do not know that.

15   Q.    Do you know the process for how a writ of execution is

16   executed?

17   A.    I do not.

18   Q.    This letter says, "Please call my office within 10 days

19   to make arrangements to pay the judgment to avoid the sale of your

20   non-exempt personal property.", correct?

21   A.    That's what it says, yes.

22   Q.    And that's not something you authorized the constables

23   to say on your behalf?

24   A.    No.

25   Q.    And you didn't know they were saying that until you saw

Page 75

1    this letter today?

2    A.    That's correct.

3    Q.    Do you see anywhere on this letter where there's a

4    notice that the constables are a debt collector attempting to

5    collect a debt?

6         MR. GRASSI:  Object to form.

7    A.    The Mini-Miranda?

8    Q.    Yeah.

9    A.    I do not see it.

10   Q.    And there is no 30-day right to dispute the debt notice

11   either, is there?

12   A.    No.

13   Q.    Let's -- one more question about the previous Exhibit,

14   Exhibit 10.

15         If you had been aware that the constables were sending

16   that letter to the debtors in your cases, would you have stopped

17   them?

18         MR. GRASSI:  Objection, calls for speculation.

19   A.    I don't know the answer to that question.  I'd like to

20   believe that I would, but it's a hypothetical that I -- I don't

21   know.

22   Q.    Irrelevant, because you didn't know they were sending

23   it?

24   A.    Yeah.

25   Q.    Okay.  Let's go to Exhibit 11, then.

Page 76

1         [Exhibit 11 Marked]

2         Have you seen this letter before?

3    A.    I have not.

4    Q.    Okay.  This letter is styled the same way as a legal

5    pleading, correct?

6         MR. GRASSI:  Object to characterization.

7    A.    Ironically, this one looks more like a letter to me.

8    But it does have the elements of a pleading.

9    Q.    It lists the plaintiff and defendant, the parties?

10   A.    Yes.

11   Q.    Case number?

12   A.    Yes.

13   Q.    And it says, in all caps, "PLEASE TAKE NOTE OF THE

14   ATTACHED SALE NOTICE", correct?

15   A.    Yes.

16   Q.    Is this the first time you're seeing this letter?

17   A.    Yes.

18   Q.    This letter doesn't contain a notice that the constable

19   is a debt collector collecting the debt?

20   A.    It does not.

21   Q.    It doesn't contain a notice that says, "You have the

22   right to dispute this debt."?

23   A.    It does not.

24   Q.    Let's turn the page.

25         Is this the first time you're seeing page two of this

Page 77

1    letter?

2    A.    Yes.

3    Q.    Page two of this letter says, "Notice of proposed sale".

4    And it has a date, September 30th, 2022, and a time, 12:40;

5    correct?

6    A.    Yes.

7    Q.    And it says, in all capital letters, "NOTICE IS HEREBY

8    GIVEN", and then it goes in tiny letters that, that they're

9    selling -- basically, it's summarized that they're selling my

10   client's property.

11        Is that fair?

12        MR. GRASSI:  Objection, calls for conclusion.

13   A.    It appears -- yeah, but yes.  The reason for the pause

14   is I don't know where your client is listed on here.

15        Oh, I do see him.

16   Q.    Yeah, the plaintiff is listed as Mountain Land,

17   defendant my client, case number.

18   A.    Yes.

19   Q.    And the place of the sale is listed at my client's home

20   address, correct?

21   A.    Where are you seeing that, Eric?

22   Q.    Right there.

23   A.    It's listed as 18525 Jefferson Ave, Cedar Valley, which

24   I'm assuming is your client's home address.

25   Q.    And this is the first time you're seeing this?

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 78..81

Page 78

1    A.    Yes.
2       Q.    So no one at Mountain Land ever expressed concerns that
3    this letter was being sent on its behalf?
4            MR. GRASSI:  Object to characterization.
5       A.    We didn't know it was being sent on our behalf.
6       Q.    Right.  And so there was no reason to express a concern
7    because you didn't even know?
8       A.    Yes.
9       Q.    Does it concern you now?
10           MR. GRASSI:  Objection.  Calls for speculation.
11      A.    It concerns me now because we're involved in litigation
12   about it that Mountain Land has been named in.  So, yes, it
13   concerns me now.
14      Q.    Okay.  So because you weren't aware of this letter, you
15   never told the constables to stop sending this letter or to make
16   changes to this letter?
17      A.    That's correct.
18      Q.    Before you saw this letter, did you have any indication
19   of any kind that the constables were threatening to sell people's
20   property to collect the judgments for you?
21           MR. GRASSI:  Object to form.
22      A.    No.  The way you asked the question, no.  Those reports
23   they would get from the constable as they would send them -- in
24   fact, no.  I don't know of any of them; I don't know of any.
25           Sit there for a minute while I pick my brain.

Page 79

1            I believe I've seen on those reports that would come in
2    "Set for sale".
3            That's threatening to sell?  No.
4            And that was your question.  I don't know anything about
5    that.
6       Q.    Are you concerned that I call this a threat to sell; is
7    that your concern?
8       A.    I can't remember what your earlier question was, but it
9    implicated awareness of and sanctioning of, and that was the part
10   that caused me concern.
11      Q.    Okay.  And I apologize for that, that was not my intent.
12           My intent was to wonder -- I'm trying to figure out what
13   your level of awareness was, and now I know that it was none.
14           With the report, though, that says "set for sale",
15   there's no follow up from your office to figure out if the sale
16   occurred or not?
17      A.    No.  And I'm not even sure that's the right word, "set
18   for sale", but that was the sentiment.
19      Q.    I don't remember seeing that report in Discovery; are
20   you aware of whether it was disclosed or not?
21      A.    This morning.  It's going to be in your email.
22      Q.    Really?
23           MR. GRASSI:  Yeah, we did supplement this morning.
24      Q.    Okay.
25      A.    And I apologize for that.

Page 80

1       Q.    Well, you don't need to apologize for that.  I don't
2    think that it's your fault; I think that would fall somewhere
3    else.
4            But that does change the way we have to end.  I'm going
5    to have to reserve the right to come back, because I don't know
6    what it says.  I may have other questions about it.
7       A.    I'm happy to answer questions about it.
8       Q.    I feel like you've answered a lot of questions about
9    that report, and maybe we can satisfy that.
10           I haven't seen it, and you've seen it, obviously, right?
11      A.    Yes.
12      Q.    So maybe let's try to exhaust that so we don't have to
13   come back.
14      A.    Great.  I'd love it.
15      Q.    Tell me what it says.  It sounds stupid, but if I don't
16   have a copy, I can't ask you.
17      A.    It's an Excel spreadsheet that contains the name of the
18   consumer, judgment debtor in these cases.  It contains our
19   reference number.
20           I cannot remember what else it contains, but it provides
21   words like "set for payment", "writ", "served".
22      Q.    That wasn't in one of these documents we looked at
23   before?
24      A.    It is in those.  In fact, when I remembered this
25   document, I had a conversation with myself that went, "Wait a

Page 81

1    minute, I don't need to worry too much about producing this
2    because the information is elsewhere."
3            But on this report, you can see it provided to us
4    directly from the constable.  But all that information is in
5    documents that you've been provided.
6       Q.    And do you know which documents we're referring to; is
7    it Exhibit 2?
8       A.    It's going to be in the collection notes.
9            So, yes, if Exhibit 2 is the collection notes, it's
10   going to be in Exhibit 2, MLC 0050 and on, and it's going to be in
11   a whole other stack where we took screenshots of our notes.
12           But it's going to be in the consumer collection notes.
13      Q.    Okay.  And can you show me where it says "set for sale"
14   in these notes?
15      A.    In this case, I don't know if it was.  I'm just
16   answering generally that in the spreadsheet, that's what would
17   be -- that's the kind of information that would be provided to us.
18      Q.    Okay.  And in the document that was either produced this
19   morning or is going to be produced --
20      A.    It was produced this morning.
21      Q.    Is it in my email now?
22      A.    Yes.
23      Q.    Okay.  I can't open that now -- I mean, I can, but I'm
24   not going to in the middle.
25           Do you know if that document specifically says "set for

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 82..85

Page 82

1  sale" and provides any information about that?
2       A.   It's that sentiment.  I can't remember if those are the
3  words, but it's that sentiment.
4       Q.   Okay.  So I'm going to go back to the date here and see
5  if we can trace it down.
6            The letter that we talked about before, Exhibit 11: that
7  says "Please take notice of the attached sale notice."
8            And to me -- the second page says notice of proposed
9  sale -- that letter at the bottom is that little tiny date is
10 September 13th, 2022.
11      A.   Yes.
12      Q.   Can we find that here in Exhibit 2; does that help us
13 locate where it might say "set for sale"?
14      A.   The challenge is, the reports from the constable, the
15 spreadsheet that I'm referring to, that there was no regularity to
16 it.
17           So if it would have been delivered to us on 9/14, one
18 would presumably assume that it would have been in there, but
19 there may not have been a report provided to us on this writ that
20 would be in the notes.
21      Q.   And correct me if I'm wrong, but when I look through the
22 notes in that date range, page MLC 50, page 2 of Exhibit 2, it
23 covers that date range and far more, but I don't see anything that
24 says anything about a notice of sale or a sale being set.
25           Am I correct in that it's not there?

Page 83

1       A.   I'm on MLC 0050, which is that date range, and you are
2  correct.  There is no note about set for sale.
3       Q.   So there's no way to know in a general sense whether
4  other cases the constable set a sale or didn't.
5       A.   That's correct.
6       Q.   It might say it in your notes, but it might not.
7       A.   That's correct.
8       Q.   Do you know what my client did in response to receiving
9  this notice of sale?
10           MR. GRASSI:  Objection, calls for speculation.
11      A.   I know where you're headed, but the way you ask the
12 question is broad.  I don't know what your client did.
13      Q.   Yeah, my question wasn't either of those things.  It was
14 just, "Do you know?".
15      A.   I don't know.
16      Q.   Okay.  There's a process.
17           Are you aware that my client made payments toward the
18 judgment?
19      A.   Yes.
20      Q.   And he made those payments through the constables?
21      A.   Presumably so, yes.
22      Q.   The constables sent you some money?
23      A.   Yes.
24      Q.   I'm going by memory now: I think they sent you $45 for
25 each of the payments?

Page 84

1       A.   They sent four payments.  Three were $45; the fourth, if
2  my memory is correct, is an $80 payment.
3       Q.   Correct.  Yes.
4            And you don't know the total amount they collected prior to
5  sending -- you don't know the total amount they actually
6  collected?
7       A.   I do not.
8       Q.   So how -- it's not Mountain Land that determines how
9  much the constables are paid, it's the constables?
10      A.   Our understanding is that's set by law, yes.
11      Q.   The constables don't get an hourly wage or a salary to
12 collect for you?
13      A.   No.
14      Q.   Just the commission of what -- not commission, let's not
15 call it that -- just the amounts they collect and keep?
16      A.   Our understanding is that the amounts they earn are
17 authorized by statute or by law.
18      Q.   Okay.  Did you ever follow up -- well, no, let me go
19 back to Exhibit 10.
20           Exhibit 10 has a $50 service fee, $105 mileage fee.
21      A.   Hang on while I catch up with you.  I'm on 11.
22      Q.   10.
23      A.   Yes, got it.
24      Q.   Okay.  It has a $50 service fee, $105 mileage fee, an
25 $88.13 commission, and a $15 notice fee; correct?

Page 85

1       A.   Yes.
2       Q.   And it's your understanding that those amounts are based
3  on -- well, not your understanding: you didn't set those amounts?
4       A.   We did not set those amounts.
5       Q.   Do you have any verification that the constables
6  actually earned those amounts?
7       A.   We do not.
8       Q.   You don't have confirmation the constables actually
9  earned a service fee of $50?
10      A.   No.
11      Q.   You have no confirmation that the constables actually
12 incurred $105 in mileage?
13      A.   No.
14      Q.   And the notices fee of $15, do you know what that
15 covers?
16      A.   No.
17      Q.   And you don't know if it was actually earned or not?
18      A.   I do not.
19      Q.   The commission of 88.13, do you know how that's
20 calculated?
21      A.   I do not, and I don't know what a commission is.
22      Q.   You don't know if they actually earned it or not either?
23      A.   No.
24      Q.   Okay.  All right.  Let's go through these.
25           Okay.  I'm handing you Exhibit 12.

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 86..89

Page 86

1          [Exhibit 12 Marked]
2     Q.   Do you recognize this document?
3     A.   [Sneezes]  Take that down.
4          I do not.
5     Q.   Do you need a tissue?
6     A.   Yeah, can we --
7     Q.   Take a break, let's go on a break.
8          [Off the record at 12:01 p.m.]
9          [Back on record at 12:07 p.m.]
10         MR. HILL:  I wanted to add a clarification/correction to
11 the record.
12         When we commenced this, I made an appearance on behalf
13 of Rob Kolkman and Constable Kolkman LLC.  And I accidentally
14 omitted the fact that I represent all of the defendants in this
15 action other than Mountain Land Collections.
16 BY MR. STEPHENSON:
17    Q.   Let's go to Exhibit 12.
18         Have you seen Exhibit 12 before today?
19    A.   No.
20    Q.   You didn't approve this letter or see this letter prior
21 to it being mailed to my client?
22    A.   No.
23    Q.   You're not even aware if it was mailed to my client?
24    A.   Correct.
25    Q.   Exhibit 13.

Page 87

1          [Exhibit 13 Marked]
2          Do you recognize Exhibit 13?
3     A.   I do not.
4     Q.   This is not -- I'm sorry, does it appear to be a letter?
5     A.   It does, yes.
6     Q.   And it's got the plaintiff, defendant, case numbers,
7  same as the other one?
8     A.   Yes.
9     Q.   Is this the first time you've seen this letter?
10    A.   Yes.
11    Q.   So you didn't write this letter or approve of this
12 letter being mailed on your behalf?
13    A.   No, no.
14    Q.   Let's go to Exhibit 14.
15         [Exhibit 14 Marked]
16         Exhibit 14 is -- have you ever seen Exhibit 14 before?
17    A.   No.
18    Q.   So you didn't write Exhibit 14 or approve of it being
19 sent on your behalf?
20    A.   That is correct.
21    Q.   And you never expressed concerns about it being sent on
22 your behalf because you didn't know it was?
23    A.   Correct.
24    Q.   Okay.
25         [Exhibit 15 Marked]

Page 88

1          Exhibit 15 is another letter similar to the two we just
2  looked at; is that correct?
3     A.   It is, yes.  But the date is different.
4     Q.   The date is different.
5          Is this the first time you've seen this letter?
6     A.   Yes.
7     Q.   And so you didn't write this letter or approve of it?
8     A.   Correct.
9          [Exhibit 16 Marked]
10    Q.   Exhibit 16: is this the first time you've seen Exhibit
11 16?
12    A.   Yes.
13    Q.   So you're not aware of why it looks like a legal
14 pleading?
15    A.   No, sir, I'm not.
16    Q.   And you didn't write it?
17    A.   We did not.
18    Q.   And you didn't mail it?
19    A.   That is correct.
20    Q.   And you didn't express any concern about it being mailed
21 because you didn't know it was being mailed?
22    A.   Correct.  I don't even know if it was mailed.
23    Q.   Okay.  Let's do Exhibit 17.
24         [Exhibit 17 Marked]
25         Is this the first time you've seen Exhibit 17?

Page 89

1     A.   Yes.
2     Q.   So you didn't write Exhibit 17?
3     A.   That is correct.
4     Q.   You didn't approve of Exhibit 17 being mailed to collect
5  the judgment for you?
6     A.   That is correct.
7     Q.   And you're not aware of why it's formatted the same way
8  as the others with the plaintiff and defendant and case number
9  like a pleading, right?
10    A.   I'm not aware.
11    Q.   Okay.
12         [Exhibit 18 Marked]
13         Do you recognize Exhibit 18?
14    A.   I do not.
15    Q.   Okay.  This was provided by the constables in discovery.
16         Is this the first time you've seen it?
17    A.   Yes.
18    Q.   So this document appears to be three payments of $84,
19 correct?
20    A.   It appears there was an $84 payment made on December
21 6th, an $84 payment made on October 28th, and an $84 payment made
22 on September 26th.
23    Q.   And you don't know where this comes from or if those
24 numbers are accurate?
25    A.   I do not, that is correct.

Page 90

1    Q.   And you don't have any way of verifying if these numbers
2  are the ones that were collected by the constables in collecting
3  the judgment from my client?
4    A.   That's correct.
5    Q.   When you look at the bottom and it says "$81.33
6  transferred" and the fees keyed, the total of that is $2.67 -- you
7  don't know what that means, do you?
8    A.   I don't.
9    Q.   Exhibit 19.
10        [Exhibit 19 Marked]
11        Do you know what Exhibit 19 is?
12   A.   I do not.
13   Q.   It's got a dollar amount of $167, correct?
14   A.   It does, yes.
15   Q.   And it's not -- this is provided by the constables, so
16 you don't know if it's accurate or not?
17   A.   That is correct.
18   Q.   And you don't know how much of this $167 was kept by the
19 constables compared to paid to you?
20   A.   That is correct.
21   Q.   And you don't know how much of this was paid to anyone
22 else?
23   A.   That's correct.
24   Q.   And the same is true for the previous exhibit that's
25 showing those payments of $84 each: you don't know if the

Page 91

1  constables sent any of that money to someone other than themselves
2  and Mountain Land Collections?
3    A.   That is correct.
4         [Exhibit 20 Marked]
5    Q.   This is Exhibit 20.  Do you recognize this exhibit?
6    A.   I do.
7    Q.   Tell me what Exhibit 20 is.
8    A.   This is a printout of the payment screen in Debt$Net.
9    Q.   And this reflects the four payments we talked about
10 earlier, correct?
11   A.   That is correct.
12   Q.   And it shows a payment of $45 on 9/29/2022?
13   A.   Correct.
14   Q.   And on November 18th, 2022, another $45 payment?
15   A.   That's correct.
16   Q.   And on December 16th, 2022, another $45 payment?
17   A.   That's correct.
18   Q.   And on January 30th, 2023, an $80 payment?
19   A.   That is correct.
20   Q.   And those are amounts that the constables remitted to
21 Mountain Land?
22   A.   That is correct.
23   Q.   They're not payments my client made directly to Mountain
24 Land?
25   A.   That is correct.

Page 92

1    Q.   And those amounts -- this document is created by putting
2  the amount actually received by Mountain Land?
3    A.   Into Debt$Net, yes.  That is correct.
4    Q.   Okay.  It's not based on what the constables told you;
5  it's what the constables gave you.
6    A.   That is correct; what they remitted to us.
7    Q.   Okay.  So one of the things -- let's talk about your
8  defenses in this case.
9         Go to the normal -- the standard bona fide error
10 defense, let's talk about that.
11        Can you identify what violations of the Fair Debt
12 Collection Practices Act occurred?
13        MR. GRASSI:  Objection.  Calls for speculation, legal
14 conclusion.
15   A.   I cannot.
16   Q.   And what about errors; can you identify what errors
17 occurred in the collection process?
18        MR. GRASSI:  Objection, calls for speculation.
19   A.   I cannot.
20   Q.   You're not factually aware of any errors?
21   A.   No.
22   Q.   I make a little chart and I want to fill that in.
23        So on violations, I'm putting none.
24        Is that okay?
25   A.   None that I'm aware of.

Page 93

1    Q.   Right.  And errors, none that you're aware of.
2         That's fair?
3    A.   None that I'm aware of.
4    Q.   Correct.  And then the procedures is the last chart.
5         Because we haven't identified any errors or violations,
6  is it possible for you to provide a list or a categorization of
7  the procedures that are in place to avoid those specific errors?
8         I know that there's no errors identified and it's
9  stupid, but can you identify any procedures that would have
10 prevented any of the violations that I allege occurred in this
11 case?
12        MR. GRASSI:  Objection to form.
13   Q.   Let me stop.
14        You've got procedures in place?
15   A.   Yes.
16   Q.   And you've got a lot of procedures in place?
17   A.   Yes.
18   Q.   And those procedures are meant to prevent violations of
19 the FDCPA?
20   A.   That is correct.
21   Q.   You train your employees?
22   A.   Correct.
23   Q.   You monitor your employees?
24   A.   Yes.
25   Q.   You record the calls?

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 94..97

Page 94

1   A.   Yes.

2   Q.   And there's a lot more?

3   A.   Yes.

4   Q.   Are any of those procedures designed to prevent a
5   constable from making illegal threats in your name?

6        MR. GRASSI:  Object to form.

7   A.   No.  There are no policies specifically geared to the
8   constable's post-collection behavior or pre-collection behavior,
9   because our view is the constables are an authorized agent of the
10  courts or the counties.  And we're not -- we can't control them.

11  Q.   When you say you can't control them: it is possible,
12  though, that you could you could have called them or emailed them
13  and told them to stop collecting or stop doing anything at all to
14  collect money from my client?

15       MR. GRASSI:  Objection, calls for speculation.

16  A.   We did do that; we recalled the writ.

17  Q.   Right.

18  A.   That's what we believe our appropriate -- that's what
19  our authority is.

20  Q.   Right.

21  A.   We were recalling the writ.

22  Q.   And if you had known earlier what they were doing, you
23  would have recalled the writ earlier?

24       MR. GRASSI:  Objection, calls for speculation.

25  A.   I would like to believe we would.

Page 95

1   Q.   And you have you taken any disciplinary action against
2   anyone with regard to what events of this case happened?

3   A.   No.

4   Q.   Can you identify any procedures that you have that might
5   have prevented my client from receiving these letters from the
6   constables?

7        MR. GRASSI:  Object to form.

8   A.   The list is long.  The answer is yes, at any point
9   during the process, he could have engaged with us and paid or set
10  up a payment plan.

11  Q.   But that's not an internal procedure, that's just your
12  characterization of what my client could have done?

13  A.   Yes.

14  Q.   Are there any internal procedures that would have
15  stopped the constables from collecting?

16       MR. GRASSI:  Object to form.

17  A.   Again, our view is we don't control the constables;
18  they're agents of the court, of the county.  And so to draft
19  policies on them is just outside even our view.

20  Q.   Let's -- so in procedures I'm going to put none, then.
21       Is that fair?

22  A.   Applicable to the constables?

23  Q.   Yeah.

24  A.   Yes.

25  Q.   Okay.  We're almost done.  This is going much quicker

Page 96

1   than I thought.

2        Let's go on to other defenses, though.

3   A.   You bet.

4   Q.   One of them is what you just discussed, is that is
5   the -- I characterize it as the plaintiff's damages are his own
6   fault because he didn't pay you.

7        Is that a fair assessment of what you allege?

8   A.   If it came across that way, that's one interpretation;
9   that's not the interpretation that Mount Lamb intended.

10       The interpretation was we're involved in litigation,
11  it's ongoing, and there may be documents and information in the
12  possession of the plaintiff that we don't know about.  And so
13  we're going to preserve that affirmative defense.

14  Q.   Okay.  Yeah, you mentioned in your discovery -- excuse
15  me, your answer basically that my client caused his own damages.

16       And you did kind of allude to that here: that in your
17  procedures, that he could have called and made a payment and
18  stopped all of this.

19  A.   He could have called at any time, yes.

20  Q.   If he had called -- no, well, yeah.

21       What's the procedure when you send a writ of execution
22  to the constables, what happens if the debtor calls your firm
23  instead?

24  A.   We'll accept payments from him.

25  Q.   Okay.  You don't tell him, "Call the constables."?

Page 97

1   A.   No.  I suppose we could.

2   Q.   Yeah.

3   A.   But if they want to engage with us, we'll engage with
4   them.

5   Q.   Okay.  When you sent the writ to the constables,
6   Mountain Land stopped its own efforts to collect the debt, didn't
7   it?

8   A.   Yes.  In our mind, all of our efforts had been
9   exhausted.

10  Q.   Right.  There was no reason to continue on your end,
11  because the constables now had a different procedure to follow?

12  A.   We had obtained a writ that had been issued by the court
13  and we delivered it to the constables.

14  Q.   Right.  You gave the writ to the constables to execute,
15  so you don't want to keep calling and collecting because you've
16  exhausted that already.  You've essentially leveled it up?

17  A.   Yes.  Although, we'll never stop our own efforts to try
18  and collect.

19       We may skip trace.  We're not going to call the consumer
20  anymore, but we may see if we can find a place of employment.

21  Q.   Okay.  But in this case, you did stop calling and
22  sending letters?

23  A.   That's correct.

24  Q.   So you stopped seeking payment from my client directly;
25  you just left that in the hands of the constables?

CHARLES YOUNG vs MOUNTAIN LAND COLLECTIONS
QUINN KOFFORD - 04/23/2024

30(b)(6), Confidential
Pages 98..101

Page 98

1    A.   No.  What we put in the hands of the constables was a
2  validly issued writ of execution so that they could perform their
3  functions.
4    Q.   Okay.  The other -- you also raised failure to mitigate
5  damages, which is essentially kind of what we're discussing
6  already, but it was framed as a second defense.
7         Can you tell me what my client -- how he could have
8  mitigated his damages here?
9    A.   Well, again, the concept behind that affirmative defense
10 is we're involved in ongoing litigation.  Discovery continues,
11 your client may be in possession of information that we don't
12 know, so preserve the defense.
13        But as already stated, at any time he could have
14 called -- or, as our notes indicate, he could have called back the
15 next couple of days when he said he was going to and it would have
16 stopped everything.
17   Q.   Are you aware of anything my client could have done to
18 stop the constables from threatening to take his property?
19        MR. GRASSI:  Object to form.
20   A.   I'm unaware of anything.  There is a reply and request
21 form that we deliver to the constables as part of the writ.
22   Q.   Other than that reply and request form, are you aware of
23 anything else my client -- and other than the reply and request
24 for a hearing and paying, is there anything else my client could
25 have done to prevent these threats being made against him?

Page 99

1         MR. GRASSI:  Object to form.
2    A.   I don't know.
3    Q.   You also mentioned in your defense the statute of
4  limitations.  Do you know the factual basis for that?
5    A.   Yeah, again, it's the same concept.  There seems to be
6  kind of a little bit of a moving target.
7         And as a result, the preservation of statute of
8  limitations, anything that happened a year ago or more under the
9  FDCPA is precluded by the statute of limitations.
10        So that's what that is.
11   Q.   We are very close.  I want to talk about preservation
12 issues, spoliation type of stuff.
13        Did you destroy any evidence in this case?
14   A.   No.
15   Q.   Did you conceal any evidence?
16   A.   No.
17   Q.   Because, I mean, is it fair to say that you took all
18 reasonable steps to preserve whatever evidence was relevant to the
19 case?
20   A.   Yes.
21   Q.   And when you answered discovery requests, your discovery
22 responses, you had an attorney representation with that?
23   A.   Yes.
24   Q.   And you knew your obligations and what you needed to
25 provide and what you had to say and what you could not say?

Page 100

1    A.   Yes.
2    Q.   Are you aware of all the objections that were made in
3  your discovery responses?
4    A.   Yes.
5    Q.   Okay.  And you're aware of what documents were produced?
6    A.   Correct.  Yes, I am.
7    Q.   And are any documents being withheld that haven't been
8  discussed yet?
9    A.   Yes.
10   Q.   And what are those documents?
11   A.   Well, that's a good question.
12        The agreements with our original creditor clients,
13 information that doesn't pertain to Mr. Young.
14        And I'm struggling to remember the other stuff, Eric.
15 We tried our darndest to produce as much as possible.
16   Q.   When you say information pertaining to other debtors,
17 can you be a little more specific on what that was?
18   A.   Well, in some of the information that was provided to
19 you, there was information that was redacted.
20   Q.   Yes, there was a lot redacted.  And that was payments?
21   A.   Yes, that's what I'm referring to:  anything with regard
22 to another judgment debtor wasn't produced.  It was part of what
23 was produced but redacted.
24   Q.   Yeah.  Those other payments are fine to redact, I have
25 no issues with that.

Page 101

1         But I want to make sure there weren't documents withheld
2  that I am supposed to be worried about.
3    A.   No.
4    Q.   Nothing like that.
5    A.   And -- yeah.
6    Q.   Okay.  Did you make any efforts to talk to the
7  constables when this case -- other than what you've already
8  discussed when I called you and we discussed this case and what
9  was happening, did you talk to the constables about it other than
10 that?
11   A.   No.  And I wished our system weren't built that way, our
12 legal system.
13   Q.   One thing I'm curious about:  in your discovery
14 responses, and I don't have a copy to show you, but you mentioned
15 that you don't have attorney-client privilege with the original
16 creditor.
17        Is that accurate?
18   A.   That is accurate.
19   Q.   And the reason for that is because of the way the debts
20 are assigned to Mountain Land to collect in its own name?
21   A.   That, and I as an attorney don't want to represent the
22 original creditors.  To me, it creates a problem.
23   Q.   Do you know anything about why Constable Kolkman left
24 Wasatch Constables?
25   A.   I don't even know who Wasatch Constables is, so no.

Page 102

1    Q.    You're not aware that he used to own it?

2    A.    No.

3    Q.    Have you tried to send writs of execution to any other

4    constables besides Sindt, Kolkman, and Erickson for the purpose of

5    collecting the judgments?

6    A.    We've not sent any writs to any constables office other

7    than those, period.

8    Q.    When you do writs of garnishment, do they go to these

9    same three constables?

10    A.    No.

11    Q.    Who do you send those to?

12    A.    We use a variety depending on where the employer is.

13    Q.    And you don't send those other variety of constables

14    writs of execution?

15    A.    No.

16    Q.    And what is the reason for focusing the writs of

17    execution on these three constables and only these three

18    constables?

19    A.    It doesn't have anything to do with the constables; it

20    has everything to do with the concentration of our clients and our

21    primary business, Utah County.

22    Q.    Okay.  I have no other questions.

23    MR. GRASSI:  A couple cleanup questions, but should not

24    take long.

25    BY MR. GRASSI:

Page 103

1    Q.    So we talked briefly about documents produced.

2    Other than documents that were specifically withheld,

3    has Mountain Land produced all relevant documents requested?

4    A.    Yes.

5    Q.    And are you Quinn Kofford, a licensed attorney?

6    A.    I am.

7    Q.    And so when you filed that action, you filed it as an

8    attorney on behalf of Mountain Land Collections LLC?

9    A.    I did, yeah.

10    Q.    And to your knowledge, can a limited liability company

11    file a lawsuit without an attorney?

12    A.    No.  To the best of my knowledge, they cannot.

13    Q.    And then I do want to talk briefly about the documents

14    that were sent this morning.

15    You mentioned a set for sale; was there a spreadsheet

16    indicating Mr. Young's property had been set for sale?

17    A.    Not that I recall, no.

18    Q.    But that is a general spreadsheet?

19    A.    Yes.

20    Q.    Okay.  I think that's all I have.

21    MR. STEPHENSON:  Mr. Hill?

22    MR. HILL:  I have no questions of this witness.

23    MR. STEPHENSON:  Okay.  I have no follow-up questions.

24    THE WITNESS:  This was easy.

25    THE STENOGRAPHER:  Can I get an interest in copy orders.

Page 104

1    Mr. Grassi?

2    MR. GRASSI:  Yes, electronic is fine.

3    THE STENOGRAPHER:  Great.

4    Mr. Hill, are you interested in copy?

5    MR. HILL:  Yes, electronic as well, thank you.

6    THE STENOGRAPHER:  Sounds good.

7    And sir, are you interested in a read and sign?

8    MR. GRASSI:  Yes, he is.

9    THE STENOGRAPHER:  Through you?

10    MR. GRASSI:  Yes.

11    THE STENOGRAPHER:  Okay, great.

12    THE WITNESS:  If there's anything worse than hearing

13    your own voice, it's reading your own voice.

14    THE STENOGRAPHER:  And an electronic copy for you?

15    MR. STEPHENSON:  Yes.

16    [Adjourned at 12:32 p.m.]

17

18

19

20

21

22

23

24

25

Page 105

1    CERTIFICATE OF DEPONENT

2    PAGE    LINE    CHANGE

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    I, Quinn Kofford, deponent herein, do hereby certify and

19    declare under penalty of perjury the within and foregoing

20    transcription to be my deposition in said action; that I have

21    read, corrected, and do hereby affix my signature to said

22    deposition.

23    _____

24    Quinn Kofford, Deponent

25

Page 106

```
 1                REPORTER'S CERTIFICATE

 2   STATE OF UTAH )

 3   COUNTY OF UTAH )

 4          I, Spencer Von Jarrett, a Certified Shorthand Reporter,

 5   Registered Professional Reporter, hereby certify:

 6          THAT the foregoing proceedings were taken before me at

 7   the time and place set forth in the caption hereof; that the

 8   witness was placed under oath to tell the truth, the whole truth,

 9   and nothing but the truth; that the proceedings were taken down by

10   me in shorthand and thereafter my notes were transcribed through

11   computer-aided transcription; and the foregoing transcript

12   constitutes a full, true, and accurate record of such testimony

13   adduced and oral proceedings had, and of the whole thereof.

14          I have subscribed my name on this 23rd day of April,

15   2024.

16          _____

17          Spencer Von Jarrett

18          Registered Professional Reporter #993793

19

20

21

22

23

24

25
```