Exhibit P-16

Page 1

```
 1              UNITED STATED DISTRICT COURT

 2        FOR THE DISTRICT OF UTAH CENTRAL DIVISION

 3                     – – –

 4   TARA PERETTO,                )
                                  )
 5        Plaintiff,              )   Case No. 1:23-cv-00025
                                  )
 6   vs.                          )   Judge David B. Barlow
                                  )
 7   THE CHERRINGTON FIRM, et al., )
                                  )
 8        Defendants.             )
                                  )
 9   ------------------------------

10

11                 DEPOSITION OF

12               LACY CHERRINGTON

13               JD LEGAL SUPPORT

14                  LEHI, UTAH

15               JANUARY 30, 2025

16

17

18

19

20

21

22

23

24

25
```

**CERTIFIED COPY**

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 2..5

Page 2

1  APPEARANCES OF COUNSEL:
2  FOR PLAINTIFF:
3        Eric Stephenson
          STEPHENSON LAW FIRM
4        250 North Redcliffs Drive, 4B #254
          St. George, Utah 84790
5        801.386.5200
          Ericstephenson@utahjustice.com
6
7
8  FOR FOR DEFENDANTS:
9        Ronald F. Price
          PRICE PARKINSON & KERR
10       5742 West Harold Gatty Drive
          Salt Lake City, Utah 84116
11       801.530.2964
          Ronprice@ppktrial.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  INDEX OF EXHIBITS (Cont.)
   EXHIBIT                                          PAGE
2
   No. 12   Email With Attached Status Update From   151
3            Erickson to Kerby
4  No. 13   Email With Attached Status Update From   155
            Erickson to Kerby
5
   No. 14   Email With Attached Status Update From   157
6            Erickson to Kerby
7  No. 15   Email With Attached Status Update From   160
            Erickson to Kerby
8
   No. 16   Email With Attached Status Update From   161
9            Erickson to Kerby
10 No. 17   CUBS System Notes (Cherrington00151)     167
11 No. 18   Constables Notes - 210653 Tara Peretto   202
            (CONSTABLES000088)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  LACEY CHERRINGTON, WITNESS
2  INDEX OF EXAMINATION
3  Examination by Mr. Stephenson                        5
4  Witness Instructed Not To Answer                     6
5  Witness Instructed Not To Answer                    39
6  Examination by Mr. Price                           205
7  Reporter's Certificate                             207
8
   INDEX OF EXHIBITS
9  EXHIBIT NO.                                       PAGE
10 No. 1    Writ of Execution Re Peretto               98
11 No. 2    Constable's Proof of Service              110
            (CONSTABLES000086)
12
   No. 3    Writ of Execution Cost Tally              111
13
   No. 4    Constable's Office Payor's Receipt For    115
14          Payment
15 No. 5    Utah County Constable's Office            117
            Correspondence
16
   No. 6    Utah County Constable's Office            118
17          Correspondence
18 No. 7    Utah County Constable's Office            120
            Correspondence
19
   No. 8    Utah County Constable's Office            122
20          Correspondence
21 No. 9    Utah County Constable's Office            129
            Correspondence
22
   No. 10   Utah County Constable's Office            132
23          Correspondence (CONSTABLE000091)
24 No. 11   Email With Attached Status Update From    141
            Erickson to Kerby (CONFIDENTIAL)
25

Page 5

1  LEHI, UTAH, THURSDAY, JANUARY 30, 2025, 10:10 A.M.
2                    - - -
3              LACEY CHERRINGTON,
4  having been first duly sworn, testified as follows:
5                  EXAMINATION
6  BY MR. STEPHENSON:
7      Q.   Will you state your name for the record.
8      A.   Lacey Cherrington.
9      Q.   And the company you work for.
10     A.   The Cherrington Firm.
11     Q.   And your title at that company.
12     A.   I'm the president.
13     Q.   And you own the company?
14     A.   I do.
15     Q.   Does anyone own it with you?
16     A.   Nobody else but me.
17     Q.   What did you do to prepare for today's
18 deposition?
19     A.   I looked through a lot of documents, talked
20 to my attorney.
21     Q.   Do you remember what documents you looked at?
22     A.   I looked at --
23     MR. PRICE:  I'm going to -- first off, I want to
24 make sure that the witness doesn't disclose any work
25 product or attorney-client information, so I'll counsel

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 6..9

Page 6

1 you to limit your answer to yes or no as to whether you
2 remember what you looked at. That's the question.
3 Don't -- I don't want you to disclose the details of
4 what documents you looked at since that's privileged.
5 THE WITNESS: Okay. I looked at a lot of
6 documents.
7 **Q. (BY MR. STEPHENSON) Okay. And what documents**
8 **did you look at?**
9 MR. PRICE: Objection; calls for a disclosure of
10 work product and instruct the witness not to answer.
11 **Q. (BY MR. STEPHENSON) Are you refusing to**
12 **answer the question?**
13 A. Yeah.
14 **Q. Did those documents refresh your recollection**
15 **of the case?**
16 A. I wouldn't say refresh my recollection. I
17 looked through a lot of documents.
18 **Q. What was the purpose of looking through the**
19 **documents?**
20 A. To prepare for today's testimony.
21 **Q. Okay. And was it to prepare by refreshing**
22 **your memory of the events?**
23 A. It was to prepare for the questions today.
24 **Q. Okay. Was any part of that to refresh your**
25 **memory?**

Page 7

1 MR. PRICE: Objection; asked and answered.
2 **Q. (BY MR. STEPHENSON) Okay. Well, then I'll do**
3 **this. Objection to your answer, it was nonresponsive.**
4 **Did you -- was part of your preparation of**
5 **reading those documents meant because you needed to**
6 **refresh your recollection of the events?**
7 A. No.
8 **Q. Okay. So you remember -- how many cases do**
9 **you handle in a year?**
10 A. In a year? Oh, we prepare about 250 a month.
11 **Q. And this case was filed, excuse me, not this**
12 **case, the case against Tara Peretto. You filed that**
13 **when?**
14 A. I think it was 2021. I don't remember.
15 **Q. Okay. And so if we do 250 monthly from 2021,**
16 **that's a couple thousand cases since you file the case**
17 **against my client?**
18 A. Mm-hm.
19 **Q. Is that a yes?**
20 A. Yes.
21 **Q. And you remember my client then out of all**
22 **those clients?**
23 A. Yes.
24 **Q. And why do you remember my client's case**
25 **specifically?**

Page 8

1 A. Well, I reviewed some documents yesterday and
2 you sued me on this case.
3 **Q. Okay. So the documents you reviewed**
4 **yesterday did refresh your recollection of the events?**
5 A. No, I wouldn't say refresh my recollection.
6 I reviewed a lot of documents.
7 **Q. Okay. So are you testifying that you**
8 **remembered my client and her case before you read those**
9 **documents yesterday?**
10 A. Yes.
11 **Q. Okay. And you met with your attorney to**
12 **prepare?**
13 A. Yes.
14 **Q. How long did you meet with him?**
15 A. I don't remember.
16 **Q. Was it yesterday?**
17 A. Yes.
18 **Q. Can you give me a ballpark of how long it**
19 **was?**
20 A. 30 minutes yesterday.
21 **Q. Was anyone else there?**
22 A. No.
23 **Q. How long have you been with the company?**
24 A. Since its exception in 2014.
25 **Q. And you've been the owner since then?**

Page 9

1 A. Correct.
2 **Q. So I have a couple of pages of questions and**
3 **your answer -- you can actually short cut that if you**
4 **want.**
5 A. Okay.
6 **Q. I'm going to ask you first is Cherrington Law**
7 **Firm a debt collector under the FDCPA?**
8 A. I believe so, yes.
9 **Q. Okay.**
10 A. That will help speed up your questions.
11 **Q. That will eliminate many questions. Thank**
12 **you.**
13 I will ask some of them, but thank you,
14 because that does help a lot. I appreciate your
15 cooperation.
16 **Does your firm do anything other than**
17 **collecting consumer debts to generate revenue?**
18 A. We don't do anything but collections.
19 **Q. And those are -- are they consumer debts or**
20 **business also?**
21 A. Business also.
22 **Q. Okay. Do you know the percentage?**
23 A. I don't.
24 **Q. Is it mostly consumer?**
25 A. The majority, yes.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 10..13

Page 10

1    Q.    And when you collect debts from consumers, do
2    you use the mail?
3    A.    Yes.
4    Q.    Do you use the telephone?
5    A.    Yes.
6    Q.    Do you use email?
7    A.    We're starting to.
8    Q.    Fax?
9    A.    With consumers, no.  I guess if they request
10   it, so that -- there's a chance.
11   Q.    Occasionally?
12   A.    Sure.
13   Q.    Text message?
14   A.    Starting to.
15   Q.    Do you use couriers like USPS or Fed Ex?
16   MR. PRICE:  I just want to object to the
17   questions.  I think it's vague and ambiguous.  When you
18   say you, are you talking about her personally or the
19   firm?
20   MR. STEPHENSON:  Oh.  Good point.  Good point.
21   Sorry, we -- I do that and I'm sorry.
22   Q.    (BY MR. STEPHENSON) When I say you, I
23   sometimes mean your company, sometimes I mean you.
24   I'll be more clear.
25   A.    And I sometimes might say me when I mean the

Page 11

1    firm as well, so do we need to clarify that as we're
2    each answering --
3    Q.    I didn't --
4    A.    -- and asking?
5    Q.    I didn't think so because I think -- I think
6    my questions are pretty clear that I'm not asking
7    specifically about you, I'm asking about the company,
8    but I can clarify.  That's fine.  So let's just go
9    backwards.
10   A.    Okay.
11   Q.    Your firm uses mail, telephone, email, fax,
12   and text messages to collect debts?
13   A.    Yes.
14   Q.    Okay.  And then I was going to say does your
15   firm UPS or Fed Ex?
16   A.    To collect debts, no.
17   Q.    Does the firm use process servers,
18   constables, or police officers to collect debts?
19   A.    We use -- to collect debts the -- the process
20   servers assist in that, but they don't actually collect
21   debts.
22   Q.    What about constables?
23   A.    The constables, well, the constables we
24   assign a writ of execution to them and they do what
25   they do.

Page 12

1    Q.    Police, sheriffs, anything like that?
2    A.    Nope.
3    Q.    And you take payments from consumers?
4    A.    Yes.
5    Q.    You take payment -- or excuse me again.  Your
6    firm takes payments from consumers by mail, telephone,
7    electronic, or through your website?
8    A.    Mail, yes.  Telephone, yes.  Through our
9    website, yes.  Well, the website is through a
10   third-party processor, but I don't think that's
11   important.
12   Q.    And you file lawsuits against consumers?
13   A.    Yes.
14   Q.    And that's done through the court's online
15   filing system?
16   A.    Yes.
17   Q.    Are you familiar with the Fair Debt
18   Collection Practices Act?
19   A.    I am.
20   Q.    And you've been running this firm since how
21   long?
22   A.    Since 2014.
23   Q.    And you've been familiar with the FDCPA then
24   for over a decade here?
25   A.    Correct.

Page 13

1    Q.    So you're familiar -- and then this time I am
2    speaking specifically of you.  Okay.
3    A.    Okay.
4    Q.    Because I'm not asking about your firm's
5    familiarity, although, I think it's transferable in
6    some way, but you tell me if I'm wrong.
7    Do you specifically have more than -- or do
8    you know what the FDCPA prohibits and requires?
9    A.    I would like to think I do, yes.
10   Q.    And are you familiar with what the FDCPA
11   allows?
12   A.    I would like to think so, yes.
13   Q.    And what efforts does your firm make to
14   assure compliance with the FDCPA?
15   A.    Training.
16   Q.    What kind of training?
17   A.    The ACA provides a really great training for
18   the FDCPA, and we use that.
19   Q.    How much time does it take for you to train a
20   new employee to the full finishing product of when
21   they're ready to work?
22   A.    Oh.  I would say at least three, four months.
23   Q.    And is that all through the ACA, that
24   training?
25   A.    The majority, yes.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                              Pages 14..17

Page 14

1    Q.   Is it on the internet or in person?
2    A.   I think it's still on a disk if you really
3    want to know the details.  On a disk, I believe.
4    Q.   And so the training involves the person
5    sitting at a desk watching videos and taking tests?
6    A.   Yes.
7    Q.   Do they also listen in to phone calls, live
8    calls?
9    A.   Once they're to a certain point, yes, they
10   would listen to live phone calls.
11   Q.   And then eventually they'll actually start
12   taking live calls with a coach?
13   A.   Yes.
14   Q.   And what about mailing letters?  Do they do
15   that sooner or they wait until that process is
16   complete?
17   A.   Well, an individual collector doesn't mail a
18   letter.
19   Q.   So the collector's job is to do what
20   specifically?
21   A.   That's a pretty broad question.
22   Q.   Okay.  So let's say who -- who's mailing the
23   letters if it's not collectors?
24   A.   And are we talking prejudgments?  Just
25   overall --

Page 15

1    Q.   Yeah, yeah.  I'm --
2    A.   -- overall collect -- prejudgments?
3    Q.   Yes.
4    A.   Talking prejudgments?
5    Q.   Yes.
6    A.   They call on the telephone.
7    Q.   Okay.  And that's what the collectors do?
8    A.   That's what the collectors do.
9    Q.   And they take incoming calls?
10   A.   Correct.
11   Q.   And in those calls sometimes they take
12   payments?
13   A.   Yes.
14   Q.   And they are -- those collectors don't mail
15   letters?
16   A.   The system mails letters.
17   Q.   Do you use a third party for that?
18   A.   We do.
19   Q.   Who do you use to send the letters?
20   A.   We do it through the software Columbia
21   Ultimate or CUBS for short.
22   Q.   And, I'm sorry, I heard Columbia Ultimate?
23   A.   Columbia Ultimate.
24   Q.   Okay.
25   A.   Which they've recently sold, but we still

Page 16

1    refer to the software as CUBS.
2    Q.   Okay.  So in CUBS you will have access for a
3    computer at your office?
4    A.   Yes.
5    Q.   And you'll tell it which letters to send and
6    when?
7    A.   Yes.
8    Q.   And then CUBS is a third-party service that
9    prints those letters and mails them?
10   A.   Yes.
11   Q.   And --
12   A.   And I believe they have outsourced that as
13   well, but it's done through the software.
14   Q.   Okay.  And the letters CUBS sends for you,
15   who wrote those?
16   A.   I wrote those.
17   Q.   All of them?
18   A.   From scratch, no, it wasn't -- it wasn't me
19   on all of them from scratch, but I reviewed all of
20   them.
21   Q.   And the ones that you didn't write from
22   scratch, who wrote those?
23   A.   I would have received them from somebody in
24   the industry, but they would have been vetted by me
25   before they were put into -- into place.

Page 17

1    Q.   Why would you vet them before putting them
2    into place?
3    A.   To make sure they are in compliance.
4    Q.   And when you say in compliance, you mean with
5    the FDCPA's requirements?
6    A.   Yes, correct.
7    Q.   How -- how frequently do you change the
8    letters and go through those and make changes to them?
9    A.   Not often.
10   Q.   And when they are changed, it's you that does
11   that?
12   A.   Yes.
13   Q.   And it's you that vets -- well, you write the
14   changes, so I guess you're also vetting the changes?
15   A.   That's correct.
16   Q.   Does CUBS have any systems in place to also
17   vet the letters?
18   A.   No.
19   Q.   They'll send whatever you want?
20   A.   They'll send whatever I want, yes.  Yeah.  It
21   would be a template at that point, so the template's
22   been reviewed and the specific data per debtor input.
23   Q.   Why -- why do you vet the letters?  Never
24   mind.  You already answered that.
25        Other than you, is anyone else in your firm

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 18..21

Page 18

1  responsible for compliance with the FDCPA?
2      A.    Yes.
3      Q.    Who would that be?
4      A.    The executive director.
5      Q.    Her name.
6      A.    Sydney Carnesecca.
7      Q.    Will you spell that for the court reporter.
8      A.    Yes.  S-y-d-n-e-y.  Carnesecca is
9  C-a-r-n-e-s-e-c-c-a.
10     Q.    And what is her role in compliance?
11     A.    She trains the collectors initially.
12     Q.    And she answers to you?
13     A.    Yes.
14     Q.    And how long has she been with the company?
15     A.    Since 2014.
16     Q.    Does she have anything to do with the
17  letters?
18  MR. PRICE:  Objection; vague.
19     Q.    (BY MR. STEPHENSON) You can answer.
20     A.    Give me more specifics.  Anything to do with
21  them is really --
22     Q.    Does --
23     A.    -- broad.
24     Q.    Does your executive director write the
25  letters?

Page 19

1      A.    No.
2      Q.    Does she vet the letters?
3      A.    No.
4      Q.    Does she do anything at all with the letters?
5      A.    She would request them.
6      Q.    And under what circumstances would she
7  request a letter?
8      A.    When it's required by the FDCPA, if a
9  consumer requested it under certain circumstances.
10     Q.    Like a debt validation request?
11     A.    Yeah.
12     Q.    Do all of the debt validation requests go
13  through Sydney?
14     A.    No.
15     Q.    Where else do they go?
16     A.    There is an operations employee that sends
17  many of those.
18     Q.    And who's that?
19     A.    Her name's Kathy.  Her last name is
20  Reimschisel and I cannot spell that.
21     Q.    And how long has she been with the company?
22     A.    Since 2014.
23     Q.    And her job is to request responses to debt
24  validation requests?
25     A.    If the customer or the consumer asks for it,

Page 20

1  yes, she would handle those.
2      Q.    What else does she do?
3      A.    She's our client services representative.
4      Q.    When would Sydney handle a debt validation
5  request instead of Kathy?
6      A.    If there's a question whether it needs to be
7  sent or not.  So Sydney doesn't send them, but she
8  helps decide if they need to be sent, but Kathy
9  requests them.
10     Q.    What does that mean that Kathy requests them?
11     A.    So our validation letters are actually mailed
12  from our office, so she mails them in office.
13     Q.    CUBS does not send your validation letters?
14     A.    CUBS does not send the validation letters,
15  that's correct.
16     Q.    And when we're speaking of validation
17  letters, what --
18     A.    No, I'm sorry.  Are you talking about the
19  initial letter or the validation notice that goes out
20  like the dunning notice?
21     Q.    That's exactly what I'm trying to clarify --
22     A.    Okay.
23     Q.    -- what you're talking about.
24     A.    Okay.
25     Q.    So let me -- let me -- I think I have it.

Page 21

1  The initial letter is sent by CUBS?
2      A.    Correct.
3      Q.    When the customer -- not customer.  When the
4  debtor -- I'll say that accidentally a lot just for
5  your --
6      A.    I will say customer as well.
7      Q.    Okay.  Forgive me if I do, and we'll go the
8  same page, but then when the client -- oh, see.
9          When the debtor sends you a request for a
10  validation letter, that's when Kathy takes it over and
11  sends the validation letter that you're talking about?
12     A.    It's actually a verification letter, a
13  verification of the debt.  So validation is sent
14  through CUBS, verification is sent in office.
15     Q.    And sometimes that verification letter will
16  include documentation?
17     A.    Correct.
18     Q.    It won't always?
19     A.    Correct.
20     Q.    And she makes the determine -- Kathy makes
21  the determination of when it will include -- when the
22  verification letter will include documentation or not?
23     A.    Yes.
24     Q.    And the reason for that is because sometimes
25  you need verification depending -- like if it's an

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                        Pages 22..25

Page 22

1  identity theft case, you probably want verification,
2  but if it's a regular case, you don't need
3  verification; right?  You don't need documentation, the
4  letter is sufficient under the FDCPA.  Does that make
5  sense?
6        MR. PRICE:  I'm going to object to it as vague.
7  I'm not sure I understand --
8        MR. STEPHENSON:  Yeah, I think --
9        MR. PRICE:  -- your question.
10       MR. STEPHENSON:  I think it made sense, but your
11 wheels are turning.
12       THE WITNESS:  It's -- it's vague.  There's a lot
13 of -- there's other things in there, so I want to make
14 sure I'm answering your question.  I don't want to
15 assume what you're asking.
16       Q.   (BY MR. STEPHENSON) Yeah, and it's okay.  I'm
17 just -- I'm just trying to clarify that sometimes a
18 verification letter does not need documentation.
19       A.   That's true.
20       Q.   Okay.  And sometimes it may not need it, but
21 you'll send it anyway?
22       A.   I don't know if I can answer that.
23       Q.   Okay.  Sometimes you will send documentation
24 though?
25       A.   Yes.

Page 23

1        Q.   And when you do, what are the circumstances
2  that documentation goes with the verification letter?
3        A.   When it's requested.
4        Q.   Okay.  Okay.  Like if they ask for billing
5  statements, they're confused about the debt, you'll
6  send those if you have them?
7        A.   Yes.
8        Q.   The validation requirement of the FDCPA, can
9  you tell me generally what that is?
10       MR. PRICE:  I'm going to object to the question to
11 the extent it seeks expert testimony, but you can
12 answer in terms of how the person perceives it.
13       MR. STEPHENSON:  Yeah, yeah.  That's fine.
14       THE WITNESS:  It's required as the initial -- one
15 of the initial communications with the customer under
16 the FDCPA.
17       Q.   (BY MR. STEPHENSON) And so in that -- and
18 then when you say one of the initial communications, do
19 you mean either in the initial communication or within
20 five days of the initial communication?
21       A.   That's digging into the FDCPA pretty
22 specifically, so yes.
23       Q.   But you know that's the requirement?
24       A.   Correct, yeah.
25       Q.   I'm not arguing with you about it.

Page 24

1        A.   All right.
2        Q.   We both know this.
3        A.   Okay.
4        Q.   And the verification, validation notice,
5  whatever we call it, because I've heard it used -- I
6  use it interchangeably, I'm assuming other people do,
7  that -- it's a 30-day notice; correct?
8        A.   It was a 30-day notice.  The reg F changed
9  some of that, so we refer to it as a 45-day notice now.
10 2023 and forward I believe is when reg F.  So if you're
11 talking -- you're going to have to give me some dates
12 here because . . .
13       Q.   Before reg F was changed to the 45 days, it
14 was a 30-day requirement?
15       A.   Yes.
16       Q.   And now it's a --
17       A.   And what do you mean by 30 days requirement?
18       Q.   Well, yeah.  So within -- in the initial
19 communication, or within five days of the first verbal
20 communication, you're required to send notice to the
21 consumer; correct?
22       A.   Yes.
23       Q.   And that notice is required to include a
24 statement that they have 30 days to dispute the debt?
25       A.   Yes.

Page 25

1        Q.   Okay.  And that requirement is still intact?
2        A.   Yes.
3        Q.   And you're saying under reg F, it's now a
4  45-day requirement?
5        A.   That's my understanding.
6        Q.   But in the letters it will still say 30 days?
7        A.   I think it gives a specific date now.
8        Q.   Yeah, yeah.  That's actually -- that's more
9  accurate.  Thank you.
10            And that specific date is more than 30 days
11 away.
12       A.   That's my understanding, yes.
13       Q.   And the reason for that 30 days is so that
14 the client -- the debtor can ask you for clarification
15 of what the debt is?
16       MR. PRICE:  Object to form.
17       Q.   (BY MR. STEPHENSON) Did you understand my
18 question?
19       MR. PRICE:  I'm also going to object on the
20 grounds for lack of foundation.
21       MR. STEPHENSON:  Okay.
22       Q.   (BY MR. STEPHENSON) Do you know why the
23 30-day validation notice is in the FDCPA?
24       A.   If they have a dispute, I think it actually
25 reads, and I'm not going to quote it, but if you

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                              Pages 26..29

Page 26

1  dispute, you have 30 days to request the original
2  creditor or -- I can't remember specifically what it
3  says.
4       Q.   Do you agree that a lot of people who ask for
5  that verification are doing it because they don't know
6  what the debt is, they don't recognize it?
7       A.   I wouldn't --
8       MR. PRICE:  Object to form.
9       THE WITNESS:  I wouldn't characterize it as that.
10      Q.   (BY MR. STEPHENSON) How would you
11 characterize -- when you get people that request a
12 verification, why are they requesting it?  What does it
13 say in their letter generally?
14      A.   It gives the balance of who the original
15 creditor is and the documents if we have them.
16      Q.   Oh, yeah.  I mean -- I mean, when they send
17 you a letter asking for the verification, what are they
18 asking for?  Why are they asking?
19      MR. PRICE:  Object to form.
20      THE WITNESS:  They might dispute that they owe the
21 debt.
22      Q.   (BY MR. STEPHENSON) All right.  And are you
23 aware of whether or not some of those people are
24 confused about if they even owe the debt?
25      A.   I can't answer that.

Page 27

1       Q.   Do you read --
2       A.   Some people?  That's so broad.
3       Q.   Do you ever see the -- when they request a
4  validation or a verification, they do it in writing
5  usually?
6       A.   Usually.
7       Q.   And do you ever review those?
8       A.   Often.
9       Q.   So what do they say in general?  I mean, can
10 you think of one specifically that you can think of why
11 they were asking?
12      A.   Disputed it, had a question about the billing
13 as you stated.
14      Q.   Are you familiar with the Mini Miranda
15 warning?
16      A.   I am.
17      Q.   Can you tell us what that is?
18      A.   It's something that our collectors say on
19 every phone call and it's in each of the communications
20 that comes from our office, the written communications.
21      Q.   And what is the notification that's
22 considered to be called --
23      A.   Are we talking prejudgment --
24      Q.   Yes --
25      A.   -- at this point?

Page 28

1       Q.   Yes.
2       A.   Okay.
3       Q.   We are still prejudgment.
4       A.   Okay.
5       Q.   What is the notification, the Mini Miranda,
6  warning specifically?
7       A.   The exact words?
8       Q.   It doesn't have to be exact, but the gist of
9  it.  What is the -- what is the phraseology?
10      A.   This is an attempt to collect the debt and
11 any information obtained will be used for this purpose.
12      Q.   And that is required in every communication
13 with the debtor?
14      A.   That's my understanding, yes.
15      Q.   Where the validation --
16      A.   Prejudgment, yes.
17      Q.   Prejudgment, okay.  So you don't think the
18 30-day validation, excuse me, excuse me, the Mini
19 Miranda is required after judgment?
20      A.   Not on every writing.
21      Q.   Oh, okay.
22      A.   Phone calls.  We practice and say the Mini
23 Miranda on every phone call.
24      Q.   I would bet that it's in every letter you
25 have too?

Page 29

1       A.   Yes.
2       Q.   Okay.  You're speaking of it's not required
3  in legal documents?
4       A.   Correct.
5       Q.   Yeah, okay.  It's a violation of the FDCPA if
6  you don't include that Mini Miranda in every
7  communication except for legal documents?
8       MR. PRICE:  Objection to the extent it's seeking
9  expert testimony.
10      Q.   (BY MR. STEPHENSON) Do you believe it's a
11 violation?
12      A.   Yes.
13      Q.   And that 30-day validation notice that we
14 talked about before, that's only required once?
15      A.   Yes.
16      Q.   And that's in the initial communication or
17 within five days of the first verbal communication?
18      A.   Yes.
19      Q.   Are you aware that the FDCPA prohibits debt
20 collectors from making false or misleading statements?
21      MR. PRICE:  Objection; seeks expert testimony.
22      THE WITNESS:  Yes.
23      MR. PRICE:  And maybe just to short circuit that
24 so I don't have to raise the same objection --
25      MR. STEPHENSON:  I'm okay with the same objection.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                    Pages 30..33

Page 30

1    MR. PRICE: Yeah, that's what I was going to say.
2  Same objection.
3    MR. STEPHENSON: Yeah.
4    MR. PRICE: Just her understanding.
5    MR. STEPHENSON: Yeah, I get that. And I actually
6  think she actually technically is an expert, but I
7  understand your -- we can have a standing objection on
8  that. I think that's fair. I think there's a lot
9  of -- I think she has a tremendous amount of expertise
10 on that.
11    Q.  (BY MR. STEPHENSON) What I was asking you is
12 about false statements or misleading statements. The
13 FDCPA gives a list of those statements, correct, that
14 are false?
15    A.  I don't think there's a list. I think it
16 just says false. I don't remember the exact verbiage.
17    Q.  There is a catchall that says any false
18 statement will violate; correct?
19    A.  I don't re -- I can't recall exactly those
20 words.
21    Q.  Do you -- but in your practice, in the firm's
22 practice and both you and the firm, don't try to -- you
23 don't intentionally make false or misleading statements
24 to debtors?
25    A.  That's correct.

Page 31

1    Q.  And that's not just because it violates the
2  FDCPA, it's also because it's just the way business --
3  it's just good people?
4    A.  I think that's fair to say, yes.
5    Q.  Yeah. And there's no reason to be deceptive
6  with people because they're going to pay you or they're
7  not one way or another?
8    A.  (Nods head.)
9    Q.  Is that right?
10   A.  I would agree with that, yes.
11    Q.  Would you agree that it's -- that they're
12 more likely to pay if you lie to them in some specific
13 way?
14    MR. PRICE: Object to form. Lack of foundation.
15    Q.  (BY MR. STEPHENSON) Yeah. Have you -- well,
16 tell me this. Let's let me rephrase this.
17    The FDCPA, do you know why they enacted it in
18 the first place?
19    A.  I don't.
20    Q.  If I told you it was partially because they
21 wanted to prevent false or misleading statements, would
22 you agree that that's probably at least one?
23    A.  I wouldn't disagree with that.
24    Q.  Do you know, what is -- when you send a
25 collection letter to a debtor, what is your -- what is

Page 32

1  the rate of return of people who respond to that
2  letter?
3    MR. PRICE: I'm going to object to form.
4    MR. STEPHENSON: And what -- what can I do to make
5  that question work?
6    MR. PRICE: Well, I'm not sure what you mean by
7  the term respond.
8    MR. STEPHENSON: Okay.
9    Q.  (BY MR. STEPHENSON) When you send a
10 collection letter to a debtor, I'm just wondering what
11 percentage response, and then I was going to ask what
12 percentage of response by mail and what percentage
13 response by calling?
14    A.  I don't think I can -- I don't -- I don't
15 know those numbers.
16    Q.  You don't track those numbers?
17    A.  The system might track them, but I don't --
18 no, I don't think it does. I don't remember getting
19 those reports or anything, so I can't give you that. I
20 mean, I could guess, but that's not going to do us any
21 good.
22    Q.  Are you aware of the industry standards of
23 response rates to debt collection letters?
24    A.  I'm not.
25    Q.  Is it -- I know you have to -- I don't want

Page 33

1  you to guess, but do you know if it's a really high
2  number or really low number? So is it more like -- is
3  it closer to 80 percent or closer to 30 percent or
4  10 percent?
5    MR. PRICE: Object to form.
6    Q.  (BY MR. STEPHENSON) Do you know what I'm
7  asking? You understand what I'm asking?
8    A.  I don't think it's as high as 80 percent. If
9  it's 10 percent or 30 percent, I really don't know that
10 difference, but I would say it's not as high as
11 80 percent.
12    Q.  Is it fair to say that it's probably less
13 than 50 percent?
14    A.  I think that would be fair. And, again,
15 we're talking prejudgments?
16    Q.  Yes.
17    A.  Okay.
18    Q.  Yes.
19    A.  The dunning notice?
20    Q.  I'm really just trying to lay a foundation
21 for the whole rest of the day.
22    A.  Okay.
23    Q.  I'm asking generic. Not generic, but general
24 questions so that we are on the same page with our
25 understanding of how your firm works and how it -- how

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 34..37

Page 34

1  it works.
2          Do you agree that it would violate the FDCPA
3  if a debt collector lied about the amount of the debt?
4      A.  Yes.
5      Q.  And do you agree that it would violate the
6  FDCPA if the debt collector lied about their identity?
7      A.  We use -- yes, I do, but we do use alias
8  names.
9      Q.  Oh, yeah.
10     A.  I want to be clear on that.
11     Q.  Yeah, I'm okay with that.  What I mean is if
12  a debt collector said -- if the debt collector's name
13  is The Cherrington Firm, but they called and said we
14  are the Utah Department of Justice, would that violate
15  the FDCPA?
16     A.  Yes.
17     Q.  That's what I mean.  I totally get the alias
18  thing.
19     A.  Okay.
20     Q.  And that does not violate the FDCPA?
21     A.  Correct.
22     Q.  I'm not sure where it carved out, but
23  somewhere along the line, I think it was the FTC, said
24  you can use aliases.  Is that right?
25     A.  I don't know that to be true.  I don't -- I

Page 35

1  don't know where it came from.
2      Q.  It's a longstanding rule enough that no one's
3  arguing that one?
4      A.  I believe that's correct.
5      Q.  Yeah.  What about -- okay.  Do you agree that
6  it would violate the FDCPA if a debt collector lied
7  about the consequences a debtor would face if they
8  failed to pay?
9      A.  I believe that's correct.
10     Q.  I'll give you an example.  Okay, I liked the
11  answer.  I'm going to give you an example to reinforce
12  the question.  I've had clients call me and say that
13  the debt collector said they're going to have me
14  arrested if I don't pay this, they're going to revoke
15  my driver's license if I don't pay them.  Those are
16  violations of the FDCPA?
17     A.  I would say that would be a violation, yes.
18     Q.  And are you aware whether or not unfair
19  practices that are not technically false or misleading,
20  but other unfair practices are also prohibited under
21  the FDCPA?
22     A.  As a generic statement, yes.
23     Q.  And those would include things like cashing a
24  postdated check too soon?
25     A.  A postdated check?

Page 36

1      Q.  Yeah.  You probably don't deal with those
2  anymore, do you?  It's all electronic?
3      A.  That's right.
4      MR. STEPHENSON:  Are you cold?
5      MR. PRICE:  Yeah.
6      MR. STEPHENSON:  We have access.  We can turn it
7  up if you want to.
8      MR. PRICE:  Yeah.  I don't want to overheat
9  everybody.
10     THE WITNESS:  That's why I dressed warm, so.
11     MR. STEPHENSON:  If that changes, let us know.
12  We'll bump it up.  We'll turn it down one notch until
13  we get it right.
14     Q.  (BY MR. STEPHENSON) What does your firm do to
15  assure that it's not violating the FDCPA's prohibition
16  on making false or misleading statements?
17     A.  Initial training and followup training.
18     Q.  How often does the followup training occur?
19     A.  I'm not sure I can put a time line on it.  As
20  necessary.
21     Q.  There's no schedule?
22     A.  In the initial training there is.
23     Q.  And once you've got a collector that's been
24  there for a year or two, do they receive training after
25  that?

Page 37

1      A.  We do periodic training, yes.
2      Q.  But not on any schedule, just when it sort of
3  makes sense for the group?
4      A.  Yes.  That's fair -- that's fair to say.
5      Q.  Okay.  In this case we've talked about -- or
6  not here, but in the case we've -- we've asked in
7  discovery and things about the bona fide error defense.
8  Are you aware of those discussions, or not discussions,
9  of your assertion of the bona fide error defense?
10     MR. PRICE:  I'm going to object because we haven't
11  asserted bona fide error defense in the Answer.
12     MR. STEPHENSON:  Okay.  I thought you did.
13     MR. PRICE:  Yeah, not in this one we haven't.
14     Q.  (BY MR. STEPHENSON) Okay.  Are you aware of
15  the FDCPA's bona fide error defense in general?
16     A.  In general, yes.
17     Q.  And are you saying that you're not asserting
18  that defense here?
19     A.  I think we don't know what the claims are
20  specifically, so I'm deferring to my attorney.
21     Q.  Okay.  So what I do in these is I make a
22  chart, and that's what I'm trying to figure out.  So is
23  it fair to say that at this point in time, you haven't
24  identified any violations of the FDCPA that you're
25  aware of that your firm committed?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 38..41

Page 38

1    A.    That's a fair statement, yes.

2    Q.    I'm going to write no there.  And then
3    errors.  Can you identify anything your firm did that
4    was unintentional?

5    MR. PRICE:  I'm going to object to form.

6    Q.    (BY MR. STEPHENSON) Well, did your firm --
7    everything your firm did, when collecting the debt
8    against my client, was normal firm practice; correct?

9    A.    Yes.

10   Q.    Nothing happened that was considered an error
11   or mistake?

12   A.    No.

13   Q.    And so then when I asked you what procedures
14   you have in place to avoid those errors and those
15   violations, the answer is I don't know, we don't -- we
16   haven't -- we don't have any specifics that we can
17   identify today?

18   A.    Correct.

19   Q.    Okay.  So now I'm going to backtrack to the
20   more specifics of this specific debt.  Do you know when
21   you acquired the debt from the original creditor?

22   A.    I don't recall that date right offhand.  If I
23   had the notes in front of me, I could identify that,
24   but I don't have those in front of me.

25   Q.    Okay.  Did you -- did you review those notes

Page 39

1    before coming here today?

2    MR. PRICE:  Objection; I'm going to instruct the
3    witness not to answer the question on grounds of work
4    product.

5    MR. STEPHENSON:  Okay.

6    Q.    (BY MR. STEPHENSON) It would be helpful if we
7    were on the same page with when you acquired the debt
8    from the original creditor.  I think it was 2018.  Does
9    that sound right or close?

10   A.    2017, 2018.  I think we're in that ballpark,
11   yes.

12   Q.    I think -- I think you're right.  I think it
13   was 2017.

14   A.    Do you have the notes as an exhibit --

15   Q.    Yeah.

16   A.    -- today?

17   Q.    But we don't -- it's not that important yet.

18   A.    Okay.

19   Q.    And that would put my exhibits out of order,
20   so.

21   A.    Okay.  Fair enough.

22   Q.    I'm just trying to establish that it was a
23   while ago?

24   A.    It has been a while ago.

25   Q.    And do you remember who the -- the original

Page 40

1    creditor was Brigham Young University?

2    A.    Brigham Young University, correct.

3    Q.    And it was a bounced check?

4    A.    Correct.

5    Q.    I'm just -- I'm just laying a foundation.  It
6    doesn't -- we don't need to, you know, go crazy with
7    it.

8          When you acquired the debt, do you know how
9    long it took you before you started collecting?

10   A.    I don't.

11   Q.    Do you know what the typical time is?  When
12   the debt is assigned and then you start, there's a gap
13   of time.  Do you know what that time frame normally is?

14   A.    Maybe a couple of days to get the -- to have
15   an input into CUBS.

16   Q.    And when -- so Brigham Young University
17   assigned the debt to Cherrington Firm to collect?

18   A.    That's correct.

19   Q.    And is there a written assignment for that?

20   A.    I believe so.

21   Q.    Does your firm have a written standing
22   agreement with BYU to collect debt for it?

23   A.    Yes.  To collect debt, yes.  Prior to
24   litigation, yes.

25   Q.    Okay.  This isn't the first debt you

Page 41

1    collected for Brigham Young University?

2    A.    No, it's not.

3    Q.    And it's not the last?

4    A.    They don't have a lot of returned checks
5    anymore, so there's not a lot.

6    Q.    Okay.  And when you say prior to litigation
7    an understanding agreement with BYU, does that mean you
8    have a separate agreement after litigation or to handle
9    litigation?

10   A.    They want a sign off before we begin
11   litigation.

12   Q.    Okay.  So they're the ones who make the
13   decision whether to sue or not?

14   A.    That's a fair statement, yes.

15   Q.    And after they make the decision to sue, do
16   they stay involved in other decision making process?

17   A.    After that, no.

18   Q.    So post judgment you decide what steps to
19   take?

20   A.    Post judgment they rely on my authority, yes.

21   Q.    And when I say you in this case, I kind of
22   mean both you and the firm or --

23   A.    Again, when I say me, when I say me, I also
24   mean the firm.

25   Q.    Okay.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 42..45

Page 42

1    A.    So if you want something specific --
2    Q.    Well, you know, let's be specific then.
3    A.    -- clarify what you mean.
4    Q.    So the firm -- the firm decides what to do
5    after -- like post judgment.  And we'll backtrack a
6    little.  But when you get a judgment, the firm decides
7    how to collect the post judgment judgment?
8    A.    Yes.
9    Q.    And is that you specifically that makes that
10   decision or is it also these other people, whatever
11   their --
12   A.    I'm very -- I'm involved in all the steps of
13   litigation.
14   Q.    Okay.  So you're the one who decides whether
15   to garnish wages or execute property or put a lien on a
16   house?
17   A.    Yes, I make those decisions as the attorney,
18   yes.
19   Q.    Does anyone else participate in those
20   decisions?
21   A.    Yes.
22   Q.    Who else?
23   A.    The people on my team, my internal team.
24   Q.    Okay.  Who are those people?
25   A.    All of the people that have anything to do

Page 43

1    with the initial litigation process?
2    Q.    No, no, no.  Just the people who look at a
3    case and say -- and make the decision whether to
4    garnish wages, put a lien on a house, execute a writ,
5    or whatever post judgment needs to be done.
6    A.    Okay.  So you need to specify.  Let's go
7    through each of those things because to put a lien on a
8    house is outside of the people in my office.
9    Q.    Okay.  Who does that -- who makes those
10   decisions?
11   A.    Well, at that point, if we've obtained a writ
12   of execution and we have provided that to the
13   constable, that's -- that's their decision.  That's
14   post judgment.
15   Q.    Okay.  Can I stop you because I don't think
16   that's -- I don't think that's where we are.
17   A.    I just want to clarify where you're at.
18   Q.    Well, I think you're jumping ahead.
19   A.    Okay.
20   Q.    So you mentioned a lien.  If you're placing a
21   lien on a house, that's the decision that you make?
22   MR. PRICE:  Well --
23   MR. STEPHENSON:  We're not talking about an
24   execution at all yet.  We will, but.
25   MR. PRICE:  I'm going to object to the question to

Page 44

1    the extent it misconstrues the law.  If there's a
2    judgment and the debtor owns the real property, then I
3    think the lien automatically attaches.  Are you talking
4    about taking separate steps?
5    MR. STEPHENSON:  Yeah.
6    MR. PRICE:  Okay.
7    MR. STEPHENSON:  Yeah, I'll clarify.
8    Q.    (BY MR. STEPHENSON) I mean, I'm talking about
9    separate steps where you file a lien with the state or
10   the city or the county, whoever, with the county.
11   A.    Okay.  To clarify, I don't file liens.
12   Q.    Okay.  That's -- that's --
13   A.    Okay.
14   Q.    -- much more helpful --
15   A.    Okay.
16   Q.    Rather than trying to get a committee to
17   figure out who makes that decision --
18   A.    Okay.
19   Q.    -- you just don't do it?
20   A.    No.
21   Q.    Okay.  Wage garnishments.  I know you do wage
22   garnishments.
23   A.    We do wage garnishments, yes.
24   Q.    And who makes the decision to whether -- to
25   decide do we garnish wages in this case or not?  Who

Page 45

1    makes that decision?
2    A.    The collector brings it to my attention and
3    then I approve whether or not the garnishment goes out.
4    Q.    Okay.  And then -- and then the writs of
5    execution, how is -- is that the same process, the
6    collector and then you approve?  Or tell me how.
7    A.    That's correct.
8    Q.    So BYU in this case, and I don't really want
9    to ask this question right now because I really want to
10   ask it later, but I'm going to do it now while my
11   memory's fresh.
12          So BYU in this case approved sending this
13   case out for a writ of execution?
14   A.    They gave me the authority to litigate and
15   passed that authority up to me.
16   Q.    Okay.  And that's -- that's -- okay.  So you
17   made the decision to send this one out for a writ of
18   execution?
19   A.    That's correct.
20   Q.    Okay.  BYU did not have anything to do with
21   that?
22   A.    Correct.
23   Q.    Okay.
24   A.    Other than --
25   Q.    Other than granting you authority?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                           Pages 46..49

Page 46

1   A.   Correct.
2   Q.   Now, what about -- let's go back then to the
3   wage garnishment.  Is that the same process or did we
4   misspeak on that one?
5   A.   There wasn't a wage garnishment on this case.
6   Q.   I know, but in general when there's a wage
7   garnishment, does the debt collector -- or excuse me --
8   the original creditor, do you go to them and say do you
9   want me to garnish wages or do you make that decision?
10  A.   I make that decision.
11  Q.   Okay.  So when you said the collector
12  approves that decision, you mean they preapprove it by
13  giving you authority to do it if you sue?
14  A.   The collector is my employee.
15  MR. PRICE:  I think -- I think you misspoke.
16  MR. STEPHENSON:  I did.  I did.
17  Q.   (BY MR. STEPHENSON) So if a wage garnishment
18  is to occur, do you have a collector, one of your
19  collectors come to you and say hey, here's a list of
20  things we want to garnish?
21  A.   A list of things.  A wage -- a wage
22  garnishment --
23  Q.   Cases.  A list of judgments.
24  A.   Yes.
25  Q.   Okay.  And you look at the list and you look

Page 47

1   at every one of those cases and you say yes or no to
2   each of those?
3   A.   That's correct.
4   Q.   And the same thing is -- that's the same
5   process with writs of execution?
6   A.   That's correct.
7   Q.   And that process doesn't occur with liens
8   because you don't do liens?
9   A.   That's correct.
10  Q.   And did I miss any other ways of collecting
11  debts that you would have the same process for?
12  A.   Not that I can think of, Eric.
13  Q.   I mean, those are the three; right?
14  A.   Those are the three, yes.
15  Q.   How were you compensated by the original
16  creditor in this case for collecting?
17  A.   In this case on a check.  I believe we keep
18  the check fees and a portion of the check.
19  Q.   By check fees, you mean the statutory check
20  fees?
21  A.   Correct.
22  Q.   And what are those?  Treble damages?
23  A.   Well, are we talking prejudgment or post
24  judgment?
25  Q.   Well, I want to know -- well, actually, both.

Page 48

1   A.   Okay.
2   Q.   I want to know how your firm -- how the
3   original creditor -- you don't work for free?
4   A.   Correct.
5   Q.   The original creditor pays you to collect on
6   its behalf?
7   A.   That's correct.
8   Q.   And so I just wonder how they pay you.
9   A.   I think -- I can't speak specifically for BYU
10  because I didn't review their contract, but in general
11  we keep the check fees, the two $20 fees, and a portion
12  of the principal, generally, and the treble damages are
13  for the original creditor.
14  Q.   Okay.  And so the portion of the principal,
15  would it be fair for me to call that commission, or is
16  that some other word you want me to use?
17  A.   I think a commission's fair.  And I don't
18  recall if this particular client, if we take a
19  commission on the check, so I'm speaking in
20  generalities.
21  Q.   Yeah, no.
22  A.   Not specific to this case.
23  Q.   Absolutely.  But I think that helps for the
24  future for us to understand each other.
25       What about your costs that you incur.  Do you

Page 49

1   get reimbursed for those costs?
2   A.   Be more specific.
3   Q.   Filing fees, service of process fees,
4   subpoenas?
5   A.   Post judgment I don't -- we up front those
6   fees for our client.
7   Q.   And then they pay you back?
8   A.   Once we collect it.
9   MR. PRICE:  I'm just going to object in terms of
10  vagueness.  When you're talking about they pay you
11  back, are you talking about the client after paying or
12  simply the firm retaining a portion of the money that
13  was collected?
14  MR. STEPHENSON:  Yes.  I think they're the same
15  thing, but you clarify for me which it is.
16  Q.   (BY MR. STEPHENSON) You collect the money
17  from the -- this is important, you're right.  So you
18  collect money from the debtor and then you take out
19  your portion, and then you give the rest to the
20  original creditor?
21  A.   That's -- that's correct.
22  Q.   Okay.  And the other way of doing it you
23  don't do which would be you collect the money, send all
24  of it to the original creditor, and then they send you
25  back money?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 50..53

Page 50

1    A.   We don't do it that way for this client.  Not
2    that I -- not that I recall.
3        Q.   Okay.
4        A.   We do have some clients that do that, but I
5    don't think this particular client, but I did not
6    review that.
7        Q.   Okay.  And I think there's some confusion
8    here and it's probably my fault.  You keep saying --
9    clarifying whether it's post judgment or prejudgment.
10   Is that because there's two sort of sides to the
11   business?  There's a collection part and there's a
12   litigation part?
13       A.   Yeah.
14       Q.   And so the collection part also collects a
15   collection fee?
16       A.   On a -- on a returned check, yes.
17       Q.   Okay.
18       A.   Because that's by the statute.
19       Q.   Okay.  And if -- and then you also get your
20   attorney's fees for the litigation side?
21       A.   Per statute, that's correct, yes, once it --
22   once it goes to litigation.
23       Q.   Okay.  But it's only one firm, it's not two
24   separate business?
25       A.   It's not two separate businesses.  One firm.

Page 51

1        Q.   And so you -- the original creditor keeps
2    ownership of the debt, you don't own the debt?
3        A.   That's correct.
4        Q.   And so the original creditor, do they have
5    the authority to take the debt back any time they want?
6        A.   If they want to cancel it, yes.
7        Q.   Would that be --
8        A.   They do have that authority.
9        Q.   Okay.  And that would be true even in the
10   middle of litigation?
11       A.   Yes, it would be true.
12       Q.   When BYU gave you this debt to collect, did
13   they give you specific instructions on how they wanted
14   you to collect?
15       A.   No, they didn't.
16       Q.   And they didn't give you specific
17   instructions because there's already an understanding
18   of what you're going to do?
19       A.   That's a fair statement.
20       Q.   They know that you'll make initial efforts to
21   collect the debt, and if that doesn't work, you'll sue
22   if it warrants a lawsuit?
23       A.   That's a fair statement, yes.
24       Q.   Did they -- excuse me.  Did the original
25   creditor specifically tell you anything don't do?

Page 52

1        MR. PRICE:  I'm going to object to the extent it
2    seeks discovery of attorney-client communication and --
3        MR. STEPHENSON:  Okay.
4        MR. PRICE:  -- so I counsel you not to disclose
5    specific communications between you and BYU and its
6    attorney.
7        MR. STEPHENSON:  Okay.  That's fair.  I got that.
8        THE WITNESS:  Can I clarify then?
9        MR. STEPHENSON:  Yeah, if you want.  It's a
10   standing objection on that, yeah.
11       THE WITNESS:  They give me authority to collect
12   the debt within the bounds of the law.
13       Q.   (BY MR. STEPHENSON)  Okay.  Well, yeah,
14   they're not going to -- well, we don't need to go
15   there.  They're not going to tell you to go rob the
16   person or harm somebody?
17       A.   That's right.
18       Q.   They don't expect that, you don't do that.
19   They're not going to tell you to do something illegal,
20   and if they did, you wouldn't do it?
21       A.   That's correct.
22       Q.   Yeah.  The decisions in litigation, though,
23   are those left up to you?
24       A.   Yes.  Specifically?
25       Q.   Yeah.  I was going to say is there any area

Page 53

1    that's not left up to you, say a settlement amount?
2    Like if the client -- the debtor calls in the middle --
3    okay.  Let's give you a specific example.
4            Debtor gets a summons and they panic and they
5    call you instead of me, and they say to you I'll pay
6    50 percent, do you have authority to take that without
7    calling the original creditor?
8        A.   We have some authority.
9        Q.   Okay.
10       A.   But beyond that authority, and most of the
11   time we do talk to our client to settle an amount.
12       Q.   And I'm not trying to -- I'm not -- I don't
13   defend debt, so I'm not trying to get like numbers and
14   stuff.
15       Okay.
16       Q.   I don't care about that.  But most debt
17   collectors, they get a number from the original
18   creditor of how low they're willing to let you go.  Is
19   that fair here too?
20       A.   I think that's fair, yeah.
21       Q.   And I won't -- like I'll just give you an
22   example to make sure we're on the same page.  Other
23   collectors I've heard say well, the original creditor
24   will let me go down to 90 percent or 80 percent, but no
25   lower without calling them.  Is that sort of what's

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                                Pages 54..57

Page 54

1  happening here?  No numbers, not specific percentages,
2  but that concept?
3      MR. PRICE:  Object to form.  When you say here,
4  are you talking about this specific case or are you
5  talking about in general?
6      MR. STEPHENSON:  Yeah, in this specific case.
7  BYU.
8      THE WITNESS:  On a return check, if there's a
9  settlement on the principal, the principal amount, then
10 we would call the client.  We would contact BYU.
11     Q.  (BY MR. STEPHENSON) Okay.  Let's backtrack a
12 little.  I want to talk about your employees and kind
13 of identify people.  In your discovery you identified
14 five people, and I don't think that's everyone that's
15 actually involved, but let's go through it and figure
16 it all out.
17         I asked -- well, you identified five
18 employees that had involvement in collecting this
19 specific debt.  Yourself, Bernice Vasquez, Angela
20 Cloward, Jaylinn Faulkner, and Candi Burrell.  Is that
21 accurate?  Does that sound right?
22     A.  I think that's correct.
23     Q.  Okay.  We've also identified Sydney and
24 Kathy.  Did they work on this specific debt, Sydney and
25 Kathy?

Page 55

1      A.  Not that I could see in the notes.
2      Q.  Okay.  The way you came up with that list of
3  five people was from the collection notes that we'll
4  look at later?
5      A.  That's right.
6      Q.  What about Melissa Kerby?  What did she do;
7  do you know?
8      A.  I don't recall.
9      Q.  Jamie Devenesh.
10     A.  I don't remember.
11     Q.  Do you remember what Elena Roundy did in this
12 case?
13     A.  Elena would have been one of the people that
14 prepared it for litigation for my review.
15     Q.  She's been with you for a long time?
16     A.  She has.
17     Q.  How long?
18     A.  Since 2014.
19     Q.  Okay.  And Jamie Devenesh, how long has Jamie
20 been with you?
21     A.  She's not with the company anymore.
22     Q.  How long was she there?
23     A.  I don't remember.
24     Q.  Do you remember her involvement in this case?
25     A.  I don't.

Page 56

1      Q.  Why did Jamie leave?
2      A.  I don't remember.
3      Q.  How long ago did she leave?
4      A.  I don't remember.
5      Q.  It wasn't contentious when she left?
6      A.  Not that I recall.
7      Q.  No drama with that?
8      A.  Not that I recall.
9      Q.  You'd recall the drama; right?  Melissa
10 Kerby, is she still there?
11     A.  She's not.
12     Q.  Where did she go?
13     A.  I don't know where she went.
14     Q.  Do you know when she left?
15     A.  She left in, I think, May or June of 2024.
16     Q.  And was her leaving drama?  Was it something
17 you remember?
18     A.  Yes.
19     Q.  What happened there?
20     A.  She decided that she wanted to move on.
21     Q.  Was she unhappy with her job at your firm?
22     A.  I wouldn't characterize it like that.  She
23 was having some personal struggles at home.
24     Q.  Now, the other five that we talked about,
25 Lacey Cherrington, that's you, so you're still there.

Page 57

1  Bernice Vasquez, is she still there?
2      A.  She is.
3      Q.  Generally speaking, without the notes, can
4  you tell me what she did in this case?
5      A.  At that time I don't know if she had anything
6  to do with preparing the litigation.  She might have
7  been a collector at that time.
8      Q.  Angela Cloward.
9      A.  Would have been a collector.
10     Q.  Is she still employed there?
11     A.  She's not.
12     Q.  Do you know where she went?
13     A.  She owns her own company now.
14     Q.  Do you know what it does?
15     A.  They sell lemonade.
16     Q.  I'm in the wrong business.
17     A.  You know the Texas Twisters that you get at
18 the fair and things like that?
19     Q.  Yeah.
20     A.  She owns one of those.
21     Q.  Man.
22     A.  Great business.  She's done well.
23     Q.  I have a story I'll tell later off the
24 record.
25         Jaylinn Faulkner.  Is she still there?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 58..61

Page 58

1    A.    She's not.

2    Q.    And where did she go?

3    A.    She works at a veterinary clinic now.

4    Q.    Was her termination or leaving, was it

5  something to be concerned about?

6    A.    No.

7    Q.    Candi Burrell.  Is she still there?

8    A.    She's not.

9    Q.    And where did she go?

10   A.    She went to work for a bank.  I'm impressed I

11  remember all these.

12   Q.    I am too.  Did she go voluntarily or was it a

13  problem?

14   A.    Voluntarily.  It ended really well.

15   Q.    Okay.  And can you remember what any of these

16  people did specifically in this case without the notes?

17  We'll go through the notes later too.

18   A.    Notes would be better.

19   Q.    Okay.  We'll go through them later.

20   A.    Okay.

21   Q.    None of these people were ever -- were any of

22  these people ever reprimanded for breaking company

23  policies?

24   A.    On this particular case?

25   Q.    At all.

Page 59

1    A.    That's a vague, broad question.

2    Q.    Yeah, I can ask it individually, but it

3  doesn't seem to make sense to ask.

4    A.    If so, on a rare occasion.

5    Q.    Okay.

6    A.    Good people doing --

7    Q.    None of these people were fired for violating

8  company policy?

9    A.    No.

10   Q.    Okay.  Are any of these people related to

11  you?

12   A.    Jamie Devenesh.

13   Q.    And she is your --

14   A.    She's my niece.

15   Q.    Niece.  Does your sister work for your

16  company?

17   A.    She does.

18   Q.    And what is her name?

19   A.    That's Sydney.

20   Q.    Okay.  You're the supervisor of all of these

21  people?

22   A.    Not the direct supervisor, but overall, yes.

23   Q.    There's a chain of command between you and

24  some of them?

25   A.    Yes.

Page 60

1    Q.    But, ultimately, they all do -- you have the

2  power to fire or terminate any of these people?

3    A.    Yes.

4    Q.    Melissa Kerby.  She's not related to you?

5    A.    She's not.

6    Q.    My understanding is Melissa Kerby was the one

7  who handled emailing the writs of execution to Michael

8  Erickson.  Is that -- do you remember if that's correct

9  or not?

10   A.    Yes.

11   Q.    Did anyone else handle providing the writs of

12  execution to the constables?

13   A.    On this particular case or just overall?

14   Q.    In general.

15   A.    Most -- most recently, Shauna, but not on

16  this case.

17   Q.    And who's Shauna?

18   A.    Shauna is in operations.

19   Q.    Her last name?

20   A.    She recently got married.  Lear, L-e-a-r.

21   Q.    Do you know her maiden name?

22   A.    Winter.

23   Q.    And I was going to get to this later, but

24  I'll ask now to clarify.  Do you still use these

25  constables today in general terms?

Page 61

1    MR. PRICE:  Object to form.

2    Q.    (BY MR. STEPHENSON) Do you understand the

3  question?

4    MR. PRICE:  I don't know who you mean by these

5  constables.

6    MR. STEPHENSON:  Oh.

7    Q.    (BY MR. STEPHENSON) Does your firm still use

8  Constable Erickson?

9    A.    No.

10   Q.    Does your firm still use Constable Kolkman?

11   A.    No.

12   Q.    Okay.  Does your firm use any constable for

13  anything at this point?

14   A.    No.

15   Q.    So when you say Shauna provides the emails or

16  provides the writs of execution, that was in the past,

17  not now?

18   A.    Correct.

19   Q.    Okay.  And that was all I wanted about that.

20  So did Shauna provide writs of execution to

21  Erickson and Kolkman or just Kolkman?

22   A.    I can't answer that.  I don't remember the

23  timing of -- to give you a correct answer.

24   Q.    Yeah.

25   A.    I don't remember.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                                Pages 62..65

Page 62

1    Q.    There is a timing problem.  Not problem, but
2  there is a distinction because -- well, I want to get
3  to that later.
4          Melissa Kerby, she provided this one, this --
5  in this case this writ of execution that we'll get to
6  in a minute, to Erickson?
7    A.    I think so.  I think she was the one doing
8  writs of execution at that time.
9    Q.    I have here a question that I don't
10 understand.  Who's Jennifer Wright?
11   A.    I don't know that is.
12   Q.    Okay.  We may come back to that, I may not.
13         When Melissa Kerby was -- okay.  Melissa
14 Kerby was -- was she the only one providing writs of
15 execution to Constable Erickson at the time, back in
16 2018, 2019, 2020?
17   A.    I think so.
18   Q.    And do you know how often she was sending
19 writs of execution to the constables or to Constable
20 Erickson?
21   A.    There was no set schedule.  Just when they
22 were signed by the court.
23   Q.    Would she send them individually or in
24 batches?
25   A.    I would believe she would send them in

Page 63

1  batches.
2    Q.    Do you know how many she sent in a given time
3  frame, a year?
4    A.    It was sporadic.  I don't have an answer for
5  that.
6    Q.    Do you know how many total your firm -- of
7  writs of execution your firm has sent to Constable
8  Erickson and Kolkman?
9    A.    I think we reviewed that yesterday.  I think
10 that was one of our answers in the admissions and I
11 think from 2019 to somewhere in 2024 there was 600 in
12 that time span.  In a certain amount of time beyond
13 that, I can't -- I can't recall.
14   Q.    When did your firm start sending writs of
15 execution to Michael Erickson?
16   A.    Gosh, at least since 2014.  I believe it was
17 Erickson at the time.  Utah County Constables, let's be
18 more broad.  We would send it to Utah County
19 Constables.  I don't remember the timing of their
20 change in ownership.
21   Q.    Do you know who the constable was when you
22 first started sending writs of execution to Utah County
23 Constables?
24   A.    I think it was Erickson at that time.
25   Q.    Do you know the name John Sindt?

Page 64

1    A.    I do know the name John Sindt.
2    Q.    Who is John Sindt?
3    A.    I believe he was a constable at Utah County
4  Constables and I think he's retired now.
5    Q.    Did you ever have communications with John
6  Sindt?  You personally?
7    A.    Not at -- not at this firm, no.  Previously
8  in my collection experience, yes.
9    Q.    Okay.  And what was that previous collection
10 experience?
11   A.    I worked for Check Net.
12   Q.    I thought you owned Check Net.
13   A.    My family did.
14   Q.    Oh, okay.  And so when you worked for Check
15 Net, you specifically had dealings with John Sindt?
16   A.    Not me specifically, but I remember the
17 attorney at the time had sent writs to John Sindt.
18   Q.    And the attorney for Check Net, who was that?
19   A.    Kevin Richards.
20   Q.    And he would send writs of execution to John
21 Sindt?
22   A.    I believe so.  Again, I don't remember the
23 timing of when they -- when it changed -- they changed
24 hands, but Utah County Constables is a fair statement.
25   Q.    Okay.  Yeah, and at some point you know that

Page 65

1  it was taken over by Erickson?
2    A.    Yes.
3    Q.    And then later Utah County Constables,
4  Michael Erickson decided to retire or something, and
5  gave the writs of execution job to Kolkman; is that --
6    A.    Yes.
7    Q.    And that was 2023?
8    A.    I don't remember.  Some were '22, '23.  We're
9  in the ballpark there.
10   Q.    And so your firm shifted along with when
11 Erickson said we're not going to do these anymore,
12 we're sending them to Kolkman, your firm went and
13 shifted too?
14   A.    That's a fair statement, yes.
15   Q.    And did Erickson -- did Kolkman's office do
16 anything different than Erickson's office, in your
17 perspective?
18   A.    Not that I'm aware of.  Some contacts changed
19 of who we were to contact and send the writs to, but,
20 otherwise, I don't know of any changes.
21   Q.    Okay.  Is that Corey?  Do you know Corey
22 Revill?
23   A.    That name's familiar.
24   Q.    He's one of the contacts that you would
25 contact with the writs?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 66..69

Page 66

1    A.   I didn't have a lot of communication with --
2  with the constables myself.
3    Q.   And who did?  Did I already ask that?  Was
4  that Melissa Kerby?  I forgot.
5    A.   Yeah.
6    Q.   Melissa Kerby?
7    A.   That's correct.  I don't know who Jennifer
8  Wright is.  You were going to say that.  It sounded
9  like you were going to say Jennifer.  I don't know who
10  that is.
11    Q.   I was.  I think she worked for the
12  constables.
13    A.   Okay.
14    Q.   Okay.  Do we need a break or anything or
15  should we keep going?
16    MR. PRICE:  Yeah, if could we take a short break.
17    MR. STEPHENSON:  Yeah.  Let's take five, six,
18  seven minutes.  Whatever.
19    THE WITNESS:  Great.
20    (Recess taken from 11:13 a.m. to 11:21 a.m.)
21    Q.   (BY MR. STEPHENSON) Before we went on break I
22  was shifting gears, so let's go to this specific case,
23  the details.  Let's get to the writ of execution.  You
24  remember requesting a writ of execution against my
25  client?

Page 67

1    A.   I do.
2    Q.   And the judge granted that writ of execution?
3    A.   That's correct.
4    Q.   So in general terms tell me what specifically
5  is a writ of execution.
6    A.   A writ of execution, the general idea is to
7  be able to seize personal property and sell it to
8  satisfy the judgment.
9    Q.   And that's a creature of the Rules of Civil
10  Procedure?
11    A.   I believe so, yeah.  Yeah, Rule 64 I believe.
12    Q.   Okay.  So to be specific, a writ of execution
13  is a court order that allows you to take a debtor's
14  property to satisfy the judgment?
15    A.   Yes.
16    Q.   Contrast that with a writ of garnishment.
17  That would be -- allow you to seize property in
18  someone -- that someone else is holding?
19    A.   Yes.
20    Q.   And when you hold the sale, the property is
21  sold, that money goes toward the judgment first?  Well,
22  no, not first, it goes towards the cost first?
23    A.   When the -- let's clarify, let's break that
24  down.
25    Q.   Okay.

Page 68

1    A.   What the constables -- I only know what the
2  constables send me.
3    Q.   Well, let's go back to general terms though.
4  Generally speaking, you don't execute the writs of
5  execution?
6    A.   I don't.
7    Q.   You're not allowed to execute the writs; you
8  have to -- you have to hire a sheriff or constable?
9    A.   That's my understanding.
10    MR. PRICE:  I'm going to object to form.
11    MR. STEPHENSON:  Okay.
12    MR. PRICE:  I think the term is vague with respect
13  to the term hire.
14    MR. STEPHENSON:  Oh, okay.  I anticipated this
15  issue because in your paperwork you also had a problem
16  with the word hire.
17    Q.   (BY MR. STEPHENSON) Tell me what it is --
18  what word I need to use to make this work.
19    A.   Well, I don't -- I don't do it myself.
20    Q.   Right.
21    A.   I give the writ to the constables to do what
22  the constable does to execute.
23    Q.   Okay.  I used the word hire because it's the
24  one that makes the most sense to me.  If I have a
25  plumber come in and fix the sink, I'm hiring him to do

Page 69

1  that.  Do you agree with that?
2    A.   In those terms, but I'm giving the writ.  I'm
3  giving the writ to the constable.
4    Q.   Okay.  When you -- when you send a summons
5  and a complaint to a process server, is that the same
6  thing?  You're not hiring that person to do anything
7  for you, you're just giving them a paperwork and
8  they're just doing something?
9    A.   Yes.
10    Q.   And I'm not allowed to say that that's hiring
11  someone?
12    A.   I wouldn't characterize it like that, no.
13    Q.   Okay.  Can you tell me what word I can plug
14  into this to make it work?
15    A.   Give it to them, deliver it to them.
16    Q.   Okay.
17    A.   Provide it to them.
18    Q.   Why don't we do this.  If you're willing, let
19  me use the word hire, then you can have a standing
20  objection to that word and concept.
21    MR. PRICE:  Okay.  I think that makes sense.
22  Let's just have a standing objection.  And my concern
23  is I don't want any connotation that would concede to
24  the term hire with respect to that means that there's
25  agency and that's what it means.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 70..73

Page 70

1    MR. STEPHENSON: Yeah, I get that. I get that. I
2  want to ask questions on that, we'll go down that road,
3  but to me it just makes more sense that you're hiring
4  this person the same as you're hiring a process server
5  to do the job -- to do something.
6          Like you would hire anyone, like a plumber.
7  I mean, it's a really good example. It's the same
8  thing to me. So let's proceed in that regard with your
9  standing objection.
10   MR. PRICE: Yeah, with that standing objection
11 because to me it's two different things.
12   MR. STEPHENSON: Okay. So I will try to use other
13 words.
14   Q.  (BY MR. STEPHENSON) Okay. In general terms,
15 you give a writ of execution to a sheriff or a
16 constable, and that's the starting point; right?
17   A.  Yes.
18   Q.  And their job is to seize and sell the
19 property?
20   A.  Again, what they do beyond that, I really --
21 I don't know. The constables do what the constables
22 do.
23   Q.  Okay. In terms of -- okay. Have you ever
24 hired -- has your firm ever hired a constable other
25 than Kolkman and Erickson that you know of, or Utah

Page 71

1  County Constables specifically, to execute writs of
2  execution?
3    A.  I don't think so.
4    Q.  And your understanding of a writ of execution
5  is that -- you've already mentioned that it's to take
6  the property and sell it to satisfy the judgment?
7    A.  I think that's how the law reads. What they
8  do beyond that, I don't know. And I could be wrong on
9  that too. Again, I'm not -- I haven't read the rule
10 for a long time. I don't know -- that's their
11 authority.
12   Q.  Okay. So what did you hire Erickson and
13 Kolkman to do in this specific case?
14   A.  To execute on the writ issued by the court.
15   Q.  And when you say the words execute the
16 writ, you mean seize the property and sell it at
17 auction?
18   A.  Whatever they do.
19   Q.  Okay. What did you expect them to do?
20   A.  I think I already stated that. Whatever they
21 do.
22   Q.  Well, I object to that answer because it's
23 nonresponsive. I think it's too generic and too
24 confusing to me.
25          What specifically did you think they were

Page 72

1  going to do when you gave them the writ of execution?
2    A.  To execute on the writ.
3    Q.  Okay. And, now, so the word execute the writ
4  is something more than serving the writ; correct?
5    A.  I really don't know.
6    Q.  Okay. In a normal -- in your understanding
7  of writs of execution, what is the process that is
8  normally followed or that you -- let me give you an
9  example of what I'm asking.
10          There are steps to it. The writ is first
11 served on the debtor; correct?
12   A.  They would give us a return of service, so I
13 don't know if that was hand delivered or sent through
14 the mail, I don't know which, but we would get a return
15 of service.
16   Q.  Do you know if mailing a writ of execution
17 counts as proper service?
18   A.  I don't know.
19   Q.  And do their writs -- do their returns of
20 service indicate whether they were mailed or hand
21 delivered?
22   A.  I don't recall.
23   Q.  Either way, you would still file it with the
24 court?
25   A.  Yes.

Page 73

1    Q.  And to you, when they give you the return of
2  service, what did that mean? That they were delivered
3  the writ of execution?
4    A.  Yes.
5    Q.  Did it indicate to you that they had seized
6  property?
7    A.  I don't believe it would state that, but I
8  don't recall.
9    Q.  Well, when --
10   A.  It just shows -- again, it gives a date
11 provided the writ of execution, proof of service.
12   Q.  Okay. And what happens after you file the
13 writ of, I'm sorry, the return of service with the
14 court? What happens next?
15   MR. PRICE: Objection --
16   THE WITNESS: File it.
17   MR. PRICE: -- vague.
18   Q.  (BY MR. STEPHENSON) Go ahead.
19   A.  My office does nothing.
20   Q.  Nothing. Okay. And what is your office
21 waiting for if it's doing nothing?
22   A.  Well, it's in the constable's hand at that
23 point.
24   Q.  Okay. What is your office -- your office
25 stops collecting, doesn't make anymore phone calls,

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 74..77

Page 74

1  send anymore letters?
2      A.    Right.
3      Q.    Okay.  So what is it -- what is it waiting
4  for the next thing to happen?
5      A.    For the constable to execute on the writ to
6  satisfy the judgment.
7      Q.    And you can -- and are you able to articulate
8  what you mean by executing the writ to satisfy the
9  judgment specifically?
10     MR. PRICE:  Objection; asked and answered.
11     Q.    (BY MR. STEPHENSON) Is it your testimony that
12 you have no idea what's supposed to happen next?
13     A.    I really don't know what they do.  That is my
14 testimony.
15     Q.    Okay.  But is it your testimony you don't
16 know what's supposed to happen next?
17     A.    To satisfy the judgment.
18     Q.    Okay.  Are you aware that Rule 64E and
19 Rule 64, and I think Rule 69A, whatever, the rules as
20 far as executing a writ, they allow the debtor 14 days
21 to object?
22     A.    I don't know the specifics, I don't recall,
23 but I do know in our writ, our writ packet, let's call
24 it the packet, there is a request for hearing.  And if
25 that's 14 days, then that's -- I believe that's where

Page 75

1  that would be.
2      Q.    Okay.  So your firm gives a writ of execution
3  packet to the constables?
4      A.    That's signed by the court, yes.
5      Q.    That includes the execution -- or the writ of
6  execution signed by the court; yes?
7      A.    Yes.
8      Q.    The reply and request for hearing, whatever
9  it's called?
10     A.    Yes.
11     Q.    That's so the debtor can object?
12     A.    I believe so, yes.
13     Q.    14 days is the time they have, according to
14 your paperwork?
15     A.    If that's what it says, I'm going to rely on
16 you telling me that.  I don't -- I don't recall.
17     Q.    Okay.  What happens when a debtor objects?
18     A.    I believe they file a request for hearing
19 with the court.
20     Q.    And then you do what?  How do you respond?
21     A.    The court will set up for a hearing and we'll
22 appear at the hearing.
23     Q.    Do you file any paperwork opposing the
24 objection?
25     A.    That happens so seldom.  I don't believe so.

Page 76

1  I think we just -- if it's just for a objection to the
2  writ, it's just scheduled for a hearing.
3      Q.    Okay.  And you say seldom.  Do you know --
4  can you quantify that more specifically?  How many
5  times a year does someone object to a writ of
6  execution?
7      A.    Less than one time.
8      Q.    And can you remember what happens in -- or
9  what happened in the last hearing that you had on the
10 objection?
11     A.    I don't remember specifically, no.
12     Q.    Can you remember any of these hearings going
13 back, any of them at all?
14     A.    If there's going to be a hearing, the
15 defendant issues the judgment itself.
16     Q.    Would that be a different motion though, a
17 motion to vacate?
18     A.    If they were to file it, that would be a
19 different motion, but that's -- that's not what we're
20 talking about here.  You --
21     Q.    Right.
22     A.    -- specifically asked about request for --
23     Q.    Yeah.
24     A.    If they object to the -- to the writ.
25     Q.    Okay.  And so you're not familiar with the

Page 77

1  process of what happens when you -- when a constable is
2  given -- in a general sense.  Not these guys, in a
3  general sense, what is the process supposed to be?  Do
4  you have any familiarity with that process?
5      A.    I don't know what -- tell me more.
6      Q.    And I'll give you an example.  When a lawyer
7  executes a writ of execution, normally we give the writ
8  to the constable.
9      A.    Mm-hm.
10     Q.    The con -- is that a yes?
11     A.    Yes.
12     Q.    The constable then seizes the property; yes?
13     MR. PRICE:  Objection; lack of foundation.
14     Q.    (BY MR. STEPHENSON) But if you don't know,
15 that's okay, just --
16     A.    I don't know.
17     Q.    Okay.  So my understanding is the constable
18 first would execute the writ by handing it to the
19 person and taking their property into possession that
20 day.  Is that not your understanding?
21     A.    I don't know that to be.
22     Q.    Okay.  And then the person has 14 days to
23 object, then the court holds the hearing.  Your
24 understanding -- you agree with that?
25     A.    I understand the hearing, yes.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                          Pages 78..81

Page 78

1   Q.   Okay.  And then the court decides if that
2   property can be sold or not, but if there's no
3   objection, the property is sold at auction.  Do you
4   know that part of it?
5   A.   Again, if there's no objection, I don't see
6   what the constables do.  So my only involvement is if
7   there is an objection and a hearing is scheduled.
8   Q.   Okay.  Tell me about the garnishment process
9   when you're garnishing wages.  Let's walk me through
10  the steps of that.  When you send a writ of garnish,
11  you first obtain the writ from the court?
12  A.   Yes.
13  Q.   And you then send it to a constable or a
14  process server?
15  A.   A process sever.
16  Q.   And then they serve the writ of garnishment
17  on the bank, usually, or whoever it is?
18  A.   On the -- let's call it the garnishee.
19  Q.   Garnishee, yeah.
20  A.   Yeah.
21  Q.   And then the garnishee does what?  What's the
22  next step?
23  A.   The garnishee puts the writ of garnishment in
24  place and they hold the assets that are in their
25  possession.

Page 79

1   Q.   And they hold while there's a period of time
2   when the debtor can object?
3   A.   Yes.
4   Q.   It's 21 days?
5   A.   I believe it's 21 days.
6   Q.   And do people object to those?
7   A.   Yes.
8   Q.   More commonly than the writ of execution?
9   A.   Yes.
10  Q.   How many writs of -- how many -- can you give
11  me a ballpark on how many people object to the writs of
12  garnishment in a year for a given time frame?
13  A.   Less than once a month.
14  Q.   Okay.  Do you know how many of those -- how
15  many writs of execution you send in a month?
16  A.   I don't.
17  Q.   Do you send more writs of garnishment than
18  writs of execution?
19  A.   Yes.
20  Q.   Okay.  And when -- let's say there's no
21  objection to a writ of garnishment.  What happens next?
22  A.   The garnishee -- and let's just specifically
23  talk about wages.  The garnishee will hold wages,
24  they'll hold it for 21 days, and then they'll send it
25  to my office.

Page 80

1   Q.   Do you notify the court then when you receive
2   that?
3   A.   The funds?
4   Q.   Yeah.
5   A.   No.
6   Q.   Only when it fully pays the judgment?
7   A.   Yes.  Once the judgment's satisfied, yes.
8   Q.   And then you'll file a satisfaction of
9   judgment?
10  A.   Yes.
11  Q.   And are you the one that handles these writs
12  of garnishment or somebody else in your office?
13  A.   I approve the writs.
14  Q.   And that includes both writs of garnishment
15  and writs of execution?
16  A.   Yes.
17  Q.   And who handles sending the writs of
18  garnishment to the process server?
19  A.   Currently, right now, that is Bernice.
20  Q.   Okay.  Is she also the one that -- never
21  mind.  Let me strike that question.
22  Q.   Okay.  Did I miss any of the steps that are
23  involved in a writ of garnishment?  Did we miss
24  anything?
25  A.   I think the only thing that was missed is the

Page 81

1   return of service we get back from the process server
2   and we file that with the court.
3   Q.   Okay.  Okay.  And now the writs of execution
4   are somehow different in that you're not getting any
5   information back from the constables like you are with
6   the garnishments of -- like the employer's not
7   responding to you.  Now you're not getting a response
8   back; is that right?
9   MR. PRICE:  Object to form.
10  THE WITNESS:  My testimony was that we get the
11  return of service on the writ.
12  Q.   (BY MR. STEPHENSON) Yeah.  And after that,
13  your firm doesn't get any -- you don't do anything
14  else?
15  A.   That's correct.
16  Q.   But the constable -- the process is supposed
17  to involve the sale of property; correct?
18  MR. PRICE:  Objection to the extent it seeks
19  expert testimony, asked and answered.
20  Q.   (BY MR. STEPHENSON) Can you answer?
21  A.   I don't know.
22  Q.   If you don't know, then is it fair to say
23  that you -- when you gave the writs of execution to the
24  constables, that you did not expect them to seize the
25  property and sell it at auction?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 82..85

Page 82

```
 1     A.   I didn't say that.
 2     Q.   Okay.  Tell me then.  What did you expect?
 3     A.   For them to execute on the writ.  The
 4  constables do what the constables do.
 5     Q.   Okay.  But -- but that's a generic answer to
 6  a specific question.  The constables do what the
 7  constables do doesn't tell me what you expected them to
 8  do.
 9     MR. PRICE:  I'm going to object to the question.
10  She's answered that question multiple times.  You don't
11  like her answer, but that's her answer.
12     MR. STEPHENSON:  Yeah, I don't.  I object to her
13  answer.  It's nonresponsive.
14     MR. PRICE:  Well, it is responsive.  You just
15  don't like it.  The fact that you don't like it is of
16  no moment.  She's answered the question multiple times.
17     MR. STEPHENSON:  Yeah, and I keep objecting to it
18  as nonresponsive, which is appropriate, and I'm going
19  to keep asking until I get an answer, and I think we
20  can do that --
21     MR. PRICE:  Well, if you're going to keep asking
22  her, I'm going to terminate the deposition.
23     MR. STEPHENSON:  No, no.  We're okay.  We're okay.
24  I think we can do this.  I think we can help.
25     Q.   (BY MR. STEPHENSON) Does Rule 64E say
```

Page 83

```
 1  anything about seizing and selling property?  Or what
 2  are in the rules that are involved in writs of
 3  execution?
 4     A.   I don't recall specifically.
 5     Q.   Do you know what the rules say about posting
 6  the sale publicly?
 7     A.   I don't.
 8     Q.   Do you know what the rules say about selling
 9  the debtor's property?  Anything at all?
10     A.   I don't recall.
11     Q.   Okay.  Do you know anything about the fees
12  that a constable is allowed to collect in the process
13  of executing a writ?
14     A.   I don't.
15     Q.   And when you say the word executing a writ of
16  execution, you don't have an answer of what else that
17  means, even though when we talk about writs of
18  garnishment, you know exactly the steps, one through
19  whatever; correct?
20     A.   That's correct.
21     Q.   Okay.  So if somebody objected and said this
22  writ is invalid, you wouldn't have any knowledge of how
23  to -- whether it's -- whether it's invalid or not?
24     MR. PRICE:  Objection; improper hypothetical.
25     Q.   (BY MR. STEPHENSON) Go ahead.
```

Page 84

```
 1     A.   That wasn't my testimony.
 2     Q.   But is it true?  Is it true?  If somebody
 3  objected to a writ and said I object to this writ, you
 4  wouldn't know whether it's valid or not because you
 5  don't know the rules well enough?
 6     MR. PRICE:  Objection; incomplete and improper
 7  hypothetical.
 8     Q.   (BY MR. STEPHENSON) Okay.  Would you know
 9  what to do if they objected?
10     A.   If it attacks the judgment, yes.
11     Q.   Okay.
12     A.   Because you can't attack the judgment through
13  an objection to the writ.
14     Q.   Okay.  And if they attack the writ itself,
15  would you know what to do?
16     MR. PRICE:  Objection; incomplete hypothetical.
17     THE WITNESS:  In the sense if they said it was
18  issued improperly, then I could argue that, but,
19  otherwise, I don't -- I don't know where you're going
20  with your hypothetical, so I can't answer that.
21     Q.   (BY MR. STEPHENSON) Okay.  Do you know what
22  requirements -- what does the rule require with what
23  needs to be in the writ itself?
24     A.   I can't recall that from memory.
25     Q.   Do you request writs of execution in all of
```

Page 85

```
 1  your cases?
 2     A.   No.
 3     Q.   What percentage of cases do you request a
 4  writ of execution?
 5     MR. PRICE:  Objection; vague as to time frame.
 6     MR. STEPHENSON:  In the last five years.
 7     MR. PRICE:  Objection; still vague as to time
 8  frame.  She's testified previously that they don't do
 9  writs of execution internally.
10     Q.   (BY MR. STEPHENSON) Okay.  You request writs
11  of execution from the court though?  You have?
12     A.   I have, yes.
13     Q.   And do you know what percentage of cases,
14  when you were requesting those writs, what percentage
15  of cases you were requesting those writs in?
16     A.   I believe my earlier testimony is that from
17  2019 to some date in 2024 you asked we had done 600,
18  and so if we do that math backwards of how many suits,
19  I don't know what that math is, but I would say
20  that's -- that's very few.
21     Q.   What criteria do you use, did you use when
22  you were determining whether to request a writ of
23  execution?
24     A.   If I couldn't or wasn't successful in doing a
25  writ of garnishment or collecting and otherwise in
```

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                    Pages 86..89

Page 86

1  satisfying the judgment.
2      Q.   So the writ of execution was only considered
3  after you first tried to collect and, second, decided
4  garnishment wouldn't work?
5      A.   I think that's a -- that, in general terms,
6  yes.  How we do it is we try to collect the judgment
7  amicably, and if we can, that's great.  If not, then
8  we'll issue a garnishment.  And if we can't issue a
9  garnishment, then the writ would be -- would be the
10  last thing.
11      Q.   Have you ever hired -- or excuse me.  Have
12  you ever used a sheriff to execute writs of execution?
13      A.   Not that I can recall.
14      Q.   Can you tell me why you never used a sheriff,
15  you use constables instead?  What's the process there?
16      A.   The attorney I worked for before, that's who
17  he used.  That's how, as we talked before --
18      Q.   Kevin Richards?
19      A.   That's correct.
20      Q.   Were you aware in say 2018-2020, and whatever
21  time period you want to choose, were you aware that a
22  sheriff could execute a writ of execution?
23      A.   Yeah.  I guess I would have been, yeah.
24      Q.   But traditionally you were used to the Utah
25  County Constable?

Page 87

1      A.   Yes.
2      Q.   It made sense to just to go with who you
3  knew?
4      A.   Yes.
5      Q.   Who does the skip tracing?  Your firm does
6  that?
7      A.   My firm does skip tracing, yes.
8      Q.   Do constables also do skip tracing?
9      A.   I have --
10  MR. PRICE:  Objection; lack of foundation.
11  THE WITNESS:  I have no idea.
12      Q.   (BY MR. STEPHENSON) When a writ of execution
13  is given to the constables, you aren't aware of when a
14  sale takes place?
15      A.   I'm not.
16      Q.   And you're not aware of when a sale is
17  advertised?
18      A.   I'm not.
19      Q.   You're not aware of when a sale is posted
20  publicly?
21      A.   I'm not.
22      Q.   You're not aware of where a sale might be
23  publicly posted?
24      A.   No.
25      Q.   Have you ever -- have you ever been driving

Page 88

1  around anywhere, ever, and seen a posting of a writ of
2  execution on a lamp post?
3      A.   No.
4      Q.   Are you aware of who the auctioneer is at the
5  sale?
6      A.   No.
7      Q.   Are you aware of the criteria for when
8  something can be sold and when something can't be sold
9  under a writ of execution?
10      A.   I know there are objections, but I can't
11  speak to those.  I'm sorry, exemptions.  There's
12  exemptions, but I can't speak to those specifically.
13      Q.   You leave that up to the constable?
14      A.   Correct.
15      Q.   If you serve a writ of garnishment on
16  someone, whether it's a bank or employer, it doesn't
17  matter, on anyone, and they don't -- you get zero
18  response, what do you do next?
19      A.   On a writ of --
20      Q.   Garnishment.
21      A.   -- garnishment to the garnishee, employer, or
22  a bank?
23      Q.   Yeah.
24      A.   We would contact them directly.  My firm
25  would.

Page 89

1      Q.   When you send a writ of execution to the
2  constables and nothing -- you hear nothing back, what
3  do you do on those?
4      A.   We don't do anything.
5      Q.   You don't follow up like you do with a writ
6  of garnishment?
7      A.   Not with any -- anyone but the constable.  If
8  we wanted an update, then we might ask the constable,
9  but that happened on a rare occasion.
10      Q.   Okay.  And what circumstances would you
11  request an update from the constables?
12      A.   If they had already provided one.
13      Q.   Provided one what?
14      A.   An update.
15      Q.   Oh.
16      A.   That was your question though.  At what point
17  would you provide -- would you ask for an update?
18      Q.   Yeah.
19      A.   And my answer was when they haven't provided
20  one, meaning an update.
21      Q.   Okay.  And what responses do -- what kind
22  of -- when the constables do update you, what do they
23  tell you happened?
24  MR. PRICE:  Objection; vague, overbroad.
25      Q.   (BY MR. STEPHENSON) Well, we mentioned --

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 90..93

Page 90

1  we're talking about these updates.  The constables --
2  let's go back.  Constables would periodically update
3  your firm on their progress?
4      A.   Correct.
5      Q.   And in those updates, what do they contain?
6      A.   Let's call it a status.
7      Q.   And what are the statuses that they would
8  give you for a particular -- let's make a list of each
9  status you can expect in an update from a constable.
10     A.   They might not be the exact terms, but in
11 generic terms, I've seen one notice of sale, I've seen
12 something about a letter, and I've seen -- I can't -- I
13 can't remember.  I'm trying to think of those
14 spreadsheets, what they would say.
15     Q.   Do the constables ever call you to give the
16 update?
17     A.   On a rare occasion.  If there was something
18 specific, but in general terms, no.
19     Q.   And who was the contact point for the
20 constable's communications with your firm?
21     A.   There was somebody in the office and then I
22 think -- somebody in the constable's office, and I
23 don't know that person's name, and Mike Erickson.  I
24 remember hearing his name paged.  And Corey is another
25 familiar name.

Page 91

1      Q.   And your contact in your firm with those guys
2  was -- was --
3      A.   Melissa.
4      Q.   Melissa.
5           Were you ever involved in these updates?
6      A.   Not me specifically, no.  And it was usually
7  through email.
8      Q.   And that's because they provided lists of
9  each case and what was going on?
10     A.   That's my understanding, yes.
11     Q.   Okay.  And so --
12     A.   Not what was going on specifically, but
13 whatever one of those statuses were.
14     Q.   So let me just be clear on this.  When you
15 give -- when you give the writ to the constables, your
16 firm stops communicating, stops collecting with the --
17 with the debtor, stops collecting from the debtor,
18 stops negotiating, all of it, a hundred percent?
19     A.   Yes.
20     Q.   Okay.  And all of that is then handled by the
21 constable?
22     A.   Yes.
23     Q.   So when you give the writ to the constables,
24 you're expecting them to communicate with the
25 plaintiff; yes?

Page 92

1      A.   Again, I can't talk specifics.  Whatever they
2  do, whatever the constables do is what they do.  They
3  execute on the writ.  I don't know the specifics.
4      Q.   Just have no idea?  None whatsoever?
5      A.   I don't.
6      Q.   Okay.
7      A.   They're acting under their authority as a
8  constable.
9      Q.   Okay.  And that's kind of the problem we're
10 having with this discussion and why we're hemming
11 around it and kind of dancing here.  But you -- so
12 you -- but when you give them the writ of execution,
13 you don't limit their authority in any way?
14     A.   I expect them to follow the law.
15     Q.   Of course, of course.  But you don't tell
16 them you better follow the law, here's a writ?
17     A.   And my clients don't say that to me either,
18 so.
19     Q.   Right.  Right.
20     A.   Okay.
21     Q.   You expect them to follow the law?  That is
22 one thing --
23     A.   That's correct.
24     Q.   -- you do expect?
25     A.   I do expect them to stay within their

Page 93

1  authority.
2      Q.   Okay.  But do you also -- is it fair to say
3  you expect them to communicate with the debtor in some
4  way, because they're going to serve the debtor, that's
5  communication?
6      A.   Serving the debtor, I would consider that
7  some sort of communication, yes.
8      Q.   Okay.  And if a sale was to occur, you expect
9  them to carry that out honorably and, what's the word,
10 without lying?
11     A.   Yes.
12     Q.   Okay.  And who does the asset search?  Do you
13 do that before you send a writ to them or do the
14 constables do that or do you know?
15     A.   I don't do that.
16     Q.   Your firm doesn't do that either?
17     A.   No.
18     Q.   Skip tracing.  Does your firm do that before
19 they send it to the constable?
20     A.   Sure, yeah, we do some skip tracing.
21     Q.   Do you know whether or not the constable did
22 any skip tracing?
23     A.   I don't.  I would imagine they would, but I
24 don't know the specifics on that.
25     Q.   Okay.  And then how do you compensate the

Page 94

1  constables for their work?
2      A.   I don't know how they're compensated.
3  They -- they charge a certain fee and they keep that
4  before they send any funds to us.  So I don't know how
5  they're -- how they're compensated.
6      Q.   Your firm doesn't pay them directly?
7      A.   We don't.
8      Q.   So -- okay.
9      A.   Let's go backwards on that, Eric.  I think if
10 there's an opportunity where they were not able to
11 serve the writ and they return it back to us, I think
12 they would ask for a fee from us, but I think that's
13 only in the case they were unable to serve the writ.
14     Q.   Okay.  I'm concerned about that because -- so
15 let me get -- just because it's confusing.
16          If -- if -- so if the constable is -- he
17 tries to serve the writ of execution and he fails, he
18 asks for a fee from you?
19     A.   I think so.  I think that's the only time,
20 yes.
21     Q.   Do you know how much that fee is?
22     A.   I don't.
23     Q.   Does your firm ever threaten to seize and
24 sell a person's property when it doesn't intend to
25 actually seize and sell a person's property?

Page 95

1      A.   No.
2      Q.   And the reason for that is because that would
3  be deceptive and illegal under the FDCPA?
4      A.   Yes.
5      Q.   Okay.  One of the words -- let me ask you
6  this.  How do you feel, you personally or your firm,
7  you choose how you want to answer this.  How does --
8  how does your firm and you perceive the notion that --
9  trying to think of how to ask this question.
10          In a previous deposition the constable
11 characterized seizing and selling a person's property
12 as devastating to a person.  Do you agree with that;
13 that it would be devastating to have their personal
14 property seized and sold at auction?
15     A.   So this is a hypothetical?
16     Q.   It is.
17     A.   And you're just asking my opinion?
18     Q.   Yes.
19     A.   I think that would be -- that could be
20 considered devastating to some people.
21     Q.   The constable -- I'm trying to figure out if
22 you're on the same page with the constable that
23 collecting a payment from a person, a hundred bucks or
24 whatever, is less devastating than seizing and selling
25 all their property.  Do you agree with that?

Page 96

1      A.   In general terms, yes.
2      Q.   Okay.
3      A.   I think any human being would probably say
4  that.
5      Q.   Okay.  So when you -- let's just go down this
6  road and hold on tight.  When you give the writ of
7  execution to the constable, you don't give them any
8  instructions on what to do?
9  MR. PRICE:  Objection; asked and answered.
10         THE WITNESS:  I don't have that authority, no.
11     Q.   (BY MR. STEPHENSON) Okay.  Well, when you
12 give a summons to a constable, you might give them some
13 instructions like this guy works at so and so, try
14 there first; right?
15     A.   It's on -- it's on the cover sheet.
16     Q.   Yeah, you might type in some instructions on
17 how to find the person better or if you know where they
18 work or where they frequent?
19     A.   It would be on the cover sheet, yes.
20     Q.   Okay.  And when you give the writs of
21 execution to the constables, you don't do that?
22     A.   I think they also go with a cover sheet.
23     Q.   Okay.  And that cover sheet might include
24 instructions then on how to find somebody -- or what
25 would they include?

Page 97

1      A.   Contact information.
2      Q.   Okay.  But not how to seize the property?
3      A.   No.
4      Q.   You wouldn't tell them where to store the
5  property?
6      A.   No.
7      Q.   You wouldn't tell them what property to take?
8      A.   No.
9      Q.   Did the constables do anything in this case
10 outside of what you told them to do?
11 MR. PRICE:  Objection.  Object to form, lack of
12 foundation.
13         THE WITNESS:  I gave them the writ to execute on.
14     Q.   (BY MR. STEPHENSON) Right.  And they didn't
15 do anything -- like they didn't take my client's cat?
16     A.   I don't think so.
17     Q.   Did the constables -- have they ever -- have
18 they ever done anything that violated the authority you
19 granted to them to execute the writs?  Can we at least
20 agree on that one?  That you authorized them to execute
21 the writs?
22     A.   Yes.
23     Q.   Okay.
24     A.   I didn't give them -- their authority is
25 under the law.  I didn't give them any authority.  I

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 98..101

Page 98

1  assigned it to them.  Their authority is not from me.
2      Q.    Okay.
3      A.    Their authority is under the law.
4      Q.    Why did you fire the constables?
5  MR. PRICE: Object to form.
6      Q.    (BY MR. STEPHENSON) Go ahead.
7      A.    I didn't fire the constables.  You sued me,
8  so I stopped requesting them from the court.
9      Q.    So you didn't just stop using Constable
10 Erickson and Constable Kolkman, you stopped getting
11 writs of execution completely?
12     A.    That's correct.
13     Q.    Are you aware of any constables -- never
14 mind.  Let me strike that.
15         All right.  Let's just get this in there now.
16 We'll do it Exhibit No. 1.
17              (Exhibit 1 marked.)
18     Q.    (BY MR. STEPHENSON) Okay.  Do you recognize
19 Exhibit 1?
20     A.    I do.
21     Q.    Tell me what that is.
22     A.    This is the valid writ of execution signed by
23 the court.
24     Q.    Okay.  You threw in the word valid.  What was
25 that for?

Page 99

1      A.    I could just see the court's stamp up here
2  (indicating).
3      Q.    Okay.  Are you testifying that this writ of
4  execution is valid?
5      A.    I am.
6      Q.    Okay.  And why do you say it's valid?  Why do
7  you claim that?
8      A.    It's got the court's stamp up here with the
9  date that it was signed (indicating).
10     Q.    Okay.  But the court stamp up there means it
11 was entered by the court, it doesn't mean the court --
12 it doesn't -- do you have a court order that looked --
13 where another court or any court looked at this writ of
14 execution and said this is valid?
15     A.    I guess no.
16     Q.    Okay.  The court approved this writ though?
17     A.    Correct.
18     Q.    Okay.  That's an important distinction
19 because I want to ask you some questions about it.
20     A.    Okay.
21     Q.    Are you -- I've already asked you on the
22 rules.  You're not familiar with what specificity is
23 required to be in a writ of execution; correct?
24     A.    I drafted the writ, and when I drafted it, I
25 was very aware.  To say that I read it recently and can

Page 100

1  recite that, no, but I did draft this and sign it
2  before it was -- or signed the application before it
3  was submitted to the court.
4      Q.    And this is a template?
5      A.    It is a template, yes.
6      Q.    And so all of your writs contain the
7  paragraph starting with "You are commanded to collect
8  the judgment?"  That same --
9      A.    Can you tell me where you're looking.
10     Q.    The bottom.
11     A.    Oh, yes.
12     Q.    "You are commanded to collect the judgment."
13 That entire paragraph is standard in all of your writs
14 or most of them anyway?
15     A.    I believe so, yes.  I took this off the
16 court's -- the court's forms.
17     Q.    Okay.  And the reason I'm asking this
18 question is because the rule -- I'm just going to tell
19 you the rule requires specificity in what specific
20 things you can take, but this is generic.  It says TVs,
21 stereos, electronic equipment, farm equipment, for
22 crying out loud; right?  But is it your testimony that
23 you think this follows the statute?
24     A.    Yes.
25     Q.    Okay.  Your testimony is that you're not

Page 101

1  required to be more specific in finding out what
2  property a person owns before you request a writ?
3      A.    If you -- if you know specifically, then you
4  can add that is my understanding, but to use -- to ask
5  for personal property I believe is correct.
6      Q.    And this total balance due says $2606.18.  Is
7  that -- did I read that right?
8      A.    Yes, that's what it says.
9      Q.    And that's what the balance is after the
10 principal amount and the fees are all included?
11     A.    That's what it says.
12     Q.    Right.  But is that accurate?
13     A.    I think so, yes.
14     Q.    Okay.  So the number the court approved was
15 $2,606.18?
16     A.    Correct.
17     Q.    I want to be sure we're clear on this, and
18 we've talked about Erickson when you hired him, you
19 expected him to not break the law.  The same is true
20 with Kolkman; right?
21     A.    Yes.
22     Q.    And the same is true with Kolkman as far as
23 giving him instructions on what to do?  You didn't give
24 him any instructions?
25     A.    Yes, correct.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                          Pages 102..105

Page 102

1    Q.   And you don't know what Kolkman did either
2    after you gave him the writ?
3    A.   I don't.
4    Q.   Okay.  And let's be clear on that.  Did you
5    give Kolkman the writ or did Erickson give him the
6    writ?
7    A.   Erickson gave Kolkman the writ, but we were
8    notified of that.
9    Q.   Okay.  In writing?
10   A.   I think they called on the phone.
11   Q.   And they just --
12   A.   I don't know.  I don't remember specifically.
13   Q.   Did they speak to you?
14   A.   No.
15   Q.   To Melissa?
16   A.   Most likely, yes.
17   Q.   Does Melissa know more about what the
18   constables are doing than you do?
19   A.   I don't think so.
20   MR. PRICE:  Objection; lack of foundation.
21   Q.   (BY MR. STEPHENSON) Do you know how many
22   other -- do you know of any -- do you know of any other
23   law firms the constables were also executing writs of
24   execution for?
25   A.   Yes.

Page 103

1    Q.   And what are -- who are those other firms?
2    A.   I think only two.  Quinn Kofford and Mark
3    Olson.
4    Q.   So Mountainland Collections and Olson Shaner;
5    is that right?
6    A.   Yes.  Well, Mountainland is the collection
7    agency.  Quinn Kofford is the attorney.
8    Q.   And Mark Olson is the attorney for Olson
9    Shaner?
10   A.   Yes.
11   Q.   Have you ever communicated with Quinn or Mark
12   Olson or anybody from those firms about this?
13   A.   About this particular case?
14   Q.   About the writs of execution situation.  Not
15   necessarily this case, but in general.
16   A.   Yes.
17   Q.   And what's -- what did -- well, tell me about
18   those conversations.  What happened in those
19   conversations with Mark Olson and Quinn Kofford?
20   A.   We talked about you suing us.
21   Q.   Okay.  But, I mean, before I sued, before you
22   knew I was involved, did you talk to these guys
23   beforehand?
24   A.   No.
25   Q.   Did you know they were using the same

Page 104

1    constables before I got involved?
2    A.   I don't recall any specific conversations,
3    no.
4    Q.   Has anyone ever complained to you -- other
5    than me and my clients, has anyone ever complained to
6    you about the constables' efforts to collect debt?
7    A.   No.
8    Q.   Okay.
9    A.   Not that I can recall.
10   Q.   That's fair.  Okay.
11   I got to be clear on this.  Is it your
12   testimony that you did not know the constables were
13   collecting payments on your behalf?
14   A.   I knew they would send payments.
15   Q.   Okay.
16   How they set that up, I don't know.
17   Q.   Okay.  Let's do this.  You knew the
18   constables were sending you payments?
19   A.   They were sending me money, yes.
20   Q.   Okay.  Sending money.  And you knew that
21   money was less than the judgment amount?
22   A.   Yes.
23   Q.   And you knew that money was -- you knew they
24   were sending multiple payments from some consumers?
25   A.   Yes.

Page 105

1    Q.   And you never asked why they were sending
2    partial payments?
3    A.   No.
4    Q.   And you never asked why they were sending
5    repeated payments consecutive, a month here, a month
6    there?
7    A.   No.  I don't know how they got the money.
8    Q.   And do you know how much of the payments they
9    were giving you, how much they kept for themselves?
10   A.   I don't.
11   Q.   You never asked for an accounting of the
12   money?
13   A.   No.
14   Q.   What about notifying the court?  Did you ever
15   notify the court of these payments?
16   A.   Once the -- once the judgment was satisfied.
17   Q.   And in those cases that the judgment was
18   satisfied, how did you calculate the amount that was
19   needed to satisfy the judgment?
20   A.   I calculated what they sent me.
21   Q.   What the constables gave you?
22   A.   Correct.
23   Q.   So if the debtor paid the constables more
24   than the constables paid you, that was not included in
25   your calculation for determining whether the judgment

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 106..109

Page 106

1  was satisfied?

2      A.   The constables add what they can per statute.
3  Again, all their authority comes from the court or the
4  laws, the county.  I have no idea what they're adding.

5      Q.   That doesn't quite answer the question
6  though.  I get what you're saying, that they add what
7  they want, essentially, according to the law, but you
8  assume that they're -- let's go back.

9           You assume they're adding what the law says
10  they can add, but you don't know if they're adding
11  more?

12      A.   Correct.

13      Q.   They could be -- they could be doubling debt
14  for all you know, and you wouldn't know?

15      A.   I have no idea.

16      Q.   Right.  So -- so the amount you -- when you
17  tell -- when you calculate what amount is needed to
18  satisfy the judgment, it does not include whatever the
19  payment -- whatever the constables kept in their own
20  pocket?

21      A.   That's correct.

22      Q.   So the constables sent you payments.  How
23  many times did the constables send you a notice or
24  documentation of a sale?

25      MR. PRICE:  Objection; compound.

Page 107

1      Q.   (BY MR. STEPHENSON) Did you -- can you answer
2  it?

3      A.   Break it down into two questions.

4      Q.   Okay.  I don't know that it is two questions.
5  Did the constables ever send you notice of a sale?

6      A.   Not that I recall.

7      Q.   Okay.  So out of 600, you can safely testify
8  that you know none of them resulted in a sale?

9      A.   I don't recall seeing a notice of sale.

10      Q.   Okay.  Objection; nonresponsive, but it was
11  close.  Can you say for certain that whether or not --
12  you can't tell me any -- can you give me one example of
13  any sales?

14      A.   I can't.

15      Q.   Okay.  So you should be able to testify that
16  your -- that, to your knowledge, zero sales occurred?

17      MR. PRICE:  Objection; lack of foundation.  She
18  answered the question.  She said she's not aware, not
19  to her knowledge.  She can't testify beyond what she
20  knows.

21      MR. STEPHENSON:  No, I'm not asking -- I'm really
22  trying to ask it the right way and forgive me for my
23  lack of ability.  I'm really trying here.

24      Q.   (BY MR. STEPHENSON) To your knowledge, zero
25  sales occurred?  That's just.

Page 108

1      A.   I never -- I never saw a notice of sale.

2      Q.   Okay.  And that includes both Erickson and
3  Kolkman?

4      A.   Yes.

5      Q.   And did they ever provide -- at any time did
6  either one of them ever give you an inventory of the
7  property they seized?

8      A.   No.

9      Q.   At any time did Kolkman or Erickson ever send
10  you any documentation of seizing property in any form?

11      A.   Not that I can recall, no.

12      Q.   Okay.  And did you ever ask them why they
13  weren't selling the property?

14      A.   No.

15      Q.   Did you ever ask them why they weren't
16  seizing property?

17      A.   No.

18      Q.   What did you think they were doing then if
19  you knew they weren't seizing or selling property, but
20  they were collecting payments?  You agree that you knew
21  that; right?

22      A.   I knew they were collecting payments, yes.

23      Q.   Okay.  And you knew they were not seizing or
24  selling property?

25      MR. PRICE:  Object to form; misstates her

Page 109

1  testimony.

2      Q.   (BY MR. STEPHENSON) Did you believe they were
3  seizing and selling property?

4      A.   I don't know.  You asked if I ever saw a
5  notice of sale.  I never saw a notice of sale.  I don't
6  know if they were.

7      Q.   Okay.  That's fair.  But did you ever wonder
8  if they were actually seizing or selling property?  Did
9  it ever cross your mind that they might not be?

10      A.   I didn't.

11      Q.   You didn't think about it at all?

12      A.   I stay out of their business.  They have
13  their own authority.

14      Q.   Did Erickson or Kolkman do anything for the
15  firm that was not part of executing the writs of
16  execution?

17      A.   No.

18      Q.   You don't use Erickson or Kolkman to serve
19  summons and complaints?

20      A.   I don't.

21      Q.   You didn't or never did use Erickson or
22  Kolkman to serve subpoenas?

23      A.   No.

24      Q.   Did you ever use these two constables,
25  Erickson or Kolkman, for serving writs of garnishment?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                Pages 110..113

Page 110

1      A.   No.
2      Q.   The only thing you used them for was to
3   execute the writs of execution?
4      A.   Yes.
5      MR. STEPHENSON:  Let's do Exhibit 2.
6                (Exhibit 2 marked.)
7      Q.   (BY MR. STEPHENSON) Do you recognize
8   Exhibit 2?
9      A.   I do.
10     Q.   Tell me what Exhibit 2 is.
11     A.   This is the proof of service from the
12  constable.
13     Q.   And this is the constable's notice to you and
14  the court that he served the writ of execution on my
15  client?
16     A.   Yes.
17     Q.   And it says here, twice in fact, it says in a
18  really small paragraph where it's numbered No. 1, it
19  says "I delivered the attached process to the above
20  named defendant."
21          Do you see that?
22     A.   That's what it says.
23     Q.   And then down here it says Date Delivered:
24  December 19, 2018.
25     A.   That's what it says.

Page 111

1      Q.   Okay.  Does it say on here how this delivery
2   occurred, whether in person or by mail?
3      A.   Not that I can see.
4      Q.   Do you know whether it occurred by in person
5   or by mail?
6      A.   I don't.
7      Q.   And you filed this with the court?
8      A.   I did.
9      Q.   And you filed this with the court to notify
10  the court that service of process of the writ of
11  execution occurred?
12     A.   That's correct.
13     Q.   And you didn't pay Constable Kolkman to do
14  this, to serve this writ of execution?
15     A.   I didn't.
16     Q.   When you say you didn't pay him, he was
17  compensated for serving this writ of execution though?
18     MR. PRICE:  Objection; lack of foundation.
19     MR. STEPHENSON:  Okay.  Let's -- let's go down
20  that road in a little while.  Let's put that on hold.
21     THE WITNESS:  Okay.
22     MR. STEPHENSON:  Let's go through these really
23  quick.
24               (Exhibit 3 marked.)
25     Q.   (BY MR. STEPHENSON) Okay.  Exhibit 3.  Do you

Page 112

1   recognize Exhibit 3?
2      A.   This is something that you provided in your
3   documents in the case.
4      Q.   When was the first time you saw this
5   document?
6      A.   When you provided it.
7      Q.   So you were not aware that Constable Erickson
8   mailed this letter to my client?
9      A.   No, I was not.
10     Q.   And does this letter contain the FDCPA's
11  30-day notice of verification?
12     A.   Not that I can see.
13     Q.   And the balance that says is due is
14  $2,166.27.  Do you see where it says that?
15     A.   That's what it says.
16     Q.   And that is not the balance due; correct?
17     A.   I don't know that.
18     Q.   Okay.  But if we go to the writ of execution,
19  Exhibit 1, the total due from the court is $2,606.18.
20  They're different right?
21     A.   The $2,606.18 is the judgment balance on the
22  top of what you've handed me, Exhibit 3.
23     Q.   Right.  And the -- the constable added fees
24  to that amount; correct?
25     A.   Looking at this, yes.

Page 113

1      Q.   He added a $50 service fee.  Do you know why?
2      A.   I don't.
3      Q.   He added a $18 mileage fee.  Do you know why?
4      A.   I don't.
5      Q.   He added a $44.09 commission.  Do you know
6   why?
7      A.   I don't.
8      Q.   He added a $20 notices fee.  Do you know why?
9      A.   I don't.
10     Q.   He added another $18 for mileage to Post.  Do
11  you know why?
12     A.   I don't.
13     Q.   And a sale notice fee of $260.  Do you know
14  why?
15     A.   I don't.
16     Q.   Do you know of any statute or regulation or
17  rule that allows the constable to add these amounts
18  without getting them approved by a judge?
19     A.   I don't.
20     Q.   Do you know why -- do you know whether or not
21  the constables actually earned any of these fees?
22     A.   I don't.
23     Q.   You don't know whether he posted any mileage
24  -- or excuse me -- posted any notice of sales or
25  anything like that?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                             Pages 114..117

Page 114

1    A.   I don't.
2    Q.   You have no idea what he did?
3    A.   Outside of their authority, I don't know
4  anything that they did.
5    Q.   Well, no, no.
6    A.   Outside of what they're allowed to do, I
7  don't.
8    Q.   Okay.  I object; nonresponsive.
9         Forgetting what their authority is, the only
10 thing you know about the constables in this case is
11 that you gave them the writ of execution and they
12 collected payments from my client and gave those
13 payments, partial -- part of those payments to you?
14   A.   That's what I know.
15   Q.   Nothing else?
16   A.   I don't know anything else.
17   Q.   Okay.  Do you -- if this -- hypothetically,
18 if this letter was the first communication a debt
19 collector mailed to someone, would it violate the
20 FDCPA?
21        MR. PRICE:  Objection; lack of foundation,
22 incomplete hypothetical.  This is not an expert
23 witness.
24   Q.   (BY MR. STEPHENSON) But you can answer your
25 opinion.

Page 115

1    A.   If it was a collection notice, it doesn't
2  have Mini Miranda on it if that's what you're asking.
3    Q.   Yes.  It doesn't have the debt validation or
4  the Mini Miranda?
5    A.   It does not.
6    Q.   And if these fees were not earned, but
7  they were being collected here, that would violate the
8  FDCPA as well?
9         MR. PRICE:  Same objections.
10        THE WITNESS:  Yes.
11        MR. STEPHENSON:  Let's do the next.
12             (Exhibit 4 marked.)
13   Q.   (BY MR. STEPHENSON) Do you recognize
14 Exhibit 4?
15   A.   I do from your exhibits.
16   Q.   This is not a document the constables
17 provided before this case was filed?
18   A.   It's not.
19   Q.   And what does this document indicate to you?
20   A.   This looks like a receipt for payment from
21 your client to the constable.
22   Q.   And the payment amount was $100?
23   A.   Yes.  That's what it says.
24   Q.   Paid on February 2nd, 2021?
25   A.   That's what it says.

Page 116

1    Q.   And the date of Exhibit 3, if you go down to
2  the teeny, tiny letters in the corner, she might have
3  actually covered them accidentally, but -- did she not?
4         It says the date of that letter was
5  February 2nd, 2021, the same date as --
6    A.   It's very little.
7    Q.   Yeah.
8    A.   Yes.
9    Q.   You can see it?
10   A.   February 2nd, 2021.
11   Q.   And the payment is the same day?
12   A.   Yes.
13   Q.   How much of that hundred dollars did you
14 receive?
15        MR. PRICE:  Objection; lack of foundation.
16        THE WITNESS:  I don't know.
17   Q.   (BY MR. STEPHENSON) When the constables send
18 you payment, they don't send you an explanation or a
19 breakdown of what was actually paid?
20   A.   They don't.
21   Q.   And you never asked them why?
22   A.   Nope.
23   Q.   And you never asked them to provide a better
24 explanation?
25   A.   No.

Page 117

1         MR. STEPHENSON:  Let's mark this next one.
2    Q.   (BY MR. STEPHENSON) Oh.  And you never told
3  constables to stop sending the letter marked as
4  Exhibit 3?
5    A.   No.  I never knew of the letter.
6    Q.   Okay.  And so -- so you didn't approve it
7  before they sent it; they just sent it on to her?
8    A.   Correct.
9             (Exhibit 5 marked.)
10   Q.   (BY MR. STEPHENSON) Exhibit 5.  Is this the
11 -- did you know that constables sent this letter to my
12 client before the lawsuit?
13   A.   Until the lawsuit, no.  You provided us a
14 copy of this.
15   Q.   So you didn't write this letter?
16   A.   I did not.
17   Q.   You didn't -- you didn't approve of this
18 letter?
19   A.   I did not.
20   Q.   And this letter gives 10 days for my client
21 to contact the constables to pay the debt; correct?
22   A.   That's what it says.
23   Q.   And you never told the constables to stop
24 sending this letter to your debtors?
25   A.   No.  I didn't know of the letter.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 118..121

Page 118

1    Q.    And do you agree that this letter fails to
2  contain the Mini Miranda?
3    A.    There is not a Mini Miranda on this notice.
4    Q.    So, in your opinion, does this letter violate
5  the FDCPA if a debtor collector sent it?
6    A.    Yes.
7    Q.    Is this letter -- okay.  Never mind.  Let's
8  mark the next one.
9              (Exhibit 6 marked.)
10    Q.    (BY MR. STEPHENSON) Do you recognize
11  Exhibit 6?
12    A.    Only from your exhibits.
13    Q.    This letter was not a letter you knew the
14  constables were sending?
15    A.    I didn't know they were sending this.
16    Q.    If you did know the letter -- the constables
17  were sending this letter, would you have stopped them?
18  MR. PRICE:  Objection; improper hypothetical,
19  speculation.
20  THE WITNESS:  I don't know.
21    Q.    (BY MR. STEPHENSON) Okay.  Does this letter
22  have the Mini Miranda?
23    A.    It does not have the Mini Miranda.
24    Q.    And this letter says the same thing; "call my
25  office within 10 days?"

Page 119

1    A.    It does.
2    Q.    Can you explain to me why Exhibits 5 and 6
3  contain a caption, a court caption?
4    A.    A court caption.  I don't know what you're
5  referring to.
6    Q.    Okay.  So a court caption looks like -- the
7  top of these letters has the case number listed;
8  correct; Exhibits 5 and 6?
9    A.    Yes.
10    Q.    And they list Brigham Young University as the
11  plaintiff and my client as the defendant; correct?
12    A.    Yes.
13    Q.    And that is in the same format or similar to
14  a court caption; correct?
15    A.    I didn't notice that until now.  It looked
16  like a letter to me.  But that top part looks like the
17  caption of a pleading, yes.
18    Q.    And these are not court filings?
19    A.    Not that I -- not that I'm aware, no.
20    Q.    Okay.  And do you know why they are styled
21  this way?
22    A.    I don't.
23    Q.    You didn't approve the constables styling the
24  letters that way?
25    A.    No.

Page 120

1    Q.    Okay.
2              (Exhibit 7 marked.)
3    Q.    (BY MR. STEPHENSON) Same questions for
4  Exhibit 7.  Do you know why it's styled to look like a
5  court filing?
6    A.    I don't.
7    Q.    Do you know why it doesn't contain the Mini
8  Miranda?
9    A.    I don't see a date.  Oh, I do.  I don't know
10  why it doesn't state -- it doesn't -- what was your
11  question again?
12    Q.    Do you know why it doesn't -- okay.  Let's
13  start with this.  It doesn't have a Mini Miranda;
14  correct?
15    A.    I don't see a Mini Miranda on page 1.  Let me
16  look at page 2.
17    Q.    Oh, yeah.  Definitely look at page 2.
18    A.    It's an envelope.  No, I don't see the Mini
19  Miranda anywhere.
20    Q.    Okay.  Do you know why it doesn't contain a
21  Mini Miranda?
22    A.    I don't.
23    Q.    Would this letter violate the FDCPA if it was
24  sent by a debt collector?
25    A.    If --

Page 121

1  MR. PRICE:  Objection; she answered this before.
2  THE WITNESS:  If sent by a debt collector, what
3  was your question again?
4    Q.    (BY MR. STEPHENSON) This letter would violate
5  the FDCPA; correct?
6    A.    If it was sent by a debt collector, yes.
7    Q.    And this letter is notifying the client, or
8  excuse me, my client that Rob Kolkman is taking over
9  the collection process; correct?
10    A.    That's what it says.
11    Q.    And it even mentions "Your payment will be
12  going through" this office, or "his office," and, "The
13  process will remain the same;" correct?
14    A.    That's what it says.
15    Q.    Okay.  So essentially this letter is
16  communicating to my client that she needs to start
17  making payments through Kolkman instead of Erickson?
18  MR. PRICE:  Objection; lack of foundation.
19  THE WITNESS:  That's what it says.
20    Q.    (BY MR. STEPHENSON) Okay.  And you didn't
21  approve that letter?
22    A.    I didn't.
23    Q.    You didn't know it was -- it existed until
24  this case was filed?
25    A.    That's correct.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 122..125

Page 122

1          (Exhibit 8 marked.)
2     Q.   (BY MR. STEPHENSON) Do you recognize
3  Exhibit 8?
4     A.   (Peruses document.)
5          I actually don't recognize this one from what
6  you sent.
7     Q.   Do you remember when the first time you've
8  seen -- you saw this exhibit?
9     A.   It would be today.
10    Q.   Oh.
11    A.   I mean, I reviewed a lot of documents
12 yesterday, so it could have been in your -- in your
13 documents.
14    Q.   Okay.
15    A.   So at the time of this case if it was
16 provided to us.
17    Q.   Okay.  Looking at this letter, you notice --
18 you recognize -- do you agree that it has the -- that
19 it looks like a court caption on the top?
20    A.   It has that same heading.
21    Q.   And it doesn't have the Mini Miranda?
22    A.   It's two pages.  The first page is not, the
23 second page -- it does not have the Mini Miranda.
24    Q.   So do you agree that this would violate the
25 FDCPA if it was sent by a debt collector?

Page 123

1     A.   Yes.
2     MR. PRICE:  And I'm just going to have a standing
3  objection on that.
4     MR. STEPHENSON:  Absolutely.  Absolutely.
5     Q.   (BY MR. STEPHENSON) And this -- can you
6  discern the purpose of this letter?
7     MR. PRICE:  Objection; lack of foundation.
8     THE WITNESS:  In bold it says "Please take note of
9  the attached sale notice," and then -- and you turn to
10 the second page, it says "Notice of Sale, Personal
11 Property."
12    Q.   (BY MR. STEPHENSON) Okay.  So how do you
13 interpret this letter?  If you received this letter in
14 the mail, what would you think it means?
15    A.   That they were selling my personal property.
16    Q.   All right.  And if you turn to page 2, the
17 date and time of the sale is listed; correct?
18    A.   It has a date on here, March 2nd, 2023, and a
19 time of 9:30.
20    Q.   Okay.  And it mentions that you can contact
21 this office immediately to make a payment or
22 arrangements to cancel the sale.  Do you see that in
23 the middle?
24    A.   Oh, right here.  "Contact this office
25 immediately to make" payments -- "to make a payment or

Page 124

1  arrangements to cancel the sale."  That's what it says.
2     Q.   So this letter is soliciting payments based
3  on the writ of execution?
4     MR. PRICE:  Objection to the characterization of
5  the letter.  The letter speaks for itself.
6     Q.   (BY MR. STEPHENSON) Do you agree with my
7  characterization?
8     A.   The letter does speak for itself as we read
9  it.
10    Q.   Well, I would rather -- I would rather hear
11 your characterization.  Do you agree with my
12 characterization that this is soliciting payment?
13 Let's start there.  This letter is soliciting a
14 payment?
15    A.   Yes.  It asks for -- it says to cancel the
16 sale, make a payment.
17    Q.   And payments can be made by cash, card, or
18 certified funds?
19    A.   It says that, yes.
20    Q.   And it's also -- this letter is also
21 soliciting contact with my client for the purpose of
22 making that payment?
23    A.   That's what it says.
24    Q.   Okay.  And you didn't authorize this letter?
25    A.   I didn't.

Page 125

1     Q.   And your firm doesn't send this letter?
2     A.   We don't send this letter.
3     Q.   Would you send this letter?
4     A.   I'm not the constable, no.
5     Q.   I know.  That's why I'm asking.  Would your
6  firm send this letter?  Would your firm happily send
7  this letter?
8     A.   No.
9     Q.   And the reason is because this letter would
10 violate the FDCPA if you sent it?
11    A.   Correct.
12    Q.   Do you agree that this letter is making a
13 threat to sell the property?
14    MR. PRICE:  Objection.  Now you're seeking to have
15 the witness be an expert as to linguistics where she
16 clearly is not.
17    Q.   (BY MR. STEPHENSON) Yeah, you can answer.  I
18 think you're -- you're a lawyer, but even if you
19 weren't, a normal person can see this and see that it's
20 a threat?
21    MR. PRICE:  No.  That's expert testimony.
22    Q.   (BY MR. STEPHENSON) Okay.  Well, in your
23 opinion, is this considered a threat?
24    MR. PRICE:  No, I'm not going to let her answer
25 and provide testimony and state her opinion for expert

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 126..129

Page 126

1  opinion unless you agree that it's not expert -- that
2  she's not providing expert opinion.
3       MR. STEPHENSON:  I absolutely agree.
4       Q.   (BY MR. STEPHENSON) As this question
5  pertains, you're just asking -- you're just answering
6  as a normal, regular human being.  Does this look like
7  a threat to you?  Would you consider this to be a
8  threat?
9       THE WITNESS:  Answer it (to Mr. Price)?
10      MR. PRICE:  Well, first off, I'm also going to
11 object to the term threat being vague.
12      MR. STEPHENSON:  Okay.
13      Q.   (BY MR. STEPHENSON) Do you agree that it's a
14 threat?
15      A.   Am I to answer (to Mr. Price)?
16      MR. PRICE:  Subject to my objections.  I think
17 it's vague and ambiguous, but you can answer.
18      THE WITNESS:  I wouldn't say threatening.  I think
19 it's a notice of sale.
20      Q.   (BY MR. STEPHENSON) Okay.  So what word
21 should I use then instead of threat?  Promise?  Hint?
22 What is this letter saying?  It's saying we're going
23 to -- this letter is saying -- you're refusing to use
24 the word threat.  Let me just go there.  Is that
25 accurate?

Page 127

1       A.   I'm not refusing.  I just said -- you asked
2  me if I thought it was a threat, I said no.
3       Q.   Okay.  So it's your testimony this does not
4  look like a threat to you?
5       A.   No.
6       MR. PRICE:  Asked and answered.
7       Q.   (BY MR. STEPHENSON) Okay.  I need it to be
8  clear because the jury is going to hear this question.
9       MR. PRICE:  Well, it was clear.
10      MR. STEPHENSON:  Okay.  I really just want it just
11 to make sure it was clear.
12      Q.   (BY MR. STEPHENSON) This, to you, is not a
13 threat?
14      A.   No.
15      Q.   Okay.  And do you have any idea whether or
16 not this sale ever occurred?
17      A.   I don't.
18      Q.   And do you have any idea -- assuming the sale
19 didn't occur, do you have any idea why it didn't occur?
20      A.   I don't.
21      Q.   And do you know -- do you know if these
22 constables, Kolkman or Erickson, have sent this letter
23 to other people?
24      A.   I don't.
25      Q.   And do you know whether or not they've ever

Page 128

1  carried out a sale after sending this letter with the
2  date and time as to the sale?
3       A.   I don't.
4       Q.   So you never expressed any concern over this
5  letter because you didn't know it existed?
6       A.   I didn't know it existed.
7       Q.   So you didn't express any concern to the
8  constable about this letter?
9       A.   That's correct.
10      Q.   If they were still employed by you now, or
11 still taking writs of execution from you now, and you
12 knew this letter, would you let them send it?
13      A.   I don't know.
14      Q.   Okay.  What would you -- what would you need
15 to know whether or not you would say it's okay for
16 you -- for the constables to send this letter to your
17 debtors?
18      A.   I don't --
19      MR. PRICE:  I'm just going to object to form.
20      THE WITNESS:  I would have to understand a lot
21 more about the constable's authority.
22      MR. STEPHENSON:  Okay.
23      THE WITNESS:  To make that determination.
24      Q.   (BY MR. STEPHENSON) Is it -- do you know if
25 the constables are allowed to lie to debtors?

Page 129

1       A.   I think the answer's no.
2       Q.   No, you don't know or no, they're not allowed
3  to lie?
4       A.   No, they're not allowed to lie.
5       Q.   Okay.  And you certainly don't want them
6  lying to your debtors because it triggers issues like
7  this.  Is that fair?
8       MR. PRICE:  Object to form.
9       THE WITNESS:  I think that's fair.
10      Q.   (BY MR. STEPHENSON) Is it clear in your mind
11 that this letter is expressing that a notice of -- that
12 a sale of the property has been set?
13      A.   That's what it looks like.
14      Q.   Okay.  I just want to make sure you agree
15 with that characterization.  And that's fair; you do?
16      A.   Yes.
17      Q.   Okay.
18           (Exhibit 9 marked.)
19      Q.   (BY MR. STEPHENSON) Exhibit No. 9 is -- is
20 this a letter you've seen before today?
21      A.   I believe you provided it in your exhibits.
22      Q.   And it says "A sale of your personal property
23 has been set;" correct?
24      A.   That's what it says.
25      Q.   So that -- that coincides with our

Page 130

1  characterization that the previous exhibit, Exhibit 8,
2  is communicating to the debtor that a notice -- that a
3  sale of their personal property has been set?
4      A.  Does it coincide?
5      Q.  Well, it matches.  You and I both
6  characterize the notice of sale, Exhibit 8, as
7  communicating to the debtor that a sale of the personal
8  property has been set?
9      A.  Yes.
10     Q.  And now we've got confirmation in a second
11 letter that that's what it means.  Do you agree with
12 that?
13     A.  That's what it says.
14     Q.  Yeah.  And that "to cancel the sale, you must
15 call my office and make a payment prior to the day of
16 sale."
17         Do you see that -- where it says that?
18     A.  That's what it says, yes.
19     Q.  Is that what the law says about canceling a
20 sale, an execution sale?
21     A.  I don't know.
22     Q.  Do you know anything about what the law says
23 on what -- what the constable's authority is to cancel
24 a sale?
25     A.  I don't.  Other than paying it in full

Page 131

1  perhaps, but, otherwise, I don't.
2      Q.  You didn't approve this letter ahead of time?
3      A.  No.
4      Q.  And you don't know why it has a case caption
5  on the top?
6      A.  I don't.
7      Q.  And you know that it doesn't have a Mini
8  Miranda, but you don't know why?
9      A.  Is there a date on this letter?
10     Q.  Yeah.  First answer the question, then I'll
11 answer yours.
12     A.  I'm sorry, ask your question again.
13     Q.  You know there's no Mini Miranda, but you
14 don't know why?
15     A.  There's no Mini Miranda and I don't know why.
16     Q.  This would violate the FDCPA if it was sent
17 by a debt collector?
18     A.  Yes.
19     Q.  And now I'll answer your question.  They
20 don't put dates on things properly.  Sometimes there's
21 one in the corner, sometimes there's not.  That's why
22 the back page is attached.
23     A.  Okay.
24     Q.  Because it's -- that's why I attached the
25 envelope.

Page 132

1          Do you know why the constables don't know how
2  to put a date on a letter?
3      A.  I don't.
4      MR. PRICE:  Object to form.
5          (Exhibit 10 marked.)
6      Q.  (BY MR. STEPHENSON) Okay.  That date issue is
7  important here, actually.  Do you see the date on this
8  letter?
9      A.  July 6th of 2023.
10     Q.  Do you know whether or not that date is
11 correct for this letter?
12     A.  I don't.
13     Q.  And I will testify -- not testify, but I will
14 tell you for while we discuss this letter, I think that
15 date is wrong.  I think that's the date they produced
16 it for discovery.  Just so you know.  I think this was
17 sent much earlier.
18         But the questions are do you -- did you see
19 this letter before the constables mailed it to my
20 client?
21     A.  I would have seen it for the first time --
22 no.  No, I did not.
23     Q.  You didn't approve the constable sending
24 this -- there sending my debtor, my client, this
25 debtor -- oh, my gosh.

Page 133

1          You didn't approve of this letter being sent
2  to my client?
3      A.  I did not.
4      Q.  And you don't know why the case caption is on
5  the top?
6      A.  I don't.
7      Q.  You don't know why the Mini Miranda is not
8  listed?
9      A.  I don't.
10     Q.  And is it your testimony this would violate
11 the FDCPA if sent by a debt collector?
12     A.  Yes.
13     Q.  And you never told the constables to stop
14 sending that letter because you didn't know it existed?
15     A.  That's correct.
16     MR. PRICE:  Are you done with that exhibit?
17     MR. STEPHENSON:  Yeah.
18     MR. PRICE:  Could we take a five-minute break?
19     MR. STEPHENSON:  Yeah.  I'm actually wondering if
20 we should take more than that.  We've only been going
21 two hours, two and a half.  Should we just take a short
22 break?  What do you guys feel like?  A short break for
23 another hour, and then maybe lunch?
24     THE WITNESS:  Short break, then an hour?
25     MR. STEPHENSON:  Then an hour, yeah.  Then go for

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 134..137

Page 134

1  an hour --
2      THE WITNESS:  Yes, that's fine.
3      MR. STEPHENSON:  -- then take lunch?
4      THE WITNESS:  Uh-huh.
5      MR. STEPHENSON:  And you're okay?
6      THE REPORTER:  (Nods head.)
7      MR. STEPHENSON:  Let's do that.  Let's take a
8  five-minute break.
9      (Recess taken from 12:35 p.m. to 12:46 p.m.)
10     Q.  (BY MR. STEPHENSON) Let's sort of walk
11 through a little bit of generic stuff and just sort of
12 -- essentially your firm's job is to collect, excuse
13 me, solicit, collect, negotiate payments, and satisfy a
14 debt; correct?
15     A.  That's a fair characterization.
16     Q.  And that's a normal role of a normal debt
17 collector?
18     A.  Yes.
19     Q.  And can you identify any legal authority that
20 permits a constable to take an action other than
21 seizing and selling property?
22     A.  No.
23     Q.  Can you point to any specific legal authority
24 that grants a constable the authority to act as a debt
25 collector, soliciting payments, taking payments,

Page 135

1  negotiating payments?  Do you have any authority that
2  you know of that allows that?
3      A.  You're asking me if I know of any written
4  authority?
5      Q.  Yeah.  Law, rule, regulation.
6      A.  Not that I'm aware of.
7      Q.  Can you point to any specific law or
8  authority of any kind that grants a constable the
9  authority to collect periodic payments from a debtor
10 because they have a writ of execution?
11     A.  I don't.
12     Q.  Can you point to any specific authority or
13 law that allows a court to bestow more authority on the
14 constable than what state law provides?
15     A.  I can't.
16     Q.  Do you agree that soliciting payments,
17 negotiating payments, and collecting payments is not a
18 normal duty of a normal constable?
19     MR. PRICE:  Object to form, lack of foundation.
20     THE WITNESS:  I don't know how to answer that.
21 Say it again.
22     Q.  (BY MR. STEPHENSON) Do you agree that
23 soliciting payments, collecting payments, negotiating
24 payments is not what a normal constable does?
25     A.  Normal constable.  I don't even know how to

Page 136

1  characterize that.  I have my experience with these
2  constables and that's the extent.
3      Q.  Okay.  Are you aware of any other constables
4  anywhere at all that also solicit payments, collect
5  payments, negotiate payments?
6      A.  My only experience are with these constables
7  at Utah County Constables.
8      Q.  And Kolkman?
9      A.  Well, Utah County Constable, I think they're
10 all under that same umbrella, so --
11     Q.  Okay.  I want to be clear on that, make sure
12 we're clear on that.  You're considering both Kolkman
13 and Erickson under the Utah County Constable as well?
14     A.  I think so.  Yes, I am.
15     Q.  Okay.
16     A.  Yeah.
17     Q.  And we've talked about these letters and the
18 violations that we agree took place, if the constables
19 were debt collectors, but is it your testimony that --
20 your opinion or testimony, or however you want to
21 characterize it, that your firm has no obligations to
22 monitor or supervise the constable's duties?
23     A.  I don't have the authority to do that.
24     Q.  Okay.  And so if you don't have the authority
25 to do it, you also don't have the obligation to do it?

Page 137

1      A.  That's correct.
2      Q.  And can you explain the basis for your
3  opinion that your firm doesn't have the authority to
4  monitor or supervise the constable's actions?
5      A.  Their authority comes from the state, from
6  the court, from -- I don't have that authority over
7  them.
8      Q.  Is there any other reason you can -- you say
9  that you don't have any authority to govern what they
10 do?
11     A.  No.
12     Q.  When you gave the constables the writ of
13 execution, what precautions did you take to assure they
14 wouldn't violate the law?
15     A.  I delivered the writ to them.
16     Q.  And you didn't take any other precaution to
17 assure that they would follow the law?
18     A.  No.
19     Q.  Did you take any precautions to assure they
20 would not make false threats?
21     A.  No.
22     Q.  Did you take any precautions to assure that
23 they would communicate with the debtors truthfully?
24     A.  No.
25     Q.  Did you take any measures or precautions to

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 138..141

Page 138

1  assure the constables would not solicit, negotiate, or
2  collect payments on your behalf?
3      MR. PRICE: Object to form.
4      THE WITNESS: No.
5      Q.  (BY MR. STEPHENSON) You didn't tell the
6  constables don't solicit payments, don't negotiate
7  payments?
8      A.  I didn't.
9      Q.  And you never corrected the constables for
10 taking payments and said don't do that, go serve the
11 writ, execute the writ and sell the property?
12     A.  I didn't.
13     Q.  And when you did discover the constables were
14 negotiating payments, seizing -- or threatening to
15 seize property, that's when you canceled your
16 association with them?
17     A.  I didn't characterize it as threatening to
18 seize payments.
19     Q.  Okay. Well, okay. Can you answer the
20 question anyway?
21     A.  Ask the question again.
22     Q.  Well, when you found out the constables were
23 soliciting payments, negotiating payments, and
24 threatening or -- or telling, not threatening, but
25 telling debtors we're going to seize and sell your

Page 139

1  property, but they didn't actually seize and sell
2  property, when you found out they were doing that,
3  that's when you stopped associating with them?
4      A.  I stopped associating with them when you
5  initiated this lawsuit.
6      Q.  Okay.
7      A.  I stopped sending them writs. I don't want
8  to say associating with them. I stopped requesting
9  writs from the court and sending them to the constable.
10     Q.  Okay. And that -- and you stopped sending
11 the writs -- requesting the writs and sending them to
12 the constable because you knew, at that point, that
13 they were telling client -- or telling debtors that
14 they're going to seize and sell property?
15     MR. PRICE: Objection; misstates her testimony.
16     THE WITNESS: I didn't say that.
17     Q.  (BY MR. STEPHENSON) Okay. Well, help me
18 understand. Just help me -- help me through this so we
19 can get -- move on to something else.
20     The reason -- the reason you stopped sending
21 writs to the constables was what?
22     MR. PRICE: Asked and answered.
23     MR. STEPHENSON: Okay.
24     THE WITNESS: I didn't want you to sue me again.
25     Q.  (BY MR. STEPHENSON) Okay. You didn't have

Page 140

1  any concerns about what they were doing other than
2  being sued by me?
3      A.  Not until you sued me.
4      Q.  Okay. Was there a point of time where you
5  knew what they were doing as far as soliciting
6  payments, negotiating payments, but you didn't have any
7  concerns about that until I sued?
8      MR. PRICE: Objection to form.
9      THE WITNESS: I didn't have any concern that they
10 were sending me payments. I don't know how they got
11 the money.
12     Q.  (BY MR. STEPHENSON) You didn't care how they
13 got the money?
14     A.  I wouldn't say I didn't care. I didn't know.
15     Q.  Okay. But you didn't do anything to find out
16 how they were getting the money; correct?
17     A.  No. I don't know how they got the money is
18 my testimony.
19     Q.  Right. But you also didn't do anything to
20 find out how they got the money?
21     A.  I didn't.
22     Q.  So I kind of really want to make sure that
23 we're clear. You didn't know -- you knew the
24 constables were collecting payments for you?
25     A.  They would send me payments, yes.

Page 141

1      Q.  Okay. But you didn't know that they were
2  mailing letters to debtors?
3      A.  I didn't know.
4      Q.  You didn't know they were threatening to
5  seize and sell their property or telling them they
6  would seize and sell their property?
7      A.  I didn't know they were telling -- no, I
8  didn't.
9      Q.  Okay.
10         (Exhibit 11 marked.)
11     Q.  (BY MR. STEPHENSON) Do you recognize
12 Exhibit 11?
13     A.  Yes.
14     Q.  Tell me what this is.
15     A.  This is an email from Mike Erickson's office
16 to Melissa Kerby that works for me.
17     Q.  And the purpose of this email is to update
18 your office on the status of the cases its handling for
19 you?
20     A.  It says "Here are some status lists," so yes.
21     Q.  Okay. How often do --
22     MR. PRICE: I just want to note that this is a
23 mistake on our part. I notice that there are some
24 debtors' names in here that should have been redacted
25 on the first page, and so given that, we request that

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                              Pages 142..145

---

Page 142

1  this be marked confidential.
2       MR. STEPHENSON:  Okay.
3       THE WITNESS:  First and second page.
4       MR. PRICE:  Yeah, first and second page.
5       Q.   (BY MR. STEPHENSON) If -- if we -- if we
6  redact that, can we not have it be confidential for
7  this proceeding?
8       MR. PRICE:  Yeah.
9       MR. STEPHENSON:  For now that's fine.  We'll just
10 designate it as confidential and we'll go from there.
11      Q.   (BY MR. STEPHENSON) Okay.  So is this -- this
12 email is a response to -- okay.  Melissa asks for Mike
13 Erickson to give an update on these accounts, and
14 that's what he's responding to?
15      A.   Okay.  That's right.  On November 12 of 2020
16 Melissa wrote to Mike asking for updates on this
17 certain list of accounts.
18      Q.   And is it fair to say that if Melissa knew
19 this conversation was taking place, that that could be
20 attributable to the firm knowing the information?
21      A.   That the email's taking place?
22      Q.   Yeah.  Her knowledge of this process and what
23 was happening, that's attributable to the firm as well?
24      A.   Yes.
25      Q.   Let's go to page -- I don't know where it

---

Page 143

1  starts.  Let's see.  It's the third page in marked as
2  No. 8.
3       A.   Okay.
4       Q.   This is -- what does this page indicate?
5       A.   It looks like this was attached to the email
6  and this is one of those status reports.
7       Q.   Okay.  And page 8, it's marked as page 8, but
8  I think it's actually page 4.  Let's call it page 8 for
9  simplicity.
10      A.   Okay.
11      Q.   Bates No. 8.  Let's call it that.
12           What is this indicating to you?
13      A.   That these certain writs that were with the
14 constable have a date sale set and a date sale set time
15 on each of them.
16      Q.   Okay.  And can you explain to me why there
17 are two sales occurring at the same exact time on
18 November 19th, 2020 at 13:10 in the afternoon?
19      MR. PRICE:  Objection; lack of foundation.
20      Q.   (BY MR. STEPHENSON) Do you know why that
21 that's --
22      A.   I don't.
23      Q.   Okay.  So you don't know why those two sales
24 were scheduled at the same time, but can you tell me
25 whether or not you think it's physically possible for a

---

Page 144

1  constable to be in two different locations at the same
2  time handling two different sales at the same time?
3       MR. PRICE:  Object to form.
4       THE WITNESS:  I don't know what the location is.
5  I don't know where the sales would have happened.
6       Q.   (BY MR. STEPHENSON) Well, you acknowledge
7  that two sales are set for the same time though?
8       A.   Yes, that's what it says.
9       Q.   And at 12:50 the same day, got two more sales
10 scheduled at the same time.
11      A.   That's what it says.
12      Q.   And then there's others that are ten minutes
13 apart; correct?
14      A.   That's what it says, yes.
15      Q.   And can you tell me why -- do you -- do you
16 believe that it's possible for a human being to be at
17 two different physical addresses at the same time and
18 conduct sales at both of those addresses at the exact
19 same time?
20      A.   I don't know how many people work for the
21 constable.  So one person, no, but a constable's
22 office, perhaps.
23      Q.   And how many of these sales actually
24 occurred?
25      A.   I don't know.

---

Page 145

1       Q.   When you say you don't know, is it actually
2  more accurate to say none, because you didn't get
3  notice of any of these sales occurring?
4       A.   Correct.  I didn't get notice of any sale
5  occurring.
6       Q.   So couldn't it be more accurate if you
7  testified that none of these sales occurred?
8       MR. PRICE:  Objection to the form.  She says she
9  doesn't know whether they did.  Whether a sale occurred
10 and she didn't get notice of it is a possibility, and
11 so I think the answer that she's not aware of any is as
12 best as she can do.
13      Q.   (BY MR. STEPHENSON) Okay.  Let's go to the
14 next page.  This page indicates that the please call
15 letter has been made to people; correct?
16      A.   That's the status please call letter.
17      Q.   And you didn't know what that letter said?
18      A.   I did not know what that letter said.
19      Q.   And if we sit here today, you actually still
20 don't know what that letter says?
21      A.   Other than what you've already shown me in
22 the exhibits.
23      Q.   Well --
24      A.   This -- let me clarify.  This specific letter
25 they're referring to?  No, I don't.

---

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                        Pages 146..149

Page 146

1    Q.   Right.  You don't know if any of these
2  letters we've looked at are a please call letter?
3    A.   I don't.
4    Q.   Okay.  That's -- none of us do.  That's fair.
5  So you didn't write the please call letter?
6    A.   I did not.
7    Q.   You didn't approve them sending it?
8    A.   I did not.
9    Q.   You didn't chastise them for sending it?
10   A.   No.
11   Q.   The next page, Bates No. 10 and, actually,
12 11, lists payments that were pending.  Do you know what
13 that means?
14   MR. PRICE:  Objection; lack of foundation.
15   Q.   (BY MR. STEPHENSON) Well, I asked if you knew
16 what it means.  I don't know how much more foundation I
17 can give than that, so please answer.  I'm not very
18 good at this apparently, but --
19   MR. PRICE:  No, you're right, that was my bad.  It
20 was a yes or no question.
21   MR. STEPHENSON:  Yeah, sometimes I wonder how, you
22 know, how other people might do this, but this is how I
23 do it.
24   Q.   (BY MR. STEPHENSON) Do you know what payment
25 pending means?

Page 147

1    A.   That a payment must be pending.
2    Q.   Okay.  But do you know more specifically?
3  Does that mean you've received or he's -- does that --
4  do you know if it means whether the constable has
5  received a payment and it's pending being given to you,
6  or it's pending clearing a bank, or what status it's
7  in?  Do you know what it means specifically?
8    A.   I don't know.
9    Q.   So it's possible that payment pending means
10 they promised a payment, but they haven't sent it yet?
11   A.   It could mean that.
12   Q.   Or it could mean they paid, but we haven't
13 cleared it and taken our portion out yet?
14   A.   It could be that.
15   Q.   That's all I want.  I just -- I'm not trying
16 to trap you on anything.  I just want to know if you
17 know because I don't know what payment pending means.
18 My client is listed on page 10, Tara Peretto, as a
19 payment pending.  Do you see that?
20   A.   I do, yes.
21   Q.   Do you know, does this list how much the
22 payments are for?
23   A.   It does not.
24   Q.   So whatever payment pending is, this isn't
25 going to tell you how much the amounts are?

Page 148

1    A.   No.
2    Q.   But it does indicate to you, as a general
3  sense, that clients -- or debtors are paying
4  constables?
5    A.   Yes.
6    Q.   If we turn to page 12, Bates No. 12, it says
7  "collator for return to client," doesn't it?
8    A.   It does.
9    Q.   And what does that mean?
10   A.   I have no idea.
11   Q.   Would it be fair to say that Cherrington
12 is -- The Cherrington Firm is the client that they're
13 talking about here?
14   A.   That would be a fair assumption.
15   Q.   Yeah.  And do you think it's fair to assume
16 that these people maybe didn't have assets or refused
17 to pay in some way that they said just give it back to
18 Cherrington and let them deal with it?
19   MR. PRICE:  Object to form, lack of foundation.
20   Q.   (BY MR. STEPHENSON) Do you know?
21   A.   I don't know.
22   Q.   Have you ever seen these reports before?
23   A.   Not before this lawsuit, no.  Other than when
24 we provided it to them, because I don't -- I'm not
25 sending the emails.  My employees are.

Page 149

1    Q.   Okay.  Yeah, that was my -- when -- do you
2  see this report before was it Melissa, before Melissa
3  sent it?
4    A.   Melissa received it if you're talking about
5  the Bates marked ones.
6    Q.   Oh.  Right, right.  Melissa received this and
7  she didn't show it to you?
8    A.   No.
9    Q.   Never did any of them ever?
10   A.   I saw the notations in the accounts.
11   Q.   Okay.
12   A.   But I can't say I ever saw the physical
13 reports.
14   Q.   Okay.  So you were totally aware that the
15 constables were collecting payments?
16   A.   I was aware we were receiving payments from
17 the constable.
18   Q.   Okay.  But you were aware those payments were
19 coming from the debtors?
20   A.   Yes.
21   Q.   And you were aware the constables were
22 keeping part of those payments for themselves?
23   A.   Yes.
24   Q.   And that's what you considered to be proper
25 compensation for their work?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 150..153

Page 150

1   A.   Yes.
2   Q.   When it says -- on page 8 when it said --
3   A.   Bates marked 8?
4   Q.   Bates marked 8, yes.
5   A.   Okay.
6   Q.   And it said the date and time of the sale,
7   how did you interpret that at the time of this
8   document?  Did you interpret that to mean that the sale
9   was set or the property had already been seized?
10  MR. PRICE:  Objection; lack of foundation.
11  THE WITNESS:  Well, if we're looking at the date
12  of this email, he sent it on November 12th, then that
13  would be the date that it was set.
14  Q.   (BY MR. STEPHENSON) The sale?
15  A.   It says date sale set.
16  Q.   So do you know whether or not the property --
17  at the time when you received this, did you have any
18  understanding or belief about whether the property was
19  already seized or it was going to be seized on this day
20  and time?
21  MR. PRICE:  Objection; vague.  I'm not sure --
22  when you say the time they received it, are you talking
23  about the time the firm received it?  I'm still not
24  clear as to whether she saw this at the time.
25  MR. STEPHENSON:  Okay.

Page 151

1   Q.   (BY MR. STEPHENSON) When your office gets
2   these reports with the date and time to get it set on
3   it, what did your office believe that meant?
4   MR. PRICE:  I'm going to object to form.
5   THE WITNESS:  (Peruses document.)
6        I think it's fair to say that based on the
7   date being after the email, that a sale date was set.
8   Q.   (BY MR. STEPHENSON) So your office thought
9   these sales were going to occur?
10  A.   Yes.
11       (Exhibit 12 marked.)
12  Q.   (BY MR. STEPHENSON) Do you recognize No. 12?
13  A.   I do.
14  Q.   This is another status report?
15  A.   Yes.
16  Q.   Similar to what we just looked at?
17  A.   Yes.
18  Q.   This is Michael Erickson updating your office
19  on the status of the cases that were requested?
20  A.   Yes.
21  Q.   On Bates-stamp 176 there's two cases listed
22  that says hold for attorney.  Do you know what that
23  means?
24  A.   Oh.  176.
25  Q.   Just the second page of the exhibit.

Page 152

1   A.   Sorry.  I was looking at 179.
2   Q.   Yeah.  Sorry.
3   A.   They say hold for attorney.
4   Q.   Yes.  Do you know what that means?
5   A.   Maybe there was a client that wanted us to
6   hold collection efforts in our office, so we, in turn,
7   communicated that to the constable.
8   Q.   When you say maybe, do you know more certain
9   than that?  Is it a guess?
10  A.   I don't know more certain, no.
11  Q.   Is it possible then the hold for attorney
12  could mean that the constable had an issue that
13  didn't -- that he didn't know how to handle and he
14  wanted to ask you?
15  A.   No.
16  Q.   Did that ever happen?  Did the constable ever
17  call your office and say hey, I don't know what to do
18  here on this particular case?
19  A.   No.
20  Q.   Okay.  Let's look at 177.  "Filed other order
21  in line."  What is -- do you know what that means?
22  A.   I don't know what that means.
23  Q.   It just doesn't make any sense at all, does
24  it?
25  MR. PRICE:  Object to form.

Page 153

1   Q.   (BY MR. STEPHENSON) Doesn't make any sense at
2   all to you?
3   A.   It doesn't.
4   Q.   Do you recognize any of the client file codes
5   that might jog your memory?
6   A.   No.
7   Q.   Okay.  Let's go to the next one, 178.  "Moved
8   doing more skips."  Does that make sense to you?
9   A.   Yes.
10  Q.   That means that the person moved and the
11  constables are skipping skip tracing; right?
12  A.   That's a fair characterization.
13  Q.   So they didn't ask you to do their skip
14  tracing, they took care of that on their own?
15  A.   Yeah, they did ask us to do skip tracing.
16  Q.   Let's go to page, or excuse me, Bates
17  No. 179.  Another list of payments; correct?
18  A.   Payments pending, yes.
19  Q.   Payments pending, yes.  And my client is
20  listed again; correct?
21  A.   Yes, she is.
22  Q.   Bates 181 says "Pull to return to plaintiff."
23  Is that the same thing as before; you don't know what
24  that means?
25  A.   I don't know that means, but that must mean

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                  Pages 154..157

Page 154

1  that they're returning it to my office on behalf of the
2  plaintiff.
3       Q.   Do you know what your office does with cases
4  when the constables return them like that?
5       A.   If the constable returns a case, we continue
6  collections in office.
7       Q.   And page 182.  Again, that's showing some
8  sales that were indicated as being set for a specific
9  date and time?
10      A.   It looks like the previous list, yes.
11      Q.   Okay.  And is it fair to characterize that
12  your firm thought these sales were going to occur?
13      A.   Yes.
14      Q.   And I'll point out, just for your sake, this
15  actually has your name at the time top, Mr. Price.
16      A.   Which one are you looking at?
17      MR. PRICE:  Yes.
18      MR. STEPHENSON:  Exhibit 12.
19      MR. PRICE:  Because I printed it out.
20      MR. STEPHENSON:  Yeah.  I don't think that causes
21  any problems, but it might be good just to have it on
22  the record so it won't be an issue.
23      MR. PRICE:  That simply is how it printed out from
24  the documents.
25      MR. STEPHENSON:  Yeah.  Okay.

Page 155

1            (Exhibit 13 marked.)
2       Q.   (BY MR. STEPHENSON) Exhibit 13, that is
3  another status report from Michael Erickson to your
4  firm?
5       A.   It's a different date.
6       Q.   Yes.
7       A.   Yes.
8       Q.   The date is April 27th, 2021 this time.
9       A.   Yes.
10      Q.   And let's go to Bates No. 203 in that
11  exhibit.  It lists attempting service.  Do you know
12  what that means?
13      A.   I don't.
14      Q.   Okay.  204 Bates number, please call letter
15  being sent.  Again, you don't know what that means
16  specifically, but you assume it's a letter?
17      A.   I assume it's a letter.
18      Q.   Page -- or Bates 205, hold for attorney; same
19  thing?  You don't know what that means specifically?
20      A.   I don't know specifically, but I'm guessing
21  my -- the plaintiff contacted me and told us to hold
22  and so we communicated that to the constables.  Without
23  looking at that file, I wouldn't know specifically.
24      Q.   And if I go through all these and ask the
25  same questions on the same notes, you're going to say

Page 156

1  the same thing; correct?  Moving, doing more skips?
2  That's just the same answer as before?  They're going
3  to do more skips?
4       A.   Yes.
5       Q.   And payment pending on the next pages means
6  payments are pending, but we don't know exactly,
7  specifically what stage the payment is at?
8       A.   Correct.
9       Q.   Okay.  And that's going to be true for the
10  others that we come up later too; right?
11      A.   Yes.
12      Q.   And my client again is listed as making a
13  payment on page or, excuse me, Bates No. 207?
14      MR. PRICE:  Object to form.  Mischaracterizes the
15  document.
16      MR. STEPHENSON:  Did I get it wrong?
17      Q.   (BY MR. STEPHENSON) On Bates No. 207 my
18  client is listed as a payment pending.  Is that
19  accurate?
20      A.   Yes.  That's what it says.
21      Q.   Okay.  And then on Bates 209 there's a list
22  of dates for sales that are purportedly scheduled;
23  correct?
24      A.   That's what it says.
25      Q.   And your office thought these sales were

Page 157

1  going to occur?
2       A.   Yes.
3       Q.   Okay.  Bates No. 210, served setting
4  payments.  Can you tell me what that means?
5       MR. PRICE:  Objection; lack of foundation.
6       THE WITNESS:  I would say that that means that a
7  writ was served and they're trying to set payments.
8       MR. STEPHENSON:  Okay.
9            (Exhibit 14 marked.)
10      Q.   (BY MR. STEPHENSON) Okay.  14 is another
11  status update from Michael Erickson to Melissa Kerby on
12  March 18th, 2022; correct?
13      A.   Yes.
14      Q.   And we've got the same notations, so your
15  answer should be the same on those that are the same?
16  Attempting service means probably attempting service?
17      A.   Yes.
18      Q.   Please call letter is probably the same
19  thing, same letter, you don't know what it means?
20      A.   Yes.
21      Q.   "CR post sale doing further research."  Do
22  you know what that means?
23      A.   I don't.  We haven't seen that for any other
24  emails.
25      Q.   No, we haven't.  And that's why I want to

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 158..161

Page 158

1  know if you know what it means.  You don't know?
2      A.   I don't.
3      Q.   Have any clue?
4      A.   I don't.
5      Q.   You never got notification a sale ever
6  occurred?
7      A.   Not that I can remember, no.
8      Q.   So the note saying post sale doesn't actually
9  make sense, does it?
10     A.   No.
11     Q.   Doing further research also wouldn't make
12 sense if a sale occurred, would it?
13     A.   No.
14     Q.   Okay.  Payments pending.  My client again is
15 listed on 196.  You see that?
16     A.   Yes.
17     Q.   And do you recognize that the list of
18 payments pending is much larger than a list of sales
19 being scheduled in these notices?
20     A.   That's a fair characterization.
21     Q.   Okay.  And then on page 199 the Bates-stamp
22 lists a few sales that are supposedly scheduled.  Your
23 office believed those sales were going to occur?
24     A.   Yes.
25     Q.   Okay.  These status reports all contain my

Page 159

1  client's information.  Is it because there -- let me
2  start over.
3          Are there more status reports like this that
4  were not produced because they didn't contain my
5  client's name?
6      A.   I don't know that answer.
7      Q.   Well, it's -- do you have a reason to believe
8  that there are more status reports than the few that
9  were produced in this case?
10     A.   And was your client on each of these?
11     Q.   Yes.
12     A.   There are probably others, yes.
13     Q.   Because the dates of these are not one week
14 after another and status reports were being provided
15 more frequently than every three months?
16     A.   There was no set time.  It was sporadic.
17     Q.   But even though there was no set time, there
18 was a sort of clock on it that they weren't waiting
19 four months between status reports?
20     A.   I can't -- I can't answer that.
21     Q.   Okay.  So it's possible that December 10th,
22 2020 the next status report didn't come until
23 April 27th, 2021, if you contrast 12 and 13?  It's
24 possible that much time went between status reports?
25     A.   Doubtful.

Page 160

1      Q.   Yeah.  Okay.
2              (Exhibit 15 marked.)
3      Q.   (BY MR. STEPHENSON) Okay.  15 is another
4  status report.  This one is dated for July 11th, 2022;
5  correct?
6      A.   Yes.
7      Q.   From Michael Erickson this time to Shauna
8  Winter; correct?
9      A.   Yes.
10     Q.   And is that because Melissa did some -- why
11 is that to Shauna instead?
12     A.   The tasks moved over to Shauna.  Melissa
13 trained her.
14     Q.   If we go through this, and we're going to
15 look at the same notations, do you have any reason to
16 believe that these notations are any different answers
17 than before?
18     A.   Let's look through them.
19          (Peruses document.)
20     Q.   Attempting service.  You don't know what that
21 means?
22     A.   I don't.
23     Q.   Please call letter.  You're not sure what
24 that is?
25     A.   I'm not sure what that is.

Page 161

1      Q.   Moving to do more skips probably means they
2  moving -- they moved and they're doing more skips?
3      A.   Yes.
4      Q.   Payment pending.  My client is listed as a
5  payment pending?
6      A.   Yes.
7      Q.   And you're not sure whether that means a
8  payment was received or is it going to be received?
9      A.   I don't know.
10     Q.   And in the back there's some sales dates and
11 times.  Your firm thought those sales would occur?
12     A.   Yes.
13     Q.   How -- how did the constables pay you?
14     A.   By check.
15     Q.   How often did that check come in?
16     A.   Maybe twice per month.
17     Q.   They weren't required to specifically have a
18 date to send it?
19     A.   No.
20     Q.   Twice per month just made sense?
21     A.   I don't know if that -- I said maybe twice
22 per month.  I don't -- I don't know exactly.
23          (Exhibit 16 marked.)
24     Q.   (BY MR. STEPHENSON) 16 is another status
25 report; correct?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                    Pages 162..165

Page 162

1    A.   Yes.
2    Q.   Changes though.  This time it's to Shauna
3  Winter again, but from Nitro Blown Bass, or is it base?
4  Is it a guitar situation or fish?
5    A.   I don't know.
6    Q.   That's Corey Revill?
7    A.   That's Corey Revill.  It says C Revill.
8    Q.   Yeah.  And you understand that to be Corey
9  Revill?
10   A.   I think that's Corey, yes.  I would -- I
11 would assume so.
12   Q.   And the date February 7th, 2023 is after
13 Kolkman took over?
14   A.   After Kolkman took over, yes.  If that was
15 the end of '22 -- yeah.  Well, that one letter that you
16 produced said January '23.
17   Q.   Yes, January 1st of '23.  So this is after
18 Kolkman took over?
19   A.   Yes.
20   Q.   But the status report is the same as the
21 others?  In format.  In format, not in content?
22   A.   (Peruses document.)
23   Q.   Although, let me rephrase that because it's
24 arguably a little different.
25   A.   Yeah, this is --

Page 163

1    Q.   But this is -- let's start at the beginning.
2  This is a status report from Kolkman's office to yours?
3    A.   Yes.
4    Q.   And it's similar to the others, but the
5  format has changed a little?
6    A.   Yes.
7    Q.   Okay.  Payment pending is still listed.  Lots
8  of those.
9    A.   Yes.
10   Q.   Then there's one that says set for sale bin.
11 Do you know what that means?
12   A.   I don't know what that means.
13   Q.   But did your firm believe that whatever sales
14 they were scheduling would still occur?
15   A.   Yes.
16   Q.   Then "preserve letters sent" down the middle
17 of page 138.  Or Bates 138.  Do you know what that
18 means?
19   A.   I don't.
20   Q.   Attempting service.  Do you know what that
21 means?
22   A.   I don't.
23   Q.   Serve setting payments.  Do you know what
24 that means?
25   A.   I think we answered that on the last one that

Page 164

1  they were probably served and they're trying to set up
2  payments.
3    Q.   Yes.  I'm asking it again just because this
4  is Kolkman's office now instead of Erickson's.
5    A.   Okay.
6    Q.   I want to know if it changed any of that for
7  you.
8    A.   No.
9    Q.   Temporary file.  Do you know what that means?
10   A.   I don't know what that means.
11   Q.   Corey Research?
12   A.   I don't know what that means.
13   Q.   CR Post Sale, Doing Further Research.  That
14 came up again, two of these.  You don't know what that
15 means?
16   A.   I don't know what that means.
17   Q.   Please Call Letter.  Same thing?  You don't
18 know what it means?
19   A.   I don't know what that means.
20   Q.   Filed Other Order In Line.  Do you know what
21 that means?
22   A.   We saw that before and I don't know what that
23 means.
24   Q.   Okay.  Move Doing More Skips, Pull to Return
25 to Plaintiff, Corey Calling.  Do you know what any of

Page 165

1  that means?
2    A.   We already said Pull to Return -- Pull to
3  Return to Plaintiff we already summarized that's
4  probably sending back to my office.  And Corey Calling,
5  I don't know what that means.
6    Q.   So basically when things switch from Erickson
7  to Kolkman, this process, from your perspective, did
8  not change?
9    A.   That's correct.
10   Q.   Okay.  Payments were still being made to the
11 constable and sent to you, and you still didn't know
12 how much was being kept by the constables?
13   A.   I did not know.
14   Q.   And Kolkman didn't change that in any way at
15 all?
16   A.   Oh, I don't know that.
17   Q.   Well, you don't know -- you don't know --
18 that's what I mean.  It's from your perspective.  You
19 don't -- you didn't see any changes?
20   A.   I didn't see any changes on what they were
21 paying.  What and how they were paying.
22   Q.   Do you have any written agreements with these
23 constables?
24   A.   I don't.
25   Q.   Do you use written agreements when you send

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                      Pages 166..169

Page 166

1   documents to process servers?  Do you have a contract
2   with them?
3        A.   I don't.
4        Q.   There's just an understanding with a process
5   server that you know the price and take it and do your
6   thing?
7        A.   Yes.
8        Q.   And that's sort of what -- that's similar to
9   what's happening here.  You know what they're going to
10  do and just do it and pay us whatever money we get?
11  MR. PRICE:  Objection.
12       Q.   (BY MR. STEPHENSON) Is that fair?
13  MR. PRICE:  Objection; misstates her testimony.
14  THE WITNESS:  Yeah, I didn't say pay whatever
15  money you get.  I said we provide the documents to
16  those individuals and they do what they do on their
17  end.
18       Q.   (BY MR. STEPHENSON) And then you accepted the
19  payments when they came in?
20       A.   From the constable, yes.
21       Q.   Did any -- do you know of any debtors that
22  got the letters from the constables and then paid you
23  directly?
24       A.   Not specifically.  If a customer called our
25  office, we would send it to the -- send them to the

Page 167

1   constable.
2        Q.   Okay.  So occasionally a debtor would call
3   your office and say I got this letter and I don't know
4   what to do with it, and you would say that's fine, go
5   pay the constable?
6        A.   I don't know specifically if that's what they
7   would say.  If they would contact us in any way, we
8   refer them back to the constable.
9        Q.   Even -- never mind.
10            It's 1:24.
11  MR. PRICE:  Do you want to go off the record for a
12  minute?
13  MR. STEPHENSON:  Let's go off the record for a
14  minute.
15            (Discussion held off the record.)
16       (Recess taken from 1:26 p.m. to 2:03 p.m.)
17            (Exhibit 17 marked.)
18       Q.   (BY MR. STEPHENSON) Do you recognize
19  Exhibit 17?
20       A.   I do.
21       Q.   What is Exhibit 17?
22       A.   These are our internal notes in the CUBS
23  system and I see some payments listed here too.
24       Q.   Okay.  Let's go through it a tiny bit.  The
25  amount owing here says $655.  Is that true?

Page 168

1        A.   Yes.
2        Q.   And then the judgment amount down below it
3   changes that to $2,289.03.  Can you explain that?
4        A.   That might be the current judgment amount,
5   but I'm not a hundred percent sure if that's when it
6   was -- well, we know that's not what it was entered for
7   because we have that information earlier.
8            I don't know.
9        Q.   Okay.  Where it says Received $1339.91, do
10  you see that there?
11       A.   I do, yes.
12       Q.   And did any of those payments come to your
13  firm directly?
14  MR. PRICE:  Object to the form.
15       Q.   (BY MR. STEPHENSON) Did you understand what I
16  meant?
17  MR. PRICE:  Directly from whom?
18  MR. STEPHENSON:  Yeah.  I sort of realized I said
19  that.
20       Q.   (BY MR. STEPHENSON) Okay.  My client paid
21  $1,339.19 towards this debt; correct?
22       A.   Yes.
23       Q.   And she paid that to the constables, not to
24  your firm?
25       A.   I think that's correct, but let me just

Page 169

1   bounce back and make sure this first payment on
2   March 12th of '19 was after the writ, which I think it
3   is, but let me just look.
4            (Peruses document.)
5            Yes.  All the payments came from the
6   constable.
7        Q.   And you're looking at -- are you looking at
8   the notes to figure that out?
9        A.   I am, yes.
10       Q.   Okay.  How do you tell from a note whether
11  the payment came from the constable or directly -- was
12  made direct to your firm by the debtor?
13       A.   Well, it says, and I'm looking at Bates
14  marked 168, line 836, it says received check in mail,
15  constable, has a check number and the amount.
16       Q.   So go down to 844 and tell me if that one was
17  a constable payment.
18       A.   (Complies.)
19            It must have been a constable payment, but it
20  doesn't -- it doesn't say the constable.  But if I look
21  at the check number, it's -- it's a similar check
22  series.  It must have been just a typo.
23       Q.   Okay.  So if I look through these notes, if I
24  see a note like that that says received check in mail,
25  constable, it means the constable paid you?  Sorry.  It

Page 170

**means the debtor paid the constable and then the constable paid you?**
A. I think that's fair, yes.
**Q. And the amount listed in those notes is the amount the constable paid you, not the amount my client paid the constable?**
A. Yes.
**Q. So going back to the first page where it says you received $1,339.91, that's the amount you received from the constable?**
A. Yes.
**Q. And you don't know how much my client paid the constable?**
A. I don't.
**Q. Okay. And was the back page a list of each payment?**
A. Yes.
**Q. Why does it start with No. 9?**
A. This is printed out of CUBS out of the payment page and this looks like a screenshot, so this was just the screenshot of the payments received. Anything above that would have been -- if there are numbers above 9, it would have been amounts added to the account, but I was -- I must have done a screenshot here that just showed the payments.

Page 171

**Q. So if I wanted a complete accounting of this account from day one to today, this is not going to do that?**
A. For the payments it will. What was added to the account there is a 1 through 8?
**Q. Right. So if I wanted a complete accounting, this page won't do it?**
A. You're right.
**Q. And the notes won't do it either? This whole -- none of this document will do it?**
A. No. I think it's in the notes except maybe -- except maybe interest.
**Q. Interest charges are noted in here throughout.**
A. In the notes.
**Q. Yeah.**
A. Okay.
**Q. And even though -- but because -- because you received payments from the constable, this couldn't possibly have a complete accounting because the constables kept some of the money?**
A. Oh. When you said complete accounting, I thought you meant accounting of what the constables had sent us. That's the -- that's the line of questioning we were in, what the constables were sending us.

Page 172

**Q. Okay. So this is a complete accounting of what the constables sent you?**
A. That's correct.
**Q. Okay. But if I want a complete accounting of the debt, I can't get it with this document because the constables have some of the money and you don't know how much it is?**
A. Correct. Just to clarify, complete accounting of what she has paid, not a complete account --
**Q. Okay.**
A. Okay. Is that what you're asking me? A complete accounting of what she has paid to the constables, I don't have that.
**Q. Yeah, I'm actually at -- I'm actually just wondering a complete accounting of the debt from day it was incurred to today, every payment, every charge, every bill, every fee, every interest rate. I can't -- I don't have any documentation in this document? There's no documentation of that you can provide?**
A. No.
**Q. Okay. Do these collection notes -- you know how tedious it is to go through these in a deposition.**
A. Yes.
**Q. I don't want to do it either.**

Page 173

A. Okay.
**Q. But let's do it in shorthand then. Can you go through it and are you able to show me the letters that your firm sent?**
A. Yes. Bates marked 158.
**Q. Okay.**
A. Line No. 18, 018.
**Q. Whoa. Stop there. I don't know what you're talking about. 18018?**
A. I'm sorry. I said 18 and then I wanted to be clear. 018 (indicating). Bates marked 0053.
**Q. Oh, 153. I thought you said 158. My apologies.**
MR. PRICE: I was on the same page you were.
THE WITNESS: Sorry. I should have said that. Bates mark 153.
**Q. (BY MR. STEPHENSON) Okay. Now try again.**
A. 153, note line 018.
**Q. It says SNT NTC 200?**
A. Sent notice 200 is what that means.
**Q. That's a letter?**
A. It is.
**Q. And what does that letter say?**
A. That is a letter from my office with my letterhead that shows that there was a return check.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                                Pages 174..177

Page 174

```
1      Q.   Is that the first indication you had -- your
2  firm had with my client?
3      A.   Yes.
4      Q.   Did you provide that in discovery?
5      A.   Yes.
6      Q.   Are you sure?
7      A.   Yes.
8      Q.   Okay.  Can you point out the rest of the
9  letters your firm sent to my client.
10     A.   (Peruses document.)
11         Okay.  In the mail?  The reason I'm asking is
12 because when we typed the suit, that's in here too, but
13 are you talking about through the mail?
14     Q.   I don't understand your question to me.  What
15 do you mean you typed the suit?
16     A.   The suit to initiate litigation.
17     Q.   Okay.  So let's go through all of the
18 collection letters first.
19     A.   Okay.
20     Q.   And then we'll jump to that.
21     A.   Okay.  So that notice 200.
22         (Peruses document.)
23     Q.   I see one on page 155, if that helps,
24 line 109.
25     A.   Okay.  That is not a letter to the debtor;
```

Page 175

```
1  that is a letter to our client.
2      Q.   Okay.  What about line 125 on page 155, "Sent
3  letter LLB?"
4      A.   That is the label for the folder that the
5  suit will go in.
6      Q.   Okay.  I'm going to let you just go ahead and
7  tell me what these -- which letters are which then.  Go
8  ahead.
9      A.   So do you want me to go every time there's an
10 SNT letter?
11     Q.   No.  I think just tell me which -- well, do
12 this.  I want you to identify all the letters you sent
13 to my client.
14     A.   Okay.
15     Q.   If they're listed, all the letters the
16 constable sent to my client, which won't be in there;
17 correct?
18     A.   Correct.
19     Q.   Okay.  So all the letters your firm sent to
20 my client and, yeah, let's just do that.  I don't -- if
21 you communicated with the original creditor, I'm not
22 concerned about that.
23     A.   Okay.
24         (Peruses document.)
25         Okay.  I didn't -- I didn't point where we
```

Page 176

```
1  typed the suit, but we did send her a Rule 26, so I'm
2  going to go to that Bates No. 159, note line 326.
3      Q.   And what is -- what do you mean when you say
4  you typed the suit?
5      A.   We're going backwards?
6      Q.   The summons and complaint?
7      A.   The summons and complaint, yes.
8      Q.   Okay.  And you're considering that a letter
9  too?
10     A.   I'm asking you if -- I clarified do you want
11 me to point out what was sent through the mail first?
12     Q.   Or served is what you meant?  The other way?
13     A.   Or served, yes.
14     Q.   Okay.  No, I don't care about that.  I just
15 want to know what letters you sent.  We can go back to
16 that later if we need to.
17     A.   Okay.
18     Q.   But no, just what you mailed.
19     A.   So that first notice that I -- notice
20 200.
21     Q.   Yeah.
22     A.   And then.
23     Q.   And then we filed the lawsuit and then you
24 sent the Rule 26 letter?
25     A.   That's correct.
```

Page 177

```
1      Q.   Okay.  And what does that one say?
2      A.   The Rule 26 notice tells who our witnesses
3  would be, what the balance is, and a copy of the return
4  check.  In this case the return check.  And a copy of
5  the notice that was mailed to her.
6      Q.   That's initial disclosures?
7      A.   That's initial disclosures.
8      Q.   Okay.  What about on page 159?
9      A.   And then on, again, on 159, note line 341,
10 "sent doc request pretrial."  So the document generates
11 in our system and then you can see my note lines down
12 here that I e-filed that with the court, the request
13 for pretrial, and a copy of that was mailed to her.
14     Q.   What about line 332, sent letter address?
15     A.   That is the address page that goes with the
16 Rule 26, so that would have been part of that Rule 26
17 packet.
18     Q.   Okay.  You know, I'm going to ask you about
19 the phone calls too, if you want to identify those.  If
20 it's easier to do that at the same time, do that.  If
21 not, we'll come back.  It's up to you.
22     A.   It's up to you.
23     Q.   I'll do it either way.  I want to make it
24 easy for you.  It doesn't matter to me one way or
25 another.  I want to identify each.
```

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                             Pages 178..181

Page 178

1    A.   Okay.  So we're this far into notices.  Do
2  you want to finish that, otherwise, we're going to
3  start over.
4    Q.   Yeah, let's do that.
5    A.   Okay.
6         (Peruses document.)
7         Okay.  So on -- still on Bates 159, on the
8  date of October 18th of 2017, we had a conflict with
9  the date the court set for pretrial, so we sent a
10 notice of continuance to the debtor, and you can see
11 where the note line is mailed to debtor on note
12 line 371.
13        And then, again, you can see another address
14 page was printed on 373.  On Bates 160 is the 373.
15        (Peruses document.)
16        Okay.  There's another sent letter on
17 Bates 161, but that was preparing the file for me for
18 the hearing.
19   Q.   On November 29th, 2017?
20   A.   Yes.
21   Q.   Okay.
22   A.   And then note line, still Bates 161, on
23 December 5th, 2017 we prepared the notice to submit and
24 the pretrial order, because she failed to appear at the
25 pretrial, so we submitted that and mailed her a copy.

Page 179

1         (Peruses document.)
2         Okay.  On Bates 164 we requested a notice of
3  entry of judgment on December 20th of '17.  You can see
4  in note line 604 that was mailed.  "Mailed NEJ, notice
5  of entry of judgment to debtor."
6         I know there's a payment plan that happened
7  somewhere.  She would have received a notice for that.
8  Okay.  Here we go.  On Bates 165, note line 689, "sent
9  pay plan letter."  Okay.  On Bates 166, note line 720,
10 "sent letter 050."  That's a post judgment demand
11 letter.
12
13   Q.   Okay.  And that also went out again on
14 8/30/18, line 734?
15   A.   Let me just make sure I'm not missing
16 something.  That went out again, yeah, 8/30/18.
17   Q.   And that letter says what?
18   A.   It's telling her that we have judgment and it
19 gives her the current balance due.
20   Q.   Did you provide that in discovery?
21   A.   Yes.
22        (Peruses document.)
23        Okay.  And then after that is the request for
24 the writ.
25   Q.   What about line 784 on Bates No. 167?

Page 180

1    A.   That's the -- that's the packet for the writ.
2    Q.   So that didn't go to my client, that went to
3  the constable?
4    A.   No, no.  That's internal.  That went for me
5  to look at and review.
6    Q.   Okay.  Does that -- the list of letters you
7  sent to her, my client, that's complete now?  That's
8  it?
9    A.   I believe so.
10   Q.   All right.  And those all went through CUBS?
11   A.   No.  Some of them were sent internal, some of
12 them went through CUBS.
13   Q.   Okay.
14   A.   Okay.  Now you want to go back to phone
15 calls?
16   Q.   Yeah.  Let's just do phone calls.  Let's
17 identify each phone call that occurred, both in and
18 out.  Let's do this.  I want to see in here all the
19 phone calls where my client called in, where you called
20 out, and where there was a call to the constable.
21   A.   Okay.
22   Q.   Or with the constable.  Both ways.
23   A.   (Peruses document.)
24        What about the attempts to contact?  Do you
25 want those or just actual contacts?

Page 181

1    Q.   Let's identify what the attempts to contact
2  look like.
3    A.   Okay.
4    Q.   So I can -- so I can -- because we want to
5  do -- this needs to be complete; right?  In fact, let's
6  get there.  This is -- this document, the collection
7  notes, that is essentially a diary of the firm's
8  complete knowledge of the case, isn't it?
9    MR. PRICE:  Object to form.
10   THE WITNESS:  Everything's tracked in CUBS, yes.
11   Q.   (BY MR. STEPHENSON) And it's not going to
12 obviously have details of notes?
13   A.   Everything that happened in the firm is
14 tracked in CUBS.
15   Q.   Okay.  But would it be fair to call this a
16 memorialization of the firm's knowledge of the case?
17   A.   Of the actions that were taken on the case,
18 yes.
19   Q.   Okay.  Yeah, so let's go through the phone
20 calls.  Just identify each attempt to make it simple so
21 that we're not questioning what these are down the
22 road.
23   A.   Okay.  Bates 153, note line 036, "telephone
24 residence, phone disconnected."  That would be an
25 attempt.  Bates 154, note line 039, that's "telephone

Page 182

1  other, voice mail, Peretto Construction," and it looks
2  like I left message to call.
3          And then these other calls to the bank, that
4  was verifying funds in her account.
5      Q.  Can you pause on that and tell me what that
6  means.  You called her bank to see if the funds were
7  available to rerun that check?
8      A.  Not to rerun the check.  That was to verify
9  if the account was active enough for us to consider
10  litigation.  That used to be a prior requirement when
11  checks were plentiful.
12     Q.  And the banks will -- if you call the bank at
13  that time, you could -- they would just tell you if
14  this account is open and has enough money?
15     A.  It doesn't indicate if this was through their
16  automated system or over the phone with a teller, but
17  yes, they would.
18     Q.  Do they still do that?
19     A.  Rarely.  I don't know.  We don't -- we don't
20  do that anymore.
21     Q.  Yeah, I would think that's a privacy issue.
22  Does that mean that I can call your bank and ask what your
23  account -- if your account has enough to cover a check?
24     A.  No.  If you have the account number.
25     Q.  Oh, okay.  Okay.  You don't need a subpoena

Page 183

1  though; they'll just tell you over the phone?
2      A.  Then, yes.  I can't speak to now because we
3  don't do it anymore.
4      Q.  Oh, yeah, because line 52, sufficient amount
5  won't clear.
6      A.  Correct.
7      Q.  Is that what they said?
8      A.  Yeah.
9      Q.  Okay.  Go ahead.
10     A.  And I don't know if -- like I said, I don't
11  know if this was through their automated system or
12  online.  I'm sorry, not online.  Over the phone, key in
13  the number.
14     Q.  So they call the bank on 11/28/16, then they
15  call the bank again on 11/30/16?
16     A.  Yes.
17     Q.  Got it.  Okay.  Go ahead, please.  Looks like
18  they called the bank again on December 2nd, 2016.
19     A.  Yes, I guess I said -- you wanted to know
20  generalities.  Do you want me to go through every time
21  we called the bank?
22     MR. PRICE:  Let's make sure what the witness is
23  looking for.  I understood the question to be attempt
24  to call the debtor or communication calls with the
25  debtor and with the constable.

Page 184

1      MR. STEPHENSON:  Yeah.  And that's fine to stick
2  with that.  We got off track because of the bank.  But
3  he's right, you can keep --
4      THE WITNESS:  Okay.
5      MR. STEPHENSON:  The other ones are more
6  important.
7      THE WITNESS:  That was my understanding too and
8  then you stopped me at the bank.
9      MR. STEPHENSON:  Well, yeah, you mentioned it, so
10  I thought I would ask.
11     THE WITNESS:  Okay.
12     MR. STEPHENSON:  But we don't need to ask the bank
13  questions anymore now that I know that's what those
14  are.
15     THE WITNESS:  (Peruses document.)
16          Okay.  It looks like on Bates 156 --
17  actually, that's not a -- that's not a contact with
18  her.  That's the return of the summons.  Okay.  So
19  Bates 157, note line 216, "telephone cell," and it
20  gives the phone number.  "Voice mail ID Tara, left
21  message to call."
22          And then again on note line 220.  Do you want
23  me to give the dates?
24     MR. STEPHENSON:  No.  You can if you want.  Either
25  way is fine.  As long as we have the line number, I

Page 185

1  think that's good to identify.
2      THE WITNESS:  Okay.  Note line 220, telephone
3  cell, gives the number.  "Voice mail ID Tara with
4  Satori Construction," left message to call.
5          (Peruses document.)
6          Okay.  Then on Bates 158, note line 264 it
7  looks like your client called us.  So debtor called.
8          Again, note line 158 -- I'm sorry.
9  Bates 158, note line 305, "telephone cell," and then it
10  looks like at that same time, next line down, we called
11  a different number, asked for Tara.  And then on that
12  same Bates 158, note line 314, "telephone cell, left
13  message to call."  Another one on line 316, "telephone
14  cell, voice mail."
15     MR. PRICE:  And just so the record's for that, I'm
16  going to interject.  Can we have the witness look at
17  line 296 and see if that was one also.
18     THE WITNESS:  Yes.  "Telephone cell."  On note
19  line 296, "telephone cell."
20     MR. PRICE:  I just want to make sure it was
21  complete.
22     MR. STEPHENSON:  Yeah, thank you.
23     THE WITNESS:  And did we hit 299 also?  Did I skip
24  that one?
25     MR. STEPHENSON:  You did skip it.

Page 186

1   THE WITNESS: Note line 299.
2   MR. STEPHENSON: Thank you. Okay.
3   THE WITNESS: Bates 160, note line 376, "debtor
4   called."
5   Okay. Still Bates 160, note line 422,
6   "telephone cell."
7   Q. (BY MR. STEPHENSON) Are lines 376 down to
8   421, that's all one phone call? Because line 402 looks
9   like something different.
10  A. Again, are we looking for contacts with your
11  client?
12  Q. Yeah. I just want to see if that's -- that
13  all these notes are based on that one contact or if
14  there are multiple calls. I guess -- I guess I'm just
15  asking it says MSG on line 402. Is that a separate
16  phone call or not?
17  A. It's not a separate phone call, no.
18  Q. Okay. Okay. That's fine.
19  A. Okay. And we hit that line 426.
20  Q. 426, okay. Thank you.
21  A. Okay. Now we're on Bates 161, note line 432,
22  "telephone cell." Same Bates 161, note line 435,
23  "telephone cell." Note line 432, "telephone cell."
24  Q. You mean 439?
25  A. I'm sorry, yes, 439. And then 441,

Page 187

1   "telephone cell." Okay.
2   Same Bates 161, note line 471, "debtor
3   called." Bates 162, note line 505, "telephone cell."
4   Note line 520, "debtor called."
5   Okay. Bates 164 note, line 609, "telephone
6   cell." Bates 164 still, line 633, "telephone cell."
7   Line 637, "telephone cell," 641, "telephone cell." And
8   then changing to Bates 165, line 654, "telephone cell."
9   Looks like that was a contact.
10  Q. And AMC that's listed after that is the
11  collector that made the call?
12  A. That's correct.
13  Q. And who is AMC?
14  A. Angie -- or Angela Cloward.
15  Q. And who's JDH?
16  A. JDH. I don't remember.
17  Okay. Still Bates 165, note line 695,
18  "telephone cell." Note line 698, "telephone cell,"
19  703, "telephone cell," and 708.
20  Q. "Zortman." What does Zortman mean on
21  line 708?
22  A. There was a certain voice mail -- voice mail
23  message that we would leave, and it was referred to as
24  Zortman. Okay.
25  Bates 166, note line 724, "telephone cell."

Page 188

1   Note line 371, "telephone cell." Note line -- I'm
2   sorry, I'm sorry. I think I said 371. 731.
3   Q. Thank you.
4   A. And then 738, "telephone cell." 742,
5   "telephone cell." Line 747, "telephone cell."
6   Bates 167, note line 774, "debtor called."
7   (Peruses document.)
8   I think that's -- that's it.
9   Q. Okay. Did you point out -- I didn't see any
10  contacts between you and the constables listed in that.
11  Are there any messages in here?
12  A. Well, we were focusing on the contacts with
13  the debtor.
14  Q. I'm not chastising. I'm just wondering are
15  there any -- are there any contacts between your firm
16  and the constables listed in here too?
17  A. Yes.
18  Q. Okay. Let's identify those too.
19  A. Okay. It looks like on -- okay. So
20  Bates 167, we emailed writ of execution to constable.
21  No, I'm sorry. No. Bates 167, note line 818.
22  Q. And that was where your firm's involvement
23  ended in the collection?
24  A. Yes.
25  Q. Okay.

Page 189

1   A. So now are we focusing on communication
2   either way with the constable?
3   Q. Yes. Between the constable back and forth.
4   Any kind of communication any direction.
5   A. Okay. Bates 168, note line 827, "return of
6   service."
7   Q. Can I ask you about 823, "received notice of
8   sale?"
9   A. Oh. That is notice of sale. I missed that.
10  Q. In what way did that notice come through?
11  A. That would have been -- I think they send
12  those regular mail.
13  Q. That's not referring to the email updates
14  that we looked at before?
15  A. (Peruses document.)
16  Q. That couldn't be, because none of the email
17  updates go back that far. So am I -- am I right
18  that -- okay. So let's go there, let's talk about
19  that. You received notice of a sale on January 10th,
20  2019 from the constable?
21  A. That's what the notes say.
22  Q. And did you produce that in discovery?
23  A. I produced everything in discovery that I
24  have.
25  Q. Okay. And what does that notice of sale look

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 190..193

Page 190

1  like!  What did you -- what did you get in the mail
2  from the constable that justifies that note?
3       A.  Do you have our exhibits?
4       Q.  (Shakes head.)
5       A.  Okay.  I can't -- I can't recall exactly what
6  it looks like.  You want me to continue?
7       Q.  Yeah, please.
8       A.  Okay.  So 827 looks like the return -- writ
9  of execution, return of service on that.  And then we
10 started receiving checks from the constable.  Do you
11 want me to go through all of those?
12      Q.  Yes.  Just identify the line numbers that
13 show and the check.  Like, for example, 836 shows a $60
14 payment, 836 and 837; is that correct?
15      A.  836 and 837 are that same payment, yes.
16      Q.  Will you just go through it that way?
17      A.  Okay.  You want me -- I'll just hit the top
18 line.
19      Q.  Yeah, that's fine.
20      A.  Line 836, line 844.
21      Q.  And the amount of the payment to too.
22      A.  Oh, sorry.  Line 836 for $60.  844, $55.
23 854, $55.  At 866, $55.  876, $55.  885, $69.91.  895,
24 $55.  905, $30.
25           Okay.  So now it looks like I've got an

Page 191

1  update from the constable on 919.  Line 922, $60.  Line
2  934, $60.  Line 943, $85.  Line 953, $200.  Line 965,
3  $100.  Line 975, $200.  And then another update, 986,
4  looks like the wrong action code was used, but a status
5  report from the constable.
6           Line 990, $30.  Line 004, email from the
7  constable payment pending.  Line 008, $100.  Line 019,
8  email from constable, temporary file.
9       Q.  What does that mean?
10      A.  I don't know.
11      Q.  Okay.
12      A.  Line 024 looks like Corey from the
13 constable's office called.  And then line 036, Corey
14 from the constable's office called again.  And then you
15 entered your appearance note line 044.
16      Q.  Okay.  Let's go back to that call with Corey.
17 What happened during that call?  It occurred on
18 March 1st, 2023; correct?
19      A.  Yes.
20      Q.  And what happened during that call with Corey
21 and your firm?
22      A.  Other than the notes?  The notes explain what
23 happened on the call.
24      Q.  Okay.  Was it -- Corey was calling your firm
25 asking -- what did he ask -- what was he asking?  Well,

Page 192

1  help me understand what the note says.  I don't want
2  you to read it, but characterize it for me.  What does
3  it mean?
4       A.  Other than what it says -- I mean, I can read
5  it to you.
6       Q.  Well, are you aware that during that phone,
7  call my client was on the phone with Corey?
8       A.  The notes don't indicate that.
9       Q.  Right.  They don't indicate that, but do you
10 know that --
11      A.  I don't.
12      Q.  Okay.  So this phone call occurred while my
13 client was on the phone with Corey and Corey said to my
14 client, "Hang on.  I don't know how much they'll take.
15 I'm going to call Cherrington and find out."  Is
16 that -- you don't that?
17      A.  I have no idea.
18      Q.  Okay.  And this note doesn't say that?
19      A.  No.
20      Q.  What does this mean, the "Can work with her
21 on the interest.  Not a SIF since she can't make a lump
22 sum payment, but maybe take off some interest.  The
23 BAKL he has is 1266.67?"  What does that mean?
24      A.  Other than what the notes say, outside of the
25 notes, I can't tell you otherwise.

Page 193

1       Q.  What does SIF mean S-I-F?
2       A.  SIF stands for settled in full.
3       Q.  And BAKL, what does that mean?
4       A.  I'm guessing that should have been BAL for
5  balance.
6       Q.  And then Corey called again on March 6, 2022;
7  is that right?
8       A.  That's what the notes show, yes.
9       Q.  And that shows Corey called in or you called
10 out?
11      A.  It looks like Corey called in.
12      Q.  Okay.
13      A.  "Other call."  That would have been a call
14 in.
15      Q.  And that's him -- oh, oh, because of me.
16 That call is about me.  Got it.  Right?
17      A.  Other than the notes, yes, those are about
18 you.
19      Q.  Okay.  Do you have a recording of this call
20 with Corey on March 1st, 2023?
21      A.  I don't.
22      Q.  Why not?
23      A.  We don't record all of our calls.
24      Q.  What volume of calls do you record?  What is
25 the criteria?  What do you do with calls?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 194..197

Page 194

1    A.    Only when we're training someone new.
2    Q.    You don't record normal collection calls?
3    A.    I don't.
4    Q.    What system do you use to record the training
5    calls?
6    A.    Teams.
7    Q.    Would it allow you to record all your calls?
8    A.    It would be manual.  You'd have to select
9    record on every call.
10    Q.    Is that something that collectors have
11    available; if there's a situation, they can push a
12    button in the middle of the call to start recording?
13    A.    No, it's a little more complicated than that.
14    That's why we only do it during training.
15    Q.    Who did Corey talk to in that phone call on
16    March 1st, 2022?
17    A.    BRV is Bernice Vasquez.  And on March 6th the
18    EB is Elena Roundy.
19    Q.    And are you certain that that phone call was
20    not recorded?
21    A.    I'm certain, yes.
22    Q.    But it could have been?  If she would have
23    wanted to record it, she could have done that?
24    A.    Bernice wasn't even a collector at the time,
25    so she wouldn't even have known how to -- how to be

Page 195

1    able to do that, so --
2    Q.    But -- okay.  Go ahead.  I didn't mean to cut
3    you off.
4    A.    Bernice wouldn't have known how to record
5    that call, no.
6    Q.    But the technology to do it was available?
7    A.    I believe so.
8    Q.    I want to backtrack to the notes listed the
9    November 12th, 2000 -- no.  They listed the
10    December 10th, 2022 update email.
11    A.    Which email are you looking at?
12    Q.    Exhibit 12.  The notes showed that exhibit.
13    I'm going to try and find it to make this easier.
14    A.    Okay.
15    Q.    Okay.  On our current exhibit, Exhibit 17, if
16    you go to Bates No. 169 and you look at line 919, it
17    shows you received update from the constables
18    December 10th, 2020; correct?
19    A.    Yes.
20    Q.    And that is Exhibit 12?
21    A.    That corresponds, yes.
22    Q.    Okay.  Exhibit 11 --
23    A.    Let me make sure that says payment made here.
24          (Peruses documents.)
25          Okay.

Page 196

1    Q.    And Exhibit 11, I don't see that listed in
2    these collection notes.
3    A.    Going to Exhibit 11.
4    Q.    An email from November 12th, 2020, an update
5    from the constables.  I don't see that listed in the
6    notes.  Tell me if it's in here or if it's not.
7    A.    (Peruses documents.)
8          This is November 12th of '20.
9          (Peruses document.)
10          I don't see that.
11    Q.    Okay.  So we know there's at least one
12    communication your firm had with the constables that's
13    not listed in these notes?
14    A.    According to this email, yes, that would be
15    correct.  I'm just making sure your client's on the
16    list, and she is.
17    Q.    Okay.  If we go back in the notes to
18    page 168, Bates No. 168, the very top is the notice of
19    sale where your firm got notice that my client got
20    notice of the sale; correct?
21    A.    That's what the notes are saying.  Received
22    notice of sale for 1/25/19.
23    Q.    And after that is when the payments started
24    coming in from my client; correct?
25    A.    Yes.

Page 197

1    Q.    And my client didn't make any payments until
2    that notice of sale was received by her?
3    MR. PRICE:  Objection; assumes facts not in
4    evidence.
5    Q.    (BY MR. STEPHENSON) Until -- my client didn't
6    receive -- or my client didn't make any payments until
7    your constable -- until the constable sent my client a
8    notice of sale?
9    MR. PRICE:  Objection; assumes facts not in
10    evidence.
11    Q.    (BY MR. STEPHENSON) Okay.  Did my client make
12    any payments before January 10th, 2019?
13    A.    No.
14    Q.    Okay.  But she made lots of payments after
15    that date; correct?
16    A.    Yes.
17    Q.    Okay.  And did you provide us a copy of that
18    notice of sale in discovery?
19    A.    I believe so, yes.
20    MR. PRICE:  Asked and answered.
21    Q.    (BY MR. STEPHENSON) So let's go to Exhibit 8
22    and tell me again if you want to stick with that
23    answer.  Well, let me rephrase that because that
24    sounded rude and I don't mean to be rude.  I think --
25    let me start over.

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 198..201

Page 198

1    A.   Okay.
2    Q.   There are two notices of sale.  Exhibit 8 is
3  a notice of sale dated for 2023; correct?
4    A.   I don't see a date.
5    Q.   Well, turn it to the second page.  That's
6  when the sale was marked.
7    A.   We're looking at Exhibit 8?
8    Q.   Yes.  And the notice of sale is -- the date
9  of the sale is supposedly going to take place on
10  March 2nd, 2023; correct?
11    A.   Yes.
12    Q.   So let's go back to Exhibit 17 and the note
13  here, "has received notice of sale for the year of
14  2019."
15    A.   Okay.
16    Q.   That means there was a second notice of sale
17  provided to my client; correct?
18    A.   And I think we provided that in our --
19    Q.   Okay.
20    A.   -- disclosures.
21    Q.   But you're confirming that there were two
22  notices of sale then?
23    A.   Without looking at the notices of sale,
24  according to the notes in CUBS, it shows we received
25  that, but I'm not -- I'm not -- I want to make clear

Page 199

1  that I'm not saying that Exhibit 8 is that notice.
2    Q.   Right.  That's exactly the point I'm trying
3  to find out.  Okay.
4         Is the notice of sale from 2023 listed in
5  these collection notes?
6    A.   No.
7    Q.   Do you know why it's not listed in these
8  collection notes and the other one is?
9    A.   I wouldn't have received this one from the
10  constable.
11    Q.   And why not?
12    A.   I don't know.
13    Q.   Do you know why you received the other one?
14    A.   I don't.
15    Q.   Maybe in 2019 the constables were sending
16  those invoices to your firm, but they stopped doing
17  that at some point?
18    MR. PRICE:  Objection; speculation, lacks
19  foundation.
20    THE WITNESS:  I can't speak to that.
21    Q.   (BY MR. STEPHENSON) Okay.  I'm speculating
22  because I don't know, but you don't know either?
23    A.   I don't know either, no.
24    Q.   Okay.  And it's your testimony that you think
25  you provided this in discovery, the 2019 notice of

Page 200

1  sale?
2    A.   I believe so, but I don't know without
3  looking at our discovery.
4    Q.   Okay.  And just for clarity, that sale didn't
5  occur, but none of the sales ever occurred?
6    A.   I don't know.
7    Q.   You don't know.  Okay.
8         So your testimony is that you did not
9  compensate the constables for their work with regard to
10  my client?
11    A.   I did not.
12    Q.   But they were compensated.  You agree to
13  that?
14    A.   I do agree to that.
15    Q.   So because your firm doesn't consider that it
16  compensated them, you didn't send any 1099s or W-9s to
17  the constables?
18    A.   That's correct.
19    Q.   And did the constables send your firm a W-9
20  or a 1099 or any other tax forms?
21    A.   I don't think so.
22    Q.   When you hire process servers -- excuse me.
23  When you use process servers, do you send them a 1099
24  or tax forms?
25    A.   I don't know.

Page 201

1    Q.   And do they send you tax forms?
2    A.   I don't know.
3    Q.   Are you aware of the IRS reporting
4  requirements for how much -- for what the threshold is
5  for reporting to the IRS payments you make to vendors?
6    A.   I'm not.
7    Q.   Do you have an accountant that does that?
8    A.   I do.
9    Q.   Who's your accountant?
10    A.   Brad Allan.
11    Q.   Is he related to you?
12    A.   No.
13    Q.   I know that name and I don't know why.  Is he
14  anybody that I should know?
15    A.   He lives in Heber.
16    Q.   Okay.
17    A.   And Allan I think is A-l-l-a-n.
18    Q.   The constables, do they ever send you a bill
19  for the work they were doing on your behalf?
20    A.   I answered that if it was not served.
21    Q.   Oh, okay.  Right.  But if it was served, no
22  bill?
23    A.   Yes.
24    Q.   And you never asked the constables for an
25  accounting of this debt or any other debt?

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Pages 202..205

Page 202

1    A.   No.
2    Q.   Let's do the next one.
3         (Exhibit 18 marked.)
4    Q.   (BY MR. STEPHENSON) Do you recognize
5  Exhibit 18?
6    A.   I don't.
7    Q.   Well, I'll tell you this was given to us in
8  discovery by the constables.  You don't know how this
9  was created, why it was created?
10    A.   I've never seen this document.
11    Q.   Even in preparing for this, you didn't look
12 at it?
13    A.   No.
14    Q.   This is the first time?
15    A.   This is the first time.
16    Q.   Wonderful.  Okay.
17    A.   Do you recall seeing this document?  Was this
18 provided to us, Ron?
19    MR. PRICE:  I've never seen it before.
20    THE WITNESS:  Okay.  Just want to make sure I
21 didn't miss it.  I've never seen this document.  This
22 is not familiar.
23    MR. PRICE:  Not that I'm aware of.  I've never
24 seen this before.
25    MR. STEPHENSON:  You haven't seen this either?

Page 203

1    MR. PRICE:  I don't believe so.
2    MR. STEPHENSON:  Interesting.  Can we stop for
3  just a second, take a minute then.
4    THE WITNESS:  Yes.
5    MR. STEPHENSON:  I need to think through this.
6    MR. PRICE:  Should we go off the record here?
7    MR. STEPHENSON:  Yeah, we can stop.
8         (Discussion held off the record.)
9    Q.   (BY MR. STEPHENSON) Okay.  You've never seen
10 this document before?
11    A.   I've never seen this document before.
12    Q.   So that means that the constables didn't
13 provide you this document while they were working on
14 collecting the debt from my client?
15    A.   No.
16    Q.   And they didn't provide you anything even --
17 they didn't provide you anything similar to this that
18 showed -- well, did they provide you anything similar
19 to this?
20    A.   No.
21    Q.   Did they provide you anything that showed the
22 phone calls they were engaging in to collect the debt?
23    A.   No.
24    Q.   So I can't really ask you much about this
25 document.  You don't know anything.

Page 204

1    A.   I don't.
2    Q.   Let's just wrap it up then.  Let me ask a few
3  final questions.
4         Are there any other documents that you're
5  aware of that are relevant to the case?  Or not
6  relevant.  Are there any documents, because I'm not
7  asking you to make a legal conclusion.  Are there any
8  documents that you're aware of that you haven't
9  produced in this case?
10    A.   I believe we've produced everything you asked
11 for.
12    Q.   Okay.  There are no documents that did exist
13 at one point, but they've been destroyed since?
14    A.   Not to my knowledge, no.
15    Q.   Have any of the documents you provided been
16 altered or manipulated in any way that changes what
17 they said when they were originally created?
18    A.   No.
19    Q.   So the phone calls were never recorded, not
20 recorded and deleted?  They were never recorded in the
21 first place?
22    A.   Never recorded.
23    Q.   Are you sure that none of the calls with my
24 client were recorded?
25    A.   I don't believe so.  Based on the years, no.

Page 205

1  No.
2    Q.   It's been long enough since we were talking
3  about John Sindt before.  I don't remember if you told
4  me or not.  Do you know anything about his ownership of
5  Wasatch -- Utah County Constables?
6    A.   I don't.
7    Q.   Do you know where he worked before that?
8    A.   No idea.
9    Q.   Do you know his ownership of Utah County
10 Constables now?
11    A.   I have no idea.
12    Q.   Okay.  I am done.  I have no further
13 questions.
14         Do you have any followup?
15    MR. PRICE:  Just real quick.
16         EXAMINATION
17 BY MR. PRICE:
18    Q.   With respect to Exhibit 17.
19    A.   Okay.
20    Q.   Mr. Stephenson had you go through and
21 identify phone calls and communications with his client
22 and also with the constables.
23    A.   Okay.
24    Q.   And you recall you went through and you
25 attempted to identify all the phone calls and all those

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                        Pages 206..207

Page 206

 1  communications, correct --
 2      A.   Yes.
 3      Q.   -- you remember that?
 4           If there is a communication either with the
 5  debtor or the constable that appears in Exhibit 17 that
 6  you didn't identify, would it be fair to say that was
 7  simply an oversight?
 8      A.   It would have been an oversight, yes.
 9      MR. PRICE:  Yeah.  I have nothing further.
10      MR. STEPHENSON:  Okay.  Yeah, let's be done then.
11      MR. PRICE:  We can go off the record.
12      MR. STEPHENSON:  Yeah.
13           (The proceedings ended at 3:02 p.m.)
14                       - - -
15
16
17
18
19
20
21
22
23
24
25

Page 207

 1  STATE OF UTAH      )
                       ) ss.
 2  COUNTY OF SALT LAKE )
 3               REPORTER'S CERTIFICATE
 4      I, Amanda Richards, certified shorthand reporter
 5  for the State of Utah, certify:
 6      That the deposition of the witness herein was
 7  taken before me at the time and place herein set forth,
 8  at which time the witness was by me duly sworn to
 9  testify the truth; that the testimony of the witness
10  and all objections made and all proceedings had of
11  record at the time of the examination were
12  stenographically reported and transcribed by me.
13      That the foregoing transcript, as transcribed by
14  me, is a full, true and correct record of my
15  stenographic notes so taken; that review of the
16  transcript by the witness was not requested pursuant to
17  Rule 30(e) of the Utah Rules of Civil Procedure.
18      I further certify that I am neither counsel for
19  nor related to any party to said action, nor in anywise
20  interested in the outcome thereof.
21      IN WITNESS WHEREOF, I have subscribed my name
22  below this 7th day of February 2025.
23
         *Amanda Richards*
24
         Amanda Richards, CSR
25

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: $1,339.19..18

## Exhibits

**Exhibit 1** 98:16,17,19 112:19

**Exhibit 2** 110:5,6,8,10

**Exhibit 3** 111:24,25 112:1,22 116:1
117:4

**Exhibit 4** 115:12,14

**Exhibit 5** 117:9,10

**Exhibit 6** 118:9,11

**Exhibit 7** 120:2,4

**Exhibit 8** 122:1,3 130:1,6 197:21
198:2,7 199:1

**Exhibit 9** 129:18,19

**Exhibit 10** 132:5

**Exhibit 11** 141:10,12 195:22 196:1,3

**Exhibit 12** 151:11 154:18 195:12,20

**Exhibit 13** 155:1,2

**Exhibit 14** 157:9

**Exhibit 15** 160:2

**Exhibit 16** 161:23

**Exhibit 17** 167:17,19,21 195:15
198:12 205:18 206:5

**Exhibit 18** 202:3,5

## $

**$1,339.19** 168:21

**$1,339.91** 170:9

**$100** 115:22 191:3,7

**$1339.91** 168:9

**$18** 113:3,10

**$2,166.27** 112:14

**$2,289.03** 168:3

**$2,606.18** 101:15 112:19,21

**$20** 48:11 113:8

**$200** 191:2,3

**$260** 113:13

**$2606.18** 101:6

**$30** 190:24 191:6

**$44.09** 113:5

**$50** 113:1

**$55** 190:22,23,24

**$60** 190:13,22 191:1,2

**$655** 167:25

**$69.91** 190:23

**$85** 191:2

## 0

**004** 191:6

**0053** 173:11

**008** 191:7

**018** 173:7,11,18

**019** 191:7

**024** 191:12

**036** 181:23 191:13

**039** 181:25

**044** 191:15

**050** 179:11

## 1

**1** 98:16,17,19 110:18 112:19 120:15
171:5

**1/25/19** 196:22

**10** 33:4,9 117:20 118:25 132:5 146:11
147:18

**109** 174:24

**1099** 200:20,23

**1099s** 200:16

**10:10** 5:1

**10th** 159:21 189:19 195:10,18 197:12

**11** 141:10,12 146:12 195:22 196:1,3

**11/28/16** 183:14

**11/30/16** 183:15

**11:13** 66:20

**11:21** 66:20

**11th** 160:4

**12** 142:15 148:6 151:11,12 154:18
159:23 195:12,20

**125** 175:2

**1266.67** 192:23

**12:35** 134:9

**12:46** 134:9

**12:50** 144:9

**12th** 150:12 169:2 195:9 196:4,8

**13** 155:1,2 159:23

**138** 163:17

**13:10** 143:18

**14** 74:20,25 75:13 77:22 157:9,10

**15** 160:2,3

**153** 173:12,16,18 181:23

**154** 181:25

**155** 174:23 175:2

**156** 184:16

**157** 184:19

**158** 173:5,12 185:6,8,9,12

**159** 176:2 177:8,9 178:7

**16** 161:23,24

**160** 178:14 186:3,5

**161** 178:17,22 186:21,22 187:2

**162** 187:3

**164** 179:2 187:5,6

**165** 179:9 187:8,17

**166** 179:10 187:25

**167** 179:25 188:6,20,21

**168** 169:14 189:5 196:18

**169** 195:16

**17** 167:17,19,21 179:3 195:15 198:12

**176** 151:21,24

**177** 152:20

**178** 153:7

**179** 152:1 153:17

**18** 173:7,10 202:3,5

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                         Index: 18018..6th

**18018**  173:9

**181**  153:22

**182**  154:7

**18th**  157:12 178:8

**19**  110:24 169:2

**196**  158:15

**199**  158:21

**19th**  143:18

**1:24**  167:10

**1:26**  167:16

**1st**  162:17 191:18 193:20 194:16

---

**2**

**2**  110:5,6,8,10 120:16,17 123:16

**20**  196:8

**200**  173:19,20 174:21 176:20

**2000**  195:9

**2014**  8:24 12:22 18:15 19:22 55:18
63:16

**2016**  183:18

**2017**  39:10,13 178:8,19,23

**2018**  39:8,10 62:16 110:24

**2018-2020**  86:20

**2019**  62:16 63:11 85:17 189:20
197:12 198:14 199:15,25

**2020**  62:16 142:15 143:18 159:22
195:18 196:4

**2021**  7:14,15 115:24 116:5,10 155:8
159:23

**2022**  157:12 160:4 193:6 194:16
195:10

**2023**  24:10 65:7 123:18 132:9 162:12
191:18 193:20 198:3,10 199:4

**2024**  56:15 63:11 85:17

**2025**  5:1

**203**  155:10

**204**  155:14

**205**  155:18

**207**  156:13,17

**209**  156:21

**20th**  179:3

**21**  79:4,5,24

**210**  157:3

**216**  184:19

**22**  65:8 162:15

**220**  184:22 185:2

**23**  65:8 162:16,17

**250**  7:10,15

**26**  176:1,24 177:2,16

**264**  185:6

**27th**  155:8 159:23

**296**  185:17,19

**299**  185:23 186:1

**29th**  178:19

**2:03**  167:16

**2nd**  115:24 116:5,10 123:18 183:18
198:10

---

**3**

**3**  111:24,25 112:1,22 116:1 117:4

**30**  5:1 8:20 24:17,24 25:6,10,13 26:1
33:3,9

**30-day**  24:7,8,14 25:23 28:18 29:13
112:11

**305**  185:9

**314**  185:12

**316**  185:13

**326**  176:2

**332**  177:14

**341**  177:9

**371**  178:12 188:1,2

**373**  178:14

**376**  186:3,7

---

**4**

**4**  115:12,14 143:8

**402**  186:8,15

**421**  186:8

**422**  186:5

**426**  186:19,20

**432**  186:21,23

**435**  186:22

**439**  186:24,25

**441**  186:25

**45**  24:13

**45-day**  24:9 25:4

**471**  187:2

---

**5**

**5**  117:9,10 119:2,8

**50**  33:13 53:6

**505**  187:3

**52**  183:4

**520**  187:4

**5th**  178:23

---

**6**

**6**  118:9,11 119:2,8 193:6

**600**  63:11 85:17 107:7

**604**  179:4

**609**  187:5

**633**  187:6

**637**  187:7

**64**  67:11 74:19

**641**  187:7

**64E**  74:18 82:25

**654**  187:8

**689**  179:9

**695**  187:17

**698**  187:18

**69A**  74:19

**6th**  132:9 194:17

**7**

**7** 120:2,4

**703** 187:19

**708** 187:19,21

**720** 179:10

**724** 187:25

**731** 188:2

**734** 179:14

**738** 188:4

**742** 188:4

**747** 188:5

**774** 188:6

**784** 179:25

**7th** 162:12

**8**

**8** 122:1,3 130:1,6 143:2,7,8,11 150:2,
3,4 171:5 197:21 198:2,7 199:1

**8/30/18** 179:14,16

**80** 33:3,8,11 53:24

**818** 188:21

**823** 189:7

**827** 189:5 190:8

**836** 169:14 190:13,14,15,20,22

**837** 190:14,15

**844** 169:16 190:20,22

**854** 190:23

**866** 190:23

**876** 190:23

**885** 190:23

**895** 190:23

**9**

**9** 129:18,19 170:18,23

**90** 53:24

**905** 190:24

**919** 191:1 195:16

**922** 191:1

**934** 191:2

**943** 191:2

**953** 191:2

**965** 191:2

**975** 191:3

**986** 191:3

**990** 191:6

**9:30** 123:19

**A**

**A-L-L-A-N** 201:17

**a.m.** 5:1 66:20

**ability** 107:23

**absolutely** 48:23 123:4 126:3

**ACA** 13:17,23

**accepted** 166:18

**access** 16:2 36:6

**accidentally** 21:4 116:3

**account** 170:24 171:2,5 172:10
182:4,9,14,23,24

**accountant** 201:7,9

**accounting** 105:11 171:1,6,20,22,23
172:1,4,9,13,16 201:25

**accounts** 142:13,17 149:10

**accurate** 25:9 54:21 101:12 126:25
145:2,6 156:19

**acknowledge** 144:6

**acquired** 38:21 39:7 40:8

**act** 12:18 134:24

**acting** 92:7

**action** 134:20 191:4

**actions** 137:4 181:17

**active** 182:9

**actual** 180:25

**add** 101:4 106:2,6,10 113:17

**added** 112:23 113:1,3,5,8,10 170:23

171:4

**adding** 106:4,9,10

**address** 177:14,15 178:13

**addresses** 144:17,18

**admissions** 63:10

**advertised** 87:17

**afternoon** 143:18

**agency** 69:25 103:7

**agree** 26:4 31:10,11,22 34:2,5 35:5
69:1 77:24 95:12,25 97:20 108:20
118:1 122:18,24 124:6,11 125:12
126:1,3,13 129:14 130:11 135:16,22
136:18 200:12,14

**agreement** 40:22 41:7,8

**agreements** 165:22,25

**ahead** 43:18 73:18 83:25 98:6 131:2
175:6,8 183:9,17 195:2

**alias** 34:7,17

**aliases** 34:24

**Allan** 201:10,17

**allowed** 68:7 69:10 83:12 114:6
128:25 129:2,4

**ambiguous** 10:17 126:17

**AMC** 187:10,13

**amicably** 86:7

**amount** 30:9 34:3 53:1,11 54:9 63:12
101:10 104:21 105:18 106:16,17
112:24 115:22 167:25 168:2,4 169:15
170:4,5,9 183:4 190:21

**amounts** 113:17 147:25 170:23

**Angela** 54:19 57:8 187:14

**Angie** 187:14

**answer's** 129:1

**answering** 11:2 22:14 126:5

**answers** 18:12 63:10 160:16

**anticipated** 68:14

**anymore** 36:2 41:5 55:21 65:11 73:25
74:1 182:20 183:3 184:13

**apologies** 173:13

**apparently** 146:18

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: appearance..bottom

**appearance** 191:15

**application** 100:2

**approve** 45:3,6 80:13 117:6,17
119:23 121:21 131:2 132:23 133:1
146:7

**approved** 45:12 99:16 101:14 113:18

**approves** 46:12

**April** 155:8 159:23

**area** 52:25

**arguably** 162:24

**argue** 84:18

**arguing** 23:25 35:3

**arrangements** 123:22 124:1

**arrested** 35:14

**articulate** 74:7

**asks** 19:25 94:18 124:15 142:12

**asserted** 37:11

**asserting** 37:17

**assertion** 37:9

**asset** 93:12

**assets** 78:24 148:16

**assign** 11:24

**assigned** 40:12,17 98:1

**assignment** 40:19

**assist** 11:20

**associating** 139:3,4,8

**association** 138:16

**assume** 22:15 106:8,9 148:15
155:16,17 162:11

**assumes** 197:3,9

**assuming** 24:6 127:18

**assumption** 148:14

**assure** 13:14 36:15 137:13,17,19,22
138:1

**attached** 110:19 123:9 131:22,24
143:5

**attaches** 44:3

**attack** 84:12,14

**attacks** 84:10

**attempt** 28:10 181:20,25 183:23

**attempting** 155:11 157:16 160:20
163:20

**attempts** 180:24 181:1

**attention** 45:2

**attorney** 5:20 8:11 37:20 42:17 52:6
64:17,18 86:16 103:7,8 151:22 152:3,
11 155:18

**attorney's** 50:20

**attorney-client** 5:25 52:2

**attributable** 142:20,23

**auction** 71:17 78:3 81:25 95:14

**auctioneer** 88:4

**authority** 41:20 45:14,15,25 46:13
51:5,8 52:11 53:6,8,10 71:11 92:7,13
93:1 96:10 97:18,24,25 98:1,3 106:3
109:13 114:3,9 128:21 130:23 134:19,
23,24 135:1,4,8,9,12,13 136:23,24
137:3,5,6,9

**authorize** 124:24

**authorized** 97:20

**automated** 182:16 183:11

**automatically** 44:3

**avoid** 38:14

**aware** 26:23 29:19 32:22 35:18 37:8,
14,25 65:18 74:18 86:20,21 87:13,16,
19,22 88:4,7 98:13 99:25 107:18
112:7 119:19 135:6 136:3 145:11
149:14,16,18,21 192:6 201:3 202:23

---

**B**

---

**back** 46:2 49:7,11,25 51:5 62:12,15
68:3 76:13 81:1,5,8 89:2 90:2 94:11
106:8 131:22 148:17 161:10 165:4
167:8 169:1 170:8,15 176:15 177:21
180:14 189:3,17 191:16 196:17
198:12

**backtrack** 38:19 42:5 54:11 195:8

**backwards** 11:9 85:18 94:9 176:5

**bad** 146:19

**BAKL** 192:23 193:3

**BAL** 193:4

**balance** 26:14 101:6,9 112:13,16,21
177:3 179:19 193:5

**ballpark** 8:18 39:10 65:9 79:11

**bank** 58:10 78:17 88:16,22 147:6
182:3,6,12,22 183:14,15,18,21 184:2,
8,12

**banks** 182:12

**base** 162:3

**based** 124:2 151:6 186:13

**basically** 165:6

**basis** 137:2

**Bass** 162:3

**batches** 62:24 63:1

**Bates** 143:11 146:11 148:6 149:5
150:3,4 153:16,22 155:10,14,18
156:13,17,21 157:3 163:17 169:13
173:5,11,16 176:2 178:7,14,17,22
179:2,9,10,25 181:23,25 184:16,19
185:6,9,12 186:3,5,21,22 187:2,3,5,6,
8,17,25 188:6,20,21 189:5 195:16
196:18

**Bates-stamp** 151:21 158:21

**begin** 41:10

**beginning** 163:1

**behalf** 48:6 104:13 138:2 154:1
201:19

**belief** 150:18

**believed** 158:23

**Bernice** 54:19 57:1 80:19 194:17,24
195:4

**bestow** 135:13

**bet** 28:24

**bill** 172:18 201:18,22

**billing** 23:4 27:12

**bin** 163:10

**bit** 134:11 167:24

**Blown** 162:3

**bold** 123:8

**bona** 37:7,9,11,15

**bottom** 100:10

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: bounce..client

**bounce** 169:1

**bounced** 40:3

**bounds** 52:12

**Brad** 201:10

**break** 66:14,16,17 67:23 101:19 107:3
133:18,22,24 134:8

**breakdown** 116:19

**breaking** 58:22

**Brigham** 40:1,2,16 41:1 119:10

**brings** 45:2

**broad** 14:21 18:23 27:2 59:1 63:18

**BRV** 194:17

**bucks** 95:23

**bump** 36:12

**Burrell** 54:20 58:7

**business** 9:20,21 31:2 50:11,24
57:16,22 109:12

**businesses** 50:25

**button** 194:12

**BYU** 40:22 41:7 45:8,12,20 48:9 51:12
52:5 54:7,10

---

**C**

---

**C-A-R-N-E-S-E-C-C-A** 18:9

**calculate** 105:18 106:17

**calculated** 105:20

**calculation** 105:25

**call** 15:6 24:5 27:19 28:23 35:12 48:15
53:5 54:10 74:23 78:18 90:6,15
118:24 130:15 143:8,11 145:14,16
146:2,5 152:17 155:14 157:18 160:23
164:17 167:2 180:17,20 181:15 182:2,
12,22 183:14,15,24 184:21 185:4,13
186:8,16,17 187:11 191:16,17,20,23
192:7,12,15 193:13,16,19 194:9,12,
15,19 195:5

**called** 27:22 34:13 75:9 102:10
166:24 180:19 182:6 183:18,21 185:7,
10 186:4 187:3,4 188:6 191:13,14
193:6,9,11

**calling** 32:13 53:7,25 164:25 165:4
191:24

**calls** 6:9 14:7,8,10,12 15:9,11 28:22
53:2 73:25 177:19 180:15,16,19
181:20 182:3 183:24 186:14 193:23,
24,25 194:2,5,7 203:22

**cancel** 51:6 123:22 124:1,15 130:14,
23

**canceled** 138:15

**canceling** 130:19

**Candi** 54:20 58:7

**caption** 119:3,4,6,14,17 122:19 131:4
133:4

**card** 124:17

**care** 53:16 140:12,14 153:14 176:14

**Carnesecca** 18:6,8

**carried** 128:1

**carry** 93:9

**carved** 34:22

**case** 6:15 7:11,12,16,24 8:2,8 22:1,2
37:5,6 41:21 43:3 44:25 45:8,12,13
46:5 47:16,17 48:22 54:4,6 55:12,24
57:4 58:16,24 60:13,16 62:5 66:22
71:13 91:9 94:13 97:9 103:13,15
112:3 114:10 115:17 119:7 121:24
122:15 131:4 133:4 152:18 154:5
159:9 177:4 181:8,16,17

**cases** 7:8,16 46:23 47:1 85:1,3,13,15
105:17 141:18 151:19,21 154:3

**cash** 124:17

**cashing** 35:23

**cat** 97:15

**catchall** 30:17

**cell** 184:19 185:3,9,12,14,18,19 186:6,
22,23 187:1,3,6,7,8,18,19,25 188:1,4,
5

**certified** 124:18

**chain** 59:23

**chance** 10:10

**change** 17:7 63:20 165:8,14

**changed** 17:10 24:8,13 64:23 65:18
163:5 164:6

**changing** 187:8

**characterization** 124:4,7,11,12
129:15 130:1 134:15 153:12 158:20

**characterize** 26:9,11 56:22 69:12
130:6 136:1,21 138:17 154:11 192:2

**characterized** 95:11

**charge** 94:3 172:17

**charges** 171:13

**chart** 37:22

**chastise** 146:9

**chastising** 188:14

**check** 35:24,25 40:3 47:17,18,19
48:11,19 50:16 54:8 64:11,12,14,18
161:14,15 169:14,15,21,24 173:25
177:4 182:7,8,23 190:13

**checks** 41:4 182:11 190:10

**Cherrington** 5:3,8,10 9:6 34:13
40:17 56:25 148:11,12,18 192:15

**choose** 86:21 95:7

**circuit** 29:23

**circumstances** 19:6,9 23:1 89:10

**city** 44:10

**Civil** 67:9

**claim** 99:7

**claims** 37:19

**clarification** 25:14

**clarified** 176:10

**clarify** 11:1,8 20:21 22:17 42:3 43:17
44:7,11 49:15 52:8 60:24 67:23
145:24 172:8

**clarifying** 50:9

**clarity** 200:4

**clear** 10:24 11:6 34:10 91:14 101:17
102:4 104:11 127:8,9,11 129:10
136:11,12 140:23 150:24 173:11
183:5 198:25

**cleared** 147:13

**clearing** 147:6

**client** 7:17,21 8:8 20:3 21:8 25:14
38:8 48:18 49:6,11 50:1,5 53:2,11
54:10 66:25 110:15 112:8 114:12
115:21 117:12,20 119:11 121:7,8,16
124:21 132:20,24 133:2 139:13
147:18 148:7,12 152:5 153:4,19
156:12,18 158:14 159:10 161:4
168:20 170:5,12 174:2,9 175:1,13,16,

20 180:2,7,19 185:7 186:11 192:7,13,
14 196:19,24 197:1,5,6,7,11 198:17
200:10 203:14

**client's** 7:24 97:15 159:1,5 196:15

**clients** 7:22 35:12 50:4 92:17 104:5
148:3

**clinic** 58:3

**clock** 159:18

**close** 39:9 107:11

**closer** 33:3

**Cloward** 54:20 57:8 187:14

**clue** 158:3

**coach** 14:12

**code** 191:4

**codes** 153:4

**coincide** 130:4

**coincides** 129:25

**cold** 36:4

**collator** 148:7

**collect** 10:1 11:12,16,18,19,20 15:2
28:10 40:17,22,23 42:7 48:5 49:8,16,
18,23 51:12,14,21 52:11 83:12 86:3,6
100:7,12 104:6 134:12,13 135:9 136:4
138:2 203:22

**collected** 41:1 49:13 114:12 115:7

**collecting** 9:17 38:7 40:9 47:10,16
54:18 73:25 85:25 91:16,17 95:23
104:13 108:20,22 135:17,23 140:24
149:15 203:14

**collection** 12:18 31:25 32:10,23
50:11,14,15 55:3 64:8,9 103:6 115:1
121:9 152:6 172:22 174:18 181:6
188:23 194:2 196:2 199:5,8

**collections** 9:18 103:4 154:6

**collector** 9:7 14:17 34:3,6,12 35:6,13
36:23 45:2,6 46:7,11,14,18 57:7,9
114:19 118:5 120:24 121:2,6 122:25
131:17 133:11 134:17,25 187:11
194:24

**collector's** 14:19 34:12

**collectors** 14:23 15:7,8,14 18:11
27:18 29:20 46:19 53:17,23 136:19
194:10

**collects** 50:14

**Columbia** 15:20,22,23

**command** 59:23

**commanded** 100:7,12

**commission** 48:15,19 113:5

**commission's** 48:17

**committed** 37:25

**committee** 44:16

**commonly** 79:8

**communicate** 91:24 93:3 137:23

**communicated** 103:11 152:7 155:22
175:21

**communicating** 91:16 121:16 130:2,
7

**communication** 23:19,20 24:19,20
28:12 29:7,16,17 52:2 66:1 93:5,7
114:18 183:24 189:1,4 196:12

**communications** 23:15,18 27:19,20
52:5 64:5 90:20

**company** 5:9,11,13 8:23 10:23 11:7
18:14 19:21 55:21 57:13 58:22 59:8,
16

**compensate** 93:25 200:9

**compensated** 47:15 94:2,5 111:17
200:12,16

**compensation** 149:25

**complained** 104:4,5

**complaint** 69:5 176:6,7

**complaints** 109:19

**complete** 14:16 171:1,6,20,22 172:1,
4,8,9,13,16 180:7 181:5,8 185:21

**completely** 98:11

**compliance** 13:14 17:3,4 18:1,10

**complicated** 194:13

**Complies** 169:18

**compound** 106:25

**computer** 16:3

**con** 77:10

**concede** 69:23

**concept** 54:2 69:20

**concern** 69:22 128:4,7 140:9

**concerned** 58:5 94:14 175:22

**concerns** 140:1,7

**conduct** 144:18

**confidential** 142:1,6,10

**confirmation** 130:10

**confirming** 198:21

**conflict** 178:8

**confused** 23:5 26:24

**confusing** 71:24 94:15

**confusion** 50:7

**connotation** 69:23

**consecutive** 105:5

**consequences** 35:7

**considered** 27:22 38:10 86:2 95:20
125:23 149:24

**constable** 43:13 61:8,10,12 62:15,19
63:7,21 64:3 68:8,22 69:3 70:16,24
74:5 77:1,8,12,17 78:13 81:16 83:12
86:25 88:13 89:7,8 90:9 91:21 92:8
93:19,21 94:16 95:10,21,22 96:7,12
98:9,10 110:12 111:13 112:7,23
113:17 115:21 125:4 128:8 132:23
134:20,24 135:8,14,18,24,25 136:9,13
139:9,12 143:14 144:1,21 147:4
149:17 152:7,12,16 154:5 165:11
166:20 167:1,5,8 169:6,11,15,17,19,
20,25 170:1,2,5,6,10,13 171:19
175:16 180:3,20,22 183:25 188:20
189:2,3,20 190:2,10 191:1,5,7,8 197:7
199:10

**constable's** 73:22 90:20,22 110:13
128:21 130:23 136:22 137:4 144:21
191:13,14

**constables** 11:18,22,23 60:12,25
61:5 62:19 63:17,19,23 64:4,24 65:3
66:2,12 68:1,2,21 70:21 71:1 75:3
78:6 81:5,24 82:4,6,7 86:15 87:8,13
89:2,11,22 90:1,2,15 91:15,23 92:2
93:14 94:1 96:21 97:9,17 98:4,7,13
102:18,23 104:1,12,18 105:21,23,24
106:2,19,22,23 107:5 109:24 113:21
114:10 115:16 116:17 117:3,11,21,23
118:14,16 119:23 127:22 128:16,25
132:1,19 133:13 136:2,3,6,7,18
137:12 138:1,6,9,13,22 139:21 140:24
148:4 149:15,21 153:11 154:4 155:22

161:13 165:12,23 166:22 168:23
171:21,23,25 172:2,6,14 188:10,16
195:17 196:5,12 199:15 200:9,17,19
201:18,24 202:8 203:12

**constables'** 104:6

**Construction** 182:1 185:4

**consumer** 9:17,19,24 19:9,25 24:21

**consumers** 10:1,9 12:3,6,12 104:24

**contact** 54:10 65:19,25 88:24 90:19
91:1 97:1 117:21 123:20,24 124:21
167:7 180:24 181:1 184:17 186:13
187:9

**contacted** 155:21

**contacts** 65:18,24 180:25 186:10
188:10,12,15

**content** 162:21

**contentious** 56:5

**continuance** 178:10

**continue** 154:5 190:6

**contract** 48:10 166:1

**contrast** 67:16 159:23

**conversation** 142:19

**conversations** 103:18,19 104:2

**cooperation** 9:15

**copy** 117:14 177:3,4,13 178:25
197:17

**Corey** 65:21 90:24 162:6,7,8,10
164:11,25 165:4 191:12,13,16,20,24
192:7,13 193:6,9,11,20 194:15

**corner** 116:2 131:21

**correct** 9:1 12:25 15:10 17:6,15 20:15
21:2,17,19 23:24 24:7,21 29:4 30:13,
18,25 34:21 35:4,9 38:8,18 40:2,4,18
45:7,19,22 46:1 47:3,6,9,21 48:4,7
49:21 50:21 51:3 52:21 54:22 60:8
61:18,23 66:7 67:3 72:4,11 81:15,17
83:19,20 86:19 88:14 90:4 92:23
98:12 99:17,23 101:5,16,25 105:22
106:12,21 111:12 112:16,24 117:8,21
119:8,11,14 120:14 121:5,9,13,25
123:17 125:11 128:9 129:23 132:11
133:15 134:14 137:1 140:16 144:13
145:4,15 153:17,20 156:1,8,23 157:12
160:5,8 161:25 165:9 168:21,25
172:3,8 175:17,18 176:25 183:6
187:12 190:14 191:18 195:18 196:15,

20,24 197:15 198:3,10,17 200:18

**corrected** 138:9

**corresponds** 195:21

**cost** 67:22

**costs** 48:25 49:1

**counsel** 5:25 52:4

**counts** 72:17

**county** 44:10 63:17,18,22 64:3,24
65:3 71:1 86:25 106:4 136:7,9,13

**couple** 7:16 9:2 40:14

**couriers** 10:15

**court** 18:7 62:22 67:13 71:14 72:24
73:14 75:4,6,19,21 77:23 78:1,11 80:1
81:2 85:11 98:8,23 99:10,11,12,13,16
100:3 101:14 105:14,16 106:3 110:14
111:7,9,10 112:19 119:3,4,6,14,18
120:5 122:19 135:13 137:6 139:9
177:12 178:9

**court's** 12:14 99:1,8 100:16

**cover** 96:15,19,22,23 182:23

**covered** 116:3

**CR** 157:21 164:13

**crazy** 40:6

**created** 202:9

**creature** 67:9

**creditor** 26:2,15 38:21 39:8 40:1 46:8
47:16 48:3,5,13 49:20,24 51:1,4,25
53:7,18,23 175:21

**criteria** 85:21 88:7 193:25

**cross** 109:9

**crying** 100:22

**CUBS** 15:21 16:1,2,8,14 17:16 20:13,
14 21:1,14 40:15 167:22 170:19
180:10,12 181:10,14 198:24

**current** 168:4 179:19 195:15

**customer** 19:25 21:3,6 23:15 166:24

**cut** 9:3 195:2

——————————

**D**

——————————

**damages** 47:22 48:12

**dancing** 92:11

**data** 17:22

**date** 25:7,10 38:22 73:10 85:17 99:9
110:23 116:1,4,5 120:9 123:17,18
128:2 131:9 132:2,6,7,10,15 143:14
150:6,11,13,15 151:2,7 154:9 155:5,8
161:18 162:12 178:8,9 197:15 198:4,8

**dated** 160:4 198:3

**dates** 24:11 131:20 156:22 159:13
161:10 184:23

**day** 33:21 77:20 116:11 130:15 144:9
150:19 171:2 172:16

**days** 23:20 24:13,17,19,24 25:6,10,13
26:1 29:17 40:14 74:20,25 75:13
77:22 79:4,5,24 117:20 118:25

**deal** 36:1 148:18

**dealings** 64:15

**debt** 9:7 12:17 19:10,12,23 20:4 21:13
23:5 24:24 25:15 26:6,21,24 28:10
29:19 32:23 34:3,6,12 35:6,13 38:7,
20,21 39:7 40:8,12,17,22,23,25 46:7
51:2,5,12,21 52:12 53:13,16 54:19,24
104:6 106:13 114:18 115:3 117:21
120:24 121:2,6 122:25 131:17 133:11
134:14,16,24 136:19 168:21 172:5,16
201:25 203:14,22

**debtor** 17:22 21:4,9 25:14 28:13
31:25 32:10 35:7 44:2 49:18 53:2,4
72:11 74:20 75:11,17 79:2 91:17 93:3,
4,6 105:23 118:5 130:2,7 132:24,25
135:9 167:2 169:12 170:1 174:25
178:10,11 179:5 183:24,25 185:7
186:3 187:2,4 188:6,13

**debtor's** 67:13 83:9

**debtors** 30:24 117:24 128:17,25
129:6 137:23 138:25 139:13 141:2
148:3 149:19 166:21

**debtors'** 141:24

**debts** 9:17,19 10:1 11:12,16,18,19,21
47:11

**decade** 12:24

**December** 110:24 159:21 178:23
179:3 181:8 195:10,18

**deceptive** 31:5 95:3

**decide** 20:8 41:18 44:25

**decided** 56:20 65:4 86:3

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: decides..Erickson

**decides**  42:4,6,14 78:1

**decision**  41:13,15,16 42:10 43:3,13,
21 44:17,24 45:1,17 46:9,10,12

**decisions**  42:17,20 43:10 52:22

**defend**  53:13

**defendant**  76:15 110:20 119:11

**defense**  37:7,9,11,15,18

**deferring**  37:20

**deliver**  69:15

**delivered**  72:13,21 73:2 110:19,23
137:15

**delivery**  111:1

**demand**  179:11

**Department**  34:14

**depending**  21:25

**deposition**  5:18 82:22 95:10 172:23

**designate**  142:10

**desk**  14:5

**details**  6:3 14:3 66:23 181:12

**determination**  21:21 128:23

**determine**  21:20

**determining**  85:22 105:25

**devastating**  95:12,13,20,24

**Devenesh**  55:9,19 59:12

**diary**  181:7

**difference**  33:10

**digging**  23:21

**direct**  59:22 169:12

**direction**  189:4

**directly**  88:24 94:6 166:23 168:13,17
169:11

**director**  18:4,24

**disagree**  31:23

**discern**  123:6

**disclose**  5:24 6:3 52:4

**disclosure**  6:9

**disclosures**  177:6,7 198:20

**disconnected**  181:24

**discover**  138:13

**discovery**  37:7 52:2 54:13 132:16
174:4 179:20 189:22,23 197:18
199:25 200:3 202:8

**discuss**  132:14

**discussion**  92:10 167:15 203:8

**discussions**  37:8

**disk**  14:2,3

**dispute**  24:24 25:24 26:1,20

**Disputed**  27:12

**distinction**  62:2 99:18

**doc**  177:10

**document**  112:5 115:16,19 122:4
150:8 151:5 156:15 160:19 162:22
169:4 171:10 172:5,19 174:10,22
175:24 177:10 178:6,15 179:1,6,22
180:23 181:6 184:15 185:5 188:7
189:15 196:9 202:10,17,21 203:10,11,
13,25

**documentation**  21:16,22 22:3,18,23
23:2 106:24 108:10 172:19,20

**documents**  5:19,21 6:4,6,7,14,17,19
7:5 8:1,3,6,9 26:15 29:3,7 112:3
122:11,13 154:24 166:1,15 195:24
196:7

**dollars**  116:13

**doubling**  106:13

**Doubtful**  159:25

**draft**  100:1

**drafted**  99:24

**drama**  56:7,9,16

**dressed**  36:10

**driver's**  35:15

**driving**  87:25

**due**  101:6 112:13,16,19 179:19

**duly**  5:4

**dunning**  20:20 33:19

**duties**  136:22

**duty**  135:18

## E

**e-filed**  177:12

**earlier**  85:16 132:17 168:7

**earned**  113:21 115:6

**easier**  177:20 195:13

**easy**  177:24

**EB**  194:18

**efforts**  13:13 51:20 104:6 152:6

**electronic**  12:7 36:2 100:21

**Elena**  55:11,13 194:18

**eliminate**  9:11

**email**  10:6 11:11 91:7 141:15,17
142:12 143:5 150:12 151:7 189:13,16
191:6,8 195:10,11 196:4,14

**email's**  142:21

**emailed**  188:20

**emailing**  60:7

**emails**  61:15 148:25 157:24

**employed**  57:10 128:10

**employee**  13:20 19:16 46:14

**employees**  54:12,18 148:25

**employer**  88:16,21

**employer's**  81:6

**enacted**  31:17

**end**  162:15 166:17

**ended**  58:14 188:23

**engaging**  203:22

**entered**  99:11 168:6 191:15

**entire**  100:13

**entry**  179:3,5

**envelope**  120:18 131:25

**equipment**  100:21

**Eric**  47:12 94:9

**Erickson**  60:8 61:8,21 62:6,15,20
63:8,15,17,24 65:1,4,11,15 70:25
71:12 90:23 98:10 101:18 102:5,7
108:2,9 109:14,18,21,25 112:7 121:17
127:22 136:13 142:13 151:18 155:3

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: Erickson's..firm

157:11 160:7 165:6

**Erickson's** 65:16 141:15 164:4

**error** 37:7,9,11,15 38:10

**errors** 38:3,14

**essentially** 106:7 121:15 134:12 181:7

**establish** 39:22

**events** 6:22 7:6 8:4

**eventually** 14:11

**Everything's** 181:10

**evidence** 197:4,10

**exact** 28:7,8 30:16 90:10 143:17 144:18

**EXAMINATION** 5:5

**exception** 8:24

**excuse** 7:11 12:5 28:18 46:7 51:24 86:11 113:24 121:8 134:12 153:16 156:13 200:22

**execute** 42:15 43:4 68:4,7,22 71:1, 14,15 72:2,3 74:5 77:18 82:3 86:12,22 92:3 97:13,19,20 110:3 138:11

**executes** 77:7

**executing** 74:8,20 83:13,15 102:23 109:15

**execution** 11:24 43:12,24 45:5,13,18 47:5 60:7,12 61:16,20 62:5,8,15,19 63:7,15,22 64:20 65:5 66:23,24 67:2, 5,6,12 68:5 70:15 71:2,4 72:1,7,16 73:3,11 75:2,5,6 76:6 77:7 79:8,15,18 80:15 81:3,23 83:3,16 84:25 85:4,9, 11,23 86:2,12,22 87:12 88:2,9 89:1 92:12 94:17 96:7,21 98:11,22 99:4,14, 23 102:24 103:14 109:16 110:3,14 111:11,14,17 112:18 114:11 124:3 128:11 130:20 135:10 137:13 188:20 190:9

**executive** 18:4,24

**exemptions** 88:11,12

**exhibit** 39:14 98:16,17,19 110:5,6,8, 10 111:24,25 112:1,19,22 115:12,14 116:1 117:4,9,10 118:2,4 122:2,4 122:1,3,8 129:18,19 130:1,6 132:5 133:16 141:10,12 151:11,25 154:18 155:1,2,11 157:9 160:2 161:23 167:17,19,21 195:12,15,20,22 196:1,3 197:21 198:2,7,12 199:1 202:3,5

**exhibits** 39:19 115:15 118:12 119:2,8 129:21 145:22 190:3

**existed** 121:23 128:5,6 133:14

**expect** 52:18 71:19 81:24 82:2 90:9 92:14,21,24,25 93:3,8

**expected** 82:7 101:19

**expecting** 91:24

**experience** 64:8,10 136:1,6

**expert** 23:11 29:9,21 30:6 81:19 114:22 125:15,21,25 126:1,2

**expertise** 30:9

**explain** 119:2 137:2 143:16 168:3 191:22

**explanation** 116:18,24

**express** 128:7

**expressed** 128:4

**expressing** 129:11

**extent** 23:11 29:8 44:1 52:1 81:18 136:2

---

**F**

**face** 35:7

**fact** 82:15 110:17 181:5

**facts** 197:3,9

**failed** 35:8 178:24

**fails** 94:17 118:1

**fair** 12:17 30:8 31:4 33:12,14 37:4,23 38:1 39:21 41:14 48:15,17 51:19,23 52:7 53:19,20 57:18 64:24 65:14 81:22 93:2 104:10 109:7 129:7,9,15 134:15 142:18 146:4 148:11,14,15 151:6 153:12 154:11 158:20 166:12 170:3 181:15

**false** 29:20 30:12,14,16,17,23 31:21 35:19 36:16 137:20

**familiar** 12:17,23 13:1,10 27:14 65:23 76:25 90:25 99:22 202:22

**familiarity** 13:5 77:4

**family** 64:13

**farm** 100:21

**Faulkner** 54:20 57:25

**fault** 50:8

**fax** 10:8 11:11

**FDCPA** 9:7 12:23 13:8,10,14,18 18:1 19:8 22:4 23:8,16,21 25:23 29:5,19 30:13 31:2,17 34:2,6,15,20 35:6,16,21 37:24 95:3 114:20 115:8 118:5 120:23 121:5 122:25 125:10 131:16 133:11

**FDCPA's** 17:5 36:15 37:15 112:10

**February** 115:24 116:5,10 162:12

**Fed** 10:15 11:15

**fee** 50:15 93:3,12,18,21 113:1,3,8,13 172:18

**feel** 95:6 133:22

**fees** 47:18,19,20 48:11 49:3,6 50:20 83:11 101:10 112:23 113:21 115:6

**fide** 37:7,9,11,15

**figure** 37:22 44:17 54:15 95:21 169:8

**file** 7:16 12:12 44:9,11 72:23 73:12,16 75:18,23 76:18 80:8 81:2 153:4 155:23 164:9 178:17 191:8

**filed** 7:11,12 111:7,9 115:17 121:24 152:20 164:20 176:23

**filing** 12:15 49:3 120:5

**filings** 119:18

**find** 96:17,24 140:15,20 192:15 195:13 199:3

**finding** 101:1

**fine** 11:8 23:13 134:2 142:9 167:4 184:1,25 186:18 190:19

**finish** 178:2

**finishing** 13:20

**fire** 60:2 98:4,7

**fired** 59:7

**firm** 5:10 9:7,16 10:19 11:1,11,15,17 12:6,20 13:13 17:25 30:22 33:25 34:13 36:14 37:25 38:3,6,7,8 40:17,21 41:22,24 42:4,6 48:2 49:12 50:23,25 56:21 61:7,10,12 63:6,7,14 64:7 65:10,12 70:24 75:2 81:13 87:5,7 88:24 90:3,20 91:1,16 93:16,18 94:6, 23 95:6,8 109:15 125:1,6 136:21 137:3 142:20,23 148:12 150:23 154:12 155:4 161:11 163:13 168:13, 24 169:12 173:4 174:2,9 175:19

181:13 188:15 191:21,24 196:12,19
199:16 200:15,19

**firm's** 13:4 30:21 134:12 181:7,16
188:22

**firms** 102:23 103:1,12

**fish** 162:4

**five-minute** 133:18 134:8

**fix** 68:25

**focusing** 188:12 189:1

**folder** 175:4

**follow** 89:5 92:14,16,21 137:17

**followup** 36:17,18

**Forgetting** 114:9

**forgive** 21:7 107:22

**forgot** 66:4

**form** 25:16 26:8,19 31:14 32:3 33:5
38:5 54:3 61:1 68:10 81:9 97:11 98:5
108:10,25 128:19 129:8 132:4 135:19
138:3 140:8 144:3 145:8 148:19 151:4
152:25 156:14 168:14 181:9

**format** 119:13 162:21 163:5

**forms** 100:16 200:20,24 201:1

**forward** 24:10

**found** 138:22 139:2

**foundation** 25:20 31:14 33:20 40:5
77:13 87:10 97:12 102:20 107:17
111:18 114:21 116:15 121:18 123:7
135:19 143:19 146:14,16 148:19
150:10 157:5 199:19

**frame** 40:13 63:3 79:12 85:5,8

**free** 48:3

**frequent** 96:18

**frequently** 17:7 159:15

**fresh** 45:11

**front** 38:23,24 49:5

**FTC** 34:23

**full** 13:20 130:25 193:2

**fully** 80:6

**funds** 80:3 94:4 124:18 182:4,6

**future** 48:24

## G

**gap** 40:12

**garnish** 42:15 43:4 44:25 46:9,20
78:10

**garnishee** 78:18,19,21,23 79:22,23
88:21

**garnishing** 78:9

**garnishment** 45:3 46:3,5,7,17,22
67:16 78:8,16,23 79:12,17,21 80:12,
14,18,23 83:18 85:25 86:4,8,9 88:15,
20,21 89:6 109:25

**garnishments** 44:21,22,23 81:6

**gave** 45:14 51:12 65:5 72:1 81:23
97:13 102:2,7 105:21 114:11,12
137:12

**gears** 66:22

**general** 27:9 33:23 37:15,16 46:6
48:10 54:5 60:14,25 67:4,6 68:3 70:14
77:2,3 86:5 90:18 96:1 103:15 148:2

**generalities** 48:20 183:20

**generally** 23:9 26:13 48:12 57:3 68:4

**generate** 9:17

**generates** 177:10

**generic** 33:23 35:22 71:23 82:5 90:11
100:20 134:11

**gist** 28:8

**give** 8:18 18:20 24:11 32:19 35:10,11
49:19 51:13,16 52:11 53:3,21 61:23
68:21 69:15 70:15 72:8,12 73:1 77:6,7
79:10 90:8,15 91:15,23 92:12 96:6,7,
12,20 97:24,25 101:23 102:5 107:12
108:6 142:13 146:17 148:17 184:23

**giving** 46:13 69:2,3,7 101:23 105:9

**good** 10:20 31:3 32:21 59:6 70:7
146:18 154:21 185:1

**gosh** 63:16 132:25

**govern** 137:9

**granted** 67:2 97:19

**granting** 45:25

**grants** 134:24 135:8

**great** 13:17 57:22 66:19 86:7

**grounds** 25:20 39:3

**group** 37:3

**guess** 10:9 17:14 32:20 33:1 86:23
99:15 152:9 183:19 186:14

**guessing** 155:20 193:4

**guitar** 162:4

**guy** 96:13

**guys** 77:2 91:1 103:22 133:22

## H

**half** 133:21

**hand** 72:13,20 73:22

**handed** 112:22

**handing** 77:18

**handle** 7:9 20:1,4 41:8 60:11 152:13

**handled** 60:7 91:20

**handles** 80:11,17

**handling** 141:18 144:2

**hands** 64:24

**Hang** 192:14

**happen** 74:4,12,16 152:16

**happened** 38:10 56:19 76:9 89:9,23
103:18 144:5 179:7 181:13 191:17,20,
23

**happening** 54:1 142:23 166:9

**happily** 125:6

**harm** 52:16

**head** 31:8 134:6 190:4

**heading** 122:20

**hear** 89:2 124:10 127:8

**heard** 15:22 24:5 53:23

**hearing** 74:24 75:8,18,21,22 76:2,9,
14 77:23,25 78:7 90:24 178:18

**hearings** 76:12

**Heber** 201:15

**held** 167:15 203:8

**helpful** 39:6 44:14

**helps** 20:8 48:23 174:23

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: hemming..jury

**hemming** 92:10

**hey** 46:19 152:17

**high** 33:1,8,10

**Hint** 126:21

**hire** 68:8,13,16,23 69:19,24 70:6
71:12 200:22

**hired** 70:24 86:11 101:18

**hiring** 68:25 69:6,10 70:3,4

**hit** 185:23 186:19 190:17

**hold** 67:20 78:24 79:1,23,24 96:6
111:20 151:22 152:3,6,11 155:18,21

**holding** 67:18

**holds** 77:23

**home** 56:23

**honorably** 93:9

**hour** 133:23,24,25 134:1

**hours** 133:21

**house** 42:16 43:4,8,21

**human** 96:3 126:6 144:16

**hundred** 91:18 95:23 116:13 168:5

**hypothetical** 83:24 84:7,16,20 95:15
114:22 118:18

**hypothetically** 114:17

---

I

**ID** 184:20 185:3

**idea** 67:6 74:12 87:11 92:4 106:4,15
114:2 127:15,18,19 148:10 192:17

**identified** 37:24 54:13,17,23

**identify** 38:3,17,23 54:13 134:19
175:12 177:19,25 180:17 181:1,20
185:1 188:18 190:12

**identity** 22:1 34:6

**illegal** 52:19 95:3

**imagine** 93:23

**immediately** 123:21,25

**important** 12:11 39:17 49:17 99:18
132:7 184:6

**impressed** 58:10

**improper** 83:24 84:6 118:18

**improperly** 84:18

**include** 21:16,21,22 24:23 29:6 35:23
96:23,25 106:18

**included** 101:10 105:24

**includes** 75:5 80:14 108:2

**incoming** 15:9

**incomplete** 84:6,16 114:22

**incur** 48:25

**incurred** 172:17

**indicating** 99:2,9 143:12 173:11

**indication** 174:1

**individual** 14:17

**individually** 59:2 62:23

**individuals** 166:16

**industry** 16:24 32:22

**information** 5:25 28:11 81:5 97:1
142:20 159:1 168:7

**initial** 20:19 21:1 23:14,15,18,19,20
24:18 29:16 36:17,22 43:1 51:20
177:6,7

**initially** 18:11

**initiate** 174:16

**initiated** 139:5

**input** 17:22 40:15

**instruct** 6:10 39:2

**instructions** 51:13,17 96:8,13,16,24
101:23,24

**intact** 25:1

**intend** 94:24

**intentionally** 30:23

**interchangeably** 24:6

**interest** 171:12,13 172:18 192:21,22

**Interesting** 203:2

**interject** 185:16

**internal** 42:23 167:22 180:4,11

**internally** 85:9

**internet** 14:1

**interpret** 123:13 150:7,8

**invalid** 83:22,23

**inventory** 108:6

**invoices** 199:16

**involve** 81:17

**involved** 41:16 42:12 54:15 80:23
83:2 91:5 103:22 104:1

**involvement** 54:18 55:24 78:6
188:22

**involves** 14:4

**IRS** 201:3,5

**issue** 68:15 86:8 132:6 152:12 154:22
182:21

**issued** 71:14 84:18

**issues** 76:15 129:6

---

J

**Jamie** 55:9,19 56:1 59:12

**January** 5:1 162:16,17 189:19 197:12

**Jaylinn** 54:20 57:25

**JDH** 187:15,16

**Jennifer** 62:10 66:7,9

**job** 14:19 19:23 56:21 65:5 70:5,18
134:12

**jog** 153:5

**John** 63:25 64:1,2,5,15,17,20

**judge** 67:2 113:18

**judgment** 28:19 41:18,20 42:5,6,7
43:5,14 44:2 47:24 49:5 50:9 67:8,14,
21 71:6 74:6,9,17 76:15 80:6,9 84:10,
12 86:1,6 100:8,12 104:21 105:16,17,
19,25 106:18 112:21 168:2,4 179:3,5,
11,18

**judgment's** 80:7

**judgments** 46:23

**July** 132:9 160:4

**jump** 174:20

**jumping** 43:18

**June** 56:15

**jury** 127:8

---

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: Justice..maiden

**Justice** 34:14

**justifies** 190:2

**K**

**Kathy** 19:19 20:5,8,10 21:10,20
54:24,25

**keeping** 149:22

**Kerby** 55:6 56:10 60:4,6 62:4,13,14
66:4,6 141:16 157:11

**Kevin** 64:19 86:18

**key** 183:12

**kind** 13:16 41:21 54:12 89:21 92:9,11
135:8 140:22 189:4

**knew** 87:3 103:22 104:14,17,20,23
108:19,20,22,23 117:5 118:13 128:12
139:12 140:5,23 142:18 146:15

**knowing** 142:20

**knowledge** 83:22 107:16,19,24
142:22 181:8,16

**Kofford** 103:2,7,19

**Kolkman** 61:10,21 63:8 65:5,12
70:25 71:13 98:10 101:20,22 102:1,5,
7 108:3,9 109:14,18,22,25 111:13
121:8,17 127:22 136:8,12 162:13,14,
18 165:7,14

**Kolkman's** 65:15 163:2 164:4

**L**

**L-E-A-R** 60:20

**label** 175:4

**Lacey** 5:3,8 56:25

**lack** 25:20 31:14 77:13 87:10 97:11
102:20 107:17,23 111:18 114:21
116:15 121:18 123:7 135:19 143:19
146:14 148:19 150:10 157:5

**lacks** 199:18

**lamp** 88:2

**larger** 158:18

**law** 9:6 44:1 52:12 71:7 92:14,16,21
97:25 98:3 101:19 102:23 106:7,9
130:19,22 135:5,7,13,14 137:14,17

**laws** 106:4

**lawsuit** 51:22 117:12,13 139:5 148:23
176:23

**lawsuits** 12:12

**lawyer** 77:6 125:18

**lay** 33:20

**laying** 40:5

**Lear** 60:20

**leave** 56:1,3 88:13 187:23

**leaving** 56:16 58:4

**left** 52:23 53:1 56:5,14,15 182:2
184:20 185:4,12

**legal** 29:3,7 134:19,23

**LEHI** 5:1

**lemonade** 57:15

**letter** 14:18 19:7 20:19 21:1,10,11,12,
15,22 22:4,18 23:2 26:13,17 28:24
31:25 32:2,10 90:12 112:8,10 114:18
116:4 117:3,5,11,15,18,20,24,25
118:1,4,7,13,16,17,21,24 119:16
120:23 121:4,7,15,21 122:17 123:6,13
124:2,5,8,13,20,24 125:1,2,3,6,7,9,12
126:22,23 127:22 128:1,5,8,12,16
129:11,20 130:11 131:2,9 132:2,8,11,
14,19 133:1,14 145:15,16,17,18,20,24
146:2,5 155:14,16,17 157:18,19
160:23 162:15 164:17 167:3 173:21,
23,24 174:25 175:1,3,10 176:8,24
177:14 178:16 179:10,11,12,17

**letterhead** 173:25

**letters** 14:14,23 15:15,16,19 16:5,9,
14 17:8,17,23 18:17,25 19:2,4 20:11,
13,14,17 25:6 32:23 74:1 116:2 119:7,
24 136:17 141:2 146:2 163:16 166:22
173:3 174:9,18 175:7,12,15,19 176:15
180:6

**license** 35:15

**lie** 31:12 128:25 129:3,4

**lied** 34:3,6 35:6

**lien** 42:15 43:4,7,20,21 44:3,9

**liens** 44:11 47:7,8

**limit** 6:1 92:13

**lines** 177:11 186:7

**linguistics** 125:15

**list** 30:13,15 46:19,21,23,25 55:2 90:8
119:10 142:17 147:21 153:17 154:10
156:21 158:17,18 170:15 180:6
196:16

**listed** 119:7 123:17 133:8 147:18
151:21 153:20 156:12,18 158:15
161:4 163:7 167:23 170:4 175:15
187:10 188:10,16 195:8,9 196:1,5,13
199:4,7

**listen** 14:7,10

**lists** 91:8 141:20 146:12 155:11
158:22

**litigate** 45:14

**litigation** 40:24 41:6,8,9,11 42:13
43:1 50:12,20,22 51:10 52:22 55:14
57:6 174:16 182:10

**live** 14:7,10,12

**lives** 201:15

**LLB** 175:3

**location** 144:4

**locations** 144:1

**long** 8:14,18,23 12:21 18:14 19:21
40:9 55:15,17,19,22 56:3 71:10
184:25

**longstanding** 35:2

**looked** 5:19,21,22 6:2,4,5,17 99:12,
13 119:15 146:2 151:16 189:14

**lot** 5:19 6:5,17 8:6 9:14 21:4 22:12
26:4 30:8 41:4,5 66:1 122:11 128:20

**lots** 163:7 197:14

**loud** 100:22

**low** 33:2 53:18

**lower** 53:25

**lump** 192:21

**lunch** 133:23 134:3

**lying** 93:10 129:6

**M**

**made** 22:10 45:17 87:2 124:17 145:15
161:20 165:10 169:12 187:11 195:23
197:14

**maiden** 60:21

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: mail..normal

**mail** 10:2 11:11 12:6,8 14:17 15:14 32:12 72:14 111:2,5 123:14 169:14,24 174:11,13 176:11 182:1 184:20 185:3, 14 187:22 189:12 190:1

**mailed** 20:11 72:20 112:8 114:19 132:19 176:18 177:5,13 178:11,25 179:4

**mailing** 14:14,22 72:16 141:2

**mails** 15:16 16:9 20:12

**majority** 9:25 13:25

**make** 5:24 13:13 17:3,8 22:4,13 30:23 32:4 37:21 41:12,15 42:17 43:3,21 46:9,10 51:20 53:22 59:3 68:18 69:14 73:25 90:8 123:21,25 124:16 127:11 128:23 129:14 130:15 136:11 137:20 140:22 152:23 153:1,8 158:9,11 169:1 177:23 179:15 181:20 183:22 185:20 192:21 195:13,23 197:1,6,11 198:25 201:5 202:20

**makes** 21:20 37:3 42:9 43:9 44:17,24 45:1 68:24 69:21 70:3

**making** 29:20 36:16 41:16 121:17 124:22 125:12 156:12 196:15

**Man** 57:21

**manual** 194:8

**March** 123:18 157:12 169:2 191:18 193:6,20 194:16,17 198:10

**mark** 103:2,8,11,19 117:1 118:8 173:16

**marked** 98:17 110:6 111:24 115:12 117:3,9 118:9 120:2 122:1 129:18 132:5 141:10 142:1 143:1,7 149:5 150:3,4 151:11 155:1 157:9 160:2 161:23 167:17 169:14 173:5,11 198:6 202:3

**married** 60:20

**matches** 130:5

**math** 85:18,19

**matter** 88:17 177:24

**meaning** 89:20

**means** 69:24,25 83:17 99:10 123:14 130:11 146:13,16,25 147:4,7,9,17 151:23 152:4,21,22 153:10,24,25 155:12,15,19 156:5 157:4,6,16,19,22 158:1 160:21 161:1,7 163:11,12,18, 21,24 164:9,10,12,15,16,18,19,21,23 165:1,5 169:25 170:1 173:20 182:6

198:16 203:12

**meant** 7:5 151:3 168:16 171:23 176:12

**measures** 137:25

**meet** 8:14

**Melissa** 55:6 56:9 60:4,6 62:4,13 66:4,6 91:3,4 102:15,17 141:16 142:12,16,18 149:2,4,6 157:11 160:10,12

**memorialization** 181:16

**memory** 6:22,25 84:24 153:5

**memory's** 45:11

**mentioned** 43:20 71:5 89:25 184:9

**mentions** 121:11 123:20

**message** 10:13 182:2 184:21 185:4, 13 187:23

**messages** 11:12 188:11

**met** 8:11

**Michael** 60:7 63:15 65:4 151:18 155:3 157:11 160:7

**middle** 51:10 53:2 123:23 163:16 194:12

**Mike** 90:23 141:15 142:12,16

**mileage** 113:3,10,23

**mind** 17:24 80:21 98:14 109:9 118:7 129:10 167:9

**Mini** 27:14 28:5,18,22 29:6 115:2,4 118:2,3,22,23 120:7,13,15,18,21 122:21,23 131:7,13,15 133:7

**minute** 62:6 167:12,14 203:3

**minutes** 8:20 66:18 144:12

**Miranda** 27:14 28:5,19,23 29:6 115:2, 4 118:2,3,22,23 120:8,13,15,19,21 122:21,23 131:8,13,15 133:7

**Mischaracterizes** 156:14

**misconstrues** 44:1

**misleading** 29:20 30:12,23 31:21 35:19 36:16

**missed** 80:25 189:9

**missing** 179:15

**misspeak** 46:4

**misspoke** 46:15

**misstates** 108:25 139:15 166:13

**mistake** 38:11 141:23

**Mm-hm** 7:18 77:9

**moment** 82:16

**money** 49:12,16,18,23,25 67:21 104:19,20,21,23 105:7,12 140:11,13, 16,17,20 166:10,15 171:21 172:6 182:14

**monitor** 136:22 137:4

**month** 7:10 79:13,15 105:5 161:16, 20,22

**monthly** 7:15

**months** 13:22 159:15,19

**motion** 76:16,17,19

**Mountainland** 103:4,6

**move** 56:20 139:19 164:24

**moved** 153:7,10 160:12 161:2

**moving** 156:1 161:1,2

**MSG** 186:15

**multiple** 82:10,16 104:24 186:14

**N**

**name's** 19:19 65:23

**named** 110:20

**names** 34:8 141:24

**necessarily** 103:15

**needed** 7:5 105:19 106:17

**negotiate** 134:13 136:5 138:1,6

**negotiating** 91:18 135:1,17,23 138:14,23 140:6

**NEJ** 179:4

**Net** 64:11,12,15,18

**niece** 59:14,15

**Nitro** 162:3

**nods** 31:8 134:6

**nonresponsive** 7:3 71:23 82:13,18 107:10 114:8

**normal** 38:8 72:6 125:19 126:3

134:16 135:18,24,25 194:2

**notations** 149:10 157:14 160:15,16

**notch** 36:12

**note** 123:8 141:22 158:8 169:10,24
173:18 176:2 177:9,11 178:11,22
179:4,9,10 181:23,25 184:19,22
185:2,6,8,9,12,18 186:1,3,5,21,22,23
187:2,3,4,5,17,18,25 188:1,6,21 189:5
190:2 191:15 192:1,18 198:12

**noted** 171:13

**notes** 38:23,25 39:14 55:1,3 57:3
58:16,17,18 155:25 167:22 169:8,23
170:4 171:9,11,15 172:22 181:7,12
186:13 189:21 191:22 192:8,24,25
193:8,17 195:8,12 196:2,6,13,17,21
198:24 199:5,8

**notice** 20:19,20 24:4,7,8,9,20,23
25:23 29:13 33:19 90:11 106:23
107:5,9 108:1 109:5 110:13 112:11
113:13,24 115:1 118:3 119:15 122:17
123:9,10 126:19 129:11 130:2,6
141:23 145:3,4,10 173:20 174:21
176:19 177:2,5 178:10,23 179:2,4,8
189:7,9,10,19,25 196:18,19,20,22
197:2,8,18 198:3,8,13,16 199:1,4,25

**notices** 113:8 158:19 178:1 198:2,22,
23

**notification** 27:21 28:5 158:5

**notified** 102:8

**notify** 80:1 105:15 111:9

**notifying** 105:14 121:7

**notion** 95:8

**November** 142:15 143:18 150:12
178:19 195:9 196:4,8

**NTC** 173:19

**number** 33:2 53:17 101:14 119:7
155:14 169:15,21 182:24 183:13
184:20,25 185:3,11

**numbered** 110:18

**numbers** 32:15,16 53:13 54:1 170:23
190:12

---

**O**

**object** 10:16 22:6 23:10 25:16,19
26:8,19 31:14 32:3 33:5 37:10 38:5

43:25 49:9 52:1 54:3 61:1 68:10 71:22
74:21 75:11 76:5,24 77:23 79:2,6,11
81:9 82:9,12 84:3 97:11 98:5 108:25
114:8 126:11 128:19 129:8 132:4
135:19 138:3 144:3 148:19 151:4
152:25 156:14 168:14 181:9

**objected** 83:21 84:3,9

**objecting** 82:17

**objection** 6:9 7:1,3 18:18 29:8,21,24,
25 30:2,7 39:2 52:10 69:20,22 70:9,10
73:15 74:10 75:24 76:1,10 77:13 78:3,
5,7 79:21 81:18 83:24 84:6,13,16
85:5,7 87:10 89:24 96:9 97:11 102:20
106:25 107:10,17 111:18 114:21
116:15 118:18 121:1,18 123:3,7 124:4
125:14 139:15 140:8 143:19 145:8
146:14 150:10,21 157:5 166:11,13
197:3,9 199:18

**objections** 88:10 115:9 126:16

**objects** 75:17

**obligation** 136:25

**obligations** 136:21

**obtain** 78:11

**obtained** 28:11 43:11

**occasion** 59:4 89:9 90:17

**occasionally** 10:11 167:2

**occur** 36:18 46:18 47:7 93:8 127:19
151:9 154:12 157:1 158:23 161:11
163:14 200:5

**occurred** 107:16,25 111:2,4,11
127:16 144:24 145:7,9 158:6,12
180:17 191:17 192:12 200:5

**occurring** 143:17 145:3,5

**October** 178:8

**offhand** 38:22

**office** 16:3 20:12 21:14 27:20 43:8
65:15,16 73:19,20,24 79:25 80:12
90:21,22 118:25 121:12 123:21,24
130:15 141:15,18 144:22 151:1,3,8,18
152:6,17 154:1,3,6 156:25 158:23
163:2 164:4 165:4 166:25 167:3
173:24 191:13,14

**officers** 11:18

**Olson** 103:3,4,8,12,19

**one's** 35:2

**online** 12:14 183:12

**open** 182:14

**operations** 19:16 60:18

**opinion** 95:17 114:25 118:4 125:23,
25 126:1,2 136:20 137:3

**opportunity** 94:10

**opposing** 75:23

**order** 39:19 67:13 99:12 152:20
164:20 178:24

**original** 26:1,14 38:21 39:8,25 46:8
47:15 48:3,5,13 49:20,24 51:1,4,24
53:7,17,23 175:21

**outsourced** 16:12

**overbroad** 89:24

**overheat** 36:8

**owe** 26:20,24

**owing** 167:25

**owned** 64:12

**owner** 8:25

**ownership** 51:2 63:20

**owns** 44:2 57:13,20 101:2

---

**P**

**p.m.** 134:9 167:16

**packet** 74:23,24 75:3 177:17 180:1

**paged** 90:24

**pages** 9:2 122:22 156:5

**paid** 105:23,24 115:24 116:19 147:12
166:22 168:20,23 169:25 170:1,2,5,6,
12 172:9,13

**panic** 53:4

**paperwork** 68:15 69:7 75:14,23

**paragraph** 100:7,13 110:18

**part** 6:24 7:4 50:11,12,14 78:4 109:15
114:13 119:16 141:23 149:22 177:16

**partial** 105:2 114:13

**partially** 31:20

**participate** 42:19

**party** 15:17

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                                     Index: passed..price

**passed** 45:15

**past** 61:16

**pause** 182:5

**pay** 31:6,12 35:8,14,15 48:8 49:7,10
53:5 94:6 111:13,16 117:21 148:17
161:13 166:10,14 167:5 179:10

**paying** 49:11 130:25 148:3 165:21

**payment** 12:5 95:23 106:19 115:20,
22 116:11,18 121:11 123:21,25
124:12,14,16,22 130:15 146:24 147:1,
5,9,10,17,19,24 156:5,7,13,18 161:4,
5,8 163:7 169:1,11,17,19 170:16,20
172:17 179:7 190:14,15,21 191:7
192:22 195:23

**payments** 12:3,6 15:12 104:13,14,18,
24 105:2,5,8,15 106:22 108:20,22
114:12,13 121:17 123:25 124:2,17
134:13,25 135:1,9,16,17,23,24 136:4,
5 138:2,6,7,10,14,18,23 140:6,10,24,
25 146:12 147:22 149:15,16,18,22
153:17,18,19 156:6 157:4,7 158:14,18
163:23 164:2 165:10 166:19 167:23
168:12 169:5 170:21,25 171:4,19
196:23 197:1,6,12,14 201:5

**pays** 48:5 80:6

**pending** 146:12,25 147:1,5,6,9,17,19,
24 153:18,19 156:5,6,18 158:14,18
161:4,5 163:7 191:7

**people** 24:6 26:4,11,23 27:2 31:3,6
32:1 42:10,23,24,25 43:2,8 54:13,14
55:3,13 58:16,21,22 59:6,7,10,21 60:2
79:6,11 95:20 127:23 144:20 145:15
146:22 148:16

**perceive** 95:8

**perceives** 23:12

**percent** 33:3,4,8,9,11,13 53:6,24
91:18 168:5

**percentage** 9:22 32:11,12 85:3,13,14

**percentages** 54:1

**Peretto** 7:12 147:18 182:1

**period** 79:1 86:21

**periodic** 37:1 135:9

**periodically** 90:2

**permits** 134:20

**person** 14:1,4 23:12 52:16 69:6 70:4
77:19,22 95:12,23 96:17 101:2 111:2,

4 125:19 144:21 153:10

**person's** 90:23 94:24,25 95:11

**personal** 56:23 67:7 95:13 101:5
123:10,15 129:22 130:3,7

**personally** 10:18 64:6 95:6

**perspective** 65:17 165:7,18

**pertains** 126:5

**peruses** 122:4 151:5 160:19 162:22
169:4 174:10,22 175:24 178:6,15
179:1,6,22 180:23 184:15 185:5 188:7
189:15 195:24 196:7,9

**phone** 14:7,10 27:19 28:22,23 73:25
102:10 177:19 180:14,16,17,19
181:19,24 182:16 183:1,12 184:20
186:8,16,17 192:6,7,12,13 194:15,19
203:22

**phraseology** 28:9

**physical** 144:17 149:12

**physically** 143:25

**place** 16:25 17:2,16 31:18 38:14
78:24 87:14 136:18 142:19,21 198:9

**placing** 43:20

**plaintiff** 91:25 119:11 153:22 154:2
155:21 164:25 165:3

**plan** 179:7,10

**pleading** 119:17

**plentiful** 182:11

**plug** 69:13

**plumber** 68:25 70:6

**pocket** 106:20

**point** 10:20 14:9 17:21 27:25 37:23
43:11 61:13 64:25 70:16 73:23 89:16
90:19 134:23 135:7,12 139:12 140:4
154:14 174:8 175:25 176:11 188:9
199:2,17

**police** 11:18 12:1

**policies** 58:23

**policy** 59:8

**portion** 47:18 48:11,14 49:12,19
147:13

**possession** 77:19 78:25

**possibility** 145:10

**possibly** 171:20

**post** 41:18,20 42:5,7 43:5,14 47:23
49:5 50:9 88:2 113:10 157:21 158:8
164:13 179:11

**postdated** 35:24,25

**posted** 87:19,23 113:23,24

**posting** 83:5 88:1

**power** 60:2

**practice** 28:22 30:21,22 38:8

**practices** 12:18 35:19,20

**preapprove** 46:12

**precaution** 137:16

**precautions** 137:13,19,22,25

**prejudgment** 27:23 28:3,16,17 47:23
50:9

**prejudgments** 14:24 15:2,4 33:15

**preparation** 7:4

**prepare** 5:17 6:20,21,23 7:10 8:12

**prepared** 55:14 178:23

**preparing** 57:6 178:17 202:11

**preserve** 163:16

**president** 5:12

**pretrial** 177:10,13 178:9,24,25

**pretty** 11:6 14:21 23:21

**prevent** 31:21

**previous** 64:9 95:10 130:1 154:10

**previously** 64:7 85:8

**price** 5:23 6:9 7:1 10:16 18:18 22:6,9
23:10 25:16,19 26:8,19 29:8,21,23
30:1,4 31:14 32:3,6 33:5 36:5,8 37:10,
13 38:5 39:2 43:22,25 44:6 46:15 49:9
52:1,4 54:3 61:1,4 66:16 68:10,12
69:21 70:10 73:15,17 74:10 77:13
81:9,18 82:9,14,21 83:24 84:6,16
85:5,7 87:10 89:24 96:9 97:11 98:5
102:20 106:25 107:17 108:25 111:18
114:21 115:9 116:15 118:18 121:1,18
123:2,7 124:4 125:14,21,24 126:9,10,
15,16 127:6,9 128:19 129:8 132:4
133:16,18 135:19 138:3 139:15,22
140:8 141:22 142:4,8 143:19 144:3
145:8 146:14,19 148:19 150:10,21
151:4 152:25 154:15,17,19,23 156:14

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: principal..refresh

157:5 166:5,11,13 167:11 168:14,17
173:14 181:9 183:22 185:15,20 197:3,
9,20 199:18 202:19,23 203:1,6

**principal** 48:12,14 54:9 101:10

**printed** 154:19,23 170:19 178:14

**prints** 16:9

**prior** 40:23 41:6 130:15 182:10

**privacy** 182:21

**privileged** 6:4

**problem** 58:13 62:1 68:15 92:9

**problems** 154:21

**Procedure** 67:10

**procedures** 38:13

**proceed** 70:8

**proceeding** 142:7

**process** 11:17,19 14:15 41:16 43:1
45:5 46:3 47:5,7,11 49:3 69:5 70:4
72:7 77:1,3,4 78:8,14,15 80:18 81:1,
16 83:12 86:15 110:19 111:10 121:9,
13 142:22 165:7 166:1,4 200:22,23

**processor** 12:10

**produce** 189:22

**produced** 132:15 159:4,9 162:16
189:23

**product** 5:25 6:10 13:20 39:4

**progress** 90:3

**prohibited** 35:20

**prohibition** 36:15

**prohibits** 13:8 29:19

**Promise** 126:21

**promised** 147:10

**proof** 73:11 110:11

**proper** 72:17 149:24

**properly** 131:20

**property** 42:15 44:2 67:7,14,17,20
70:19 71:6,16 73:6 77:12,19 78:2,3
81:17,25 83:1,9 94:24,25 95:11,14,25
97:2,5,7 101:2,5 108:7,10,13,16,19,24
109:3,8 123:11,15 125:13 129:12,22
130:3,8 134:21 138:11,15 139:1,2,14
141:5,6 150:9,16,18

**provide** 61:20 69:17 89:17 108:5
116:23 125:25 166:15 172:20 174:4
179:20 197:17 203:13,16,17,18,21

**provided** 43:12 62:4 73:11 89:12,13,
19 91:8 112:2,6 115:17 117:13 122:16
129:21 148:24 159:14 198:17,18
199:25 202:18

**providing** 60:11 62:14 126:2

**publicly** 83:6 87:20,23

**Pull** 153:22 164:24 165:2

**purportedly** 156:22

**purpose** 6:18 28:11 123:6 124:21
141:17

**push** 194:11

**put** 16:25 36:19 39:19 42:15 43:4,7
111:20 131:20 132:2

**puts** 78:23

**putting** 17:1

## Q

**quantify** 76:4

**question** 6:2,12 14:21 20:6 22:9,14
23:10 25:18 27:12 32:5 35:12 39:3
43:25 45:9 59:1 61:3 62:9 80:21 82:6,
9,10,16 89:16 95:9 100:18 106:5
107:18 120:11 121:3 126:4 127:8
131:10,12,19 138:20,21 146:20
174:14 183:23

**questioning** 171:24 181:21

**questions** 6:23 9:2,10,11 10:17 11:6
33:24 70:2 99:19 107:3,4 120:3
132:18 155:25 184:13

**quick** 111:23

**Quinn** 103:2,7,11,19

**quote** 25:25

## R

**raise** 29:24

**rare** 59:4 89:9 90:17

**Rarely** 182:19

**rate** 32:1 172:18

**rates** 32:23

**read** 8:8 27:1 71:9 99:25 101:7 124:8
192:2,4

**reading** 7:5

**reads** 25:25 71:7

**ready** 13:21

**real** 44:2

**realized** 168:18

**reason** 21:24 25:13 31:5 95:2 100:17
125:9 137:8 139:20 159:7 160:15
174:11

**recall** 30:19 38:22 48:18 50:2 55:8
56:6,8,9 63:13 72:22 73:8 74:22 75:16
83:4,10 84:24 86:13 104:2,9 107:6,9
108:11 190:5 202:17

**receipt** 115:20

**receive** 36:24 80:1 116:14 197:6

**received** 16:23 123:13 147:3,5 149:4,
6 150:17,22,23 161:8 168:9 169:14,24
170:9,21 171:19 179:8 189:7,19
195:17 196:21 197:2 198:13,24 199:9,
13

**receiving** 149:16 190:10

**recently** 15:25 60:15,20 99:25

**recess** 66:20 134:9 167:16

**recite** 100:1

**recognize** 26:6 98:18 110:7 112:1
115:13 118:10 122:5,18 141:11
151:12 153:4 158:17 167:18 202:4

**recollection** 6:14,16 7:6 8:4,5

**record** 5:7 57:24 154:22 167:11,13,15
193:23,24 194:2,4,7,9,23 195:4 203:6,
8

**record's** 185:15

**recorded** 194:20

**recording** 193:19 194:12

**redact** 142:6

**redacted** 141:24

**refer** 16:1 24:9 167:8

**referred** 187:23

**referring** 119:5 145:25 189:13

**refresh** 6:14,16,24 7:6 8:4,5

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025                                              Index: refreshing..seeks

refreshing 6:21

refused 148:16

refusing 6:11 126:23 127:1

reg 24:8,10,13 25:3

regard 70:8 200:9

regular 22:2 126:6 189:12

regulation 113:16 135:5

reimbursed 49:1

Reimschisel 19:20

reinforce 35:11

related 59:10 60:4 201:11

rely 41:20 75:15

remain 121:13

remember 5:21 6:2 7:8,14,21,24 8:15
26:2 30:16 32:18 39:25 55:10,11,23,
24 56:2,4,17 58:11,15 60:8 61:22,25
63:19 64:16,22 65:8 66:24 76:8,11,12
90:13,24 102:12 122:7 158:7 187:16

remembered 8:8

repeated 105:5

rephrase 31:16 162:23 197:23

reply 75:8

report 149:2 151:14 155:3 159:22
160:4 161:25 162:20 163:2 191:5

reporter 18:7 134:6

reporting 201:3,5

reports 32:19 143:6 148:22 149:13
151:2 158:25 159:3,8,14,19,24

representative 20:3

reprimanded 58:22

request 10:9 19:5,7,10,23 20:5 21:9
26:1,11 27:3 74:24 75:8,18 76:22
84:25 85:3,10,22 89:11 101:2 141:25
177:10,12 179:23

requested 19:9 23:3 151:19 179:2

requesting 26:12 66:24 85:14,15
98:8 139:8,11

requests 19:12,24 20:9,10

require 84:22

required 19:8 23:14 24:20,23 28:12,
19 29:2,14 99:23 101:1 161:17

requirement 23:8,23 24:14,17 25:1,4
182:10

requirements 17:5 84:22 201:4

requires 13:8 100:19

rerun 182:7,8

research 157:21 158:11 164:11,13

residence 181:24

respect 68:12 69:24

respond 32:1,7 75:20

responding 81:7 142:14

response 32:11,12,13,23 81:7 88:18
142:12

responses 19:23 89:21

responsible 18:1

responsive 82:14

rest 33:21 49:19 174:8

resulted 107:8

retaining 49:12

retire 65:4

retired 64:4

return 32:1 54:8 72:12,14 73:1,13
81:1,11 94:11 148:7 153:22 154:4
164:24 165:2,3 173:25 177:3,4 184:18
189:5 190:8,9

returned 41:4 50:16

returning 154:1

returns 72:19 154:5

revenue 9:17

review 27:7 38:25 48:10 50:6 55:14
180:5

reviewed 8:1,3,6 16:19 17:22 63:9
122:11

Revill 65:22 162:6,7,9

revoke 35:14

Richards 64:19 86:18

road 70:2 96:6 111:20 181:22

rob 52:15 121:8

role 18:10 134:16

Ron 202:18

Roundy 55:11 194:18

rude 197:24

rule 35:2 67:11 71:9 74:18,19 82:25
84:22 100:18,19 113:17 135:5 176:1,
24 177:2,16

rules 67:9 74:19 83:2,5,8 84:5 99:22

running 12:20

**S**

S-I-F 193:1

S-Y-D-N-E-Y 18:8

safely 107:7

sake 154:14

sale 67:20 81:17 83:6 87:14,16,19,22
88:5 90:11 93:8 106:24 107:5,8,9
108:1 109:5 113:13 123:9,10,17,22
124:1,16 126:19 127:16,18 128:1,2
129:12,22 130:3,6,7,14,16,20,24
143:14 145:4,9 150:6,8,14,15 151:7
157:21 158:5,8,12 163:10 164:13
189:8,9,19,25 196:19,20,22 197:2,8,
18 198:2,3,6,8,9,13,16,22,23 199:4
200:1,4

sales 107:13,16,25 113:24 143:17,23
144:2,5,7,9,18,23 145:3,7 151:9
154:8,12 156:22,25 158:18,22,23
161:10,11 163:13 200:5

satisfaction 80:8

satisfied 80:7 105:16,18 106:1

satisfy 67:8,14 71:6 74:6,8,17 105:19
106:18 134:13

satisfying 86:1

Satori 185:4

schedule 36:21 37:2 62:21

scheduled 76:2 78:7 143:24 144:10
156:22 158:19,22

scheduling 163:14

scratch 16:18,19,22

screenshot 170:20,21,24

search 93:12

seeking 29:8 125:14

seeks 23:11 29:21 52:2 81:18

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: seize..specifics

**seize** 67:7,17 70:18 71:16 81:24 94:23,25 97:2 138:15,18,25 139:1,14 141:5,6

**seized** 73:5 95:14 108:7 150:9,19

**seizes** 77:12

**seizing** 83:1 95:11,24 108:10,16,19, 23 109:3,8 134:21 138:14

**seldom** 75:25 76:3

**select** 194:8

**sell** 57:15 67:7 70:18 71:6,16 81:25 94:24,25 125:13 138:11,25 139:1,14 141:5,6

**selling** 83:1,8 95:11,24 108:13,19,24 109:3,8 123:15 134:21

**send** 15:19 16:5 17:19,20 20:7,13,14 22:21,23 23:6 24:20 26:16 31:24 32:9 45:17 49:23,24 62:23,25 63:18 64:20 65:19 68:2 69:4 74:1 78:10,13 79:15, 17,24 89:1 93:13,19 94:4 104:14 106:23 107:5 108:9 116:17,18 125:1, 2,3,6 128:12,16 140:25 161:18 165:25 166:25 176:1 189:11 200:16,19,23 201:1,18

**sending** 45:12 62:18 63:14,22 65:12 80:17 104:18,19,20,24 105:1,4 117:3, 24 118:14,15,17 128:1 132:23,24 133:14 139:7,9,10,11,20 140:10 146:7,9 148:25 165:4 171:25 199:15

**sends** 16:14 19:16 21:9,11

**sense** 22:5,10 37:3 59:3 68:24 69:21 70:3 77:2,3 84:17 87:2 148:3 152:23 153:1,8 158:9,12 161:20

**separate** 41:8 44:4,9 50:24,25 186:15,17

**series** 169:22

**serve** 78:16 88:15 93:4 94:11,13,17 109:18,22 111:14 138:10 163:23

**served** 72:11 110:14 157:3,7 164:1 176:12,13 201:20,21

**server** 69:5 70:4 78:14 80:18 81:1 166:5

**servers** 11:17,20 166:1 200:22,23

**service** 16:8 49:3 72:12,15,17,20 73:2,11,13 81:1,11 110:11 111:10 113:1 155:11 157:16 160:20 163:20 189:6 190:9

**services** 20:3

**serving** 72:4 93:6 109:25 111:17

**set** 62:21 75:21 104:16 129:12,23 130:3,8 143:14 144:7 150:9,13,15 151:2,7 154:8 157:7 159:16,17 163:10 164:1 178:9

**setting** 157:3 163:23

**settle** 53:11

**settled** 193:2

**settlement** 53:1 54:9

**sever** 78:15

**shakes** 190:4

**Shaner** 103:4,9

**Shauna** 60:15,17,18 61:15,20 160:7, 11,12 162:2

**sheet** 96:15,19,22,23

**sheriff** 68:8 70:15 86:12,14,22

**sheriffs** 12:1

**shifted** 65:10,13

**shifting** 66:22

**short** 9:3 15:21 29:23 66:16 133:21, 22,24

**shorthand** 173:2

**show** 149:7 173:3 190:13 193:8

**showed** 170:25 195:12 203:18,21

**showing** 154:7

**shown** 145:21

**shows** 73:10 173:25 190:13 193:9 195:17 198:24

**side** 50:20

**sides** 50:10

**SIF** 192:21 193:1,2

**sign** 41:10 100:1

**signed** 62:22 75:4,6 98:22 99:9 100:2

**similar** 119:13 151:16 163:4 166:8 169:21 203:17,18

**simple** 181:20

**simplicity** 143:9

**simply** 49:12 154:23

**Sindt** 63:25 64:1,2,6,15,17,21

**sink** 68:25

**sister** 59:15

**sit** 145:19

**sitting** 14:5

**situation** 103:14 162:4 194:11

**skip** 87:5,7,8 93:18,20,22 153:11,13, 15 185:23,25

**skipping** 153:11

**skips** 153:8 156:1,3 161:1,2 164:24

**small** 110:18

**SNT** 173:19 175:10

**software** 15:20 16:1,13

**sold** 15:25 67:21 78:2,3 88:8 95:14

**solicit** 134:13 136:4 138:1,6

**soliciting** 124:2,12,13,21 134:25 135:16,23 138:23 140:5

**sooner** 14:15

**sort** 37:2 50:10 53:25 93:7 134:10,11 159:18 166:8 168:18

**sound** 39:9 54:21

**sounded** 66:8 197:24

**span** 63:12

**speak** 48:9 88:11,12 102:13 124:8 183:2 199:20

**speaking** 13:2 20:16 29:2 48:19 57:3 68:4

**speaks** 124:5

**specific** 17:22 25:7,10 31:12 38:20 42:1,2 48:22 49:2 51:13,16 52:5 53:3 54:1,4,6,19,24 66:22 67:12 71:13 82:6 90:18 100:19 101:1 104:2 134:23 135:7,12 145:24 154:8

**specifically** 7:25 11:7 13:2,7 14:20 23:22 26:2 27:10 28:6 37:20 42:9 48:9 51:25 52:24 58:16 64:15,16 67:4 71:1, 25 74:9 76:4,11,22 79:22 83:4 88:12 91:6,12 101:3 102:12 147:2,7 155:16, 19,20,23 156:7 161:17 166:24 167:6

**specificity** 99:22 100:19

**specifics** 18:20 38:16,20 74:22 92:1, 3 93:24

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: speculating..teeny

**speculating** 199:21

**speculation** 118:19 199:18

**speed** 9:10

**spell** 18:7 19:20

**sporadic** 63:4 159:16

**spreadsheets** 90:14

**stage** 156:7

**stamp** 99:1,8,10

**standard** 100:13

**standards** 32:22

**standing** 30:7 40:21 52:10 69:19,22 70:9,10 123:2

**stands** 193:2

**start** 14:11 40:12 63:14 120:13 121:16 124:13 159:2 163:1 170:18 178:3 194:12 197:25

**started** 40:9 63:22 190:10 196:23

**starting** 10:7,14 70:16 100:7

**starts** 143:1

**state** 5:7 44:9 73:7 120:10 125:25 135:14 137:5

**stated** 27:13 71:20

**statement** 24:24 30:18 35:22 38:1 41:14 51:19,23 64:24 65:14

**statements** 23:5 29:20 30:12,13,23 31:21 36:16

**status** 90:6,9 141:18,20 143:6 145:16 147:6 151:14,19 155:3 157:11 158:25 159:3,8,14,19,22,24 160:4 161:24 162:20 163:2 191:4

**statuses** 90:7 91:13

**statute** 50:18,21 100:23 106:2 113:16

**statutory** 47:19

**stay** 41:16 92:25 109:12

**step** 78:22

**STEPHENSON** 5:6 6:7,11 7:2 10:20, 22 18:19 22:8,10,16 23:13,17 25:17, 21,22 26:10,22 29:10,25 30:3,5,11 31:15 32:4,8,9 33:6 36:4,6,11,14 37:12,14 38:6 39:5,6 43:23 44:5,7,8 46:16,17 49:14,16 52:3,7,9,13 54:6,11 61:2,6,7 66:17,21 68:11,14,17 70:1,

12,14 73:18 74:11 77:14 81:12,20 82:12,17,23,25 83:25 84:8,21 85:6,10 87:12 89:25 96:11 97:14 98:6,18 102:21 107:1,21,24 109:2 110:5,7 111:19,22,25 114:24 115:11,13 116:17 117:1,2,10 118:10,21 120:3 121:4,20 122:2 123:4,5,12 124:6 125:17,22 126:3,4,12,13,20 127:7,10, 12 128:22,24 129:10,19 132:6 133:17, 19,25 134:3,5,7,10 135:22 138:5 139:17,23,25 140:12 141:11 142:2,5, 9,11 143:20 144:6 145:13 146:15,21, 24 148:20 150:14,25 151:1,8,12 153:1 154:18,20,25 155:2 156:16,17 157:8, 10 160:3 161:24 166:12,18 167:13,18 168:15,18,20 173:17 181:11 184:1,5, 9,12,24 185:22,25 186:2,7 197:5,11, 21 199:21 202:4,25 203:2,5,7,9

**steps** 41:18 42:12 44:4,9 72:10 78:10 80:22 83:18

**stereos** 100:21

**stick** 184:1 197:22

**stop** 43:15 98:9 117:3,23 133:13 173:8 203:2,7

**stopped** 98:8,10 118:17 139:3,4,7,8, 10,20 184:8 199:16

**stops** 73:25 91:16,17,18

**store** 97:4

**story** 57:23

**strike** 80:21 98:14

**struggles** 56:23

**stuff** 53:14 134:11

**styled** 119:20 120:4

**styling** 119:23

**Subject** 126:16

**submit** 178:23

**submitted** 100:3 178:25

**subpoena** 182:25

**subpoenas** 49:4 109:22

**successful** 85:24

**sue** 41:13,15 46:13 51:21 139:24

**sued** 8:2 98:7 103:21 140:2,3,7

**sufficient** 22:4 183:4

**suing** 103:20

**suit** 174:12,15,16 175:5 176:1,4

**suits** 85:18

**sum** 192:22

**summarized** 165:3

**summons** 53:4 69:4 96:12 109:19 176:6,7 184:18

**supervise** 136:22 137:4

**supervisor** 59:20,22

**supposed** 74:12,16 77:3 81:16

**supposedly** 158:22 198:9

**switch** 165:6

**sworn** 5:4

**Sydney** 18:6 19:13 20:4,7 54:23,24 59:19

**system** 12:15 15:16 32:17 167:23 177:11 182:16 183:11 194:4

**systems** 17:16

---

### T

**takes** 12:6 21:10 87:14

**taking** 14:5,12 44:4 77:19 121:8 128:11 134:25 138:10 142:19,21

**talk** 53:11 54:12 79:23 83:17 92:1 103:22 189:18 194:15

**talked** 5:19 29:14 37:5 56:24 86:17 101:18 103:20 136:17

**talking** 10:18 14:24 15:4 20:18,23 21:11 24:11 27:23 33:15 43:23 44:3,8 47:23 49:10,11 54:4,5 76:20 90:1 148:13 149:4 150:22 173:9 174:13

**Tara** 7:12 147:18 184:20 185:3,11

**tasks** 160:12

**tax** 200:20,24 201:1

**team** 42:23

**Teams** 194:6

**technically** 30:6 35:19

**technology** 195:6

**tedious** 172:23

**teeny** 116:2

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: telephone..updates

**telephone** 10:4 11:11 12:6,8 15:6 181:23,25 184:19 185:2,9,12,13,18,19 186:6,22,23 187:1,3,5,6,7,8,18,19,25 188:1,4,5

**teller** 182:16

**telling** 75:16 138:24,25 139:13 141:5, 7 179:18

**tells** 177:2

**template** 17:21 100:4,5

**template's** 17:21

**temporary** 164:9 191:8

**ten** 144:12

**term** 32:7 68:12,13 69:24 126:11

**terminate** 60:2 82:22

**termination** 58:4

**terms** 23:12 49:9 60:25 67:4 68:3 69:2 70:14,23 86:5 90:10,11,18 96:1

**testified** 5:4 85:8 145:7

**testify** 107:7,15,19 132:13

**testifying** 8:7 99:3

**testimony** 6:20 23:11 29:9,21 74:11, 14,15 81:10,19 84:1 85:16 100:22,25 104:12 109:1 125:21,25 127:3 133:10 136:19,20 139:15 140:18 166:13 199:24 200:8

**tests** 14:5

**Texas** 57:17

**text** 10:13 11:12

**theft** 22:1

**thing** 34:18 47:4 49:15 69:6 70:8 74:4 80:25 86:10 92:22 110:2 114:10 118:24 153:23 155:19 156:1 157:19 164:17 166:6

**things** 22:13 35:23 37:7 43:7 46:20, 21 57:18 70:11 100:20 131:20 165:6

**third-party** 12:10 16:8

**thought** 37:12 64:12 127:2 151:8 154:12 156:25 161:11 171:23 173:12 184:10

**thousand** 7:16

**threat** 125:13,20,23 126:7,8,11,14,21, 24 127:2,4,13

**threaten** 94:23

**threatening** 126:18 138:14,17,24 141:4

**threats** 137:20

**threshold** 201:4

**threw** 98:24

**THURSDAY** 5:1

**tight** 96:6

**time** 13:1,19 36:19 37:23 40:11,13 51:5 53:11 55:15 57:5,7 62:8,15 63:2, 12,17,24 64:17 71:10 75:13 76:7 79:1, 12 85:5,7 86:21 94:19 108:5,9 112:4 122:7,15 123:17,19 128:2 131:2 132:21 140:4 143:14,17,24 144:2,7, 10,17,19 150:6,7,17,20,22,23,24 151:2 154:9,15 155:8 159:16,17,24 160:7 162:2 175:9 177:20 182:13 183:20 185:10 194:24 202:14,15

**times** 76:5 82:10,16 106:23 161:11

**timing** 61:23 62:1 63:19 64:23

**tiny** 116:2 167:24

**title** 5:11

**today** 6:23 38:17 39:1,16 60:25 122:9 129:20 145:19 171:2 172:17

**today's** 5:17 6:20

**told** 31:20 97:10 117:2,23 133:13 155:21

**top** 112:22 119:7,16 122:19 131:5 133:5 154:15 190:17 196:18

**total** 63:6 101:6 112:19

**totally** 34:17 149:14

**tracing** 87:5,7,8 93:18,20,22 153:11, 14,15

**track** 32:16,17 184:2

**tracked** 181:10,14

**traditionally** 86:24

**train** 13:19

**trained** 160:13

**training** 13:15,16,17,24 14:4 36:17, 18,22,24 37:1 194:1,4,14

**trains** 18:11

**transferable** 13:5

**trap** 147:16

**treble** 47:22 48:12

**tremendous** 30:9

**triggers** 129:6

**true** 22:19 34:25 51:9,11 84:2 101:19, 22 156:9 167:25

**truthfully** 137:23

**turn** 36:6,12 123:9,16 148:6 152:6 198:5

**turning** 22:11

**TVS** 100:20

**Twisters** 57:17

**type** 96:16

**typed** 174:12,15 176:1,4

**typical** 40:11

**typo** 169:22

---

**U**

**Uh-huh** 134:4

**Ultimate** 15:21,22,23

**ultimately** 60:1

**umbrella** 136:10

**unable** 94:13

**understand** 22:7 25:17 30:7 33:7 48:24 61:2 62:10 77:25 128:20 139:18 162:8 168:15 174:14 192:1

**understanding** 25:5,12 28:14 30:4 33:25 41:7 51:17 60:6 68:9 71:4 72:6 77:17,20,24 91:10 101:4 150:18 166:4 184:7

**understood** 183:23

**unfair** 35:18,20

**unhappy** 56:21

**unintentional** 38:4

**University** 40:1,2,16 41:1 119:10

**update** 89:8,11,14,17,20,22 90:2,9,16 141:17 142:13 157:11 191:1,3 195:10, 17 196:4

**updates** 90:1,5 91:5 142:16 189:13, 17

TARA PERETTO vs THE CHERRINGTON FIRM
LACY CHERRINGTON - 01/30/2025

Index: updating..Zortman

**updating** 151:18

**UPS** 11:15

**USPS** 10:15

**Utah** 5:1 34:14 63:17,18,22 64:3,24 65:3 70:25 86:24 136:7,9,13

---

**V**

**vacate** 76:17

**vague** 10:17 18:18 22:6,12 59:1 68:12 73:17 85:5,7 89:24 126:11,17 150:21

**vagueness** 49:10

**valid** 84:4 98:22,24 99:4,6,14

**validation** 19:10,12,24 20:4,11,13,14, 16,19 21:10,11,13 23:8 24:4 25:23 27:4 28:15,18 29:13 115:3

**Vasquez** 54:19 57:1 194:17

**vendors** 201:5

**verbal** 24:19 29:17

**verbiage** 30:16

**verification** 21:12,13,14,15,22,25 22:1,3,18 23:2 24:4 26:5,12,17 27:4 112:11

**verify** 182:8

**verifying** 182:4

**vet** 17:1,17,23 19:2

**veterinary** 58:3

**vets** 17:13

**vetted** 16:24

**vetting** 17:14

**videos** 14:5

**violate** 30:18 34:2,5,14,20 35:6 114:19 115:7 118:4 120:23 121:4 122:24 125:10 131:16 133:10 137:14

**violated** 97:18

**violates** 31:1

**violating** 36:15 59:7

**violation** 29:5,11 35:17

**violations** 35:16 37:24 38:15 136:18

**voice** 182:1 184:20 185:3,14 187:22

**volume** 193:24

**voluntarily** 58:12,14

---

**W**

**W-9** 200:19

**W-9S** 200:16

**wage** 44:21,23 46:3,5,6,17,21

**wages** 42:15 43:4 44:25 46:9 78:9 79:23

**wait** 14:15

**waiting** 73:21 74:3 159:18

**walk** 78:9 134:10

**wanted** 31:21 51:13 56:20 61:19 89:8 152:5,14 171:1,6 173:10 183:19 194:23

**warm** 36:10

**warning** 27:15 28:6

**warrants** 51:22

**watching** 14:5

**ways** 47:10 180:22

**website** 12:7,9

**week** 159:13

**whatsoever** 92:4

**wheels** 22:11

**Whoa** 173:8

**Winter** 60:22 160:8 162:3

**witnesses** 177:2

**Wonderful** 202:16

**wondering** 32:10 133:19 172:16 188:14

**word** 48:16 68:16,18,23 69:13,19,20 72:3 83:15 93:9 98:24 126:20,24

**words** 28:7 30:20 70:13 71:15 95:5

**work** 5:9,24 6:10 13:21 32:5 39:3 48:3 51:21 54:24 58:10 59:15 68:18 69:14 86:4 94:1 96:18 144:20 149:25 192:20 200:9 201:19

**worked** 64:11,14 66:11 86:16

**working** 203:13

**works** 33:25 34:1 58:3 96:13 141:16

**Wright** 62:10 66:8

**writ** 11:24 43:4,11 45:13,17 62:5 66:23,24 67:2,5,6,12,16 68:21 69:2,3 70:15 71:4,14,16 72:1,2,3,4,10,16 73:3,11,13 74:5,8,20,23 75:2,5 76:2,5, 24 77:7,18 78:10,11,16,23 79:8,21 80:23 81:11 82:3 83:13,15,22 84:3,13, 14,23 85:4,22,25 86:2,9,22 87:12 88:1,9,15,19 89:1,5 91:15,23 92:3,12, 16 93:13 94:11,13,17 96:6 97:13 98:22 99:3,13,16,23,24 101:2 102:2,5, 6,7 110:14 111:10,14,17 112:18 114:11 124:3 135:10 137:12,15 138:11 157:7 169:2 179:24 180:1 188:20 190:8

**write** 16:21 17:13 18:24 38:2 117:15 146:5

**writing** 27:4 28:20 102:9

**writs** 45:4 47:5 60:7,11 61:16,20 62:8, 14,19 63:7,14,22 64:17,20 65:5,19,25 68:4,7 71:1 72:7,19 79:10,11,15,17,18 80:11,13,14,15,17 81:3,23 83:2,17 84:25 85:9,10,14,15 86:12 96:20 97:19,21 98:11 100:6,13 102:23 103:14 109:15,25 110:3 128:11 139:7, 9,11,21 143:13

**written** 27:20 40:19,21 135:3 165:22, 25

**wrong** 13:6 57:16 71:8 132:15 156:16 191:4

**wrote** 16:15,16,22 142:16

---

**Y**

**year** 7:9,10 36:24 63:3 76:5 79:12 198:13

**years** 85:6

**yesterday** 8:1,4,9,16,20 63:9 122:12

**Young** 40:1,2,16 41:1 119:10

---

**Z**

**Zortman** 187:20,24