Exhibit P-17

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
_____

ELIZABETH HERNANDEZ,              )
                                  )
          Plaintiff,              )       **CERTIFIED COPY**
                                  )
vs.                               )  Case No. 2:23-cv-00772
                                  )
ROB KOLKMAN, CONSTABLE            )
KOLKMAN LLC, and JOHN DOES        )
1-5,                              )
                                  )
          Defendants.             )
_____


DEPOSITION OF:  ROB KOLKMAN

OCTOBER 30, 2024

9:06 A.M. TO 2:12 P.M.


Location:  LAW OFFICES OF KIRTON McCONKIE
301 North 200 East, Suite 3A
St. George, Utah 84770

Reporter:  Vickie Larsen, CCR/RMR
Utah License No. 109887-7801
Nevada License No. 966
Notary Public in and for the State of Utah

**ELIZABETH HERNANDEZ vs ROB KOLKMAN**
**ROB KOLKMAN - 10/30/2024**

Pages 2..5

---

Page 2

```
 1   APPEARANCES
 2   For the Plaintiff:
 3            Eric Stephenson
              STEPHENSON LAW FIRM
 4            250 North Redcliffs Drive, 4B #254
              St. George, Utah 84790
 5            801.386.5200
              Ericstephenson@utahjustice.com
 6
     For the Defendants:
 7
              David P. Gardner
 8            KIRTON McCONKIE
              301 North 200 East, Suite 3A
 9            St. George, Utah 84770
              435.574.5672
10            Dgardner@kmclaw.com
11
                    -oOo-
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1
 2                I N D E X
 3   ROB KOLKMAN                              Page
 4   EXAMINATION BY MR. STEPHENSON               5
 5
 6                   -oOo-
 7
 8             E X H I B I T S
 9   No.    Description                       Page
10   Exhibit 1   Writ of Execution             38
11   Exhibit 2   Letter to Elizabeth Hernandez 61
12               from Constable Rob Kolkman
13               dated 8-16-2023
14   Exhibit 3   Letter to Elizabeth Hernandez 67
15               from Constable Rob Kolkman
16               dated 8-16-2023
17   Exhibit 4   Writ of Execution             71
18   Exhibit 5   Notice of Sale                79
19   Exhibit 6   Notice of Sale               106
20   Exhibit 7   Utah Press printout          126
21   Exhibit 8   Utah Press printout          127
22   Exhibit 9   Typewritten notes on Elizabeth 144
23               Hernandez
24   Exhibit 10  Email from Corey Revill dated 161
25               December 29, 2023
```

---

Page 4

```
 1   Exhibit 11   Email string               162
 2   Exhibit 12   Email string               165
 3   Exhibit 13   Email string               167
 4   Exhibit 14   Email string               169
 5   Exhibit 15   Email string               170
 6   Exhibit 16   Email string               171
 7   Exhibit 17   Email from Corey Revill dated 174
 8                January 31, 2024, with
 9                attachment
10   Exhibit 18   Email from Corey Revill dated 179
11                January 17, 2024, with
12                attachment
13   Exhibit 19   Spreadsheet                184
14
15                   -oOo-
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
 1   October 30, 2024                      9:06 a.m.
 2              P R O C E E D I N G S
 3                   ROB KOLKMAN,
 4   called as a witness, having been duly sworn, was
 5         examined and testified as follows:
 6                  EXAMINATION
 7   BY MR. STEPHENSON:
 8        Q.    Will you state your name for the record.
 9        A.    Rob Kolkman.
10        Q.    Will you spell that for the record.
11        A.    Rob, R-O-B, Kolkman, K-O-L-K-M-A-N.
12        Q.    Do you have a middle name?
13        A.    I do not.
14        Q.    And you have been a constable for --
15   when?  When did you first become a constable?
16        A.    A constable or a deputy constable?
17        Q.    Well, you tell me.  Just start at the
18   beginning.  What did you first become?
19        A.    I believe it was around 1988 I became a
20   deputy constable.
21        Q.    Okay.
22        A.    2009 I became the Ogden City constable.
23        Q.    Okay.  You're appointed by anybody other
24   than Ogden City?
25        A.    No.
```

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 6..9

---

Page 6

```
 1      Q.    Have you ever been appointed by anyone
 2 other than Ogden City?
 3      A.    No.
 4      Q.    And you own Kolkman Constable Services
 5 LLC?
 6      A.    Yes.
 7      Q.    And you own 100 percent?
 8      A.    Yes.
 9      Q.    And how many employees does constable --
10 or excuse me -- Kolkman Constable Services have?
11      A.    Me.  One.
12      Q.    Okay.  And we went over this a little bit
13 before, but I'm trying to make sure there's a
14 foundation for our other questions.  And my
15 understanding is Kolkman Constable Services does
16 pretty much everything a normal constable service
17 does; is that right?
18      A.    Yes.
19      Q.    Okay.  And Constable Kolkman LLC, you own
20 that 100 percent?
21      A.    Yes.
22      Q.    And how many employees does Constable
23 Kolkman LLC have?
24      A.    Right now we're one, two -- somewhere
25 between four or five.
```

Page 7

```
 1      Q.    Okay.  And do you say four or five
 2 because you're not sure of the number today or is
 3 it --
 4      A.    Well, it -- it vary -- you know, I'm
 5 talking part-time servers type.  Some come, some go.
 6      Q.    And "servers," you mean deputy
 7 constables?
 8      A.    I mean servers.
 9      Q.    Okay.  So who is employed with Constable
10 Kolkman LLC now today?
11      A.    Kolkman -- Constable Kolkman?
12      Q.    Yeah.
13      A.    Who?
14      Q.    Yeah, let's list just the names.
15      A.    We have Corey, Andrea.
16      Q.    Hold on.  Hold on.  Will you do me a
17 favor and do last names too so we're on the record
18 with the full names.
19      A.    Corey Revill, Andrea Dobson.  That's all
20 we have in the office.
21      Q.    Okay.  And then you have servers?
22      A.    Yes.
23      Q.    And who are they?
24      A.    I have Joslyn Stevens, Jose -- oh, God --
25 I can't remember his last name.
```

Page 8

```
 1      Q.    Okay.  Is he a deputy constable?
 2      A.    No.
 3      Q.    Okay.  So other than Justin and Jose, are
 4 there any other servers?
 5      A.    Pardon?
 6      Q.    Are there any other servers besides
 7 Justin and Jose?
 8      A.    It's Joslyn.
 9      Q.    Joslyn.  Sorry, I heard that wrong.
10 Okay.  And Jose?
11      A.    Yeah.
12      Q.    So four total?
13      A.    Yeah.
14      Q.    Okay.  What about Andrew Collet?
15      A.    Who?
16      Q.    Andrew Collet.
17      A.    I don't know an Andrew Collick.
18      Q.    Collet?  Andrew Collet?
19      A.    Collet?
20      Q.    Collet, okay.  Who's that?
21      A.    He used to.
22      Q.    Okay.  Do you have any deputies right
23 now?
24      A.    No.
25      Q.    And what are the deputies that you've had
```

Page 9

```
 1 over the last two years?
 2      A.    Oh, wait.  I -- I need to make a
 3 correction.  I have a Tyler Plowman that works for me.
 4      Q.    Office or as a server?
 5      A.    He's a deputy.
 6      Q.    Okay.  And Andrew Collet was a deputy?
 7      A.    He was, yes.
 8      Q.    Okay.  And where did he go?
 9      A.    Military.
10      Q.    So you have one deputy now, Tyler
11 Plowman?
12      A.    Yes.
13      Q.    And in the last two years, what other
14 deputies have you had?
15      A.    There was a Chris Stewart.
16      Q.    And where did he go?
17      A.    Private business.
18      Q.    Okay.  Any others?
19      A.    Pardon?
20      Q.    Any other deputies?
21      A.    No.
22      Q.    Okay.  And so we're clear, this case,
23 what we're talking about, all the activity was not
24 Kolkman Constable Services LLC, it was Constable
25 Kolkman LLC; correct?
```

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 10..13

---

Page 10

1    A.    In this case, yes.

2    Q.    Okay.  And so tell me in -- just briefly

3  outline to me what you do as a constable.

4    A.    We serve and enforce court-issued

5  documents.

6    Q.    Okay.  And you've been handling those

7  kinds of tasks for a long time, since 1988?

8    A.    I'm a little hard of hearing, remember.

9    Q.    I'm sorry.  That's right.  And I talk too

10  fast, so let me try to accommodate everybody.

11         And you've been serving and enforcing

12  court-issued documents since 1988?

13    A.    Pretty much.

14    Q.    Okay.  And when you say "pretty much,"

15  help me understand if that's not what --

16    A.    That's what I've done, yes.

17    Q.    So it's more of a yes?

18    A.    Yes.

19    Q.    Okay.  Tell me about the process you

20  follow, then, when you're -- your serving legal

21  process.  What are the steps of that?

22    A.    I'm not -- I don't follow what you're

23  asking.

24    Q.    Well, when you have a summons and

25  complaint and you have to serve that, or some other

---

Page 11

1  document, what do you do to serve that?  What is the

2  process you go through?

3    A.    Per Rule 4, you know, summons complaint,

4  you need to go up and either serve the person or

5  anybody over the age of 14 that resides there, if it

6  can be sub-served.

7    Q.    Okay.  So you give the papers to the

8  person or the -- or the substitute?

9    A.    Correct.

10    Q.    And then what do you do after that?

11    A.    Depends what the order is.

12    Q.    Okay.  If it's just a summons and

13  complaint, what do you do?

14    A.    We would make a proof of service and send

15  it back to the client.

16    Q.    Okay.  And then your job is done on that?

17    A.    Pretty much.

18    Q.    When you're executing a writ of

19  execution, what's the process you follow there?

20    A.    We serve the writ as before, anybody over

21  the age of 14 that resides there, and then we bring it

22  back and sometimes we make contact with them because

23  the writ has got a blanket precipe, so we're not quite

24  sure exactly what we're looking for to seize or sell.

25         So we try to make contact with the

---

Page 12

1  defendant to explain the situation to him.  And we

2  manufacture a proof of service and return that to the

3  plaintiff so they know that it's been served.

4    Q.    Okay.  And what do you mean to explain

5  the situation to the debtor?  What does that -- what

6  does that entail?

7         MR. GARDNER:  I'll object to the form of

8  the question.

9         THE WITNESS:  How do I word this?  Some

10  of them question what it's about.  We go over that

11  with them -- with what the court process has been up

12  until that point.

13    Q.    BY MR. STEPHENSON:  Anything else?

14    A.    And explain their options on what they

15  can do.  They can pay in full.  A list of their

16  property.

17    Q.    Say that again.  I didn't quite

18  understand.  You said a list of their property?

19    A.    Of their exempt -- of their exempt

20  property, we'll ask them what it is that can be

21  auctioned off.

22    Q.    Okay.  And you do all of that right there

23  at the door?

24    A.    No.

25    Q.    When do you ask them what property they

---

Page 13

1  have that can be auctioned off?

2    A.    Probably within two weeks to three weeks

3  we'll try to get contact with them.

4    Q.    Okay.  And other than delivering the

5  papers to the debtor and then explaining their

6  situation, what else do you do to execute a writ of

7  execution?

8    A.    If we have to, we'll do a notice of sale.

9  We will post the notices as required.

10    Q.    Anything else?

11    A.    And at the time of the sale we'll either

12  have the sale or go by and cancel the sale.

13    Q.    Okay.  Anything after that?

14    A.    Depending on what the plaintiff does --

15  or the defendant does.

16    Q.    Okay.  So what happens after the sale?

17  Do you provide paperwork to the lawyer?

18    A.    Yeah, we're probably done with it.

19    Q.    That would end your involvement?

20    A.    Most of the time.

21    Q.    When would a sale not end your

22  involvement?

23    A.    When the plaintiff -- not the

24  plaintiff -- the defendant reaches out to us and wants

25  to work out some kind of a -- an arrangement to take

---

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 14..17

Page 14

1  care of the judgment.
2       Q.     And that would happen after the sale?
3       A.     It can happen before and after.
4       Q.     Okay.  And what happens when you cancel
5  the sale?  Do you notify the attorney?
6       A.     Yeah.
7       Q.     And then what happens?
8       A.     I think I already answered that.
9       Q.     Well, if they cancel the sale, I
10 didn't -- I'm asking -- you said there were two paths.
11 We went down one path, now we're going down the other.
12      A.     We canceled the sale and there's no
13 property of value, we return it to the plaintiff.
14      Q.     And if there is property available, you
15 wouldn't cancel the sale?
16      A.     We would postpone it and reset it.
17      Q.     Let's go through the specific sale
18 process.  What happens -- what's the first step in --
19 when you're finally executing the sale, what happens?
20 You drive up to the house, knock on the door.  Is that
21 the fair starting point?
22             MR. GARDNER:  I'll object to the form of
23 the question.
24             MR. STEPHENSON:  What's wrong with the
25 form of the question?

Page 15

1             MR. GARDNER:  Argumentative.  Leading.
2             MR. STEPHENSON:  Well, leading is a --
3  he's a -- I can lead.  That's not a proper objection.
4             But what do you mean argumentative?  I'm
5  asking him -- I'm asking him what he does.
6             MR. GARDNER:  In federal court I have to
7  object to the form of the question at the time the
8  question is posed or else I waive the objection.  And
9  leading is a proper objection to make in a deposition
10 to the form of the question.
11            MR. STEPHENSON:  Okay.  Purple.
12      Q.     Tell me what you do when you conduct an
13 execution sale.  Start with the first step and we're
14 going to walk through each step.  Just start with the
15 first one for me, please.
16      A.     I'm not quite sure what you're asking for
17 here.
18      Q.     Well, we talked about the sales.  I just
19 want to know what the process is.  All I'm doing is
20 trying to set -- create a foundation for knowing what
21 happens.
22             And you explained the process for serving
23 legal process and for executing the writs of
24 execution, but now I'm asking the details of a sale.
25             What's the process you follow when you

Page 16

1  conduct a sale?
2       A.     We send them a notice of sale, we post
3  the notice of sales in the court and three other
4  locations in the county.
5       Q.     Okay.  What's the next step?
6       A.     We probably cancel the sale if we don't
7  have contact and know exactly what property we have.
8  And we would probably go by and take a look and see
9  what kind of property there is, if there's anything of
10 value that would make it reasonable to hold a sale.
11      Q.     And what do you mean "look at"?  "Go by
12 and look" at things?  Do you go inside the house?
13      A.     If they let us in.  I do not force myself
14 in the house.
15      Q.     And if they don't let you in, do you look
16 through the windows?
17      A.     No.
18      Q.     Never?  You never look through the
19 windows?
20      A.     Not when I'm going to do that, no.
21      Q.     Okay.  Is there any time you look through
22 the windows?
23      A.     As a matter of officer safety, when
24 you're walking up to a house, you would look at the
25 house and anywhere that you need to retreat to for

Page 17

1  officer safety.  So looking through the window as
2  you're walking up to the door is officer safety to see
3  if there's any movement or what might be in there.
4             If the drapes are closed, you don't see
5  nothing.
6       Q.     So is that a yes, you look through the
7  windows before you -- or when you go to a person's
8  house?
9             MR. GARDNER:  I'll object to the form of
10 the question.  Mischaracterizes testimony.
11      Q.     BY MR. STEPHENSON:  Okay.  Well, I'm
12 asking a yes or no then.  Do you look through the
13 windows?
14             MR. GARDNER:  I'll object to the form of
15 the question.  It's been asked and answered, Counsel.
16             MR. STEPHENSON:  Go ahead.
17             THE WITNESS:  I already answered that.
18             MR. STEPHENSON:  I'm asking -- I'm asking
19 for yes or no.  I didn't get a clear answer and I
20 would like one.
21             MR. GARDNER:  I'll object to the form of
22 the question.  It was asked and answered --
23             MR. STEPHENSON:  Purple.
24             MR. GARDNER:  -- and he did answer it.
25             MR. STEPHENSON:  Go ahead.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                          Pages 18..21

Page 18

1    THE WITNESS:  Yeah.
2    Q.    BY MR. STEPHENSON:  Okay, yes, you do
3  look through windows, okay.
4          And we're clear on that, right, you do
5  look through windows?  For officer safety you look
6  through windows?
7    A.    Yes.
8    Q.    Okay.  Okay.  What's next?  When you post
9  the notice of sale in the three locations and you go
10  to the house next, or what happens after the posting
11  of the sale in the three locations?
12    A.    If we decide to cancel it, we go by, make
13  sure nobody's there for the sale.
14    Q.    Okay.  And if you decide to carry out the
15  sale, what happens next?
16    A.    Then we would post it and publish it in
17  the newspaper and actually hold the sale at the time
18  and place that we have figured out we're going to have
19  it.
20    Q.    Okay.  And what does the sale process
21  look like?  When you get to the -- you get to the
22  house, what do you do then?
23    A.    If there is property worthy of taking, we
24  would take it, store it, notice it up, publish it, and
25  hold the sale at public auction to the highest bidder.

Page 19

1    Q.    So you don't sell the property at the
2  person's home?
3    A.    I do not do that.
4    Q.    Okay.  And how do you decide what
5  property to take?
6    A.    I've been doing this for a long time.  I
7  know what the value of stuff is at an auction, and
8  it's just kind of a duty for me to take care of the
9  plaintiff as well as the -- the defendant and the
10  plaintiff.
11          If there is nothing of value that's going
12  to end up costing the defendant more money to seize it
13  and sell it, then it's not worth taking because then
14  the defendant is going to be farther into debt for no
15  reason.
16    Q.    So you look at the property, you go
17  through the house and look at everything they have and
18  sort of pick and choose what you should -- what you're
19  taking?
20    A.    If I go in the house, yes.  But that
21  would be the exempt property.
22    Q.    You mean non-exempt property?
23    A.    Non-exempt, sorry.
24    Q.    And so we're talking -- so you -- if you
25  see a TV, a big TV, guns, collectables, that kind of

Page 20

1  thing, you would take that?
2    A.    I would look at it.
3    Q.    Okay.  And decide whether it's valuable
4  enough to take or not?
5    A.    Yes, and who is the owner of it.
6    Q.    That's an excellent question, because
7  sometimes you have multiple people that live in the
8  home; correct?
9    A.    Correct.
10    Q.    And sometimes something might be --
11  something might have value but belong to somebody else
12  and you can't take that; right?
13    A.    Correct.
14    Q.    Okay.  What happens if they don't let you
15  in?
16    A.    Then I can do an asset check and see if
17  they have any vehicles or -- any motor vehicles, RVs,
18  whatever, and then I would look at seizing that if
19  there's any value in it.
20    Q.    Okay.  And then what happens next when
21  you conduct an execution sale after you've sold --
22  after you've picked the property that you think is
23  valuable enough to sell, then you take it to storage?
24    A.    Yes.
25    Q.    For how long?

Page 21

1    A.    I try to keep it around two weeks.  That
2  gives them time to object.
3    Q.    And who do you use for storage?
4    A.    Depends what I'm storing.
5    Q.    Okay.  What if -- let's say it's just
6  normal household goods; TVs, furniture, whatever.
7    A.    If I were to take household goods, it
8  would be at a storage unit.
9    Q.    Okay.  And what storage unit do you use?
10    A.    It would depend where I'm at.
11    Q.    Okay.  Well, say it's Salt Lake.  Which
12  storage unit do you use in Salt Lake?
13    A.    I don't have a particular one that I --
14  usually the closest storage unit.
15    Q.    Okay.  Are you the auctioneer?
16    A.    Yes.
17    Q.    You don't hire another person to do that?
18    A.    No.
19    Q.    Okay.  And how many of these execution
20  sales do you hold in a normal year?
21    A.    Not many.
22    Q.    Okay.  Can you give me a closer number
23  than that?  Ten?
24    A.    I don't know.
25    Q.    Okay.  Is it more than 100?

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 22..25

Page 22

1    A.    No.
2    Q.    Okay.  Is it more than ten?
3    A.    No.
4    Q.    Is it more than two?
5    A.    No.
6    Q.    Okay.  So in a normal year you -- you --
7    how many do you conduct?  You say you can't say, you
8    don't know.  If it's less than two, wouldn't you
9    remember that?  You having a hard time understanding
10   the...
11         Let's say 2024.  How many execution sales
12   have you held in 2024?
13   A.    That I've -- that I've held?
14   Q.    Yes.
15   A.    Probably about six.
16   Q.    Okay.  And how many last year?
17   A.    I don't know.
18   Q.    Is it roughly the same?
19   A.    Roughly.
20   Q.    Okay.  So in this year you've held six
21   execution sales, roughly, maybe it's eight, maybe it's
22   four.  Would it be closer to eight or closer to four?
23   Would it be closer to 10?  11?
24   A.    No.
25   Q.    Okay.  And how many times have you served

Page 23

1    legal process of other kinds, summons and complaints?
2         MR. GARDNER:  In 2024?
3         MR. STEPHENSON:  Yes.
4         THE WITNESS:  Couple hundred.
5    Q.    BY MR. STEPHENSON:  And how many writs of
6    executions have you executed this year?
7    A.    How many writs have we served?
8    Q.    Well, I asked you earlier about executing
9    writs of execution, and you walked me through that
10   process.  So I'm asking how many writs of execution
11   you've executed?
12   A.    I don't know.  500-plus.
13   Q.    And so that we're clear, the 200 -- these
14   are all -- the executions, the 500-plus executions
15   you've conducted are all under Constable Kolkman LLC?
16   A.    Yes.
17   Q.    And the services of legal process, the
18   200 -- around 200, is that under Constable Kolkman
19   LLC?
20   A.    No.
21   Q.    Okay.  So Constable Kolkman LLC, how many
22   services of regular process summons and complaints and
23   subpoenas, that kind of thing, has it done this year?
24   A.    None.
25         And that's because we already talked

Page 24

1    about that in the last deposition; right?  Constable
2    Kolkman is just focused on the execution of the writ
3    of executions?
4    A.    Yes.
5    Q.    Okay.  Now, when we -- when you said you
6    have conducted about six sales this year, what kind of
7    property did you sell in those sales?
8    A.    Those would have been mobile homes.
9    Q.    And how many execution sales have you
10   conducted this year of personal property that's not a
11   mobile home?
12   A.    None.
13   Q.    And how many execution sales did you
14   conduct last year, 2023, that were not mobile homes
15   but were just regular property?
16   A.    None.
17   Q.    When was the last time you held a public
18   auction for personal property that wasn't a mobile
19   home?
20   A.    I don't recall.
21   Q.    So it was at least probably four or five
22   years ago or more?
23         MR. GARDNER:  Object to the form of the
24   question.
25         MR. STEPHENSON:  Go ahead and answer.

Page 25

1         MR. GARDNER:  Asked and answered.
2         MR. STEPHENSON:  Purple.
3    Q.    Please answer the question.
4         MR. GARDNER:  Object to the form of the
5    question.  He's answered it.  He said he did not
6    recall.  That was his answer.
7    Q.    BY MR. STEPHENSON:  Well, I'm entitled to
8    explore why he doesn't recall.  So tell me what's
9    going on.  You -- tell me how many -- how many --
10   when's the last time you can remember you sold
11   personal property instead of a mobile home?
12   A.    I told you, I don't remember.
13   Q.    Okay.  And do you have any memory
14   problems or do you have a normal memory?
15         I'm not trying to be rude, I'm trying to
16   figure out why you don't remember.
17   A.    You're doing a good job.
18   Q.    Well, I'm trying to understand why you
19   don't remember.
20   A.    Because it's been -- okay, it was -- it
21   could have been four or five years ago.
22   Q.    Okay.  And so the reason you don't
23   remember is because it was a long time ago given -- in
24   comparison to the last two years?
25   A.    Correct.

Page 26

1    Q.    Okay.  How do you keep track of your
2 daily schedule?
3    A.    Run that past me again.
4    Q.    Your daily -- your daily calendar.  I
5 keep mine on my phone.  I look at my phone.  I keep it
6 on my computer.  How do you keep yours?
7    A.    I don't really have a schedule.
8    Q.    Okay.  Constable Kolkman LLC, how does it
9 keep track of its employees' services of process,
10 going out and doing things, how does it track those --
11 those activities?
12    A.    They bring them into the office, we log
13 them back in -- we log them out to them, the servers,
14 and then we log them back in.
15    Q.    So -- so the process server comes to --
16 or the -- not a process server.  This is a deputy
17 every -- let me make that clear; right.
18        We're talking about a deputy, not a
19 process server, when we're talking about serving -- or
20 excuse me -- executing a writ of execution?
21    A.    What do you mean by "executing"?
22    Q.    Well, that was the confusion I had from
23 you, is I'm -- so what do you mean by "executing"?
24    A.    Serving it.
25    Q.    Okay.  Because I think serving it and

Page 27

1 executing it are two different things, so --
2    A.    Okay.
3    Q.    -- explain to me, are they the same?  Is
4 executing a writ of execution the same as serving a
5 writ of execution?
6        MR. GARDNER:  I'll object to the form of
7 the question.  Calls for a legal conclusion.
8        THE WITNESS:  Yeah, I think they're -- if
9 you serve it, you serve it.  If you execute on it then
10 you're actually going to seize something, so we're
11 serving it.
12    Q.    BY MR. STEPHENSON:  Okay.  So when your
13 deputy -- so -- so are process servers serving writs
14 of execution then?
15    A.    Most of the time, yes.
16    Q.    Okay.  And sometimes it's not a process
17 server.  Sometimes it's a deputy?
18    A.    Correct.
19    Q.    And would it be you sometimes?
20    A.    Not very often.
21    Q.    Okay.  And so the process server or the
22 deputy, whoever is serving the writ of execution, you
23 give them a pile of these and they take them out for
24 the day, and then when they're done they bring them
25 back and they log them back in; is that fair?

Page 28

1    A.    Yeah.
2    Q.    Okay.  And then how are those tracked
3 from that point?  What -- do you have software that
4 tracks these things, or anything like that?
5    A.    We enter them into the computer, yes.
6    Q.    Okay.  What software do you use for that?
7    A.    FileMaker Pro.
8    Q.    And is -- do they -- do your process
9 servers and deputies also track their mileage that
10 way?
11    A.    They do not track their mileage.  We
12 enter their mileage.
13    Q.    And that's done using -- how is that
14 calculated then?
15    A.    It's usually done with the computers,
16 that the program that throws mileage in for...
17    Q.    Can you explain what that means?  I
18 didn't understand.  So the computer just knows how far
19 they drove?
20    A.    Let me -- let me correct that now.
21        The gal that enters the paper would take
22 from the court to the place that would -- it was
23 served and calculates that mileage and enters it into
24 the computer for each attempt.
25    Q.    Okay.  And the time involved, the process

Page 29

1 servers and the deputies, how do they track their
2 time?
3    A.    They don't get paid by time.
4    Q.    Paid by the serve?
5    A.    Yes.
6    Q.    And is it the same for serving a writ of
7 execution that it is for a summons and complaint?
8    A.    Yeah.
9    Q.    Are they reimbursed for their fuel?
10    A.    No.
11    Q.    And do you use FileMaker Pro for tracking
12 the money you make in the property sales also?
13        MR. GARDNER:  I'll object to the form of
14 the question.  Argumentative.  Assumes facts not in
15 evidence.
16    Q.    BY MR. STEPHENSON:  What do you use to
17 track money you make in property sales?
18        MR. GARDNER:  Same objection.
19        THE WITNESS:  FileMaker.
20    Q.    BY MR. STEPHENSON:  Okay.  And what other
21 details of the property sales do you track in
22 FileMaker, besides the money you've generated?  Do you
23 track the property you've sold?
24    A.    I don't know.
25    Q.    Okay.  Let's move to the business a

Page 30

1  little bit. You started it from -- Constable Kolkman
2  LLC, you started that in January of 2023?
3      A.    Yeah.
4      Q.    And you took it over from Erickson,
5  Michael Erickson?
6      A.    Yeah.
7      Q.    And how much did you pay to take it over
8  from Michael Erickson?
9      A.    Nothing.
10     Q.    And what exactly did you take over from
11 Michael Erickson in January of 2023?
12     A.    All the writs that were being worked.
13     Q.    Did you take over anything else from him?
14     A.    Clarify what you're asking.
15     Q.    Well, I'm asking you to give me a list of
16 everything that you obtained when Michael Erickson
17 gave you his business of executing writs of execution.
18     A.    A refrigerator.
19     Q.    Okay.  What else?
20     A.    That's about it.
21     Q.    So other than a refrigerator and
22 the writs being worked, Michael Erickson didn't give
23 you anything else when you took over his business?
24     A.    No.
25     Q.    So you didn't -- he didn't give you

Page 31

1  clients?
2      A.    He gave us the writs.
3      Q.    Okay.  So that would be clients, too,
4  then?
5      A.    Yes.
6      Q.    You served the clients that he used to
7  serve; correct?
8      A.    Yes.
9      Q.    Okay.  I'm going to add clients to the
10 list then.
11           What about the letters that you mail to
12 people?  Those look the same to me.  Did he give you
13 his letters?
14     A.    Yeah.
15           MR. GARDNER:  Object to the form.
16     Q.    BY MR. STEPHENSON:  Okay.  So I'm going
17 to add letters to the list, and clients.
18           Employees.  Corey Revill used to work for
19 Michael Erickson; correct?
20     A.    Correct.
21     Q.    And now he works for you?
22     A.    Correct.
23     Q.    Okay.  Did you take any other employees
24 from Michael Erickson?
25     A.    Andrea.

Page 32

1      Q.    So what about office space?  Did you take
2  his office?
3      A.    No.
4      Q.    Did you take any of his equipment?
5      A.    Equipment.  Clarify what you mean by
6  "equipment."
7      Q.    Well, I'm trying to create a list, so I
8  wanted to keep it generic.  But did you take his
9  phones?  His computers?  Anything?
10     A.    Took the program.
11     Q.    Okay.  That's FileMaker Pro?
12     A.    Yep.
13     Q.    Okay.  That was actually my next
14 question, so thank you.
15           What about payment processing?  You
16 didn't take his payment processing.  You have your
17 own?
18     A.    Yeah.
19     Q.    Okay.  So other than the software, a
20 couple of employees, the clients, the letters, the
21 writs, and a refrigerator, did you take anything else
22 over from Michael Erickson's business?
23     A.    Not that I recall.
24     Q.    Okay.  And what were the terms of the
25 takeover?  What were you -- what were you obligated to

Page 33

1  do?  If you didn't pay him any money, what were you
2  obligated to do?
3      A.    Continue in servicing the writs.
4      Q.    And did you provide him -- you didn't pay
5  any money, but did you give him any other compensation
6  for taking all of his refrigerator, his letters, his
7  clients, his employees, and his software, and his
8  writs?
9      A.    No.
10     Q.    Are you friends then?
11     A.    Huh?
12     Q.    Are you a friend of Michael Erickson's?
13     A.    I think we're friends, but...
14     Q.    Okay.  And do you have any paperwork to
15 memorialize the takeover of Erickson's business?
16     A.    No.
17     Q.    There were no contracts exchanged or
18 anything else?
19     A.    No.
20     Q.    What about emails or letters or text
21 messages?
22     A.    No.
23     Q.    It was all just done over a handshake in
24 person?
25     A.    Yes.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 34..37

Page 34

1    Q.    When you discussed taking over Erickson's
2  business, was anyone else there?
3    A.    I can't recall.
4    Q.    And when did you start first -- first
5  start discussing taking over Erickson's business?
6    A.    Latter couple months of '22.
7    Q.    Okay.  Your answer in your discovery
8  responses you denied violating the Fair Debt
9  Collection Practices Act and the Utah Consumer Sales
10  Practices Act; correct?  Do you remember that?
11    A.    Yeah.
12    Q.    Since filing that answer and serving your
13  discovery responses, have you identified any
14  violations of the FDCPA or consumer -- or Utah
15  Consumer Sales Practices Act that you've violated?
16          MR. GARDNER:  Object to the form.  Calls
17  for a legal conclusion.
18          THE WITNESS:  I'm not sure I follow what
19  you're asking.
20    Q.    BY MR. STEPHENSON:  Well, you're being
21  accused of violating different statutes.  I'm just
22  asking if you have identified any violations.
23    A.    No.
24    Q.    Okay.  And I also asked in discovery if
25  you've -- to identify errors you committed in this

Page 35

1  case.  Can you identify any errors you committed in
2  this case so far?
3    A.    No.
4    Q.    Okay.  And then what about procedures?
5  What procedures do you have in place to avoid
6  violating the FDCPA?
7    A.    Since I'm exempt from the FDCPA because I
8  am a State of Utah POST Certified Peace Officer, I
9  didn't violate it.
10    Q.    Okay.  Well, I've got a chart, and I've
11  already put "none" in violations, and "none" in
12  errors, but now I'm looking for procedures.
13          So do you have any procedures in place to
14  avoid violating the FDCPA?
15          MR. GARDNER:  I'll object to the form.
16  It's been asked and answered.
17          MR. STEPHENSON:  Purple.
18    Q.    Please answer.
19    A.    I am a POST Certified Peace Officer.
20    Q.    Okay.  So you don't have any specific
21  procedures that are designed to avoid violating the
22  FDCPA?
23          MR. GARDNER:  Object to the form.
24  Misstates testimony.
25    Q.    BY MR. STEPHENSON:  Well, let's get past

Page 36

1  his -- his objections and tell me then.  What
2  procedures do you have in place to avoid violating the
3  FDCPA, if any?  It's either do you have some or you
4  don't.
5    A.    Guess we don't.
6    Q.    Okay.  Then I'll just put "none."
7          What about any procedures to avoid
8  violating the Utah Consumer Sales Practices Act?
9    A.    None.
10    Q.    Okay.  Do you believe you're exempt from
11  that one, too?
12          MR. GARDNER:  Object to the form to the
13  extent it calls for a legal conclusion.
14          THE WITNESS:  We -- none.
15    Q.    BY MR. STEPHENSON:  Okay.  So you don't
16  know if you're exempt from the Utah Consumer Sales
17  Practices Act or not?
18    A.    I don't know.
19    Q.    Do you have any opinion on that issue?
20          MR. GARDNER:  I'll object to the form to
21  the extent it calls for a legal opinion.
22          THE WITNESS:  What's the question again?
23    Q.    BY MR. STEPHENSON:  Do you believe you're
24  exempt from the Utah Consumer Sales Practices Act?
25          MR. GARDNER:  Same objection.

Page 37

1          THE WITNESS:  No, but we don't violate
2  it.
3    Q.    BY MR. STEPHENSON:  Okay.  So you're
4  familiar with the Utah Consumer Sales Practices Act
5  requirements?
6    A.    Not much.
7    Q.    Then how can you be sure you're not
8  violating it?
9          MR. GARDNER:  I'll object to the form of
10  the question.  Argumentative.  Foundation.
11          THE WITNESS:  Our practice is to take
12  care of both parties.  The objective of the writ of
13  execution is to satisfy a judgment.  We work with both
14  the plaintiff and the defendant, mostly the defendant,
15  to help them satisfy that judgment in the least
16  destructive means or the least -- you know what I
17  mean.
18    Q.    BY MR. STEPHENSON:  I don't.
19    A.    Well --
20    Q.    Please explain.  What do you mean "the
21  least destructive means"?
22    A.    We try to take care of the defendants as
23  well as the plaintiff and work with the defendant to
24  make it easy for them -- easier for them to satisfy
25  the judgment.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 38..41

Page 38

1    Q.    And what do you mean by "least
2  destructive means"?  What's more destructive than what
3  you already do?
4    A.    I don't follow.
5    Q.    Well, I'm just following your lead.  You
6  said "least destructive means."  What does that mean?
7    A.    By seizing and selling their property
8  that they're going to have to be -- that will be sold
9  at pennies on the dollar, they will lose that.  They
10 would have to replace that, and the money that we
11 would get from a sale would be not enough to cover the
12 cost of having the sale.
13        So the defendant would be more upside
14 down and the plaintiff would not be ahead, and the
15 judgment would still be there even larger.
16    Q.    So if the cost of the sale outweigh the
17 value of the sale, you believe it's better to not hold
18 the sale?
19    A.    Common sense would say that, yeah.
20    Q.    Of course.  Okay.
21        Let's mark this as Exhibit 1.
22    (Exhibit 1 was marked for identification.)
23    Q.    BY MR. STEPHENSON:  Do you recognize the
24 document I've given you?
25    A.    Yeah.

Page 39

1    Q.    This is the writ of execution issued in
2  Hernandez's case; correct?
3    A.    Yep.
4    Q.    And when did you first become aware of
5  this writ?
6    A.    Couldn't tell you.
7    Q.    How did you first become aware of this
8  writ?
9    A.    I would imagine it would be that we
10 received it from Olson and Shaner.  I don't know the
11 exact date we got it.
12    Q.    You're -- are you -- is it fair to say
13 that you didn't go to the court and get this writ of
14 execution from the court?  You wouldn't do that; is
15 that fair?
16    A.    Yeah.
17    Q.    You don't go to the court looking for
18 these.  The attorneys send them to you?
19    A.    Correct.
20    Q.    Okay.  And why did -- why did -- sorry,
21 I'm reading -- why did Olson and Shaner provide you
22 with this writ of execution?
23    A.    That's a question I can't answer, because
24 I can't speak for why they did what they did.
25    Q.    Okay.  When they gave it to you, they

Page 40

1  didn't tell you why?
2    A.    I don't follow what you're asking.
3    Q.    Well, I'm asking why they gave it to you,
4  and you said you don't know.  So I'm following that up
5  with asking why you don't know.
6        They didn't tell you what to do with this
7  writ when they gave it to you?
8    A.    To serve it and execute.  To serve it.
9    Q.    Okay.  That's -- that's the question
10 is -- what I'm asking is so your testimony is that
11 Olson and Shaner gave you this writ of execution to
12 serve it?
13    A.    Yeah.
14    Q.    Okay.  And so writ -- Olson and Shaner
15 didn't expect you to execute this writ?
16    A.    Oh, Jesus.  We need to take a break.
17    Q.    No.  Answer the question, please.
18    A.    They gave us the paper to serve and
19 execute.
20    Q.    To serve and execute, okay.
21        So Olson and Shaner, when they gave you
22 this writ of execution, they didn't provide any
23 specific instructions?
24    A.    No.
25    Q.    But they gave it to you to serve and

Page 41

1  execute.  You're sure of that?
2    A.    Yes.
3    Q.    Okay.  We can take a break in a minute if
4  you need one to take a rest, but if you want to confer
5  with him, we won't.  So tell me if you need a break
6  for another reason.
7    A.    I need to break to calm down.
8    Q.    Okay.  Let's go for a minute, then, I'll
9  finish this line of questioning first.
10        So what did you do when you first got
11 this writ of execution?
12    A.    We processed it.
13    Q.    What does that mean?  What's the process
14 for processing?
15    A.    We entered it into our database and put
16 our cover sheet on it for the server to go out and
17 serve.
18    Q.    Okay.  And what happened after you put
19 the cover sheet on it to -- for the process server?
20    A.    I just told you.  It was given to the
21 process server to go serve.
22    Q.    Okay.  And did he serve it?
23    A.    I would imagine so, otherwise, we
24 wouldn't be here.
25    Q.    Do you know what method he used to serve

Page 42

1    it?
2        A.    I think he -- this one was a sub-serve.
3        Q.    Meaning what?
4        A.    I think it was served on her husband, or
5    on the husband.
6        Q.    It wasn't mailed to her husband?
7        A.    No.
8        Q.    And then what happened to this writ of
9    execution after it was served?
10       A.    To the best of my recollection, the
11   husband called and asked about it.  We explained how
12   it got to where it is, going over the court records
13   and stuff, and if he had any other questions to get
14   ahold of the court and get back to us and let us know
15   what's going on.  To either file a hearing or whatever
16   that he needed to do.
17       Q.    And how did that conversation come about?
18       A.    He called.
19       Q.    And you're saying the husband called
20   after you -- one of your deputies served the writ of
21   execution?
22       A.    Well, yeah, he wouldn't call before
23   because he wouldn't know.
24       Q.    What about -- what about mailing this
25   writ of execution?  Does mailing this writ of

Page 43

1    execution count as service?
2        A.    It can.
3        Q.    In what circumstances can mailing it
4    count as service?
5        A.    When they actually call us.  Sometimes
6    when we served and nobody's there, we will leave a
7    sticky saying that we have legal process for you and
8    please call our office.  And then when they call,
9    we'll talk to them, tell them what it is and say --
10   and if they're okay with us mailing it, we will mail
11   it and then they call us back when they get it and we
12   go over it with them.
13       Q.    Okay.  And -- and we've -- I want to be
14   clear we were on the same page with this.
15            So this writ of execution was served, but
16   was it ever executed?
17       A.    No.
18       Q.    Did you serve this writ of execution with
19   any other paperwork?
20       A.    I think there was a letter on the front
21   of it saying to contact our office and told them what
22   it would cost at that time.
23       Q.    Okay.  What exactly does this writ of
24   execution authorize you to do?
25       A.    You are commanded to collect the judgment

Page 44

1    with costs, interest, and fees, and to sell enough of
2    defendants non-exempt personal property, including but
3    not limited to cash, TVs, stereos, electronic
4    equipment, VCRs, office equipment, cameras, works of
5    art, collections, guns, camping equipment, furniture,
6    livestock, machinery, farm equipment, tools, and any
7    and all other to satisfy the same.
8        Q.    Okay.  That's what it says.  So tell me
9    what it -- what it authorizes.  How you -- how you --
10   without reading it again, what are you authorized to
11   do with this writ, in just a simple laymen's terms.
12       A.    We -- we can and could seize those items
13   to hold for auction or payment.
14       Q.    So you're interpreting this writ to give
15   you authorization to collect payments instead of
16   seizing the property?
17       A.    According to Rule 64(e).
18       Q.    And what does Rule 64(e) say?
19       A.    Not a verbatim quote, but pretty close
20   to -- to seize and sell all non-exempt personal
21   property or payment.
22       Q.    Okay.  So other than this writ and
23   Rule 64(e), do you have any other authority to collect
24   payments?
25       A.    No.

Page 45

1            MR. GARDNER:  Would now be a good time to
2    take a break?
3            THE WITNESS:  Yeah, because I got to go.
4        Q.    BY MR. STEPHENSON:  Why are you so upset
5    with me?
6            MR. GARDNER:  I'm going to object to
7    that, Counsel; that's not a proper question.
8        Q.    BY MR. STEPHENSON:  Why do you need a
9    break?
10       A.    Because I need to go to the restroom.
11           MR. GARDNER:  So do I.  Could we take a
12   break?
13           MR. STEPHENSON:  In a minute.  I'm still
14   on a line of questioning, and I'm almost done with it
15   and I'll -- we'll take a break in a few minutes.  I
16   want you to show me --
17           THE WITNESS:  That's what you said a few
18   minutes ago.
19       Q.    BY MR. STEPHENSON:  Well, I want you to
20   show me where exactly it says in this writ that you
21   can mail collection letters, or in Rule 64(e).
22           MR. GARDNER:  I'll object to the form of
23   the question.  Argumentative.
24           THE WITNESS:  There's other rules.
25   Rule 4, I think, rule -- I think it's Rule 4, I'm not

Page 46

1  quite sure.
2      Q.    BY MR. STEPHENSON:  Okay.  So Rule 4
3  authorizes you to send collection letters?
4      A.    I don't send collection letters.
5      Q.    Okay.  Well, so --
6      A.    I'm not a debt collector.
7      Q.    Okay.  Well, what -- you send letters to
8  client -- to debtors; correct?
9      A.    I send letters, yes.
10     Q.    Okay.  What part of this writ or Rule 64
11 allows you to send letters to debtors?
12     A.    Common sense.
13     Q.    Common sense.
14           So you can't -- what part of this writ or
15 Rule 64 authorizes you to make collection phone calls?
16           MR. GARDNER:  Object to the form.
17           THE WITNESS:  I don't make collection
18 phone calls.
19     Q.    BY MR. STEPHENSON:  Do you speak with
20 debtors over the phone?
21     A.    I speak with people who have judgments.
22     Q.    And you speak with them about the
23 judgment?
24     A.    Yes.
25     Q.    And about paying the judgment?

Page 47

1      A.    Yes.
2      Q.    And about making partial payments on the
3  judgment?
4      A.    We do not bring that up.
5      Q.    You never bring up making partial
6  payments?
7      A.    No, we don't bring that up.
8      Q.    When the debtor brings it up, then what
9  happens?  You do discuss making partial payments with
10 the debtor?
11     A.    Yes.
12     Q.    And you allow them to make partial
13 payments?
14     A.    On the judgment, yes.
15     Q.    And you discuss the various other issues
16 like fees with them when you're making those
17 arrangements?
18     A.    Yes.
19     Q.    And you decide the amount of a payment
20 that you're willing to accept from the debtor?
21     A.    We work with the debtor.
22     Q.    You want to make sure if they commit to
23 making a payment arrangement, they can keep it?
24           MR. GARDNER:  Object to the form.
25 Misstates testimony.

Page 48

1           THE WITNESS:  Yeah.
2      Q.    BY MR. STEPHENSON:  Okay.  How is that
3  different from a regular debt collector?
4      A.    Because we're not collecting a debt.
5  We're collecting a judgment.
6      Q.    Any other reason why what you do is
7  different from a debt collector?
8           MR. GARDNER:  Object to the form.  Calls
9  for a legal conclusion.
10          THE WITNESS:  We're enforcing a court
11 order.
12          MR. GARDNER:  Counsel, I'm going to ask
13 you again if you will let us have a break.
14          THE WITNESS:  I got to go.
15          MR. STEPHENSON:  I have a couple more
16 questions.
17          THE WITNESS:  Eric, I have to go.
18          MR. GARDNER:  Yeah, can you give him the
19 opportunity to use the restroom, Counsel.
20          MR. STEPHENSON:  Let's put purple in
21 there again.  Yeah, let's take a break.
22          MR. GARDNER:  Let's put purple there,
23 thanks.  Off the record.
24          (There was a break taken.)
25          MR. STEPHENSON:  Let's go back on the

Page 49

1  record.
2          MR. GARDNER:  Okay.
3      Q.    BY MR. STEPHENSON:  Before we took a
4  break, we were talking about what Constable Kolkman
5  LLC does with these writs and how that's different
6  from a typical debt collector.
7          Other than the fact that Constable
8  Kolkman LLC is collecting a judgment, is there any
9  other reason that you're saying that what you do is
10 different than a typical debt collector?
11          MR. GARDNER:  And I'll just object to the
12 form to the extent it calls for a legal conclusion.
13          THE WITNESS:  I don't know what a debt
14 collector does, so...
15     Q.    BY MR. STEPHENSON:  So you can identify
16 no other reasons why you would consider it -- yourself
17 to be different than a regular debt collector?
18     A.    Since I don't know exactly what a debt
19 collector has to do, I don't, no.
20     Q.    Have you ever had a debt collector send
21 you a letter?
22     A.    Once.
23     Q.    Okay.  Are you aware that debt collectors
24 make phone calls with debtors?
25     A.    I would imagine so.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                    Pages 50..53

Page 50

1      Q.     And debt collectors, are you aware that
2  they sometimes collect money from debtors?
3      A.     I'm thinking that probably they do since
4  that's what they do.
5      Q.     And are you aware that debt collectors
6  sometimes discuss payment options with debtors?
7      A.     I would imagine so.
8      Q.     Okay.  And Constable Kolkman LLC does all
9  of those things that we just discussed.  Constable
10 Kolkman LLC mails letters, makes phone calls, collects
11 money from debtors, and discusses payment arrangements
12 with debtors; correct?
13     A.     Yeah.
14     Q.     So other than that, is there anything
15 that you can tell me that's different of what
16 Constable Kolkman does compared to a regular debt
17 collector?
18     A.     We're working off a court-ordered writ of
19 execution.
20     Q.     Okay.  And does that exhaust our list,
21 then, of any -- of your -- of the way you would
22 differentiate your firm from a debt collector?
23     A.     Yeah.
24     Q.     Okay.  Do you have any written agreements
25 with Olson and Shaner?

Page 51

1      A.     Not that I'm aware of.
2      Q.     When they give you writs of execution,
3  they don't assign them to you with a written
4  assignment?
5      A.     No.
6      Q.     They just deliver a batch of writs of
7  execution to your office?
8      A.     Yeah.
9      Q.     And does your office -- how does that --
10 how are these writs of execution delivered to your
11 office?
12     A.     We pick them up.
13     Q.     And how often do you pick them up?
14     A.     Maybe once a week.
15     Q.     And how many do you pick up each week?
16     A.     Varies.
17     Q.     And what does it vary between?
18     A.     None and 50.
19     Q.     Has Olson and Shaner ever expressed any
20 disagreement with your efforts to collect judgments
21 for them?
22     A.     No.
23     Q.     Have they ever -- oh, sorry, did I
24 hear --
25     A.     No, I...

Page 52

1      Q.     Oh, I'm sorry.
2             Has Olson and Shaner ever expressed any
3  disagreement or concerns about the way you mail
4  letters to the people that you're collecting from?
5      A.     No.
6      Q.     Has Olson and Shaner ever expressed any
7  concerns or disagreements with the way you collect
8  payments from debtors?
9      A.     Did you just ask that?  It's still no,
10 but...
11     Q.     Okay.  Maybe I did.
12            Has Olson and Shaner ever expressed
13 disagreement or concern about the way you talk to
14 debtors over the phone?
15     A.     No.
16     Q.     Has Olson and Shaner ever expressed
17 concerns or disagreements with the way you arrange for
18 payments?
19     A.     No.
20     Q.     Is there any point in the process where
21 you need to get Olson and Shaner's approval to do
22 something?
23     A.     Yes.
24     Q.     And what are those circumstances?
25     A.     If a debtor or a defendant calls us and

Page 53

1  wants to make a lump sum payment but it's not quite
2  what the judgment is, we will contact the defendant
3  and see if they want to accept that.
4      Q.     You mean -- sorry, I did not mean to
5  interrupt you.
6             Do you mean the plaintiff?
7      A.     We will call the plaintiff to see if
8  they'll accept the defendant's offer.
9      Q.     Okay.  So your office doesn't decide, if
10 there's a lump sum payment, how much to accept?
11            Maybe that was confusing.
12     A.     Yeah.
13     Q.     So let's say a debtor makes an offer to
14 pay 50 percent of the total amount.  Does your office
15 have discretion to accept that without --
16     A.     No.
17     Q.     -- calling Olson and Shaner?
18     A.     No.
19     Q.     Okay.  Does your office have any leeway
20 in that?  If they offer 90 percent is your office
21 allowed to say we can take 90?
22     A.     No.
23     Q.     No?
24            I'm sorry, we went over each other.
25            MR. GARDNER:  Yeah, wait.

Page 54

1          THE WITNESS:  You should let me answer
2  before you start talking again.
3          MR. STEPHENSON:  Wow.
4          MR. GARDNER:  Let him get the question
5  out and then answer.
6          THE WITNESS:  Sorry.
7          MR. GARDNER:  Let him get the whole
8  question out.  Sometimes you even know what the
9  question is, but let him finish the question.
10         THE WITNESS:  My apology.
11         MR. GARDNER:  And don't talk over each
12  other, okay, or else that will aggravate our wonderful
13  court reporter here, okay.
14         THE WITNESS:  Then she'll smack me.
15    Q.    BY MR. STEPHENSON:  So what I'm just
16  trying to -- and I'm not trying to be confrontational,
17  really.  I know you're upset with me and the twitch
18  and the jump just now was weird, but I'm not trying to
19  be confrontational.
20         I really just want to know what's
21  happening here.  I'm trying to avoid arguments.  I'm
22  trying to avoid objections.  I'm trying to avoid you
23  walking out.  I'm just trying to figure this out.
24  Please bear with me on that, okay.  I'm not trying to
25  cause any problems.

Page 55

1          All I want to know is, is Olson and
2  Shaner gives you something to collect, and is there a
3  point where you -- your office decides -- and there's
4  a lump sum -- is there any amount that your office is
5  authorized to take without calling Olson and Shaner?
6    A.    The full judgment.
7    Q.    Okay.  So if they offer 92 percent,
8  95 percent, you've got to call Olson and Shaner and
9  get approval?
10   A.    Correct.
11   Q.    Okay.  Does Olson and Shaner have any
12  control over any of the other decisions that are --
13  that happen when you're collecting these judgments?
14   A.    Clarify.
15   Q.    Well, Olson and Shaner decides if you're
16  allowed to take less than the full settlement -- the
17  full amount, but do they have any other oversight with
18  what you're doing?
19   A.    What you're saying, no.
20   Q.    Okay.  And what about what I'm not
21  saying?  Where would the yes be?
22   A.    There would not be -- we -- we handle the
23  writ.  We do what we see is fit by statute.  If
24  there's any alteration on that, like if they want to
25  make a lump sum payment and it's less, or whatever, we

Page 56

1  contact the attorney.  The -- or Olson and Shaner, I
2  guess, yeah.  They do not tell us exactly what to do.
3    Q.    So Olson and Shaner -- no, no, let me
4  start over.
5          Constable Kolkman LLC, you guys set the
6  date and time of the sale?
7    A.    Yes.
8    Q.    And you decide whether or not to cancel
9  or postpone the sale?
10   A.    Yes.
11   Q.    And you decide whether to seize property
12  and conduct the sale?
13   A.    Yes.
14   Q.    Olson and Shaner doesn't decide any of
15  those decisions?
16   A.    No.
17   Q.    How many writs of execution has Olson and
18  Shaner given you in the last two years?
19   A.    Many.
20   Q.    More than a thousand?
21   A.    Probably.
22   Q.    How many writs of execution did the
23  Cherrington firm give you in the last two years?
24   A.    I don't know.
25   Q.    More than a thousand?

Page 57

1    A.    I don't think so.
2    Q.    More than -- well, how about -- I'm
3  sorry, what was that?
4    A.    I have no idea.
5    Q.    Okay.  In one of the other cases they
6  said it was around 600.  Does that sound about right?
7    A.    Probably.
8    Q.    Okay.  Mountain Land Collections, in the
9  last two years, they said they gave you more than
10  1,300.  Does that sound right?
11   A.    Probably.
12   Q.    Okay.  And Olson and Shaner is your
13  biggest client; correct?
14   A.    Probably.
15   Q.    Okay.  Who else would be list -- added to
16  the list of your clients?  I've got the Cherrington
17  Firm, Mountain Land Collections, and Olson and Shaner.
18  Who else do you execute writs of execution for?
19   A.    I can't think of any right off.
20   Q.    When I say Olson and Shaner's probably
21  your biggest client as far -- I'm talking about as far
22  as volume of writs they send to you.
23         When you say "probably," how -- how sure
24  are you?
25   A.    They are.

Page 58

1    Q.    Yeah, okay.
2          Do you think that Olson and Shaner maybe
3    has given you more than 5,000 writs of execution in
4    the last two years?
5    A.    I have no idea.  I do not know.
6    Q.    Okay.  And how many -- out of the writs
7    -- out of the thousands of writs of execution Olson
8    and Shaner has given you in the last two years, how
9    many did you execute?
10   A.    I don't have that information available
11   to me right now.
12   Q.    And how many did you serve in person?
13   A.    How many did I serve in person?
14   Q.    Well, the company, Constable Kolkman LLC.
15   A.    I don't have that information available
16   right now.
17   Q.    Okay.  Is it normal to -- when they give
18   you a writ of execution normally you would serve it,
19   at least; right?
20   A.    Pardon?
21   Q.    Normally when you get a writ of
22   execution, you do serve it; correct?
23   A.    Yes.
24   Q.    So if they gave you thousands, you
25   probably served thousands?

Page 59

1    A.    You don't get them all served.
2    Q.    Sure.  But you do serve a substantial --
3    you serve a majority of them?
4    A.    Yeah.
5    Q.    Okay.  Probably what percentage?
6    80 percent be served?
7    A.    I'd say it's roughly probably closer to
8    60.
9    Q.    Okay.  And the other 60 never get served
10   at all?
11         MR. GARDNER:  40 you mean?
12         THE WITNESS:  You mean 40.
13         BY MR. STEPHENSON:  Excuse me, thank you.
14   40.
15   A.    That would be probably correct.
16   Q.    And the reason -- what is the reason
17   those -- that 40 percent isn't ever served?
18   A.    Either move, unable to get somebody to
19   answer the door, whatever.  We're just unable to make
20   contact with the people to serve them.
21   Q.    And out of those thousands of writs of
22   execution Olson and Shaner sent you, how many of those
23   cases did you seize a collect -- a debtor's property?
24   A.    Probably none.
25   Q.    And how many public sales have you had

Page 60

1    for those thousands of writs?
2    A.    Well, since I didn't seize anything, I
3    probably didn't sell anything, did I.
4    Q.    Okay.  And so your answer is none?
5    A.    No.
6    Q.    And how many of those did you collect
7    payments on?
8    A.    Probably 70, 80 percent of those.
9    Q.    And do you know how many letters you sent
10   based on the thousands of writs of execution you
11   received from these law firms?
12   A.    How many letters I've sent?  I have no
13   idea.
14   Q.    Do you know how many notices of sale you
15   mailed to these debtors, to the thousands of debtors
16   that these law firms gave you writs of execution for?
17   A.    I don't know the exact number.
18   Q.    Do you know what percentage of cases
19   where you get a writ of execution, what percentage of
20   those are -- do you send a notice of sale on?
21   A.    If I'm understanding the question right,
22   it would be only the ones that were served.
23   Q.    They have to be served first, then you
24   send a notice of sale?
25   A.    Yes.  We went over that a little bit

Page 61

1    earlier.
2    Q.    And what -- so the -- okay.
3          So if you get -- so out of the thousands
4    of writs of execution you get, 60 percent of those are
5    served.  And out of that 60 percent that are served,
6    how many also get a notice of sale?
7    A.    Probably 60 percent.  That -- all of
8    them.
9    Q.    Okay.  100 percent of the ones that are
10   served?
11   A.    That would be reasonable.
12   Q.    Well, I want to make sure I'm getting the
13   right answer.  I think that was nonresponsive, but I'm
14   not arguing with you, I just want to be sure that
15   we're clear.
16         It's your testimony that 100 percent of
17   the people who are served also get a notice of sale?
18   A.    To be safe, 90 percent.
19   Q.    Okay.  At least 90 percent?
20   A.    Yes.
21   Q.    Okay.
22   (Exhibit 2 was marked for identification.)
23         MR. STEPHENSON:  This is Exhibit 2.
24   Q.    Do you recognize Exhibit 2?
25   A.    I believe this is a letter we sent them.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 62..65

Page 62

1    Q.    A letter you sent to Elizabeth Hernandez?
2    A.    Yes.
3    Q.    And the date is August 16, 2023; correct?
4    A.    Yeah.
5    Q.    It lists the balance due on the judgment
6    as $6,148.81?
7    A.    Uh-huh.
8    Q.    And costs of the writ of execution of
9    $259.23?
10   A.    Yeah.
11   Q.    A total balance of $6,408.04?
12   A.    Yes.
13   Q.    Okay.  And you -- so is the date correct?
14   That's the date you mailed this to the client -- or to
15   the debtor?
16   A.    Yes.
17   Q.    And you're saying this letter is part of
18   your duties of executing the writ of execution for
19   Olson and Shaner?
20   A.    Yes.
21   Q.    Your name is typed at the bottom.  That
22   counts as your signature?
23   A.    Yes.
24   Q.    Who wrote this letter?
25   A.    Our office.

Page 63

1    Q.    And this is from a template that you use
2    in other cases, too?
3    A.    Yes.
4    Q.    And this is -- you just plug in the
5    judgment amount, the cost of execution, and the
6    balance amount, and the client's -- or excuse me --
7    the debtor's name and address?
8    A.    Yes.
9    Q.    And you knew what this letter said before
10   you mailed it?
11   A.    Yes.
12   Q.    So why did you mail this letter to
13   Elizabeth Hernandez?
14   A.    To let them know what the costs were, if
15   they wanted to pay it off, is what it says.
16   Q.    So you were trying to tell them -- tell
17   my client you owe a judgment amount, and here's the
18   amount.  If you want to pay it off, contact us?
19   A.    Yeah.
20   Q.    Okay.  So other than that, were you
21   trying to convey any other message to my client?
22   A.    No.
23   Q.    And is it fair to say that this letter
24   has been mailed to other debtors several thousand
25   times, at least?

Page 64

1    A.    Yes.
2    Q.    What criteria do you consider before
3    sending this letter?
4    A.    That they were served the writ.
5    Q.    And this letter automatically goes out
6    after they're served?
7    A.    Yes.
8    Q.    How did you determine the balance my
9    client owed was $6,408.04?
10   A.    Well, the judgment is the judgment, and
11   then the cost for service, mileage is in there.
12   That's our cost of doing the writ, makes a total.
13   Q.    The $259.23 were your costs?
14   A.    Yeah.
15   Q.    Okay.  At the bottom you say failure --
16   let's see.  When -- you tell the client -- the debtor,
17   when calling, prepare the -- prepare -- excuse me.
18   Let me start that over.
19        At the very bottom paragraph you tell the
20   debtor to call and make appropriate payment
21   arrangements; correct?
22   A.    I -- what was your question again?
23   Q.    The final paragraph is your notification
24   to the client -- or the debtor to call you --
25   A.    Yeah.

Page 65

1    Q.    -- and make payment arrangements?
2         MR. GARDNER:  Object to the form.  I
3    think the letter speaks for itself.
4    Q.    BY MR. STEPHENSON:  In the last paragraph
5    you're telling the debtor to call you between 8:00 and
6    5:30; correct?
7    A.    Okay.
8    Q.    And you're telling the debtor to make the
9    appropriate arrangements; correct?
10   A.    Yes.
11   Q.    And you're telling the debtor that
12   failure to do so could result in additional court
13   costs added to your judgment?
14   A.    Yes.
15   Q.    What does that mean?  Failure to call and
16   make payment arrangements would result in additional
17   court costs?
18   A.    Where does it say "payment arrangements"?
19   Q.    It says in the final paragraph, "to make
20   appropriate arrangements."  Doesn't that mean payment?
21        MR. GARDNER:  Object to the form.
22        THE WITNESS:  No.
23   Q.    BY MR. STEPHENSON:  What does
24   "appropriate arrangements" mean?
25   A.    It means appropriate arrangements.

**Page 66**

1  "Payment must be made by credit card, cash, or
2  certified funds.  Please call our office."
3       Q.     Okay.  And you're saying that's not a
4  call to pay?
5       A.     It's a call to pay the judgment.
6       Q.     Okay.  And if they don't, you're going to
7  add additional court costs?
8       A.     Could.
9       Q.     Could.
10             What does that mean?  What additional
11 court costs could be added?
12      A.     The sale, posting of the sale, all that.
13      Q.     Any other additional court costs that
14 could be added?
15      A.     Pardon?
16      Q.     Well, you said that the -- you could add
17 a sale costs and posting of the sale costs.  Are there
18 any other court costs that could be added if they fail to
19 make "appropriate arrangements"?
20      A.     Right off the top of my head, probably
21 not.
22      Q.     Okay.  And in what percentage of cases do
23 you add the sale costs and the posting of sale costs
24 when they don't make appropriate arrangements?
25      A.     I'm not sure I follow what you're asking

**Page 67**

1  here.
2       Q.     Well, you're saying to the debtor they
3  need to make appropriate arrangements, or we could add
4  additional court costs.  I want to know what
5  percentage that could turns into a did.
6       A.     Not very often.
7       Q.     Ever?
8       A.     Oh, maybe 10 percent of the time.
9       Q.     10 percent of the time when the debtor
10 fails to call and make appropriate arrangements, you
11 add additional court costs for the sale and the
12 posting of the sale?
13      A.     Correct.
14      Q.     And this letter, was this your first
15 contact with my client?
16      A.     Pardon?
17      Q.     Was this letter your first contact with
18 my client?
19      A.     I don't know.
20      Q.     This is normally the first letter you
21 would send though?
22      A.     Yeah.
23      (Exhibit 3 was marked for identification.)
24      Q.     BY MR. STEPHENSON:  Do you recognize
25 Exhibit 3?

**Page 68**

1       A.     Okay.
2       Q.     Do you recognize Exhibit 3?
3       A.     Vaguely, yes.
4       Q.     And what is Exhibit 3?
5       A.     Huh?
6       Q.     What is Exhibit 3?
7       A.     I believe that sometimes it's sent out as
8  a letter before it's served.
9       Q.     Okay.
10      A.     Preserve letter, how's that.
11      Q.     Preserve letter?
12      A.     I'm -- to the best of my recollection.  I
13 don't deal with sending these out a lot.  The office
14 does.
15      Q.     Well, this is -- this is important,
16 though, so I'm glad you brought that up.
17             We look at Exhibit 2.  Is Exhibit 2 what
18 you would call a preserve letter?
19      A.     No, that's after service.
20      Q.     Okay.  And Exhibit 3 has the same date on
21 it as the Exhibit 2; correct?
22      A.     It does.
23      Q.     And you're saying that Exhibit 3 is a
24 letter you send before you serve?
25      A.     You got me on that.  I'm not sure which

**Page 69**

1  one goes first.
2       Q.     All right.  I'm trying to figure out how
3  to ask this question without making you angry, but let
4  me -- let me --
5       A.     Don't worry about it.
6       Q.     Let me tell you what I think is happening
7  here and maybe --
8       A.     What's that?
9       Q.     And you tell me if I'm right or wrong.
10 This is just the easiest way to do this.
11             I think Exhibit 3 is what you send -- I
12 think they're the same letter, but you changed the
13 letter so that now you send Exhibit 3 to people, when
14 before you sent Exhibit 2.  Is that wrong?  Am I right
15 or wrong on that?
16      A.     No.  I don't know why it's got the date.
17 I -- I have no way of telling you which happened first
18 or what.
19      Q.     Is there a point in your process where
20 you went through your collection letters and changed
21 the language in them?
22      A.     There has been, yes.
23      Q.     Okay.  I think this is one of those
24 letters.  Am I wrong or you don't know?
25      A.     I don't know.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 70..73

Page 70

```
 1        Q.     Okay.  That's fair.  That's fair.  Just
 2   so we're on the same page.  Because the one you've
 3   provided me in Exhibit 3 comes from your side of this
 4   case, and it has some substantial changes from
 5   Exhibit 2, but they do appear to be the same letter;
 6   is that correct?
 7        A.     I don't know.  It -- it appears they may
 8   be something.
 9        Q.     The two letters ultimately convey the
10   same message to the debtor; correct?
11        A.     Pretty much, yes.
12        Q.     The message is, call us, here's how much
13   you owe, we can help you pay it -- or not help you pay
14   it.  We can take payment for you; is that right?
15        A.     Yeah, we can take a payment, yeah.
16        Q.     Okay.  And do either of these letters
17   provide any notice to the debtor that you're a debt
18   collector?
19        A.     No, because I'm not a debt collector.
20        Q.     Okay.  And do either of these letters
21   notify the client that they have 30 days to verify the
22   debt?
23        A.     No, they don't say 30 days.
24        Q.     And the first one, Exhibit 2, says they
25   have ten days?
```

Page 71

```
 1        A.     Which is the legal -- if you object to a
 2   execution, usually don't set a date for sale until at
 3   least ten working days after service, so that if
 4   there's a problem with it, they can file an objection
 5   with the court.  So there's ten days that they just --
 6   it's in limbo.
 7        Q.     The objection period starts when the writ
 8   is served?
 9        A.     Yes.
10        Q.     Not when the property is seized?
11        A.     It can be both.
12        Q.     Because you can serve and seize at the
13   same time?
14        A.     Yes.
15        Q.     But because you never seize the property,
16   it's -- in this -- for these purposes, it's always --
17   that period is always triggered when you serve?
18        A.     Yeah.
19        Q.     And you think it's ten days, not
20   fourteen?
21        A.     Ten working days, which is fourteen days.
22        Q.     But the letter says ten days
23   specifically; correct?
24        A.     It does say ten days.
25        (Exhibit 4 was marked for identification.)
```

Page 72

```
 1             MR. GARDNER:  Counsel, if I could just --
 2   so Exhibit 2 doesn't have any Bates number on it.
 3             MR. STEPHENSON:  No.
 4             MR. GARDNER:  And 4 does not.
 5             MR. STEPHENSON:  That's correct.
 6             MR. GARDNER:  Are those documents that
 7   you produced?
 8             MR. STEPHENSON:  Yes.
 9             MR. GARDNER:  With your disclosures or in
10   discovery?
11             MR. STEPHENSON:  Both, probably.
12             MR. GARDNER:  Okay.
13             MR. STEPHENSON:  I usually do them both.
14   I usually double produce.  Whatever I produce in my
15   initial disclosures, I usually produce it again.
16             MR. GARDNER:  But there's no
17   identifying --
18             MR. STEPHENSON:  No, I don't Bates stamp.
19   I used -- I don't do that anymore.  I used to, but
20   it -- I don't -- I don't waste my time with it.  So,
21   no, this is not Bates-stamped.  And that's why this
22   one -- why Exhibit 3 is different, because that was
23   your production.
24             MR. GARDNER:  Yeah, I gathered that.  I
25   just didn't know and I just wanted to confirm that
```

Page 73

```
 1   those were produced in discovery.  Thanks.
 2             MR. STEPHENSON:  Well, let's go back to
 3   that, then, and look at Exhibit 2 and 3 real quick.
 4        Q.     Do you know which one was mailed to my
 5   client?
 6        A.     Pardon?
 7             MR. GARDNER:  He's asking about 2 and 3.
 8        Q.     BY MR. STEPHENSON:  Exhibits 2 and 3, do
 9   you know which one was mailed to my client?
10        A.     I do not know which one.  Could have been
11   both, could have been one, I don't know.
12        Q.     Okay.  Let's move on to Exhibit 4, then.
13   Do you recognize Exhibit 4?
14        A.     Yes.
15        Q.     And what is Exhibit 4?
16        A.     It is the writ, and it looks like it was
17   the one that was served on the husband.
18        Q.     And the date of service was 8-21-2023?
19        A.     Yep.
20        Q.     And that would be after Exhibit 2 was
21   mailed?
22        A.     Correct.
23        Q.     So now does that refresh your memory
24   about whether Exhibit 2 is a pre-service letter?
25        A.     It would appear that way.
```

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 74..77

Page 74

1    Q.    Okay.  And this letter, is this -- what
2  do you call this in your system?  Because I know a
3  pre-service letter is a notation you put in your
4  system.  Is this letter noted in your system as --
5  what is it called in your system?
6    A.    This one?
7    Q.    Yes, Exhibit 4.
8    A.    This is attached to the writ that was
9  served.
10   Q.    Okay.  And what do you call this letter?
11   A.    I don't know what they call it.
12   Q.    But you know they sent it?
13   A.    Yes, it is attached to the front.
14   Q.    And it's normally -- you send this to all
15  of your collection -- all of your debtors that you're
16  trying to collect from?
17   A.    Yeah.  During this time, yeah.
18   Q.    And then did you write this letter or is
19  this another template from Michael Erickson?
20   A.    It probably -- it's another template.
21   Q.    And why has it got a court caption at the
22  top?
23   A.    Don't know.  Because it's easier to
24  figure out what it is because it's got the case
25  number, it's got the plaintiff and defendant.  I think

Page 75

1  that was the theory behind it.
2    Q.    This isn't a court filing?
3    A.    No.
4    Q.    Do you ever file anything with the court?
5    A.    Proof of service.
6    Q.    Anything other than proof of service?
7    A.    No.
8    Q.    Okay.  Let's go through this -- the
9  calculations here.  This has the original balance of
10  $6,148.81; correct?
11   A.    Yeah.
12   Q.    The total due of $6,408.04; is that
13  right?
14   A.    Yeah.
15   Q.    Okay.  So you added a $50 fee for
16  service?
17   A.    Correct.
18   Q.    And that fee was earned when?
19   A.    It was served.
20   Q.    Which was the 21st of August 2023?
21   A.    Appears that way.
22   Q.    And the mileage to serve it was $26?
23   A.    Yes.
24   Q.    And that was earned the same day as
25  service took place?

Page 76

1    A.    Yes.
2    Q.    The commission was $97.23.  What's
3  commission?
4    A.    That's 1 percent of the first thousand --
5  2 percent of the first thousand, and 1 1/2 percent of
6  additional.
7    Q.    So $97.23 is the maximum amount you could
8  get as a commission for collecting this judgment?
9    A.    Correct.
10   Q.    And if you collect a smaller amount, you
11  wouldn't get $97.23 in commission?
12   A.    Probably not.
13   Q.    Okay.  Why would you ever get 97- -- the
14  full commission if you collected only part of the
15  debt?
16   A.    That gets adjusted as it goes.
17   Q.    Okay.  So is your --
18   A.    This is -- this is what it could be.
19   Q.    This is what it could be?
20   A.    Yes.
21   Q.    Not what it is yet?
22   A.    I guess you could say that.
23   Q.    Okay.  So as of -- where's the date of
24  this letter?  August 21, 2023, you did not have -- you
25  did not have $97.23 in commission earned?

Page 77

1    A.    No.
2    Q.    And what about the $60 for notices?  How
3  was that incurred?
4    A.    That would be notices for posting the
5  sale.
6    Q.    Okay.  So as of August 21, 2023, you
7  never -- you hadn't incurred that fee either?
8    A.    Pretty close.
9    Q.    Did you post the sale then?
10   A.    Huh?
11   Q.    You posted the sale?
12   A.    We would be doing it pretty quick.
13   Q.    But you hadn't done it yet?
14   A.    We hadn't done it yet.  And if they were
15  to call and talk to us about it, and if they were to
16  make a payment, we would adjust that and probably take
17  it out.
18   Q.    Probably take it out, but not always?
19   A.    No, we would take it out.
20   Q.    Okay.  But it's not earned yet as of the
21  date of this letter?
22   A.    No.
23   Q.    The mileage to post, what is that?
24   A.    The mileage to post the notices.
25   Q.    Okay.  And so that was --

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 78..81

Page 78

```
 1        A.      Which is a really discounted price at
 2   that.  That's just posting the court.  Now if you had
 3   to charge the cost for posting it in all the other
 4   outlying areas, that would increase the cost, but we
 5   didn't charge that.
 6        Q.      You only charged 26?
 7        A.      At this time, yeah.
 8        Q.      But you hadn't earned or incurred that
 9   yet?
10        A.      No.  Which can be deducted if judgment
11   is -- or if they decide to pay the judgment in full.
12        Q.      But Exhibit 2 and Exhibit 3 are two
13   letters that say the judgment -- excuse me -- the
14   balance due is $6,408.04; correct?
15        A.      Correct.
16        Q.      And do either of these letters say that
17   we can adjust that amount?
18        A.      They do not.
19        Q.      Do either of these letters say we haven't
20   actually earned all of that amount yet?
21        A.      Guess not.
22        Q.      Both of these letters say to the debtor
23   who's seeing it, this is the balance due and it
24   includes $259.23 that we've already added to the debt?
25        A.      Right.
```

Page 79

```
 1        Q.      And you send this same letter with the
 2   same kinds of costs to thousands of other debtors?
 3        A.      Yeah.
 4        (Exhibit 5 was marked for identification.)
 5        Q.      BY MR. STEPHENSON:  This is Exhibit 5.
 6   Do you recognize Exhibit 5?
 7        A.      Yeah.
 8        Q.      What is Exhibit 5?
 9        A.      It's a Notice of Sale, personal property.
10        Q.      And this was a notice of sale you mailed
11   to my client on -- well, you mailed this to my client?
12        A.      Yeah.
13        Q.      Oh, the date.  We find the date where
14   that you mailed it?
15        A.      I don't know.
16        Q.      Well, if I said it was sent to you -- or
17   you mailed it on August 21, 2023, would that sound
18   about right given the time of the sale?
19        A.      It probably got mailed after that date.
20        Q.      And Exhibit 5 would have been mailed
21   after Exhibit 4?
22        A.      Yes.
23        Q.      Okay.  And Exhibit 5 was mailed prior to
24   seizing any of plaintiff's property?
25        A.      Pardon?
```

Page 80

```
 1        Q.      This Exhibit 5, you mailed this to my
 2   client before you seized any of her property?
 3        A.      Yeah.
 4        Q.      And you mailed this as part of what you
 5   do in your normal practice?
 6        A.      Yes.
 7        Q.      And so this notice of sale is a template
 8   also?
 9        A.      Yes.
10        Q.      And Erickson created this template and
11   gave it over to you?
12        A.      Yeah.
13        Q.      And you've used this notice of sale
14   template in thousands of other cases?
15        A.      Yes.
16        Q.      Okay.  So what message were you trying to
17   convey -- and look at both pages -- what message were
18   you trying to convey with this letter and notice?
19        A.      I think it's kind of self-explanatory.
20        Q.      Okay.  You want me to be the one to
21   explain it or do you want to give me your -- what's
22   your knowledge?  What's your reason?
23        A.      We're going to schedule a sale on this
24   date and at this time.
25        Q.      Okay.  You're telling her -- my client
```

Page 81

```
 1   that we have scheduled a sale?
 2        A.      Yes.
 3        Q.      Yes?
 4        A.      Yes.
 5        Q.      And the sale is going to take place
 6   October 6, 2023, at 1550?
 7        A.      Correct.
 8        Q.      And that's what, 3:30 -- or 3:50 p.m.?
 9        A.      Yeah.
10        Q.      And you list the property that you're
11   going to sell at the sale?
12        A.      Yeah.
13        Q.      And you tell the -- and it says that
14   payment may be made by card, cash or certified funds?
15   Looking at the --
16        A.      Yeah, yeah.
17        Q.      Okay.  And then it says in bold
18   letters -- bold, large letters "Contact this office
19   immediately to make a payment or arrangements to
20   cancel the sale"?
21        A.      Yes.
22        Q.      Okay.  But that's not true, is it?
23        A.      What?
24        Q.      My client doesn't need to contact the
25   office immediately to make a payment or arrangements
```

Page 82

```
 1   to cancel the sale.
 2               Do you agree that's a false statement?
 3       A.   No.
 4       Q.   If my client doesn't contact this office
 5   immediately or make a payment or arrangements to
 6   cancel the sale, this sale will proceed?
 7       A.     Unless we find a reason to cancel it, and
 8   we can cancel it for any reason we deem.
 9       Q.   And what reason did you cancel this sale?
10       A.   On this one?
11       Q.   Yeah.
12       A.   Because the husband came into our office
13   and brought us new information that the Elizabeth
14   Hernandez was the wrong Elizabeth Hernandez.  And at
15   that point we verified the information he gave us and
16   we recalled the order, and nothing else was ever done
17   on it.  And then two days later you filed your suit.
18       Q.   So if the husband had -- if you had not
19   received contact, it's your testimony that you would
20   have conducted this sale?
21       A.   We would have continued with it.
22       Q.   Okay.  So you're telling me you would
23   have conducted a sale on October 6, 2023, at 1550?
24       A.     We would have gone by there and probably
25   canceled it, because we don't know the exact property.
```

Page 83

```
 1   And if he didn't contact us, we don't know exactly
 2   what we're going to be selling, who owns what.  And we
 3   would probably cancel the sale at that time and do
 4   some research to find assets.
 5               But prior to all of that and prior to the
 6   sale even being scheduled, I think it was a week or so
 7   prior to the sale being scheduled, Mr. Hernandez got
 8   us information that it was the wrong one.  It was the
 9   wrong Elizabeth Hernandez.  And as he sat in the
10   office, we canceled the sale.
11       Q.   And when you --
12       A.   And recalled the order and did nothing
13   else, other than contact the attorney to say it's the
14   wrong person, we've recalled the order.
15       Q.   You contacted the attorney the same day
16   the husband came in?
17       A.   No, probably the next day, because it was
18   late in the evening or late in the afternoon.
19       Q.   Did the husband talk to you?
20       A.   Not to me.
21       Q.   Who did he talk to?
22       A.   Corey.
23       Q.   Is it fair to say that Corey's handling
24   most of the office duties?
25       A.   Yeah.
```

Page 84

```
 1       Q.     His name pops up more than any others in
 2   my dealings, so I assume that.  It's good to have
 3   confirmation of that.
 4               So it's your testimony that if -- if --
 5   that when a debtor doesn't respond to this notice of
 6   sale, they just do nothing at all.  Your deputies, or
 7   you, always drive to the house on the day and time the
 8   sale is scheduled for?
 9       A.   We give it a gallant effort.
10       Q.   Okay.  What is -- what does "a gallant
11   effort" mean?  Can you quantify that for me?
12       A.     We try to do as many as we can.
13   Sometimes, you know, if you get stuck on one, you're
14   going to be late or miss one.  It depends how...
15       Q.   On your deputies, are they paid for that?
16       A.   No, they don't pay me.
17       Q.   So your deputies drive -- they look at
18   the notes -- the dates -- okay, let's backtrack on
19   this, because I need to be...
20       A.   Hold that thought.
21       Q.   You need a break.
22       A.   Yeah.  Sorry, I'm old.
23       Q.   I get it, man, I get it.  Let's take a
24   break.
25             (There was a break taken.)
```

Page 85

```
 1             MR. STEPHENSON:  Let's go back on the
 2   record.  Let me try to reset where we were.
 3       Q.   Okay.  I'm trying to remember where I
 4   actually was, because I was sort of in the middle.
 5   But other than telling my client we have
 6   a sale scheduled for this day and time, is there any
 7   other message you're trying to convey?
 8             I guess you are conveying that they can
 9   make a payment to cancel the sale.  That's pretty
10   obvious; right?
11       A.   Yeah.
12       Q.   And is there a reason the letter on the
13   back, the take notice of the attached sale letter, is
14   there a reason that has a court caption on it?
15       A.   No.
16       Q.   This is just another form you received
17   from Erickson?
18       A.   Yeah, it wasn't meant to be -- represent
19   a court form, it just had all the information.
20       Q.   And I want to be kind of on the same page
21   with this.  It's my understanding that -- I think
22   you've testified to this -- that you never hold the
23   sales, but you do send these notices of sale; is that
24   fair to say?
25       A.   Yeah.
```

Page 86

1    Q.    And so when you say that this office --
2    that my client "Contact this office immediately to
3    make a payment or arrangements to cancel the sale,"
4    that isn't true because it's not necessary for her to
5    make arrangements to cancel the sale, or contact you.
6    The sale is not going to take place?
7    A.    Yeah.
8    Q.    When you mailed this letter, you had no
9    intention of actually selling the property?
10    A.    We didn't know what property we were
11    going to sell.
12    Q.    Okay.  So you didn't intend to actually
13    seize or sell the property?
14    A.    We didn't know what there was to seize or
15    sell, so...
16    Q.    Okay.  So is it your testimony that when
17    you mailed this letter, your intention was to follow
18    through with the sale if my client didn't contact you
19    or pay?
20    A.    We --
21    Q.    Even though -- let me -- I'm going to add
22    to that -- even though you never follow through with
23    these sales?
24    A.    We need to know what the assets are.  So,
25    yes, the sale would probably be -- get canceled

Page 87

1    because we would have to go and research to see what
2    assets were available, and if they were sufficient
3    enough to make it worth doing.
4         Because then you come into the factor of
5    you can sell a big screen TV for 50 bucks, and it's
6    going to cost you $200 to get it picked up and put in
7    storage.  Does that make sense?
8         It didn't seem to make sense to me for
9    the defendant or the plaintiff.  So that would create
10    the reason for canceling a sale if they -- you know,
11    if we go back there and we see -- do search and find
12    that there's vehicles or something, we'll research to
13    see if there's a lien on it.
14    Q.    But this letter always goes out with the
15    notice of sale.  Always -- all -- they all go out,
16    they always mail them before you find out what
17    property you can actually take?
18    A.    Yeah.
19    Q.    And so when I look at this, it says
20    "Payment may be made by card, cash, or certified
21    funds," it says that; right?
22    A.    Yes.
23    Q.    And that is a true statement?
24    A.    That is a true statement.
25    Q.    Then it says "Contact this office

Page 88

1    immediately to make a payment or arrangements to
2    cancel the sale."  That is a false statement?
3    A.    No, it's a true statement.
4    Q.    Okay.  So she is required -- but she --
5    but you're not going to carry out the sale if she
6    doesn't contact the office; right?
7    A.    If you look right above here it says
8    "sale is subject to cancellation."
9    Q.    But my point is -- and you're dancing
10    around it -- but my point is you never hold these
11    sales, which means you didn't intend to hold the sale
12    when you mailed the letter.  Do you agree with that?
13         MR. GARDNER:  I'll object to the form.
14    Argumentative.
15         THE WITNESS:  We need to know what the
16    assets are that we were going to sell, so...
17    Q.    BY MR. STEPHENSON:  So is it your
18    testimony that when you mailed this letter, you
19    intended to carry out this sale?
20    A.    We intended to carry out a sale if we
21    knew what the assets were.
22    Q.    Even though you haven't carried out any
23    sales in the last two years?
24    A.    We have not.
25    Q.    Okay.  And so your testimony is that when

Page 89

1    you mailed this letter, your -- your intention was to
2    actually carry out this particular sale, even though
3    you don't actually carry out any others?
4    A.    Our intention is to get ahold of the
5    people and have communication with them to find out
6    what their assets are and go from there.
7    Q.    Your intention is to find out what assets
8    they have.
9    A.    So the reason you send this letter is not
10    to notify them a sale will take place, it's to trigger
11    a phone call from them so you can discuss their
12    assets?
13    A.    Yeah.
14    Q.    And so the purpose of this letter has
15    nothing to do with triggering a phone call from the
16    client -- or the debtor so they'll pay you?
17    A.    It works both ways.  We need to get
18    assets and payment.  It does one of the two.
19    Q.    Okay.  So if I subpoenaed or obtained in
20    discovery a bunch of call recordings from debtors
21    talking to you in response to this notice of sale, the
22    discussion would be centered around payment or what
23    property you can take?
24    A.    The -- I don't know what they said
25    verbatim, but that's the general idea of what our

Page 90

1  conversations would be about.
2       Q.    And why do you -- why do you spend any
3  time discussing over the phone with these people, with
4  the debtors, what property they can take if you never
5  take property?
6       A.    So they are informed when they make their
7  decision on what they want to do.
8       Q.    So they know you can take that property?
9       A.    Yes, and we can.
10      Q.    Okay.  So the message you're trying to
11 convey is we have scheduled a sale, and we're going to
12 hold that sale if you don't give us a call and make
13 payment arrangements; is that fair?
14      A.    That's fair.
15      Q.    And that message is false, because you're
16 never going to hold the sale?
17            MR. GARDNER:  I'll object to the form.
18 Asked and answered.  Argumentative.
19            THE WITNESS:  Yeah, kind of answered that
20 already, but...
21      Q.    BY MR. STEPHENSON:  Well, so you're --
22 you're saying --
23      A.    Probably not.
24      Q.    Okay.  And when you say "probably not," I
25 need to be sure we're clear.  Because remember you

Page 91

1  took an oath to tell the truth, the whole truth, and
2  nothing but the truth, not to -- not to dance around
3  my questions.  I'm arguing -- and I'm not arguing.
4  I'm saying this is false.
5       A.    But you are.
6       Q.    But I'm also -- it also is, on its face,
7  false.  And you're saying probably not.
8       A.    It --
9       Q.    So just help me understand -- I
10 understand that legally you don't want to answer this
11 question.  But factually, I'm not wrong, am I?  How am
12 I wrong?
13            MR. GARDNER:  Object to the form.  Vague.
14 Argumentative.
15            MR. STEPHENSON:  All right.  Let's just
16 do this:
17      Q.    You never hold sales.  You never seize
18 property; correct?
19            MR. GARDNER:  I'm going to object to the
20 form of that question.  I think it mischaracterize his
21 testimony.
22      Q.    BY MR. STEPHENSON:  Okay.  Am I -- so
23 just answer the question.
24            In the last two years you've sent
25 thousands of these letters?

Page 92

1       A.    No, we have not.
2       Q.    Okay.  Let's start over.
3            You've sent thousands of these letters in
4  the last two years?
5       A.    Yeah.
6       Q.    And you've never actually seized or sold
7  a property?
8       A.    Correct.
9       Q.    And it's your testimony that this time
10 telling my client that she has to contact the office
11 and make payment arrangements to cancel the sale is
12 true because this is the one time out of all of those
13 that you would have held the sale if they hadn't
14 contacted you and paid, or contacted you in some way?
15            MR. GARDNER:  Object to the form.
16 Argumentative.
17            THE WITNESS:  Did you not listen to what
18 I said before?  On this one, we did have contact.
19            MR. STEPHENSON:  Okay.
20            THE WITNESS:  Okay.
21            MR. STEPHENSON:  Objection.
22 Nonresponsive, and I'm going to stop you.
23      Q.    Is this -- your -- your testimony is that
24 this letter is 100 percent true in all ways?
25      A.    Yeah.

Page 93

1       Q.    Okay.  And when you send these notices of
2  sale, your intention is to notify debtors that you've
3  got a sale scheduled and they have to call you to
4  cancel it?
5       A.    What the letter says.
6       Q.    And that's your intention when you send
7  it is to trigger a phone call?
8       A.    That's what we're looking for, yeah.
9       Q.    After you scheduled this sale, did you
10 hire any movers to seize my client's property?
11      A.    No.
12      Q.    Did you set up a storage arrangement for
13 a storage unit?
14      A.    No.
15      Q.    Did you post notice of the sale?
16      A.    In this case, no.
17      Q.    Do you normally post notice of these
18 sales?
19      A.    Majority of the time.
20      Q.    And where do you post notice -- oh, you
21 do?  Okay, let's -- let's circle then.
22            In the majority of time when you mail a
23 notice of sale to a debtor, you post notice of that
24 sale somewhere?
25      A.    Yeah.

**Page 94**

1  Q.  Where?

2  A.  The court of issuance and three other
3  places.

4  Q.  What are those three other places?

5  A.  It's getting real tough nowadays, but
6  usually if there's another court, district court in
7  that county, we'll post those.  Traffic light poles,
8  telephone poles.  There's not a lot of public posting
9  at places.

10  Q.  Okay.  So you post these on traffic
11  poles?

12  A.  Yeah.

13  Q.  And that's -- satisfies the
14  requirements --

15  A.  Is it public?

16  Q.  That satisfies it to you, in your mind?
17  Don't argue with me, just -- you think that satisfies
18  the requirements?

19  A.  Yeah.

20  Q.  Did you post this to any traffic pole?

21  A.  This one, no, because it got -- it was
22  cleared up prior to the sale.

23  Q.  Okay.  And so do you have any specific
24  traffic poles you post these to?

25  A.  No.

**Page 95**

1  Q.  We've already established that there
2  are -- that you mail thousands of notices of sale.  So
3  your testimony is that you post the majority of them.
4  What percentage is, your mind, the majority?

5  A.  99.

6  Q.  99 percent.  And this one just didn't get
7  posted because it was -- she -- her husband responded
8  quickly enough; is that right?

9  A.  That's correct.

10  Q.  Okay.  And do you have a specific court
11  where you post most of these?

12  A.  Court of issuance.

13  Q.  And it just goes on their wall?

14  A.  Yes.

15  Q.  Do you need to talk to the clerks to do
16  that, have them open the case?

17  A.  Sometimes.

18  Q.  And who does that for your office?

19  A.  Usually me.

20  Q.  And how much time a day do you spend
21  posting court -- these notices of sale publicly?

22  A.  Probably once a week.

23  Q.  And -- and the court of issuance is
24  always one of those sources of where you post it?

25  A.  Yes.

**Page 96**

1  Q.  Do you get reimbursed for your mileage to
2  do that?

3  A.  No.

4  Q.  Do you track your mileage to do that?

5  A.  In the computer.

6  Q.  Okay.  And so if you have a case say down
7  in St. George, you drive down to St. George, you put
8  it on the wall in the St. George court and then drive
9  back?

10  A.  If it's out of county like that, I
11  probably make some phone calls and see if the clerk
12  will post it, and then find a -- somebody that might
13  post it for me.

14  Q.  And then the posts -- the traffic poles
15  you post these on, is that all going to be local,
16  then, to you?

17  A.  Say that again.

18  Q.  When you post the other notices on
19  traffic poles, is that going to be local traffic poles
20  or is that going to be in the court of -- in the
21  jurisdiction where the judgment was entered?

22  A.  It's got to be in the county that it was
23  issued out of.

24  Q.  So do you drive out of county to post
25  these notices on traffic poles, or do you have someone

**Page 97**

1  else do that?

2  A.  I take care of most of them.

3  Q.  So you would drive down to St. George if
4  you had one down here, post it on a traffic pole?

5  A.  I just answered that question.

6  Q.  Okay.  So you think -- so if you had one
7  in St. George, you'd call the court clerk and ask her
8  to post it on a traffic pole?

9  A.  I didn't say I'd have her post it on the
10  traffic pole.  I said I would get ahold of another
11  server or somebody in the area that might do it for
12  me.

13  Q.  Okay.  What is the typical response you
14  receive when you send this notice of sale or a notice
15  of sale like this to someone?

16  A.  We probably have a good 80 percent
17  response.

18  Q.  And out of those 80 percent, how many
19  pay?

20  A.  Probably 95 percent.

21  Q.  And why do they pay instead of not?

22  A.  Because they want to keep their stuff.

23  Q.  Nobody really wants a process -- someone
24  coming to their house, taking everything they own and
25  selling it?

Page 98

1     A.     No.
2          Q.     In fact, that could devastate some
3     families?
4          A.     That's more devastating than what we're
5     doing.
6          Q.     Right.  I think you mentioned that word
7     earlier.  That is devastating to people, especially
8     those who may be hurt, sick, and don't have any --
9          A.     Correct.
10         Q.     Okay.  So is it fair to say, then, that
11    debtors, they have an emotional reaction when they
12    call you after receiving the notice of sale?
13               MR. GARDNER:  I'll object to the form.
14    It calls for speculation.
15               THE WITNESS:  I can't say what they're
16    feeling.
17         Q.     BY MR. STEPHENSON:  Do they sound like
18    they're having an emotional response?
19         A.     Nobody's really happy to talk to us.
20         Q.     Do they ever express fear, concern, or
21    urgency that -- about this notice of sale?
22         A.     Yes.
23         Q.     Is that a typical response?
24         A.     I couldn't say.  I would suspect.
25         Q.     Is that the response you're trying to

Page 99

1     convey when you send this letter?  You want them to be
2     afraid, have some concern, some urgency so they'll
3     pay?
4          A.     No.
5          Q.     You're not -- you're not concerned about
6     their emotional response?
7          A.     I didn't say that.
8          Q.     Okay.  Help me -- just follow through
9     with me.
10         A.     I -- we understand their position and we
11    take time to explain what's going on.
12         Q.     And in explaining what's going on, you
13    tell them a sale is going on?
14         A.     We tell them that there are sales
15    scheduled, and we tell them what it's all about.
16         Q.     And you tell them what property you're
17    going to take?
18         A.     We go over -- you know, we need to go
19    over what property you have, you know, or you can make
20    a payment and be done with it.
21         Q.     So when you send the notice of sale,
22    you're aware that the response you're going to get
23    from a lot of people is fear, urgency, concern?
24         A.     Yeah.
25         Q.     And when the people call you to -- you

Page 100

1     get an 80 percent response to this letter and a
2     95 percent pay rate, that's because the debtor
3     typically believes that you're going to carry out this
4     sale if they don't pay?
5                MR. GARDNER:  Object to the form.  Calls
6     for speculation.
7                THE WITNESS:  Legally we could.
8          Q.     BY MR. STEPHENSON:  Sure.  But the debtor
9     believes that you will; right?
10               MR. GARDNER:  Same objection.
11               THE WITNESS:  Not when they're done with
12    the phone call.
13         Q.     BY MR. STEPHENSON:  Okay.  But the reason
14    they called is because they believe you are carrying
15    out this sale?
16         A.     Because they realize that it is an actual
17    court order.
18         Q.     Okay.  So you are aware that when you
19    send the notice of sale, the response -- the debtor
20    will believe it to be true?
21         A.     Yeah.
22         Q.     How long do you wait for a response from
23    the debtor after sending this notice of sale before
24    you do the next step?
25         A.     It would probably go out on the sale.

Page 101

1          Q.     And go out -- going out on the sale means
2     what?
3          A.     Going out and seeing what's out there and
4     trying to make contact with them at that time.
5          Q.     Knocking on the door?
6          A.     Knocking on the door to talk to them.
7          Q.     If they don't answer, you go away?
8          A.     Yes.
9          Q.     And that happens in -- the percentage was
10    pretty high.
11         A.     Yeah.
12         Q.     Tell me -- what was the percentage?
13    80 percent or more?
14         A.     On going out on sales, yeah, it...
15         Q.     I really thought it was higher than that,
16    but it's at least 80 percent?
17         A.     And that's being nice.  It's -- it's -- I
18    think I go out on ten to cancel them, or go out on the
19    sales and see what's going on and look at a property,
20    out of the ten, I'd be lucky to get one or two.
21         Q.     And the one or two, what happens to
22    those?
23         A.     We -- we talk about -- we look and see
24    what the property is, and then I can make a
25    distinction on whether the property there is of value

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                    Pages 102..105

---

Page 102

1  or not.
2        Q.    So one or two out of every ten allows you
3  to look at their property, come inside the house and
4  look at their property?
5        A.    Not necessarily come into the house.
6        Q.    How many allow you to go inside?  What
7  percentage?
8        A.    .025.
9        Q.    Okay.  Is that being funny?
10       A.    Very seldom.
11       Q.    It's hardly ever?
12       A.    Yeah.
13       Q.    But it does happen?
14       A.    Yeah.
15       Q.    Do you remember the last time someone let
16  you into their house to look at their property?
17       A.    Two days ago.
18       Q.    Who was that?
19       A.    Oh, wait.  Sorry, it was last week.  End
20  of last week.
21       Q.    And who was it?
22       A.    I don't recall his name.
23       Q.    Did you take photographs?
24       A.    No.
25       Q.    Did you write down the property?

Page 103

1        A.    There was none of value.
2        Q.    Did he make a payment?
3        A.    No.
4        Q.    Did you wear your gun?
5        A.    Pardon?
6        Q.    Did you wear your gun?
7        A.    No.
8        Q.    You sure?  You didn't look confident on
9  that answer.
10       A.    I don't carry my gun very often or I'd
11  have it here.  Come on, that was funny.
12       Q.    It -- I don't know that it was, but...
13       A.    Everybody carries in St. George.  It's
14  not unusual.  Nobody -- it's not an issue, go ahead
15  and carry.
16             But I'm just wondering if you carry when
17  you serve these?
18       A.    I very seldom carry a gun.
19       Q.    Because that is an issue I've heard in
20  some of these, the fear that comes -- because you do
21  have a uniform of some kind; right?  It's a -- is that
22  what you wear?  You just alluded to --
23       A.    Plain clothes.
24       Q.    Plain clothes?
25       A.    Yeah.

Page 104

1        Q.    Do you wear a badge?
2        A.    Yeah.  It's right here.
3        Q.    And you wear that openly when you go to
4  their houses?
5        A.    Huh?
6        Q.    You wear it openly to their houses?
7        A.    No, it's on my belt.
8        Q.    Okay.  So you show up in plain clothes
9  and you're not showing that you're -- badge, gun, all
10  that's hidden?
11       A.    I have ID, too.
12       Q.    So you'd show it to them if you ask you?
13       A.    Yeah.
14       Q.    You don't have it open?
15       A.    I don't flash it.
16       Q.    What kind of car do you drive for this?
17  When you go up to these -- when you appear for the
18  notice of sale for the day and time you scheduled,
19  what vehicle are you driving?
20       A.    My car.
21       Q.    And what is it?
22       A.    Infinity.
23       Q.    Okay.  It's not a Ford -- white Ford
24  Explorer that looks like a police vehicle?
25       A.    No.

Page 105

1        Q.    It's not a Crown Victoria or -- it
2  doesn't look like a police vehicle?
3        A.    No.
4        Q.    Okay.  That's what I'm asking.
5             And I'm curious -- well, never mind.  I'm
6  not curious.
7             Okay.  And after you go to their house
8  and you look at the property they have, what's the
9  next step?
10       A.    Usually the sale gets canceled, and then
11  we evaluate whether we want to continue with the writ
12  or just send it back with no value.
13       Q.    Okay.  When you say "usually the sale
14  gets canceled" that implies that sometimes the sale
15  proceeds.
16       A.    Excuse me.  The sale gets canceled.
17       Q.    Okay.  So every time you go to someone's
18  house in response -- on the notice of the sale, time
19  and date, every single time you cancel the sale?
20       A.    Yes.
21       Q.    Then why bother going to the notice of
22  sale time and place and date?
23       A.    Because I have to.
24       Q.    Well, but you don't do it every time.  So
25  what do you mean you have to?

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                     Pages 106..109

Page 106

1      A.     Because statute says we have to be there
2   to cancel it.
3      Q.     But you cancel the ones you don't arrive?
4      A.     I can only do so much.  I'm not perfect.
5      (Exhibit 6 was marked for identification.)
6      Q.     BY MR. STEPHENSON:  Do you recognize
7   Exhibit 6?
8      A.     Looks a lot like 5.
9      Q.     Okay.  I'll -- I'll help you with this.
10          Exhibit 6 is a compilation of notices of
11  sale I put together from other cases.  Is that -- you
12  can look through it and tell me, is that a fair
13  description of what you're looking at?
14     A.     Yeah.
15     Q.     Okay.  I'm going to do -- we can go
16  through each one individually, or if you want to get
17  through quicker -- right, exactly.  We can go through
18  these as a group.  Do you prefer that?
19     A.     Probably.  All right.
20     Q.     Okay.  So let's quickly go through each
21  one so we know what's in the pile.  First one is
22  you've scheduled a sale for Lindsey and Troy
23  Campbell's property to occur August 11, 2023; correct?
24          MR. GARDNER:  Okay, I'm going to object
25  to the extent that some of these are cases that are

Page 107

1   pending.  I'm not sure that this would be the
2   appropriate forum where you get to ask questions about
3   other cases that you have pending.
4          I need to think about this.  I -- I'm
5   going to object and I don't think this is appropriate,
6   because we're not -- we're not in depositions of these
7   other cases.  We're in one deposition on one case.
8          MR. STEPHENSON:  And the reason these are
9   being brought in as exemplars, not for the other
10  cases.
11          MR. GARDNER:  Yeah, but --
12          MR. STEPHENSON:  There's some listed here
13  that are not filed cases.
14          MR. GARDNER:  Several of them are filed
15  cases, and I don't think it's appropriate to be asking
16  questions on other cases without actually noticing up
17  those depositions.
18          MR. STEPHENSON:  Okay.  Your objection is
19  noted.  Let's walk through them individually anyway
20  and we'll go from there.  And I think you'll see where
21  I'm going, it's not...
22          MR. GARDNER:  I know, but I just -- I
23  hesitate to allow him to answer questions where he's
24  not been noticed up to be deposed in these cases.
25          MR. STEPHENSON:  Okay.

Page 108

1          MR. GARDNER:  To the extent that you're
2   going to use anything he says about other cases, this
3   is not the time and place for that.
4      Q.     BY MR. STEPHENSON:  Let's go to page -- I
5   don't know what page it is.  Scroll through until you
6   find Allison Ekstrom.  She is not a case.
7          MR. GARDNER:  I still think it's improper
8   because to the extent you might be filing one for
9   Allison Ekstrom, I just don't know that that's
10  appropriate.
11          The court has given you some leeway
12  and -- in regards to your motion to compel on the
13  subpoena, but one thing that the court specifically
14  said on the subpoena was that you are not allowed to
15  talk about names, and they were allowed to redact
16  names.  So I just think this is --
17          MR. STEPHENSON:  It doesn't -- it doesn't
18  apply to this.  This is a totally separate issue.
19          In fact, let's do this:  Let's stop
20  with -- let's stop for a minute with this exhibit.
21     Q.     Do you agree that if I handed you -- and
22  theoretically -- if I handed you a stack of exhibits
23  of notices of sale, that you would be able to say to
24  me, I conducted none of those sales?
25     A.     Yeah.

Page 109

1      Q.     None of these actually occurred?
2      A.     That would be true.
3      Q.     Okay.  And can you tell me which -- if
4   you ever showed up -- let's say if you have a -- how
5   do you handle it when you have a sale that's
6   scheduled -- how often do you schedule sales?
7          MR. GARDNER:  And I need to move to
8   strike Exhibit 6 and not have it part of the record
9   here --
10          MR. STEPHENSON:  Okay.  It's --
11          MR. GARDNER:  -- to the extent he's
12  testifying about these other cases.
13          MR. STEPHENSON:  Okay.  Well, we're going
14  to -- we're going to include it.  Your objection is
15  noted, and I'm not going to -- we're not going to
16  ask -- I won't ask questions about it.
17          MR. GARDNER:  Well, you just did.
18          MR. STEPHENSON:  No, I'm asking -- I'm
19  going to go generic.  I'm going to go generic.  I
20  didn't.  I have lots of specifics to ask, but he's
21  already going to stipulate that, look, the reality is,
22  is none of these took place, but they were all
23  threatened.  Whether you like it or not, that's the
24  reality.
25          MR. GARDNER:  Well, I'm not --

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                 Pages 110..113

Page 110

1          MR. STEPHENSON:  Right?  Am I wrong?
2          MR. GARDNER:  I will object to the form
3 of your question.  Argumentative.
4          I mean, if you want to ask him generally
5 if he's had notice of sales that he has not completed
6 the sale, that --
7          MR. STEPHENSON:  That's what I was moving
8 to.
9          MR. GARDNER:  And you've asked that,
10 like, 50 times already.
11          MR. STEPHENSON:  No, no, no.  Let me --
12 let me -- why don't you let me proceed and you'll see
13 where I'm headed.
14          MR. GARDNER:  Okay.
15          MR. STEPHENSON:  Okay.
16    Q.   So my question before we were interrupted
17 was -- was it's my understanding and -- that you
18 schedule these sales on the ten minutes; is that
19 correct?
20    A.   Yeah.
21    Q.   Okay.  So you've got one at noon, one at
22 12:10, one at 12:20, one at 12:30; correct?
23    A.   Yeah, that would be -- yeah.
24    Q.   And how do you make it -- and it's your
25 testimony that you travel to most of them; correct?

Page 111

1    A.   I try to.
2    Q.   You try to, no.  You said you actually do
3 appear at 80 percent or more.
4       Don't look at him.
5    A.   Can I clarify a little bit?
6    Q.   Well, I'm --
7          MR. GARDNER:  Yeah, you can.
8    Q.   BY MR. STEPHENSON:  You know what, you
9 can answer the question, though.  If you need to
10 clarify, go right ahead.  I'm okay with that.
11    A.   Okay.
12    Q.   I just want to know the answer.
13    A.   We've changed.  The sales are not ten
14 minutes apart.
15    Q.   Okay.
16    A.   They are 20 minutes to a half hour apart.
17    Q.   Okay.  Okay.  So no, no, no.  Let's go
18 back then.
19    A.   Did I go to any of these?
20    Q.   What?
21    A.   Nothing.
22    Q.   At the time of -- before when my client
23 was being threatened with the notice of sale, you were
24 scheduling sales every ten minutes; correct?
25          MR. GARDNER:  Object to the form.

Page 112

1 Argumentative.
2          MR. STEPHENSON:  Go ahead and answer.
3          THE WITNESS:  Yeah.
4    Q.   BY MR. STEPHENSON:  Okay.  And now you've
5 changed that, so now the sales are scheduled 20 to 30
6 minutes apart.
7    A.   Correct.
8    Q.   And you appear at 80 percent of the
9 sales?
10    A.   Correct.
11    Q.   And you appear at the date and time
12 indicated in whatever notice of sale exists?
13    A.   Correct.
14    Q.   And now you're going to tell me how
15 that's possible, given ten minutes apart.
16       How do you -- how do you get from one
17 sale to another in ten minutes?
18    A.   Not very well.
19    Q.   Okay.  If I had a sale that was scheduled
20 for -- to occur in Vernal, would you be -- would it be
21 possible for you to be at a sale ten minutes later in
22 Salt Lake?
23    A.   No.
24    Q.   Okay.  So if the sale from Vernal said it
25 was going to take place, it's a lie because you're not

Page 113

1 going to go to Vernal, hold the sale, and ten minutes
2 later go to Salt Lake and hold that sale?
3          MR. GARDNER:  Object to the form.
4 Argumentative.
5    Q.   BY MR. STEPHENSON:  One of those two
6 notices of sale has to be false.
7          MR. GARDNER:  Same objection.
8    Q.   BY MR. STEPHENSON:  Which one; right?  Am
9 I wrong?
10       Let's -- let me start over with the
11 question --
12    A.   Yeah.
13    Q.   -- so it's far more clear for the record.
14       If you schedule a sale to occur in
15 Vernal, and ten minutes later you have a sale
16 scheduled for Salt Lake, one of those notices is
17 false?
18    A.   If that's the case, yeah.
19    Q.   And now you schedule them 20 to
20 30 minutes apart, so you can appear at more of them?
21    A.   Well, yeah.
22    Q.   And if they're scheduled 20 to 30 minutes
23 apart, does that mean you're adding days that you
24 schedule sales to occur?
25    A.   No.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 114..117

Page 114

1      Q.      Normally sales are scheduled for
2  Thursdays and Fridays; correct?
3      A.      Wednesday, Thursday, Friday.
4      Q.      Wednesday, Thursday, Friday.
5              And there's enough time in those three
6  days to schedule all of the sales that you're
7  scheduling?
8      A.      A lot of them get canceled prior because
9  of communications.  We can cancel a sale at any time
10 for any reason.
11     Q.      Okay.  But you're mailing --
12     A.      The ones we don't have contact on, we
13 usually go out on.
14     Q.      But you're mailing, what did you say, 50
15 of these a week?
16     A.      I did not say that.
17     Q.      How many are you mailing a week?  Notices
18 of sale specifically.
19     A.      Notices of sales?
20     Q.      Yeah.
21     A.      I couldn't give you an accurate answer on
22 that, because I don't send them.
23     Q.      It's thousands per year, though?
24     A.      Okay.
25     Q.      Do you ever schedule -- are any of these

Page 115

1  notices of sale -- not these specifically -- but any
2  of your notices of sale, do you schedule the same day
3  and time for other -- or is it separate for every
4  single person?
5      A.      They're separate for every person.
6      Q.      And what times of day do you start and
7  finish these sales?
8      A.      It varies when -- we said Wednesday,
9  Thursday, Friday.  Usually start them at about noon or
10 so.
11     Q.      And they end when?
12     A.      When I get done.
13     Q.      Well, according to the -- according to
14 what you would write in the notice of sale, what
15 times?
16     A.      Probably around 5:00.
17     Q.      Okay.  So for five hours a day and if
18 they're scheduled every ten minutes apart, that's six
19 per hour.
20     A.      We didn't do -- okay.
21     Q.      So that's -- you could hold 30 sales in
22 one day.  Or not hold, excuse me, because you don't
23 hold sales.  You can schedule 30 sales for one day; is
24 that right?
25     A.      I could schedule a lot more if you wanted

Page 116

1  to, but --
2      Q.      And how many do you schedule in a given
3  day?
4      A.      I don't do the scheduling.
5      Q.      Okay.  And you're certain, though, even
6  though you don't do the scheduling, that none of them
7  are ever scheduled for the exact same day and time?
8      A.      No.
9      Q.      And are you the only one that conducts
10 the drive-by, or whatever it is you call it, when you
11 arrive at the time of the sale and look at their
12 property?  Is that just you?
13     A.      Yes.
14     Q.      Your deputies don't do that?
15     A.      No.
16     Q.      So Wednesdays, Thursdays, and Fridays
17 your entire day is taken up by driving to these
18 notices -- to these sales?
19     A.      Pretty much.
20     Q.      And so we're clear on scheduling, the
21 word scheduling a notice of sale, that, to you, is
22 simply sending a notice of sale?
23     A.      Yes.
24     Q.      Nothing more goes into scheduling a sale;
25 right?  You schedule the sale, that's it.  You don't

Page 117

1  post it first.  You don't advertise it first.  You
2  don't arrange for moving trucks or movers or storage.
3  None of that occurs when you mail this notice of sale,
4  until after, later?
5      A.      Yes.
6      Q.      And actually none of that occurs ever
7  because you never actually sell the property?
8              MR. GARDNER:  I'll object to the form.
9  Misstates testimony.
10             MR. STEPHENSON:  Go ahead and answer.
11             THE WITNESS:  Yeah.
12     Q.      BY MR. STEPHENSON:  Okay.  How often --
13 when -- when -- when Hernandez -- when you sent her
14 the notice of sale, did you contact -- wait, wait.
15 Let me go back.
16             Did you contact law enforcement -- any
17 law enforcement agencies before serving Hernandez with
18 a writ of execution?
19     A.      No.
20     Q.      And you had a look on your face that
21 makes me wonder do you ever send -- contact local law
22 enforcement before you serve a writ of execution?
23     A.      When it's -- I know where you're going
24 now.
25             When we're out of county or out of area,

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 118..121

---

**Page 118**

1  we do.

2      Q.    And how do you contact the -- the local

3  law enforcement?

4      A.    Call up dispatch and say we're going to

5  be in the area.

6      Q.    And you do that every time you're going

7  to serve one out of county?

8      A.    Well, we do now.

9      Q.    Okay.  And did you before I sued you?

10     A.    No.

11     Q.    And so Hernandez -- oh, go ahead.

12     A.    We used to do that.  All those agencies

13 got tired of it and said, you know, unless you have a

14 problem, don't call us.

15     Q.    Okay.  But the rules require you to

16 contact them, or is it the statute; right?

17     A.    Yeah.

18     Q.    You're aware of that requirement that you

19 must -- that you have to contact law enforcement

20 before you serve a writ of execution?

21     A.    It's more like you need to contact law

22 enforcement if you're going to do something that

23 would, in general, cause a disturbance.  And whereas

24 we're serving a writ of execution and not seizing

25 anything, we're not creating a disturbance.

**Page 119**

1      Q.    So it's your understanding that the only

2  time you're required to contact law enforcement is

3  when you're going to create a disturbance?

4      A.    When there's a possibility of causing a

5  disturbance.  Like arrest on a bench warrant, if we

6  are seizing on an execution or a replevin, then we

7  would let the local know.  But when we're not going to

8  cause any disturbance, we haven't, but we will now.

9      Q.    The statute, I'm going to quote it.

10     A.    Okay.

11     Q.    Quote -- this is Utah Code

12 Section 17-25a, 3-2a.

13          Okay.  "Constables serving process

14 outside the county in which they are appointed shall

15 contact the sheriff's office or police department of

16 the jurisdiction prior to serving executions or

17 seizing property."

18          So it's your testimony that you know that

19 law, but don't follow it when serving a writ of

20 execution, or didn't at the time?

21          MR. GARDNER:  I'll object.  Compound.

22          MR. STEPHENSON:  You can answer.

23          THE WITNESS:  No.

24     Q.    BY MR. STEPHENSON:  No, you didn't follow

25 that law?

**Page 120**

1      A.    We did not contact, no.

2      Q.    Okay.  And you didn't normally contact --

3  in most of your writs of execution before now,

4  earlier, you -- it was not your normal practice to

5  contact local law enforcement?

6      A.    No.

7      Q.    And why -- and that -- and you've already

8  given me the reason, right, it's because they got sick

9  of you doing it; right?  Is there any other reason?

10     A.    I don't know.  You'd have to ask them.

11     Q.    Well, is there any -- but I'm asking you

12 why you stopped.  Why you don't notify law

13 enforcement, and you said it's because they annoy

14 you -- or you were annoying them.

15     A.    Yeah.

16          God, I'm getting cramps in both legs.

17     Q.    Yeah, my hip is going out, too.  But can

18 you answer the question, then we'll take a quick

19 break.

20          MR. GARDNER:  You can stand up.

21          MR. STEPHENSON:  You can stand, that's

22 fine.  I'm going to need to in a minute, too.

23          THE WITNESS:  Okay, what was the question

24 again?

25          BY MR. STEPHENSON:  You stopped -- you

**Page 121**

1  were contacting law enforcement out of the county.

2  You're --

3      A.    That was years ago.

4      Q.    And you stopped because it was annoying;

5  correct?

6      A.    It was not annoying to me, but it was

7  to --

8      Q.    To them.

9      A.    -- dispatch.

10     Q.    And is there any other reason you

11 stopped?

12     A.    No.

13     Q.    Okay.  But you're sure that you -- and

14 when did you start contacting law enforcement again?

15     A.    Couple months ago.

16          MR. STEPHENSON:  Okay.  Let's take a

17 five-minute break, because I actually need to stretch

18 my hip, too.

19          (There was a break taken.)

20          MR. STEPHENSON:  Okay.  Let's go back on

21 the record.

22     Q.    Okay.  So I hope I'm not backtracking too

23 much.  We were talking about law enforcement contacts,

24 and if I remember -- I'm not sure if I asked you or

25 not.  You did not contact law enforcement with regard

---

Page 122

1  to my client's notice of sale?
2      A.   No.
3      Q.   Can you identify the last time you did
4  contact law enforcement -- not -- not -- I guess
5  that's not fair, because you did it now.
6           Well, tell me, when was the last time you
7  contacted law enforcement before serving a writ of
8  execution?
9      A.   When we're out of area.
10     Q.   And do you remember the last time you did
11 that?
12     A.   I think we kind of -- no, I don't know.
13 We haven't been out of area too much.
14     Q.   And by "out of area," what do you mean?
15     A.   Well, I'm talking about along the Wasatch
16 Front.  If we're going out to way out areas then we --
17 we do.
18     Q.   Okay.  So when you say "out of area," you
19 mean specifically what?
20     A.   Out of the Wasatch Front; Utah, Salt
21 Lake, Davis, Weber.
22     Q.   So you don't ever contact law enforcement
23 in Salt Lake, Utah, Davis, or Weber County?
24     A.   Unless there's a propensity of a
25 disturbance.

Page 123

1      Q.   Okay.  And you're aware that -- we read
2  those statutes.  It says the county that you're
3  appointed in is where you can --
4      A.   Yeah.
5      Q.   -- avoid the law enforcement contact;
6  correct?
7      A.   Correct.
8      Q.   And Ogden City is in Weber County?
9      A.   Yes.
10     Q.   So even though the statute says when
11 you're outside the county you're appointed in, you
12 still don't notify law enforcement before serving
13 writs of execution in Salt Lake County, Utah County,
14 Davis County, or other areas in that Wasatch Front?
15     A.   That's true, we haven't been.
16     Q.   So doesn't that invalidate the execution?
17 The service?
18          MR. GARDNER:  Object to the form to the
19 extent it calls for a legal conclusion.
20          THE WITNESS:  No.
21     Q.   BY MR. STEPHENSON:  It doesn't follow the
22 statute, though.  You agree with that?
23     A.   It doesn't follow that rule maybe.  But
24 they don't want to be annoyed with those calls, so we
25 haven't.

Page 124

1      Q.   Okay.
2      A.   I didn't do that by the letter of the
3  law, correct.
4      Q.   Well, and you don't normally do it by the
5  letter of the law?
6      A.   As far as what?
7      Q.   Well --
8      A.   Notifying?
9      Q.   Yeah, notifying law enforcement.
10     A.   When we're out of -- if I'm in Vernal,
11 yeah, we let them know.  If we're in St. George, we
12 let them know.  Cedar City, stuff like that, but we
13 don't do that much.
14     Q.   But most of your cases are along the
15 Wasatch Front where you don't notify law enforcement?
16     A.   Yes.
17     Q.   Okay.  So you would be out of compliance
18 with the statute on most of them?
19     A.   Yeah.
20     Q.   So let's talk about advertising the sale.
21 That's something different than posting a sale at the
22 courthouse and lamp posts; correct?
23     A.   Correct.
24     Q.   How -- what is your policy with regard to
25 advertising property sales?

Page 125

1      A.   We advertise if we actually have property
2  and are actually going to hold a sale.
3      Q.   Where do you advertise the property
4  sales?
5      A.   I would advertise it usually at Deseret
6  News.
7      Q.   And when do you advertise the property
8  sales?
9      A.   Usually -- has to be at least one day
10 prior to the sale.
11     Q.   The statute requires one day?
12     A.   At least.
13     Q.   At least one day?
14     A.   Yeah.
15     Q.   Do you know what statute that is?
16     A.   Not right off.
17     Q.   Are you sure it's only one day?
18     A.   Pretty sure.
19     Q.   Are there any other legal requirements
20 you have to follow to post a sale -- or excuse me --
21 to advertise a sale, not post.  Not the lamp post sale
22 or the courthouse, but advertising?
23     A.   Advertising, no.  Just needs to be posted
24 in a newspaper of general distribution, something like
25 that.

Page 126

1       Q.      And your normal place for that is the
2   Deseret News?
3       A.      Yeah.
4       (Exhibit 7 was marked for identification.)
5       Q.      BY MR. STEPHENSON:  Do you recognize
6   Exhibit 7?
7       A.      Not yet.
8       Q.      I'm sorry?
9       A.      Not yet.
10      Q.      Okay.
11      A.      Oh, okay.
12      Q.      Actually, let me help on this, because I
13  printed this from the Utahlegals.com, and it's a
14  search of your sales from January 1, 2024, to
15  October 22, 2024.
16              Do you see -- do you see that?
17      A.      Yep.
18      Q.      And it lists -- there's some overlap, but
19  it lists one, two, three, four -- it lists eight sales
20  taking place in that time period.
21      A.      Okay.
22      Q.      And all of those sales are for mobile
23  homes?
24      A.      Correct.
25      Q.      And so there are no sales posted -- you

Page 127

1   have -- so you have not advertised any sales in the
2   last -- from January 1st of this year to now for
3   property sales of regular property?
4       A.      Correct.
5       Q.      Okay.  And that's because you didn't hold
6   any sales of public property.  If you would have held
7   the sale, you would have advertised it and it would
8   have shown up here?
9       A.      Correct.
10      Q.      Okay.  Let's mark the next one.
11      (Exhibit 8 was marked for identification.)
12      Q.      BY MR. STEPHENSON:  Exhibit 8 is the same
13  search, searching for your name, but it's for the year
14  of 2023.
15              Do you see that at the top?
16      A.      Okay.
17      Q.      I searched Utahlegals.com and I found no
18  property sales advertised.
19      A.      Okay, yep.
20      Q.      And that's because there aren't any?
21      A.      Correct.
22      Q.      And you've already put it away because
23  you know that's not in here?
24      A.      Correct.
25      Q.      There's no reason to -- okay.

Page 128

1               One, two, three, four, five.  And you
2   held 11 mobile home sales?  Yes?
3       A.      Yes.
4       Q.      Okay.
5       A.      Sorry, I keep on nodding, I need to...
6       Q.      It's okay.
7               And you -- you -- how long have you been
8   aware of the requirement to advertise a sale prior to
9   a sale?
10      A.      Long time.
11      Q.      Since the '80s?
12      A.      Yeah.
13      Q.      Do you know Michael Erickson?
14      A.      Do I know him?
15      Q.      Yeah.
16      A.      Yeah.
17      Q.      I guess I knew that, but I was trying to
18  form a foundation.
19              And your relationship with him is
20  professional or friendly, or both?
21      A.      Professional.
22      Q.      And you're aware that he used to be --
23  that he used to collect judgments for lawyers the same
24  way you're doing it now?
25      A.      Yes.

Page 129

1       Q.      And the reason you're aware of that is
2   you took over his business doing that?
3       A.      Yes.
4       Q.      Okay.  And you employ two of Michael
5   Erickson's previous employees?
6       A.      Yes.
7       Q.      And just two, no -- no more?
8       A.      Andrew Collet was for a little while.  He
9   came and did stuff for -- he was working for both of
10  us.
11      Q.      Okay.  And did you -- have you taken --
12  I'm sorry.
13              When you took over the business from
14  Michael Erickson, did you have any other employees you
15  took with you that you haven't mentioned yet because
16  they don't work for you anymore?
17      A.      I don't believe so.
18      Q.      Okay.  And then Corey Revill, he's not a
19  constable?
20      A.      No.
21      Q.      He came on board from Erickson to you?
22      A.      Yes.
23      Q.      And his job is to get the writs of
24  execution from the lawyers?
25      A.      Excuse me?

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                    Pages 130..133

Page 130

1      Q.      Sorry.  His job, he gets the writs of
2  execution from the lawyers?
3      A.      Or I pick them up, one of the two.
4      Q.      Okay.  He is in charge of -- or he is one
5  of the people that handles the collection calls
6  between the debtors and your firm?
7      A.      They're not collection calls.
8      Q.      Okay.  He's one of the people that
9  handles calls from debtors?
10     A.      Correct.
11     Q.      And he makes calls to debtors?
12     A.      Correct.
13     Q.      And they're not collection calls because
14  you're not collecting money in those calls?
15     A.      They're collecting on a judgment.
16     Q.      Okay.  So if I call them a collection
17  call, that's accurate?
18             You are collecting money in those calls?
19     A.      In that terminology, yes.
20     Q.      Okay.  Corey Revill, he is in charge of
21  mailing notices of sale?
22     A.      Yes.
23     Q.      And he, in those calls, he's part of --
24  he explains to people we're going to sell your
25  property if you don't pay?

Page 131

1      A.      Kind of a general...
2      Q.      But he -- but he does; right?  He does
3  that?  He tells people we're going to take your
4  property if you don't pay?
5      A.      That's part of what he goes through,
6  yeah.
7      Q.      And he also gathers up information about
8  what assets you could take if you were going to?
9      A.      He makes an attempt to, yes.
10     Q.      And he's the one that, over the phone,
11  negotiates the payment arrangements?
12     A.      He has in the past, yes.
13     Q.      And is he paid a -- is he an employee or
14  a contractor?
15     A.      He's an employee.
16     Q.      Is he paid a salary?  Hourly?
17  Commission?  Bonus?  How is he paid?
18     A.      Salary.
19     Q.      Does he get a commission or a bonus?
20     A.      No.
21     Q.      John Sindt, we've kind of touched on that
22  before.  You know who John Sindt is?
23     A.      Yes.
24     Q.      And it's spelled S-I-N-D-T?
25     A.      Yes.

Page 132

1      Q.      And your relationship to him is what?
2      A.      Friend, and he was the original constable
3  I started working for.
4      Q.      Okay.  Is he still a constable?
5      A.      No.
6      Q.      Was he -- what's his involvement with
7  Constable Kolkman LLC?
8      A.      What's the word I'm looking for?
9  Adviser.
10     Q.      Isn't he part of -- did he help broker
11  the deal between you and Erickson?
12     A.      He suggested it.
13     Q.      Was Michael Erickson considering giving
14  his business to anyone else other than you?
15     A.      You'd have to ask Mike about that.
16     Q.      You're not aware of anyone else?
17     A.      No.
18     Q.      What's John Sindt's involvement with
19  Kolkman Constable Services?
20     A.      I just answered that.  Advise.
21     Q.      Okay.  So I was asking Constable Kolkman
22  LLC at first.  Is his role with both companies the
23  same?
24     A.      Oh, no, he -- just with Constable
25  Kolkman.

Page 133

1      Q.      Okay.  Yeah.
2      A.      It gets a little confusing with the two.
3      Q.      It does, and that's why I wrote it really
4  carefully here, because we got confused last time.
5             Okay.  What's John Sindt's involvement
6  with Wasatch Constables?
7      A.      None.
8      Q.      Okay.  Does he own any part of any of
9  these companies?
10     A.      No.
11     Q.      Does he act as management for any of the
12  companies?
13     A.      Act as what?
14     Q.      Management.  Does he manage any of your
15  duties or obligations?
16     A.      No.
17     Q.      Does he have any financial stake
18  whatsoever in any of these companies?
19     A.      Yeah.
20     Q.      Okay.  What is that financial stake?
21     A.      If we end up with a profit, he gets a
22  little.
23     Q.      How much does he get percentage-wise?
24     A.      Probably 50 percent of the profit after
25  all the costs are taken out.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                     Pages 134..137

Page 134

1      Q.      But he doesn't own any of the company?
2      A.      He does not.
3      Q.      So what's -- what's the legal terminology
4   you would use to connect -- what's -- how do you
5   distribute 50 percent of the profit to him?  Do you --
6   as an employee or as a board member?
7      A.      I -- I don't know what you'd classify him
8   as.
9      Q.      Okay.  What would you classify him as?
10  I -- I need help with it, because I need to know why
11  he's getting 50 percent if he's not part of the
12  company.
13     A.      Because in the beginning he -- I guess in
14  a way he did broker the deal a little bit, because
15  Mike wanted out and here of me and because we --
16  you know, I worked for him many years ago, and so he
17  kind of brought me in and, you know, said that, you
18  know, we -- you can take this over and we continue
19  going on and stuff and I'll help you figure out what
20  needs to be done.
21     Q.      He's --
22     A.      For a cut of the profit.
23     Q.      Is he a lawyer?
24     A.      Huh?
25     Q.      Is he a lawyer?

Page 135

1      A.      No.  Is he a what?
2      Q.      A lawyer.
3      A.      No.
4      Q.      So did he tell you anything about the
5   legality of what you're doing?  Did he express an
6   opinion about that?
7      A.      No.
8      Q.      Did he express any concerns about what
9   you're doing?
10     A.      No.
11     Q.      Did Michael Erickson tell you before you
12  took over his company that he had been sued for this
13  before, for collecting debts?
14     A.      Yeah, by you.
15     Q.      And what did he say about that?
16     A.      He didn't really say nothing, other than
17  I know through the grapevine that there was a
18  settlement.
19     Q.      Okay.  Did he tell you about any other
20  lawsuits against him before you took over his
21  business?
22     A.      No.
23     Q.      Did John Sindt ever tell you not to worry
24  about whether or not what you're doing is legal?
25     A.      Yeah, because we're exempt because we're

Page 136

1   law enforcement.
2      Q.      Did he ever say, Don't worry about it
3   because the amount you'll have to pay in a settlement
4   is lower than how much you'll bring in?
5      A.      No.
6      Q.      And so he specifically advised you that
7   you're exempt from the FDCPA?
8      A.      And with -- yeah.
9      Q.      Did you do anything to research that
10  issue and follow up, make sure he was right?
11     A.      I looked through the -- through the FD --
12  or, yeah, for that thing and it says law enforcement
13  is exempt.
14     Q.      And you did that when?
15     A.      Pretty much from the start.
16     Q.      Okay.  And when you say "pretty much from
17  the start," can you --
18     A.      Maybe it was a month or two down the road
19  after I started doing it.
20     Q.      Okay.  So you started doing it first,
21  then thought maybe I better check?
22     A.      Kind of, because I -- my understanding
23  was we were exempt.
24     Q.      Did you check to see whether you were
25  exempt before I sued?

Page 137

1      A.      Well, yeah, I looked through the statute
2   and the statute says if, you know, you're law
3   enforcement enforcing an order, then you're exempt.
4      Q.      Okay.  So even though you hadn't been
5   sued yet, you thought you should at least find out if
6   you're covered under the FDCPA?
7      A.      Yeah.
8      Q.      And is the reason you did -- what's --
9   why did you?
10             Let me start -- or rephrase that.
11             Why did you think you needed to check the
12  FDCPA first?
13     A.      Well, because of the issue with Mike.
14     Q.      Any other reason?
15     A.      Well, that issue was brought up, and I
16  just wanted to kind of make sure that what I was being
17  told was actually in the -- FDCPA.
18     Q.      And so do you recognize, then, that what
19  you do in collecting debts or collecting judgments is
20  similar to the way a regular debt collector does it?
21             MR. GARDNER:  Object to the form.
22  Foundation.  Argumentative.
23             MR. STEPHENSON:  You can answer.
24             THE WITNESS:  It appears that way.  But
25  it's -- I firmly believe it is not.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 138..141

Page 138

1        Q.      BY MR. STEPHENSON:  And the reason you
2    believe it is not is because of the language in the
3    FDCPA that exempts process servers?
4        A.      Exempts law enforcement or peace
5    officers.
6        Q.      Okay.
7        A.      And since I am a Utah State POST
8    Certified Peace Officer, I'm certified as a
9    correctional officer, special function officer, and
10   police officer.
11       Q.      Are you aware of any other constables
12   that collect debt the same way you do?
13       A.      Not right off.
14       Q.      Have you ever heard of anyone other than
15   Michael Erickson -- are there any -- ever been aware
16   of any other constables that collect debt the way you
17   do?
18       A.      Not to my knowledge.
19       Q.      Are you aware -- well, when you worked
20   for Wasatch Constables you didn't collect debt the
21   same way you do now; is that right?
22       A.      What's that?
23       Q.      When you worked for Wasatch Constables,
24   you didn't collect debt the same way you are now?
25               MR. GARDNER:  Object to the form of the

Page 139

1    question.  Misstates testimony.
2                MR. STEPHENSON:  Well, let's go through
3    it, then, we can get rid of this objection.
4        Q.      When you worked for Wasatch Constables,
5    did you collect debt?
6                MR. GARDNER:  Same objection.
7                THE WITNESS:  There's a few executions we
8    did, yeah.
9        Q.      BY MR. STEPHENSON:  Okay.  And when you
10   did those executions, did you seize and sell the
11   property?
12       A.      Most of the time.
13       Q.      Okay.  And what -- when -- the times you
14   didn't seize and sell the property, what did you do?
15       A.      The writs back then was for a specific
16   item, and if we didn't get it, then we didn't get it.
17       Q.      But you always tried to take it?
18       A.      Yes, or payment.
19       Q.      Or payment.
20               So you -- when you worked for Wasatch
21   Constables, you would knock on people's doors and talk
22   about payment?
23       A.      Yeah.  Got a judgment here, either need
24   the item or I need a payment.
25       Q.      Okay.  And payment in full or partial

Page 140

2    payments?
3        A.      I'd take a couple partial payments.
4        Q.      And partial payments were enough to
5    satisfy the judgment?
6        A.      Yeah.
7        Q.      Always?
8        A.      Yeah.
9        Q.      And for -- when you worked for Wasatch
10   Constables executing writs of execution, did you ever
11   send a notice of sale?
12       A.      God, that was five, six years ago, at
13   least.  Yeah, we did send -- sales.
14       Q.      And did you actually show up for those
15   sales?
16       A.      Yes.
17       Q.      Every time?
18       A.      Yes.
19       Q.      And you seized the property every time?
20       A.      When we held the sale, yes.
21       Q.      And the ones you didn't hold a sale that
22   you showed up for, you didn't hold the sale because
23   they paid?
24       A.      Yeah, we didn't even have the sale.
25       Q.      So sometimes you -- when you execute a
26   writ of execution for Wasatch Constables, you show up

Page 141

1    to the door, you hand the writ to them and tell them
2    if you pay now, we're good, and they would write you a
3    check or pay somehow?
4        A.      You make it sound so black and white.
5        Q.      Okay.
6        A.      Every writ's a little different.  The
7    object is to either seize or to get payment.  We
8    didn't always get payment right then and there.
9    Sometimes it was payment a little bit down the road,
10   or we'd get the item a little bit down the road
11   because the item wasn't there.  And I'm losing my
12   voice.
13       Q.      When you worked for Wasatch Constables,
14   did you ever -- or anyone there -- ever send a
15   collection letter saying if you pay us, we don't have
16   to take your stuff?
17       A.      No.
18       Q.      Did they -- did anyone at Wasatch
19   Constables ever set up a phone system to receive
20   incoming calls so they can take payments from debtors?
21       A.      Not that I'm aware of.
22       Q.      Do you -- do you recognize that what
23   you're doing is unique, then, to you and Michael
24   Erickson?
25               MR. GARDNER:  Object to the form.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                              Pages 142..145

Page 142

1      Q.    BY MR. STEPHENSON:  The way you're
2  collecting debt through these letters, do you
3  recognize that that is unique among --
4      A.    Yes.
5      Q.    Other -- other constables don't do what
6  Constable Kolkman LLC does.
7            MR. GARDNER:  Object to the form.
8  Assumes facts not in evidence.
9            THE WITNESS:  Yeah.
10     Q.    BY MR. STEPHENSON:  Okay.  I'm trying to
11 remember, you said FileMaker Pro is what you use to
12 track time?
13     A.    It's what we use to keep track of the
14 orders, yeah.
15     Q.    And is that what you use to track the
16 payments that debtors make to you?
17     A.    Yes, it goes in there.
18     Q.    Do you use any other software to track
19 what is happening in your process?
20     A.    In the process?  I think we create a --
21 oh, God, now you going to make me figure out a term
22 that I forgot.  A spreadsheet --
23     Q.    Okay.
24     A.    -- that lists all the payments we got and
25 how they were disbursed.

Page 143

1      Q.    And do you have a place where you keep
2  notes of what happens with your interactions with the
3  debtor?
4      A.    It's in FileMaker.
5      Q.    Okay.  Do you use any other software to
6  track that kind of interaction with debtors?
7      A.    No.
8      Q.    How is -- how did Wasatch Constables
9  track writs of execution?  Did they use the same kind
10 of system?
11     A.    No.
12     Q.    And what system did they use?
13     A.    I don't -- can't remember.  You know.
14     Q.    What do you use for payment processing?
15 You have a service?
16     A.    A what?
17     Q.    Payment processing.  People can pay you
18 with credit cards?
19     A.    Square.
20     Q.    Square, okay.
21           So people can pay you with credit cards,
22 debit cards, that kind of thing.
23           We're getting close.
24     A.    Close to being done?
25     Q.    No.

Page 144

1      A.    Oh, shit.
2      Q.    Well, yes.
3      A.    Sorry.
4            MR. STEPHENSON:  I'm just wondering where
5  to break because of lunch.
6            MR. GARDNER:  It's here.
7            MR. STEPHENSON:  Oh, it is?  Okay.  Let's
8  break.  Let's do that, then, because I -- yeah, I
9  just -- I could keep going, but if your lunch is here,
10 let's stop.
11           MR. GARDNER:  Yeah.  So it's 12:30, come
12 back at 1:00.
13           MR. STEPHENSON:  Okay.
14           MR. GARDNER:  Does that sound good?
15           MR. STEPHENSON:  Yeah, that sounds good.
16           (The lunch break was taken from
17            12:27 p.m. until 1:05 p.m.)
18           MR. STEPHENSON:  Let's mark this exhibit.
19    (Exhibit 9 was marked for identification.)
20     Q.    BY MR. STEPHENSON:  Do you recognize
21 Exhibit 9?
22     A.    Not right off, no.
23     Q.    Okay.  This was provided by your
24 attorneys.
25     A.    That must have been the readout on that.

Page 145

1      Q.    Will you do me a favor and look at both
2  pages before you tell me what this document is,
3  because it might help to look at the second page.
4            I should say you don't need to read it,
5  but look at both -- you can read it if you want, but I
6  think it will just save us time if you look at both
7  pages.  I don't have a lot of questions on it.
8      A.    Okay.
9      Q.    So you've read the whole document.  What
10 is this?
11     A.    It looks like it's a -- a readout of
12 everything that happened from the time we got the writ
13 and a little bit for Corey at the end there.
14     Q.    And that's -- I'm going to -- I'm going
15 to go on my assumptions of what this is and you tell
16 me where I'm wrong as we go.
17           So if I go to the second page, it's got a
18 heading that says "Here is a complete record of our
19 notices on the docket."
20           Do you see that section?
21     A.    Yes.
22     Q.    I assume, and you tell me if I'm wrong,
23 this section is what is actually in your software
24 system, whatever it's called?
25     A.    Yeah, computer.

Page 146

1      Q.      Okay.  Is that correct, that -- that's
2  the section that's actually entered?
3      A.      That would be my assumption also.
4      Q.      You don't know for sure?
5      A.      Well --
6      Q.      It's FileMaker Pro; right?
7      A.      Yeah.
8      Q.      Okay.
9      A.      I think -- I think a lot of this part
10 here with the dates and stuff are what was in the
11 computer, and this is probably just a quick little
12 synopsis that he did.
13     Q.      Okay.  You're not sure, though; is that
14 right?
15     A.      I'm not sure, no.
16     Q.      Okay.
17     A.      This is -- my assumption is this part
18 here is what was in the computer, because that looks
19 like --
20     Q.      The first part?
21     A.      Yeah.
22     Q.      Okay.
23     A.      Okay.  And then this part down here, the
24 note, that is Corey's explanation of kind of what
25 happened.

Page 147

1      Q.      Okay.
2      A.      And then this is just a synopsis of
3  timing and everything on --
4      Q.      The second part?
5      A.      Yeah.
6      Q.      Okay.  And let me tell you why I think
7  that's wrong, and if you don't know for sure, that's
8  okay.  I'm not trying to trick you or trap you here.
9  I really am just -- I know, I'm just --
10     A.      Isn't that your job?
11     Q.      No, it's not.  I'm literally -- I've seen
12 a lot of collection notes in a lot of collection
13 cases, and that's what this looks like to me.
14             But this bottom part, to me, where it's
15 got the date and the time and then the -- and then the
16 note, that looks more like the -- a normal collection
17 note to me than the other part that you indicated in
18 the front.
19             So what I'm wondering is -- and if you
20 don't know, that's just fine -- but I think this
21 bottom part where it's got the date and time listed
22 and then the note is what's in your computer, and then
23 the rest of it was written later to explain the
24 details.
25             Do you think that's wrong or right, or do

Page 148

1  you know?
2      A.      I think that's probably correct.
3      Q.      Okay.  Because I've seen a lot of these,
4  and that's what it looks like to me.
5             So that if we're showing this to a jury,
6  or to a random person even, frankly, what's in your
7  computer normally for a normal case is probably -- and
8  you tell if you know -- this bottom part where it's
9  got the date and the time and then the note, if I was
10 looking at a different case, that's what would be
11 listed.  The additional explanation on the -- on
12 Page 1 would not be listed normally.
13     A.      No, this part here --
14     Q.      On Page 1.
15     A.      -- is what's going to be in the computer
16 down to where the note is.
17     Q.      Okay.  And -- and then can you tell me
18 why that doesn't include the time?
19     A.      It doesn't include the what?
20     Q.      The time.
21     A.      The time?
22     Q.      Yeah.
23     A.      Don't know.
24     Q.      Okay.  And then if we go to the second
25 page, you see the --

Page 149

1      A.      Got the date.  It happened that day.
2      Q.      The notes on the second --
3      A.      They didn't -- okay, so...
4      Q.      See the notes on the second page have a
5  date and a time, and they're more clinical.
6      A.      Okay, yeah.  He didn't put the -- these
7  are the notes.  He probably transcribed them, because
8  it would have had the date and time.  So here where he
9  did the -- the synopsis kind of, it had the date and
10 time.  If you go back here, it -- yeah, it should
11 match up between one -- yeah.
12     Q.      I really am not trying to trick you.
13             What it looks like to me is the clinical
14 part of it on the back page where it's got the date,
15 the time, and then it says something like "assigned
16 103 pre-service letter."
17             That's a typical collection-type of note
18 that I'm used to seeing without -- but then when I go
19 over to this first page, the date is listed, and then
20 it's got an explanation written.  Let's go through
21 that.
22             It says "Sent pre-service letter," but
23 then there's an explanation added.  "The purpose of
24 this letter is to let the defendant know that we have
25 received a writ of execution and to call us to talk

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                    Pages 150..153

Page 150

```
1    about it."
2              Do you see that where I am?
3         A.   Yeah, yeah.
4         Q.   That normally wouldn't be in a normal
5    collection note.
6         A.   No.
7         Q.   And that's why I think this first page is
8    actually a description that was made later.
9              Do you know if this was made later than
10   the -- than the indicated notes on Page 2?
11        A.   I don't know.
12        Q.   Okay.  That's perfect, because that --
13   that's a good answer, because then that helps me
14   understand -- that's good.
15             Do you know in a -- in a typical case,
16   are they taking notes of the kind that are indicated
17   on either page, Page 1 or Page 2?
18        A.   Yeah, the one with the date and time on
19   it, what we did, yeah, that would be -- that is --
20   yeah.  And this last note on 9-19, that probably would
21   have been one that's in the computer.
22        Q.   Okay.  I totally think you're right on
23   that.
24        A.   Yeah.
25        Q.   That makes sense to me.
```

Page 151

```
1         A.   So I take this is he just kind of
2    explained each one.
3         Q.   Okay.  And that's -- that's good to --
4    I -- that helps me with my assumption that Page 2 is
5    the actual note found in the computer system, whereas
6    the first page is taking those notes and -- and
7    providing additional details.
8         A.   I'll give you that.
9         Q.   Okay.  Okay.  So we look at 8-17, the
10   pre-service letter is sent; correct?
11        A.   Yep.
12             And that is the first letter, which was
13   Exhibit 2; is that correct?
14        A.   Yeah.
15             MR. GARDNER:  Why don't you look at
16   Exhibit 2.  In fact, I'll tell you to look at
17   Exhibit 2 and 3 --
18             MR. STEPHENSON:  And we'll go to --
19             MR. GARDNER:  -- before you answer that
20   question.
21             MR. STEPHENSON:  We'll go through all of
22   those letters one at a time, because they're all --
23   they're all listed.  Actually, they're not, but let's
24   go through them one at a time.
25        Q.   Exhibit 2 --
```

Page 152

```
1              MR. GARDNER:  So just so you understand
2    the question he's asking you, the second page of that,
3    when you said pre-service letter, if you know which
4    one of those letters went out.
5              MR. STEPHENSON:  That's not what I'm
6    asking, actually.
7              THE WITNESS:  Huh?
8              MR. STEPHENSON:  That's not what I'm
9    asking, actually.
10             THE WITNESS:  What are you asking?
11        Q.   BY MR. STEPHENSON:  Well, Exhibit 2 -- we
12   can get to that in a minute -- but here are your notes
13   on both one -- both pages say that a pre-service
14   letter went out August 17, 2023.  Do you know if
15   Exhibit 2 was that letter?
16        A.   I do not know, but I would assume.
17        Q.   Okay.  And the reason you don't know is
18   because there -- of Exhibit 3 that makes it confusing
19   on which letter it was?
20        A.   Correct.
21        Q.   And -- but in a general sense when you
22   list -- when -- when it lists a pre-service letter,
23   this is the general -- Exhibit 2 and 3 is probably
24   what that's referring to?
25        A.   Yes.
```

Page 153

```
1         Q.   Okay.
2         A.   Probably.
3         Q.   You're not aware of any other letters it
4    might be besides Exhibit 1 or 2?
5              MR. GARDNER:  2 or 3.
6              MR. STEPHENSON:  Oh, yeah, 2 or 3.
7              THE WITNESS:  Yeah.
8              MR. STEPHENSON:  Okay.
9              THE WITNESS:  And we don't use them
10   anymore.
11        Q.   BY MR. STEPHENSON:  Either one?
12        A.   No.
13        Q.   What do you use in replacement of these
14   two letters?
15        A.   Service.  In person.
16        Q.   Okay.  So if we go to the next note, and
17   I -- let's start -- let's do the front page to look at
18   this.  It's got a note for August 21, 2023, talks
19   about the husband calling.
20             But in the second line it says "Exec
21   served, sent copy."  That means execution was served;
22   correct?
23        A.   Correct.
24        Q.   And "sent copy," what does that mean?
25        A.   Sent a copy of the writ to him, because
```

Page 154

1    he accepted service over the phone and said send it to
2    me.
3         Q.    Do you have firsthand knowledge that he
4    said that?
5         A.    Huh?
6         Q.    Do you have firsthand knowledge that the
7    husband said I accept service of process over the
8    phone?
9         A.    No.
10        Q.    It's -- you're pretty sure he did, but
11   just because of your processes; right?  You don't know
12   for certain?
13        A.    I did not hear him say that.  Andrea
14   wouldn't lie about it.
15        Q.    So when you see the note "exec served,
16   sent copy," that's Andrew saying -- or Andrea saying
17   he accepted service over the phone?
18        A.    Yes.
19        Q.    But have you heard any of the calls with
20   the husband?
21        A.    I have not.
22        Q.    Okay.  Because his contention was is that
23   you served -- is that his wife isn't the right person;
24   correct?
25        A.    After, yeah.

Page 155

1         Q.    And during this call you don't know if he
2    was saying that or not?
3         A.    Well, obviously when he talked to Andrea,
4    because the note indicates there was no indication
5    that the wife was the wrong one.
6         Q.    But that's because that was added later,
7    probably; right?
8         A.    What?
9         Q.    Well, that's why this is important,
10   because the note on Page 1 --
11        A.    Yeah.
12        Q.    -- says "exec serve, sent copy."  And
13   then she notes "There was no indication at that time
14   that his wife wasn't the defendant."
15              But that's not listed on the other page,
16   and it wouldn't have been because he -- it wouldn't
17   have been -- nobody would have even known that was an
18   issue yet.
19              Do you agree with that?
20        A.    And I don't know the answer to that.
21        Q.    Okay.
22        A.    I don't know what she said or heard.
23        Q.    And then on 9-15-23 the note says
24   "No response" -- well, let's look at page -- well,
25   let's look at both.  Page 1 says "No response from

Page 156

1    defendant or Raziel.  Sale notice sent out for sale
2    scheduled 10-6-23."
3              Did I read that right?
4         A.    Yeah.
5         Q.    Then if we go to the next page, the
6    same -- the note for note 9-15 just says "Assigned
7    101, sale scheduled for 10-6-23"?
8         A.    Yeah.
9         Q.    Okay.  So it looks like the notice of
10   sale went out because there was no response after you
11   sent the execution letter -- or excuse me -- the
12   pre-service letter?
13        A.    Right.  And he called and said that he
14   would call back by 9-5.
15        Q.    And he called and -- go ahead.
16        A.    And he didn't call back, so on 9-15 it
17   appears that the notice of sale was sent out.
18        Q.    Okay.  And what triggered his initial
19   call was the execution being served or the letter --
20   he must have received the pre-service letter?
21        A.    Or sticky on the door.  I'm not sure
22   about that.
23        Q.    Okay.  And Exhibit 4, it's dated for
24   August 21, 2023.  It's this one if it helps, yeah.
25   But I don't see it in these notes.

Page 157

1         A.    Don't see what?
2         Q.    Exhibit 4.  I don't see a letter being
3    sent on August 21, 2023, or is that the one that's
4    noted where it says "Execution served, sent copy"?
5         A.    Yes.
6         Q.    Okay.  So the letter -- what do you call
7    this letter that's attached to the execution?
8         A.    I'm not sure what they call it.  Cost.
9         Q.    And do you still send that one?
10        A.    Nope.
11        Q.    What do you do in place of this cost
12   letter?
13        A.    Nothing.
14        Q.    When you serve a writ of execution now,
15   what do you attach to it?
16        A.    There's a letter we attach that NAR sent.
17        Q.    Okay.  And then on 9-19-23, that's when
18   the husband came in to talk to Corey?
19        A.    Yeah.  9-19, yeah.
20        Q.    And that's when he -- the husband
21   indicated "my wife is not the right person"?
22        A.    Yep.
23        Q.    And the response to that discussion was
24   to cancel the sale?
25        A.    Correct.

Page 158

1      Q.      And when we say "cancel the sale," how do
2  we really call it that if the sale was never actually
3  scheduled to occur?
4          Why does it say the sale was canceled
5  when there was no sale actually scheduled?
6      A.      There was a sale scheduled.
7      Q.      Okay.
8      A.      I'm getting so much stuff here.
9      Q.      Oh, it's about to get worse.
10     A.      Yeah, just notice of sale for 10-6.
11     Q.      Well, you're looking at the notice of
12  sale as if the sale was actually scheduled, but it
13  wasn't.  We know that it wasn't because you were not
14  going to conduct the sale?
15         MR. GARDNER:  I'm going to object.
16         THE WITNESS:  Didn't know at that time.
17         MR. GARDNER:  I'm going to object to the
18  form of the questions.  Mischaracterizes testimony.
19  Argumentative.  Yeah.
20     Q.      BY MR. STEPHENSON:  In discovery we asked
21  you to produce documents.  Did you produce all of the
22  documents relevant to this case to your attorneys?
23     A.      Yes.
24     Q.      When did you do that?
25     A.      I don't know.

Page 159

1      Q.      Was it yesterday?
2      A.      No.
3      Q.      Was it more than a month ago?
4      A.      I don't recall the date.  I've got so
5  many cases with you, I don't know which one we
6  answered first.
7      Q.      Okay.  Have you -- okay.
8          Are you aware that -- that two days ago
9  at 4:17 p.m. your attorneys dumped 1,306 pages of
10  materials on me?
11     A.      Kind of, yeah.
12     Q.      Okay.  Do you know how long ago -- how
13  long ago you pro- -- provided those documents to your
14  attorneys?
15         MR. GARDNER:  I'm going to object to the
16  form.  I think you're getting into attorney-client
17  privilege area a little bit, and I'm just going to
18  advise him not to testify about any communications
19  he's had with counsel.
20         BY MR. STEPHENSON:  I'm not asking about
21  communications.  I'm only asking when you provided
22  documents.
23     A.      I don't recall exactly.
24     Q.      And do you know what you provided?
25     A.      What you asked for and you got.

Page 160

1      Q.      Do you know if your attorneys are
2  withholding any more documents that they haven't
3  produced yet?
4          MR. GARDNER:  Object to the form of the
5  question.  Argumentative.
6          THE WITNESS:  I don't.
7          MR. GARDNER:  Calls for speculation.
8      Q.      BY MR. STEPHENSON:  You're not
9  withholding any other documents?
10     A.      (Witness shakes head.)
11     Q.      Your attorneys, whether they are or not,
12  you don't know, but you're not?
13     A.      We've -- we've produced everything that's
14  been asked of us.
15     Q.      Okay.  Headache's getting worse.  It's
16  about to get worse.
17          Okay.  So one of the documents your
18  attorneys produced a day and a half ago had 1,053
19  pages.  Those pages were mostly emails and ledgers.
20          Are you aware of that?
21     A.      I believe Corey worked those out, yeah,
22  got them all.
23     Q.      Those are emails between your employees
24  and Olson and Shaner and NAR?
25     A.      Yeah.

Page 161

1      Q.      Have you looked through those documents?
2      A.      Did I look through them?  No.
3      Q.      You haven't?
4      A.      Do I have them?
5      Q.      No.  Have you seen them?
6      A.      Not really, no.
7      Q.      So a thousand pages that were produced,
8  but you don't know what -- or you didn't look at them,
9  but you do know what's in them?
10     A.      Right off, no, I don't.
11     Q.      Okay.  Okay.  Let's mark this next one.
12  (Exhibit 10 was marked for identification.)
13     Q.      BY MR. STEPHENSON:  Okay.  Corey -- this
14  is an email, it says from Corey Revill to Josie Just.
15          Do you see that?
16     A.      Yeah.
17     Q.      And Josie Just is an employee of Olson
18  and Shaner?
19     A.      I believe so.
20     Q.      And this email indicates that a client,
21  who is not identified, but paid six payments to
22  Michael Erickson; correct?
23     A.      It appears that way.
24     Q.      And why is this email being sent
25  December 29, 2023, if the client -- or excuse me --

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                Pages 162..165

Page 162

1  the debtor hasn't made a payment since 2020?
2          MR. GARDNER:  Objection to the extent it
3  assumes facts not in evidence.  Foundation.
4          MR. STEPHENSON:  You can answer.
5          THE WITNESS:  I don't know.  You'd have
6  to ask Corey.
7      Q.   BY MR. STEPHENSON:  Corey's using a Gmail
8  address, not an address from your company?
9      A.   He did there.
10     Q.   Okay.  So you don't know if this client
11 paid more than six payments or not?
12     A.   I do not.
13     Q.   You -- do you know if this client ever
14 received a notice of sale?
15     A.   I do not.
16     Q.   And you'd know for -- you do know for a
17 certainty that this client never had his property sold
18 or seized by dry?
19     A.   Not by me, no.
20     (Exhibit 11 was marked for identification.)
21     Q.   BY MR. STEPHENSON:  Okay.  Exhibit 11 is
22 an email from Corey to Josie again.  Do you see the To
23 and From and confirm that I'm correct on that?
24     A.   Yeah.
25     Q.   And this is May 16, 2023.  That was after

Page 163

1  you took over from Michael Erickson; is that correct?
2      A.   Yes.
3      Q.   Okay.
4      A.   Sorry, I'm kind of looking at what it
5  says.
6      Q.   Sure.  And it's listing -- it looks to me
7  like it's listing four different people that had
8  different updates on their cases; is that accurate?
9      A.   That would be an assumption.  I can't say
10 for sure because I can't see it, but, yeah, probably.
11     Q.   Yeah, the first one says "not served";
12 right?
13     A.   Yeah.
14     Q.   The second one says "hasn't made payments
15 since August 22, '22.  Isn't responding to any of my
16 calls to them"; right?
17     A.   Yeah.
18     Q.   And then the third one looks like it's
19 probably someone else.  It says "I've called him
20 numerous times and he wasn't responding.  I tried him
21 again and he paid in full the balance haha!"  Smiley
22 face emoji.
23     A.   Okay.
24     Q.   So that's probably a third person?
25     A.   Yeah.

Page 164

1      Q.   And then the fourth one it mentions that
2  he hasn't made payment since 2022 and isn't responding
3  to any of our calls or letters?
4      A.   Okay.
5      Q.   So we've got updates that -- that your
6  company is sending to Olson Shaner on these four
7  cases?
8      A.   That would probably be a good assumption.
9      Q.   All right.  And it's acknowledging that
10 these -- that lots of phone calls are being made to
11 these clients, or these debtors, excuse me.
12         MR. GARDNER:  Object to the form.
13 Mischaracterizes testimony.  The document speaks for
14 itself.
15         MR. STEPHENSON:  Go ahead and answer.
16         THE WITNESS:  What was the question
17 again?
18     Q.   BY MR. STEPHENSON:  This indicates your
19 company is calling and making -- engaging in numerous
20 phone calls with other people, debtors?
21         MR. GARDNER:  Same objection.
22         THE WITNESS:  Judgment debtors.
23     Q.   BY MR. STEPHENSON:  But that's what it
24 says; right?
25     A.   Yeah, it does say that he made phone

Page 165

1  calls.
2      Q.   Okay.  And I just want to be clear, I'm
3  not trying to be confrontational.  Documents don't
4  speak for themselves, that's why we have depositions
5  so you can explain these.  It's just that simple.
6         So is this kind of an update to Olson
7  Shaner typical of what your company sends?
8      A.   If they request an update, we will update
9  and tell them what's going on with it.
10     Q.   Okay.
11     (Exhibit 12 was marked for identification.)
12     Q.   BY MR. STEPHENSON:  Exhibit 12 is an
13 email Corey sent to Josie in 2024 of February;
14 correct?
15     A.   Yeah.
16     Q.   And it says "Defendant has been served
17 with both executions and sale was scheduled"; correct?
18     A.   Yeah.
19     Q.   "Defendant doesn't respond to notices,
20 and when we talk to her on the phone, she said" no
21 thanks -- or "'no thank you' and hung up"; correct?
22     A.   Yes.
23     Q.   And after she hung up you didn't do a
24 sale?
25     A.   No.  It looks like we did an asset check.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                                Pages 166..169

Page 166

1      Q.    All right.  And then reported that to
2  Olson Shaner?
3      A.    Yeah.
4      Q.    Do you know what happened to the -- to
5  this in the end?  Did anybody ever pay or get their
6  sale?
7            That's a stupid question.  Let me
8  rephrase.
9      A.    Okay.
10     Q.    Do you know if this debtor ever paid?
11     A.    I do not.
12     Q.    You know for a certainty this debtor
13 never -- you never conducted a sale of her property?
14     A.    I don't know who it is, so I don't know.
15     Q.    Well, you do know because you haven't
16 done any sales in the last two years.  So you know
17 this debtor didn't have her -- you didn't sell her
18 property.
19     A.    I don't know whether we held a sale or
20 just returned her with no assets.
21     Q.    Well, you've testified multiple times
22 that you haven't sold -- held any sales in the last
23 two years; correct?
24     A.    Correct.
25     Q.    So you know you didn't sell her property?

Page 167

1      A.    No.
2      Q.    No, you don't know?
3      A.    No, we did not.
4      Q.    Okay.  That's -- that's it.  Thank you.
5      A.    But I don't know whether they set a sale,
6  either.
7            (Exhibit 13 was marked for identification.)
8      Q.    BY MR. STEPHENSON:  Exhibit 13 is an
9  email from Corey to Josie at Olson Shaner on March 5,
10 2024; correct?
11     A.    Yeah.
12     Q.    And this debtor is a -- this update to
13 Olson Shaner is telling the -- Olson Shaner that this
14 guy has no way to pay, and he said -- he said "He
15 understands that you need to do what you need to do
16 and he will pay a number," and it's blanked out;
17 correct?
18     A.    Yes.
19     Q.    And he says he's going to pay some money
20 in March and then pay in full in April; correct?
21     A.    I believe that's what it's saying.
22     Q.    Okay.  And if we go down to what
23 triggered this email, we see what Josie wrote to --
24 well, hang on.
25            Well, we go down and we see another email

Page 168

1  from Corey where -- hang on.  Let me start over.
2            Because initially Josie sent an email at
3  the very bottom, it goes backwards, she's sending an
4  email to Corey telling him the judgment is about to
5  expire, but the debtor's been making payments;
6  correct?
7      A.    It appears that way, yeah.
8      Q.    Okay.  And then Corey reached out -- or
9  said "I reached out to him and his wife and left
10 messages on their voicemails.  They are set up to pay
11 in full 3-14" -- meaning March 14th -- "I'm pretty
12 sure that if they call me back they will pay in full
13 now to avoid the number" banked out cost.  "I'll keep
14 you posted."  Smiley face emoji; correct?"
15     A.    Yeah.
16     Q.    So this is Olson and Shaner and Corey
17 going back and forth on what to do with this case?
18     A.    On what's happening with the case.
19     Q.    Yeah, right.  They're coordinating what's
20 happening, sending informing back and forth and
21 deciding how to handle it; right?
22            MR. GARDNER:  Object to the form.
23            THE WITNESS:  I don't know whether they'd
24 be -- Corey's letting her know -- letting them know
25 that this is what's going on with it.

Page 169

1      Q.    BY MR. STEPHENSON:  Okay.  Corey has
2  already got a deal, and he's just notifying Olson and
3  Shaner what that is?
4      A.    It appears that way, yes.
5            (Exhibit 14 was marked for identification.)
6      Q.    BY MR. STEPHENSON:  Exhibit 14 is an
7  email from Corey to Josie on December 19, 2023;
8  correct?
9      A.    Yep.
10     Q.    If we go down that page halfway, it
11 starts with another email from Joe Beecroft; correct?
12     A.    Yeah.
13     Q.    And who is Joe Beecroft?
14     A.    I'm not sure.  I think he's -- either
15 works for NAR or Olson and Shaner.
16     Q.    Okay.  Beecroft said to Josie "Please
17 follow up with the constable's office on the writ of
18 execution in this case."  And then he says "Please
19 find out if the constables has discussed resolution of
20 payments"; correct?
21     A.    It does say that.
22     Q.    So you can see from this email -- oh,
23 let's see.  When the date, December 19, 2023, that
24 was -- you were fully involved with the collections
25 because you took over almost a year before that; is

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 170..173

Page 170

1    that right?
2        A.    What was the question?  I was reading
3    this.
4        Q.    When this email was sent on December 19,
5    2023 -- 2023, you were -- this was -- when he says --
6        A.    Yes.
7        Q.    -- the constable's office, he's referring
8    to your office, not Erickson?
9        A.    Right.
10       Q.    Okay.  And so -- and then -- and then
11   Josie responds -- or not responds -- but she connects
12   to Corey and says "Can I have an update on this
13   account"; correct?
14       A.    Yeah.
15       Q.    Okay.
16       (Exhibit 15 was marked for identification.)
17       Q.    BY MR. STEPHENSON:  Exhibit 15 is an
18   email from Corey Revill to Mark Olson, March 6, 2024;
19   correct?
20       A.    Yeah.
21       Q.    And Mark Olson, who is that?
22       A.    He's an attorney at Olson and Shaner.
23       Q.    Okay.  And the email from Corey -- well,
24   let's see.  Let's go to the bottom and start at the --
25   where this chain starts.  It's Corey emailing Mark

Page 171

1    Olson payment reports; correct?
2        A.    Yeah.
3        Q.    And how often do you or your company or
4    your office email payment reports to NAR and Olson
5    Shaner?
6        A.    Once a week.
7        Q.    And then Mark responded by saying "Wow,
8    it looks like the power of tax season has kicked in.
9    Thanks, Corey"; correct?
10       A.    Oh, I was reading the line above that.
11   Yeah.
12       Q.    Okay.  And the line above that is Corey
13   responding, "Yep.  We are getting a lot of defendants
14   who just want to pay in full their balance."  Smiley
15   face emoji.
16       A.    Okay.
17       Q.    Okay.
18       A.    That's it?  No question on that?
19       (Exhibit 16 was marked for identification.)
20       Q.    BY MR. STEPHENSON:  Exhibit 16 is -- the
21   top lists a -- it's a chain of emails.  It's an email
22   chain, but I'm going to start with the date of the
23   last email sent.  It looks like they're all the same
24   date.
25       It's from Corey Revill to Josie Just

Page 172

1    May 30, 2023; correct?
2        A.    Yeah.
3        Q.    If you go to the back page, it starts
4    with an email from -- whoa -- looks like Jazmynn Pok.
5        Do you see that, the very last signature
6    from Parsons Behle Latimer?
7        A.    Okay.
8        Q.    And Jazmynn, for the record, is spelled
9    J-A-Z-M-Y-N-N.  Pok is P-O-K.
10       And it says "Mr." -- blank -- "would like
11   to reconsider entering into a payment plan with your
12   client.  Is there any offer still on the table?  He
13   wants to offer" blank "amount per month as a payment."
14       Do you see that at the top of the second
15   page?
16       A.    Yeah.
17       Q.    And so that was sent from Jazmynn Pok to
18   Joe Beecroft of Olson Shaner.  At the bottom of the
19   first page shows that.
20       A.    Okay.
21       Q.    And that was May 24, 2023.  You agree?
22       A.    Yeah.
23       Q.    Okay.  And then Beecroft forwarded this
24   email to Josie, and that's in the middle of Page 1, he
25   says "Can you please follow up with the constable on

Page 173

1    this account and let them know that the DTR would like
2    payments."
3        Do you see that?
4        A.    Yeah.
5        Q.    And "DTR" means debtor, probably, or do
6    you know?
7        A.    I don't know what that abbreviation is.
8        Q.    Okay.  And then it says "He appears to be
9    in agreement on" blank "money per month.  But in the
10   meantime, let the constable know so they do not both
11   set" -- hang on, let me read that again.
12       "Let the constable know so that they do
13   not both to set a sale date and so they may follow up
14   with DTR."
15       Did I read that right or close?
16       A.    Yeah.
17       Q.    Yeah.  So Joseph Beecroft is telling his
18   employee, Josie, whatever she is, to follow up with
19   the constables on this; correct?
20       A.    Yeah.
21       Q.    And then she does.  She emails Corey and
22   it's blanked out what she said; correct?
23       A.    Yeah.
24       Q.    And the response was -- the response from
25   Corey was "Thanks, Josie, he did call and set up

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 174..177

Page 174

1  payments"; right?
2      A.    Yeah.
3      Q.    Okay.
4  (Exhibit 17 was marked for identification.)
5      Q.    BY MR. STEPHENSON:  Exhibit 17 is an
6  email from Corey Revill to Mark Olson dated for
7  January 31, 2024.
8          Do you see that at the top of the email?
9      A.    Yeah.
10     Q.    This is -- tell me what this is.
11     A.    It looks like it's an Excel report of the
12  payments we received.
13     Q.    This is one of the weekly -- what do you
14  call it? -- updates to NAR and Olson Shaner that you
15  provide?
16     A.    Yeah.
17     Q.    There were a lot of these in the
18  documents your attorneys served on Monday.  This is
19  just a sample of that.  Do you see -- do you see that
20  where I've listed out -- I've got the email and then
21  I've got the payments all listed behind it?
22     A.    Yeah.
23     Q.    Okay.  And each page of this is around 50
24  in entries; correct?
25     A.    It appears close to that, yeah.

Page 175

1      Q.    Okay.  Except for the back two pages,
2  they're a little less, but still.  A full page is
3  about 50.
4          Does this -- does that sound right, about
5  a full page of -- like say Page 2, that's about 50;
6  Page 3 is about 50 more?
7      A.    Okay.
8      Q.    Okay.  And is this --
9          MR. GARDNER:  Could I just -- for the
10  record, if you go to the second-to-last page it gives
11  you the actual number of lines.
12         MR. STEPHENSON:  Yeah, they list -- yeah,
13  kind of, but...
14         MR. GARDNER:  No, it's consecutive.
15         MR. STEPHENSON:  Except there's a --
16  okay, well, let's do that then.
17     Q.    So this lists 236 payments, if you look
18  at the second-to-last page.
19         MR. GARDNER:  Go to the second-to-last
20  and then there's one more after it, but, yeah.
21     Q.    BY MR. STEPHENSON:  So there's 236
22  payments listed here?
23     A.    Yeah.
24     Q.    Is that more or less or typical of a --
25  of a weekly report to Olson Shaner?

Page 176

1          MR. GARDNER:  Object to the form to the
2  extent it assumes facts not in evidence.
3          THE WITNESS:  It was probably pretty
4  close.
5      Q.    BY MR. STEPHENSON:  Okay.  And then the
6  next page, that's where -- that's where I got confused
7  because the headache is kicking in.  There's 16 --
8  actually, not 16.  There's 15 more entries, but those
9  are different.  Those are full payments?
10     A.    Correct.
11     Q.    Is that right?
12     A.    Yes.
13     Q.    Okay.  So you received in that one week
14  period, you received 15 payments in full?
15     A.    Yeah.
16     Q.    And 236, and it may be 235 if we take out
17  the heading.  It's probably 235 other payments;
18  correct?
19     A.    Yeah.
20     Q.    Okay.  And the purpose of this document
21  is to keep Olson and Shaner and NAR updated on what
22  money you brought in and you're paying out to them; is
23  that right?
24     A.    Yeah.
25     Q.    And you've got it -- you've got it

Page 177

1  redacted so I can't see the amounts.  Does this
2  include -- are these -- is this list including the
3  full amount that you collected, or the amount you paid
4  to Olson and Shaner and NAR?
5      A.    Probably the amount paid to NAR.
6      Q.    Do you report to them the full amount you
7  collected?
8      A.    I didn't produce that, so I can't answer
9  that because I don't know.
10     Q.    Okay.  Both Cherrington and Mountain Land
11  have expressed that they didn't know you were
12  collecting a payment and then taking some of that out
13  and then sending them a partial payment.  Does Olson
14  Shaner know that you're doing that?
15     A.    Yes.
16         MR. GARDNER:  Object to the form.
17     Q.    BY MR. STEPHENSON:  You said yes?
18     A.    I did.  Sorry.
19         MR. GARDNER:  No.  Object to the form.
20         MR. STEPHENSON:  It doesn't matter either
21  way.
22         MR. GARDNER:  It doesn't matter either
23  way, but I just want to make clear.  Object to the
24  form.  Assumes facts not in evidence.  Foundation.
25  Yeah, that's my objection.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                Pages 178..181

Page 178

1    Your answer was yes?
2    THE WITNESS:  Yeah.
3    Q.    BY MR. STEPHENSON:  Okay.  So do you have
4  any reason to believe that -- why do you think Olson
5  Shaner knows you're collecting a certain amount, then
6  taking out some of it but sending them a partial
7  amount?
8    A.    Why do they know?
9    Q.    Yeah.
10   A.    Because, from my understanding, that was
11 the arrangement that was set up way back.
12   Q.    He wanted a foundation, so I wanted to
13 make sure we had that.
14         Do you know if any of these payments are
15 from the same people that paid another month or
16 another payment?  You know, does the part that's
17 redacted indicate whether it's a first payment, second
18 payment, or anything like that?
19   A.    Not that I'm aware.
20   Q.    Okay.  And you don't -- do you know the
21 average amount of the payments that would be in these
22 reports?
23   A.    I --
24         MR. GARDNER:  I'm going to object to the
25 form.

Page 179

1         MR. STEPHENSON:  You still have to
2  answer.
3         THE WITNESS:  Anywhere from $5 to 500.
4    Q.    BY MR. STEPHENSON:  Okay.  You just
5  don't -- don't know the average?
6    A.    No, I don't.
7    Q.    You take as little as $5?
8    A.    We have.
9    Q.    Okay.  Normally it would be more, though?
10   A.    There's just one that was like that.
11   Q.    Yeah.  I think the lowest I saw was
12 actually 20.  Does that sound right, or do you know?
13   A.    Yeah.
14   Q.    And I saw a lot in the 80 to 150 range.
15 Is that pretty typical?
16   A.    Yeah.
17   (Exhibit 18 was marked for identification.)
18   Q.    BY MR. STEPHENSON:  18 is an email from
19 Corey Revill to Mark Olson on January 17, 2024;
20 correct?
21   A.    Yeah.
22   Q.    And the purpose of this document is,
23 again, to update Olson and Shaner and NAR on the
24 amount of money you've collected?
25   A.    Correct.

Page 180

1    Q.    And it even says here "Mark, here are the
2  NAR Excel payment reports for payments being delivered
3  today" smiley face emoji; correct?
4    A.    Yeah.
5    Q.    Okay.  And this one lists -- how many
6  payments does this one list?  179, probably 178
7  because of the heading.  So 178 payments.
8    A.    Correct.
9    Q.    And another 13 payments in full.
10   A.    Correct.
11   Q.    Okay.  And so is it fair to say that this
12 email, like the one before it, are fairly typical of
13 the reports you send to NAR and Olson and Shaner?
14   A.    Yes.
15   Q.    And these go out -- is it -- they go out
16 weekly.  Is that an estimate or is that clockwork?
17   A.    It used to be clockwork.
18   Q.    And it's not now?
19   A.    No.
20   Q.    Now what is it?
21   A.    We hardly get any papers, so...
22   Q.    Okay.  From Olson Shaner or from
23 everybody?
24   A.    Oh, you know that.
25   Q.    For the record, can you...

Page 181

1    A.    Our business is probably almost shut
2  down.
3    Q.    Okay.  I know that -- I know that
4  Mountain Land is not using you anymore; is that right?
5    A.    Yeah.
6    Q.    Okay.  And Cherrington isn't using you
7  anymore?
8    A.    No.
9    Q.    And Olson Shaner is?
10   A.    Kind of, yeah.
11   Q.    I've seen a few trickle in the -- I'm
12 seeing -- I'm still seeing them.  Are you saying they
13 kind of do?  Tell me about that.
14   A.    They've cut way back.
15   Q.    Okay.  Have you started actually
16 executing the sales and seizing and selling of
17 property for them?
18   A.    We're still doing the same research on
19 them.  I'm not -- I'm not going to set a sale and ruin
20 somebody's life for a TV or that.  If they have
21 something of value that we can get and sell that it's
22 going to make a dent and it's -- you know, if they
23 have one vehicle, they got a $3,000 exemption right
24 there.
25         And if there's a lien or, you know, or if

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                    Pages 182..185

Page 182

1 it doesn't have a lien, you know, and it's a 1979
2 Pinto, what would you do?
3      Q.    Right.
4      A.    Leave it there.  So it's -- it's a
5 judgment call on a lot of them to see if there's
6 anything that's worth taking or not.
7            If there isn't, I try not to and try to
8 work with them until it gets to a point where I turn
9 it back in as no value -- no property of value.
10     Q.    I understand that -- that notion that
11 it's, you said, destroyed their life over a TV.
12 Taking someone's property can be destructive.  It can
13 prevent them from going to work.
14           A lot of these people are disabled;
15 right?
16           MR. GARDNER:  Object to the form.
17     Q.    BY MR. STEPHENSON:  No?
18           MR. GARDNER:  Misstates testimony.
19 Assumes facts not into evidence.
20           MR. STEPHENSON:  Okay.  Never mind,
21 I'll -- yeah.
22     Q.    You think most of these people aren't
23 disabled or in some way down -- well, let's say
24 disabled.  Do you know --
25           MR. GARDNER:  Object to the form.

Page 183

1      Q.    BY MR. STEPHENSON:  -- whether or not
2 these people that you're collecting from are disabled?
3           MR. GARDNER:  Object to the form.
4 Argumentative.  Assumes facts not into evidence.
5           THE WITNESS:  I couldn't say the
6 percentage on which ones are and which ones are not.
7      Q.    BY MR. STEPHENSON:  You know some of them
8 are?
9           MR. GARDNER:  Object to the form.
10          THE WITNESS:  Me personally?
11     Q.    BY MR. STEPHENSON:  Yeah.
12     A.    Yeah, I've heard.  I don't know for a
13 fact, but I've heard.  Do we bend over backwards for
14 those?  Yes.
15     Q.    Okay.  We're getting close.  Do you guys
16 want to push through the stack now?
17          MR. GARDNER:  Yeah, let's push through.
18          MR. STEPHENSON:  Okay.
19          THE WITNESS:  Do you mean you've got
20 another stack of stuff to go through?
21          MR. STEPHENSON:  Yeah.
22          THE WITNESS:  Oh, my God.  You know, it's
23 a good thing that the -- you know, the -- you're
24 killing half the forest.
25          MR. STEPHENSON:  They sent me --

Page 184

1           THE WITNESS:  I'm kidding.
2           MR. STEPHENSON:  This is one-fifth of
3 what they sent me last night, the night before.
4           MR. GARDNER:  We sent it electronically,
5 though.
6           MR. STEPHENSON:  I didn't have a choice.
7           MR. GARDNER:  Yeah, you did.
8           MR. STEPHENSON:  We have to go through
9 them here.
10          MR. GARDNER:  No, we don't.
11          MR. STEPHENSON:  Yeah, we do.
12          MR. GARDNER:  No, we don't.
13 (Exhibit 19 was marked for identification.)
14          MR. STEPHENSON:  Okay.
15          MR. GARDNER:  And I'm going to make a
16 record here, too, because counsel has kind of
17 intimated that we've been a little short in our
18 production of discovery.
19          As counsel is well aware, we had a prior
20 deposition, we had a disagreement about the scope of
21 discovery.  We filed a motion for a protective order,
22 which was denied, as was your motion for sanctions.
23          We were given some parameters, somewhat,
24 in that motion, but not completely as far as what the
25 extent of discovery would include.

Page 185

1           You later served a subpoena on Olson
2 Shaner, to which they objected, which led to a motion
3 to compel, which we just recently received an order
4 compelling that they respond to the subpoena.
5           In light of what the court held in regard
6 to the subpoena, we decided that we should supplement
7 discovery, which we did at that time.
8           And it, of course, took some time to
9 compile, produce.  We were trying to be as efficient
10 as we could.  I had contacted you both by phone and
11 email to see if you wanted to reschedule the
12 deposition in light of the most recent production.
13          I did not get a response to either my
14 email or my phone call, and we're here today.  So to
15 the extent that you're going to complain or intimate
16 that you're not completely prepared for today because
17 of our recent disclosure, I take an issue with that
18 and I would have worked with you to reschedule if you
19 needed more time.
20          So I just want to put that on the record
21 here, and I don't appreciate the -- at least the
22 indication that there is some impropriety or
23 withholding of documents, which there is not.
24          MR. STEPHENSON:  Okay.  And I object to
25 that speech.  So let's go on.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 186..189

Page 186

1      Q.      Exhibit 19.  Do you recognize this
2    document?
3      A.      No.
4      Q.      Did you look at it while we were
5    chatting?
6      A.      Yeah.
7      Q.      What does it look like to you that this
8    is -- this document is?
9      A.      I don't know.  What's it supposed to be?
10     Q.      To me, it looks like --
11     A.      Something you asked for.
12     Q.      Yeah.  To me, this looks like a list of
13   payments that -- okay.  Here's what I think it is and
14   you tell me if you agree.
15             This is a list of payments of -- that
16   you've received from debtors from January 1st --
17   excuse me -- 3rd, 2023 to March 12, 2024.
18     A.      Okay.
19     Q.      Do you agree that it's a list of
20   payments?
21     A.      I...
22             MR. GARDNER:  I'll object to the form.  I
23   would just indicate this is a nearly 300-page
24   document.  I mean, if you know what it is, but I don't
25   think that's a fair question in light of the size of

Page 187

1    the exhibit.
2              MR. STEPHENSON:  Go ahead and answer.
3              THE WITNESS:  What was the question
4    again?
5      Q.      BY MR. STEPHENSON:  This -- does this
6    look like a list of payments?
7      A.      Kind of does, yes.
8      Q.      Kind of does, okay.
9              What -- what is your best guess, if you
10   have -- if you don't know what this is, what is your
11   best guess on what this is?
12     A.      Looks like a list of payments from the
13   time period that you wanted.
14     Q.      Okay.  And this list is part of -- does
15   this look like a list that was created from -- on
16   FileMaker Pro?
17     A.      No, it's probably an Excel report.
18     Q.      Okay.  And if you look at these and --
19     A.      I don't know.  I don't know where Corey
20   got it from, but he spent a lot of time trying to get
21   it put together.
22     Q.      Okay.  If we scroll -- not scroll -- if
23   we go through, the first few pages looks like the
24   amount of money is redacted, but if you go far enough
25   in, say to Page Bates Number 111, you'll see that for

Page 188

1    some reason the dollar amounts are now listed.
2              Do you see that change?  Bates number is
3    Page 111.
4      A.      Yeah.  Okay.
5      Q.      And do you see where the dollar amounts
6    are visible for part of that page and not visible for
7    another part?
8      A.      Yeah.
9              MR. GARDNER:  And I'll just indicate
10   those are supposed to be redacted, you know, I'd -- I
11   would at least note in the record and give us a
12   chance.  Like I said, we were trying to produce this
13   quickly.
14             If those amounts need to be redacted
15   pursuant to the Court's order, I would move at this
16   time that this be protected under the standard
17   protective order that's in place, and to the extent
18   that we can, we will redact those amounts.
19             If that's been a mistake on our part, I
20   want to make sure that we get that corrected.
21             MR. STEPHENSON:  I think the mistake is
22   redacting the payments from this page up, because I
23   think the Court allowed me to see the payment amount,
24   but not the name of the debtor.
25             MR. GARDNER:  I think payment amount was

Page 189

1    also what was indicated in that order.
2              MR. STEPHENSON:  Okay.  I don't have any
3    questions on the payment amount, other than I'm trying
4    to establish what this document is, and it was
5    produced, so --
6              MR. GARDNER:  Right.
7              MR. STEPHENSON:  -- we can designate it
8    as confidential, that's no problem.
9              MR. GARDNER:  Okay.
10             MR. STEPHENSON:  I do want to know what
11   it is.  That's all I'm trying to establish here, and
12   that does help us establish what this document is.
13             MR. GARDNER:  Yeah.
14     Q.      BY MR. STEPHENSON:  Okay.  So now -- now
15   we've got -- if we look at Page 111, do you agree that
16   that helps us decide that this is probably a list of
17   payments?
18     A.      Yes.
19     Q.      Okay.  And if you look at the left-hand
20   side of the payment it's got NAR listed all the way
21   down that column; correct?
22     A.      Yeah.
23     Q.      And that's true for every page if you
24   just scroll through fast and go through all you want.
25     A.      Yeah.

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024

Pages 190..193

Page 190

1    Q.    This is all for NAR?

2    A.    It appears that way.

3    Q.    Do you -- do you collect judgments for

4  anyone -- Olson and Shaner give you any other

5  judgments for any other debt collectors besides NAR?

6    A.    No.

7    Q.    Okay.  And you can see the dates listed

8  in the middle of the page, are those the dates of

9  payment to you or to Olson Shaner?

10    A.    That, I'm not sure.  It looks like

11  payments made to us.

12    Q.    Yeah, okay.

13          And the -- again, I'm not trying to be

14  tricky.  I'm just trying to make -- establish what

15  I've been given; right?

16    A.    Well, I didn't create the document, so

17  I'm -- I agree it appears that way.

18    Q.    Okay.  Do you have any reason to doubt

19  the accuracy of this document?

20    A.    No.

21    Q.    And we don't know -- it doesn't have

22  columns that tell us how many entries are on this

23  document, are there?

24    A.    No.

25    Q.    If -- if I --

Page 191

1    A.    I would say a whole lot.

2    Q.    If I said to you it was more than 12,000

3  payments, would you believe me?  Would you agree or

4  disagree?

5    A.    12,000?

6    Q.    Uh-huh.

7    A.    That's a lot.

8    Q.    It is.  Does that sound accurate?

9    A.    I wouldn't even try to guess.

10    Q.    Okay.  But you have no reason to doubt

11  whether it's -- you have no reason to believe this is

12  inaccurate?

13    A.    No.  I didn't put it together, no.

14    Q.    And when I say inaccurate, I don't care

15  about -- I'm not talking about the amounts.  I'm

16  talking about the notation that -- look, for example,

17  the first page lists mostly payments that were

18  received on January 3rd and then January 4th a few;

19  correct?

20    A.    Yep.

21    Q.    And so this is -- this is indicative of

22  how many payments you receive on a given day?

23    A.    I would agree with you there.

24    Q.    Okay.  Okay.  Okay.  In the documents

25  that your attorneys produced the other day, there were

Page 192

1  a thousand more pages that I did not print, more than

2  a thousand pages I didn't print.

3    A.    I'm devastated.

4    Q.    But I do want to talk about them, so I'm

5  hoping you can explain them, okay?  They're not here,

6  but they listed some status codes.

7          Are you familiar with the status codes

8  you -- your -- that your company uses when it's

9  listing notes in the FileMaker Pro system?

10    A.    No.

11    Q.    Okay.  I noticed notes, status codes is

12  what I'm calling them, if you call them something

13  else, correct me.  I noticed one that noted "payment

14  pending."  I noticed one that said "set for sale bin,"

15  I noticed one that said "no reset sale," "Corey

16  research," "Corey desk," that kind of thing.  Does

17  that trigger your memory?

18    A.    Yeah.

19    Q.    Are those -- do those sound familiar to

20  you?

21    A.    Yeah.

22    Q.    Okay.  So "payment pending," what does

23  that mean?

24    A.    That means payment is pending.

25    Q.    Meaning they agreed to pay but you

Page 193

1  haven't got it yet, or you have payment and it hasn't

2  cleared the check yet -- the bank yet?

3    A.    They have a payment -- they've made a

4  payment and they still have a payment going forward.

5    Q.    Meaning that they haven't given it to you

6  yet, but they have a commitment to give it to you?

7    A.    Ongoing.

8    Q.    Okay.  "Set for sale bin," what does that

9  mean?

10    A.    Kind of says what it is.

11    Q.    Okay.  So if I believe that means you set

12  that one for sale, that's --

13    A.    It's in a bin getting ready to set for

14  sale.

15    Q.    And bin is not a physical bin, it's a

16  computer --

17    A.    No, it's a physical pin.

18    Q.    Okay.  You have a physical bin?

19    A.    Yeah.  A file cabinet, how's that.

20    Q.    You can call it whatever you want.  I

21  don't care if it's a bucket.

22    A.    Thanks.

23    Q.    I'm just trying to -- I just want to

24  make -- I just want to know if it's -- I'm just trying

25  to confirm what it is.  It's physical.  It's -- you

Page 194

```
 1  print them, put them in a bin or a file cabinet, and
 2  that means the next step is for one of your deputies
 3  to -- or you -- to take it and serve it.  That's
 4  what -- that what "set for sale bin" notation means?
 5       A.    "Set for sale" usually means that it was
 6  served.
 7       Q.    Oh, it's already been served?
 8       A.    And it's being set for sale.  There goes
 9  the sale notice.
10       Q.    Okay.  So if the -- if the note says "set
11  for sale bin" means that the notice of sale has
12  already been sent?
13       A.    No, it means it's going to be set.
14       Q.    Okay.  So it means they've been served.
15  Notice of sale is next; correct?
16       A.    (Witness nods head.)
17       Q.    And "no reset sale."  What does that
18  mean?
19       A.    What?
20       Q.    "No reset sale" is another code that I
21  saw.
22       A.    I'm not quite sure exactly what he's got
23  on that.  That could be we're returning it with no
24  assets.
25       Q.    There's plenty of others like "moved per
```

Page 195

```
 1  deputy," "moved during skips."  I'm going to assume
 2  that when it says something like that, it's -- I can
 3  take it at face value?
 4       A.    Yes.
 5       Q.    Okay.  "Pull return to plaintiff."  Tell
 6  me that.  What does that mean?
 7       A.    That means pull it and -- pull and return
 8  to plaintiff?
 9       Q.    Yeah, "pull to turn to plaintiff."
10       A.    That one's got me.
11       Q.    Okay.  How about "final call or return"?
12       A.    That's make one last call or return it.
13       Q.    And that means return it to Olson
14  Shaner --
15       A.    To --
16       Q.    -- or NAR?
17       A.    To the plaintiff.
18       Q.    Okay.  "Coming back"?
19       A.    Huh?
20       Q.    The note "coming back"?
21       A.    I don't know.
22       Q.    Okay.  "Please call letter."  Does that
23  mean a letter that -- that --
24       A.    Please call letter, but we don't do those
25  anymore.
```

Page 196

```
 1       Q.    Okay.  And is that referring to the --
 2  well, that's a letter that asks for them to call you?
 3       A.    Yeah.
 4       Q.    Okay.  And then "preserve letter," that's
 5  the exhibit we talk about -- there's -- that's another
 6  note, "preserve letter."  And that's Exhibit 2 or 3?
 7  The preserve.  I'm sorry, preserve.
 8       A.    Okay.
 9       Q.    There's no hyphen -- and I am tired.
10  Preserve letter.
11       A.    That headache's making me feel better all
12  the time.
13       Q.    I know.
14             So preserve letter, it's what we've
15  already talked about?
16       A.    Yeah.
17       Q.    "Pay missed, letter sent"?
18       A.    Kind of self-explanatory.
19       Q.    Okay.  I want to be sure, though,
20  because --
21       A.    Yeah, it means they missed.
22       Q.    They had an agreement with you to pay
23  something and they didn't pay it, so you sent out a
24  letter saying what's going on?
25       A.    Yeah.
```

Page 197

```
 1       Q.    Did we see a copy of that letter yet in
 2  these exhibits?
 3       A.    I don't recall.
 4       Q.    Okay.  It's --
 5       A.    I know you've got it somewhere.
 6       Q.    Well, but I don't think we do, because my
 7  clients never agreed to pay you.
 8             MR. GARDNER:  Talk about this case,
 9  remember.
10             MR. STEPHENSON:  Yeah, this case.
11       Q.    My clients never agreed to pay you in
12  this case, so I don't think we do have that letter.
13       A.    Okay.
14       Q.    Did you see it today?
15       A.    No.
16       Q.    Okay.  And my client never arranged for a
17  payment so you would have no reason to send them a
18  missed payment letter.
19             There's a lot of others.  I don't want to
20  go through all of them, but I do need to ask on a
21  couple -- on this one.  "CR post sale doing further
22  research."
23       A.    Say that again.
24       Q.    "CR," capital letter C, capital letter R,
25  then "post sale doing further research."
```

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                         Pages 198..201

Page 198

1       A.      Means Corey's doing more research on it.
2   Probably an asset check.
3       Q.      Okay.  And there's also actually a status
4   code of "Corey research" and "Corey desk."  I assume
5   those are similar?
6       A.      Yeah.
7       Q.      Okay.  Then it has names listed on some
8   of them.  Some of those status codes are Andrew
9   Collet -- or Collet?
10      A.      Collet.
11      Q.      Rob Kolkman, Chris Stewart, and Tyler
12  Plowman.  When those names are listed as the status
13  code, what does that mean?
14      A.      That means that's probably who the order
15  was checked out to or served by.
16      Q.      And then "temporary file," do you know
17  what that means?
18      A.      Temporarily in a file to wait for -- to
19  go wherever.  I don't know.
20      Q.      Don't know where.
21              And "filed other order in line"?
22      A.      That means we may have more than one
23  order on them.
24      Q.      Is that typical to get more than one
25  execution order?

Page 199

1       A.      Usually?  No, but it happens.
2       Q.      And so is that Olson Shaner getting a
3   second execution, or is another firm getting an
4   execution when you say that?
5       A.      Either and/or.
6       Q.      Okay.
7       A.      Tell me you got an appointment at 2:15.
8       Q.      What's that?
9       A.      Tell me you've got an appointment at
10  2:15.
11      Q.      No.  We're going to be done soon, though.
12  Okay.  So now we've talked about evidence
13  before.  Have you -- have you lost or destroyed any
14  evidence that would be helpful to this case?
15      A.      No, I have not.
16      Q.      And you haven't withheld anything?
17      A.      I have not.
18      Q.      Okay.  When you file your taxes, do
19  you -- how do you account for -- for the money you're
20  giving to Olson Shaner and NAR in your tax forms?  Are
21  you giving them a W-9 or 1099 or any kind of -- what
22  are you doing to account for that?
23      A.      That's all in the trust account.  All the
24  money we collect goes into a trust account.
25      Q.      Okay.  Is that your trust account or

Page 200

1   Olson Shaner?
2       A.      Yeah, mine.
3       Q.      And then it goes from the trust account
4   to -- well, part of it goes to you, to your firm?
5       A.      Yeah.
6       Q.      And then part of it goes to the Olson
7   Shaner NAR?
8       A.      Yeah.
9       Q.      And then do you report that to the IRS
10  with the 1099 or some other form?
11      A.      I don't know what my accountant does.
12      Q.      Does --
13      A.      I give them the paperwork and they do it.
14      Q.      Does Olson and Shaner or NAR give you a
15  1099 or a W-9 at the end of the year?
16      A.      No.
17      Q.      Do you know why that is?
18      A.      I don't.  Because we're not an employee
19  and we're not -- we're just receiving payments for
20  service.
21      Q.      Yes.  Do you issue 10- -- your deputies
22  they're employees or con -- or contractors?
23      A.      Employees.
24      Q.      Sorry?
25      A.      Employees.

Page 201

1       Q.      Okay.  So they get 1099s?
2       A.      No, they get W-2s.
3       Q.      W-2s.
4       A.      I think it's two, two or four, one of the
5   two -- one of the Ws.
6       Q.      Okay.  All right.  A W-9 is something
7   else.
8               MR. GARDNER:  A W-9 is a tax ID number.
9               MR. STEPHENSON:  Right, right.
10              MR. GARDNER:  A W-2 is a wage statement
11  for an employee.  A W-4 is the exemption form that a
12  employee fills out.
13              MR. STEPHENSON:  Yeah, I haven't had a
14  W-2 in a while.
15              MR. GARDNER:  There's a lot of Ws.
16              MR. STEPHENSON:  I messed that up.  I was
17  saying W-9 when I meant W-2.  I just haven't had one
18  in so long I forgot what they were.
19              MR. GARDNER:  Yeah.
20              THE WITNESS:  We'll let the IRS know
21  that.  Just kidding.
22              MR. STEPHENSON:  I pay my taxes.
23              MR. GARDNER:  You put that on the record.
24              MR. STEPHENSON:  I pay my taxes.
25              MR. GARDNER:  He's not under oath,

ELIZABETH HERNANDEZ vs ROB KOLKMAN
ROB KOLKMAN - 10/30/2024                                                    Pages 202..204

Page 202

1  though.  He knows that; right?
2           MR. STEPHENSON:  Boy.
3           THE WITNESS:  Keep turning those pages.
4           MR. STEPHENSON:  We are done.
5           THE WITNESS:  Cool.  Sold.
6           MR. STEPHENSON:  Hang on.  Hang on.
7  We're not done yet.
8           We -- I -- I'm --
9           MR. GARDNER:  I heard we are done.
10          THE WITNESS:  I did, too.  Read it back.
11          MR. STEPHENSON:  I -- I am done.  Do you
12  have any questions?
13          MR. GARDNER:  I have no questions.
14          MR. STEPHENSON:  Okay.  Then let's be
15  done.  Let's wrap it up.
16          THE WITNESS:  Love it.  Best idea you've
17  had all day.
18          Off the record now.
19          MR. STEPHENSON:  Well, it's not, I just
20  didn't tell you the other ones.
21          (The deposition was concluded at 2:12 p.m.)
22                      -oOo-
23
24
25

Page 204

1  Case:  Hernandez v. Kolkman, et al.
   Case No.:  2:23-cv-00772
2  Date:  October 30, 2024
   Reporter:  Vickie Larsen, CSR/RMR
3
4              WITNESS CERTIFICATE
   State of Utah         )
5                        )  ss.
   County of Salt Lake   )
6
          I, ROB KOLKMAN, HEREBY DECLARE:
7  That I am the witness referred to in the foregoing
   testimony; that I have read the transcript and know
8  the contents thereof; that with these corrections I
   have noted this transcript truly and accurately
9  reflects my testimony.
   PAGE-LINE         CHANGE/CORRECTION              REASON
10 _____ _____   _____   _____
11 _____ _____   _____   _____
12 _____ _____   _____   _____
13 _____ _____   _____   _____
14 _____ _____   _____   _____
15 _____ _____   _____   _____
16 _____ _____   _____   _____
17 _____ _____   _____   _____
18 _____ _____   _____   _____
19 _____ _____   _____   _____
20        _____    No corrections were made.
21      I, ROB KOLKMAN, hereby declare under the
   penalties of perjury of the laws of the United States
22 of America and the laws of the State of Utah that the
   foregoing is true and correct.
23
          Dated this _____day of _____,
24 2024.
                    _____
25                         ROB KOLKMAN

Page 203

1  STATE OF UTAH          )
                          )
2  COUNTY OF SALT LAKE    )
3            I, Vickie Larsen, Certified Shorthand
4  Reporter No. 109887-7801 for the State of Utah, do
5  hereby certify:
6            That prior to being examined, the witness
7  named in the foregoing deposition was duly sworn to
8  testify to the truth, the whole truth, and nothing but
9  the truth;
10           That said deposition was taken down by me
11 in shorthand at the time and place herein named and
12 thereafter reduced by me to typewritten form and that
13 the same is a true, correct, and complete transcript of
14 said proceedings.
15           Before completion of the deposition,
16 review of the transcript [X] was [ ] was not requested.
17 If requested, any changes made by the deponent (and
18 provided to the reporter) during the period allowed are
19 appended hereto.
20           I further certify that I am not interested
21 in the outcome of the action.
22                    Vickie Larsen
23           Vickie Larsen, CCR/RMR
24 Witness my hand this 11th day of November, 2024.
25